UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

**Darren J. Brown Jr.,**
    Plaintiff,

v.

**Brightline Trains Florida LLC, and
Fortress Investment Group LLC,**
    Defendants.

Case No.: _____

**COMPLAINT UNDER THE FEDERAL EMPLOYERS' LIABILITY ACT**
(45 U.S.C. § 51 et seq.)

FILED BY _____ D.C.

DEC 16 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

# I. INTRODUCTION

1.  This is an action for personal injury under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., brought by Plaintiff Darren J. Brown Jr. ("Plaintiff"), a former conductor for Brightline Trains Florida LLC ("Brightline"), against Brightline and its parent and controlling entity, Fortress Investment Group LLC ("Fortress"). A copy of the core FELA provisions is attached as **Exhibit 16**.

2.  Between approximately 2018 and 2023, Plaintiff was regularly assigned to operate high-speed Brightline passenger trains along the South Florida corridor that national media and federal officials have identified as the deadliest major passenger railroad

1

corridor in the United States, with the highest per-mile death rate among comparable services. (See **Exhibits 1, 13, 14, and 17**.)

3. During his five-year tenure as a Brightline conductor, Plaintiff was directly involved in more than ten traumatic incidents, including at least seven confirmed fatalities. These included pedestrians struck and killed, vehicles destroyed at grade crossings, and a notorious "second-train" incident in which a Brightline train was cleared through an active fatality scene, re-running over the decedent's remains while emergency responders were still on foot. These events are summarized in the composite fatal-incident table and corroborated by law enforcement and medical examiner records. (See Exhibits 8 and 9.) As a result of these repeated exposures, Plaintiff developed severe psychological injuries, culminating in a formal diagnosis of Post-Traumatic Stress Disorder (PTSD) on October 5, 2023, by Brightline's own trauma clinician. In late September 2023, Plaintiff submitted a qualifying FMLA request for leave to treat his PTSD, supported by medical certification submitted the first week of October. Defendants, however, failed to grant appropriate leave or accommodations, prompting Plaintiff to resign in order to preserve his health. Plaintiff now brings this action under the Federal Employers' Liability Act seeking compensatory damages and injunctive relief to remedy the unsafe practices and inadequate trauma support that caused his psychological injuries.

4. After these events, Plaintiff was repeatedly ordered to leave the cab and walk on foot through smoking and sometimes burning car wreckage, twisted metal, and debris fields contaminated with blood and bodily remains from pedestrians and

2

vehicles struck at speeds up to 79 mph. He was required to inspect the train and right-of-way and visually confirm whether victims were dead, despite having no medical or forensic training and being provided no adequate personal protective equipment ("PPE") or structured decontamination procedures. These practices contrasted sharply with Brightline's written "Train Crew Guardrails" and related critical-incident policies. (See Exhibit 3.)

5.  Brightline's dispatch and management also imposed extreme on-call and reporting expectations. Supervisors told Plaintiff that some crew members from Orlando "lived in their cars" near the terminal on on-call days to comply with Brightline's one-hour call-time requirement, underscoring the fatigue and constant availability expected of crews operating 79–125 mph passenger trains.

6.  Despite a growing national record of fatalities, federal grants awarded specifically to address safety problems on the Brightline corridor, and repeated warnings from the National Transportation Safety Board ("NTSB") and the Federal Railroad Administration ("FRA"), Defendants failed to implement critical safety upgrades and failed to provide adequate trauma care or recovery time for employees repeatedly exposed to catastrophic events. (See **Exhibits 11, 13, 14, and 17**.)

7.  On or about October 5, 2023, Brightline's own contracted trauma clinician, Anthony Gonzalez, LCSW, formally evaluated Plaintiff and diagnosed him with chronic Post-Traumatic Stress Disorder (PTSD). (See **Exhibit 4**.)

8.  Standardized testing during that evaluation confirmed clinically significant PTSD and anxiety, with Plaintiff scoring 56 on the PTSD Checklist for DSM-5 (PCL-5) (well

above the clinical cutoff), 10 on the GAD-7 (moderate anxiety), and 8 on the PHQ-9 (mild depression). (See **Exhibit 5**.)

9.  Mr. Gonzalez documented that Plaintiff had experienced more than ten critical incidents at work in five years and that a new assignment with increased "close calls" and less recuperation time had significantly exacerbated his symptoms, and memorialized these findings in a formal FMLA medical certification. (See **Exhibit 6**.)

10. Authoritative psychiatric and legal literature has for years recognized that railroad engineers and conductors frequently develop PTSD after repeated collisions and suicides, and that such injuries are compensable under FELA when the carrier is negligent and the worker is in the "zone of danger" of physical impact. As sophisticated rail operators, Defendants either knew or should have known that repeated fatal incidents and inadequate trauma-care programs created a substantial risk of PTSD for employees like Plaintiff, particularly in light of the federal and media scrutiny of their corridor. (See **Exhibits 13, 14, 15, and 17**.)

11. Defendants nonetheless continued to assign Plaintiff to trauma-heavy duties, denied or delayed adequate medical leave, conditioned limited "mental-health days" on staffing needs rather than clinical need, and fostered a culture that discouraged employees from using the minimal trauma leave available. (See **Exhibits 2, 3, 6, and 7**.)

12. As a result of Defendants' conduct, Plaintiff's mental health deteriorated to the point that he was effectively forced out of the railroad industry, suffering substantial economic and non-economic damages.

13. Plaintiff now seeks relief under FELA for Defendants' negligence and gross negligence, including past and future lost wages and earning capacity, medical and psychological treatment expenses, pain and suffering, emotional distress, and loss of enjoyment of life, as well as declaratory and equitable relief confirming Brightline's status as a FELA-covered rail carrier and requiring appropriate trauma-care reforms. (See **Exhibits 1–7 and 13–17.**)

# III. PARTIES

14. Plaintiff **Darren J. Brown Jr.** is an adult resident of Palm Beach County, Florida. He has nearly two decades of experience in freight and passenger rail operations and related mechanical work. (See **Exhibit 1.**)

15. Plaintiff began his railroad career in Chicago, Illinois, working for Union Pacific Railroad as a freight conductor and in yard operations. He also performed mechanical work as a pipefitter and rail-equipment worker, gaining hands-on familiarity with locomotive and rolling-stock systems. (See **Exhibit 1.**)

16. After his time at Union Pacific, Plaintiff worked for Siemens Mobility as a mechanical technician, servicing, repairing, and maintaining Brightline's Siemens trainsets. This combination of mechanical and operations experience gave Plaintiff a rare, dual-discipline perspective on the Brightline equipment and territory. (See **Exhibit 1.**)

17. From approximately 2018 to 2023, Plaintiff worked for Brightline Trains Florida LLC as a conductor on Brightline's high-speed passenger trains operating between Miami, Fort Lauderdale, West Palm Beach, and later Orlando, Florida. He was regularly scheduled on high-speed runs through some of the most incident-prone segments of the corridor. (See **Exhibit 1**.)

18. At all relevant times, Plaintiff maintained an excellent performance record, with strong attendance and a history of volunteering for extra training and responsibilities. Any late arrivals were rare and promptly addressed, and Plaintiff had virtually no attendance infractions in four years, demonstrating commitment and reliability rather than malingering or abuse of leave. (See **Exhibit 1**.)

19. Defendant **Brightline Trains Florida LLC** ("Brightline") is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Brightline operates intercity passenger trains over the Florida East Coast Railway corridor between Miami and Orlando and is subject to federal rail safety regulation and grant conditions. (See **Exhibits 11 and 12**.)

20. Defendant **Fortress Investment Group LLC** ("Fortress") is a private equity firm headquartered in New York that owns and controls Brightline. Fortress directs and approves major decisions regarding Brightline's financing, expansion, and safety budgets and exercises effective control over policies that shape working conditions for Brightline employees, including Plaintiff.

# IV. JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 45 U.S.C. § 56 because this action arises under the Federal Employers' Liability Act, a federal statute providing a cause of action to railroad employees injured due to their employer's negligence. (See **Exhibit 16.**)

22. At all relevant times, Brightline operated as a common carrier by railroad engaged in commerce within the meaning of FELA, and Plaintiff was employed by Brightline as a conductor engaged in furthering its rail operations. (See **Exhibits 1, 11, and 12.**)

23. Defendant Fortress, through its ownership and control of Brightline, participated in, directed, and approved decisions that materially affected the safety of Brightline's rail operations and Plaintiff's working conditions. Fortress is subject to personal jurisdiction in Florida and this District because of its purposeful direction of business operations here.

24. Venue is proper in the Southern District of Florida, West Palm Beach Division, under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred within this District. Plaintiff was based out of Brightline's West Palm Beach terminal, and many of the relevant fatal incidents and safety decisions occurred here. (See **Exhibits 1 and 8.**)

25. Plaintiff's claims are timely under FELA's statute of limitations, 45 U.S.C. § 56. (See **Exhibit 16.**)

# V. FELA COVERAGE AND FEDERAL PREEMPTION

26. FELA applies to "every common carrier by railroad while engaging in commerce between any of the several States" and is to be liberally construed in favor of injured railroad workers. (See **Exhibit 16**.) Brightline falls within this class of carriers because it operates high-speed passenger trains over FRA-regulated infrastructure that is integrated with interstate freight operations and built or improved using federal rail-infrastructure funds. (See **Exhibits 11 and 12**.)

27. Brightline's trains operate over the Florida East Coast Railway corridor, subject to FRA jurisdiction, using FRA-approved locomotives, signaling, and Positive Train Control systems. Brightline files required reports with FRA, is subject to FRA inspections and enforcement, and operates over track and structures that have historically supported interstate freight movements. (See **Exhibits 10, 11, and 12**.)

28. In recent years, the U.S. Department of Transportation ("DOT") and FRA have awarded tens of millions of dollars in Consolidated Rail Infrastructure and Safety Improvements ("CRISI") grants and related funding for safety projects along the Brightline corridor, including: (a) the East Coast Corridor Trespassing and Intrusion Mitigation Project; (b) the Broward Sealed Corridor project; (c) a Trespassing Identification and Classification System pilot; and (d) overtime enforcement funds for the Palm Beach County Sheriff's Office to address trespassing hot spots along the corridor. (See **Exhibits 11 and 17**.)

29. Under 49 U.S.C. § 22905(b), a "person that conducts rail operations over rail infrastructure constructed or improved" with chapter 229 funds "shall be considered a rail carrier as defined in section 10102(5)" for specified federal purposes. FRA's standard grant terms and conditions incorporate this rule and require grantees to acknowledge that operators over CRISI-funded infrastructure will be considered "rail carriers" for purposes of Title 49 and any statute that adopts that definition. (See **Exhibit 11**.)

30. Brightline is one of those operators and conducts rail operations over CRISI-funded infrastructure. In grant documentation and related correspondence, FRA has made clear that the "rail carrier" designation under § 22905(b) operates as a matter of law for such operators and that FRA expects Brightline to understand and comply with its obligations under federal law and FRA grant agreements. (See **Exhibit 11**.)

31. Consistent with § 22905(b), in 2024 the National Mediation Board ("NMB") issued a decision holding that Brightline Trains Florida LLC is a "carrier" and that its onboard service employees are "employees" subject to the Railway Labor Act ("RLA"), based on Brightline's operations over FRA grant-funded infrastructure. The NMB rejected Brightline's argument that a prior Surface Transportation Board exemption from certain economic regulations removed it from the reach of § 22905(b) or federal rail labor laws. (See **Exhibit 12**.)

32. By statutory operation, FRA policy, and federal agency determination, Brightline is therefore a rail carrier integrated into the federal rail system, and its employees, including Plaintiff, are covered by federal rail labor and benefit statutes. That same

rail-carrier status supports FELA coverage for Brightline's employees. (See **Exhibits 11, 12, and 16**.)

33. In Florida passenger-injury suits, Brightline has also been sued as a common carrier of passengers for compensation, with complaints alleging that Brightline owes passengers "the highest degree of care, foresight, prudence, and diligence for their safety" while operating its high-speed passenger service between cities such as Fort Lauderdale and Miami. (See, e.g., **Exhibit 11**.)

34. FELA contains a strong anti-waiver provision, 45 U.S.C. § 55, which renders void any "contract, rule, regulation, or device whatsoever" designed to exempt a common carrier from liability under FELA. Defendants' attempt to recast Brightline as a purely intrastate, Florida-only employer governed solely by state workers' compensation is exactly the type of "device" Congress prohibited. (See **Exhibit 16**.)

35. The Supreme Court has recognized that a railroad need not cross state lines with its own equipment to be engaged in interstate commerce under FELA; operation over interstate rail infrastructure and participation in the interstate rail system are sufficient. Brightline's reliance on federal rail grants, use of interstate freight corridors, and integration with national rail safety regulation squarely place it within the class of carriers Congress intended FELA to cover. (See **Exhibits 11 and 12**.)

36. Federal courts have repeatedly held that the Federal Railroad Safety Act ("FRSA") does not preclude or displace FELA claims by railroad employees, even where FRA has issued regulations on the same subject matter. FRSA promotes uniform

national safety standards, while FELA provides a remedial negligence framework for

injured workers; they are complementary, not mutually exclusive. (See **Exhibit 16**.)

37. Defendants' anticipated reliance on FRSA or state workers' compensation

classification to avoid FELA liability is inconsistent with the text, history, and

purpose of FELA and § 22905(b) and is preempted or superseded by federal law.

(See **Exhibits 11, 12, and 16**.)

38. Plaintiff therefore brings this suit under FELA against Brightline as his railroad

employer and against Fortress as the controlling entity that directed and approved

decisions affecting the safety of Brightline's operations and Plaintiff's working

conditions.

# VI. FACTUAL BACKGROUND

## A. *Plaintiff's Employment, Duties, and On-Call Conditions*

39. As a Brightline conductor, Plaintiff was responsible for supervising train operations,

coordinating with engineers and the Operations Control Center ("OCC"), managing

passenger safety, and ensuring compliance with federal and company operating

rules on high-speed routes between Miami and Orlando. (See **Exhibit 1**.)

40. Plaintiff was regularly assigned to runs through some of the most incident-prone parts of the South Florida corridor, including quiet zones and grade crossings with a history of collisions, trespassing, and fatalities. (See **Exhibit 8**.)

41. In addition to routine train handling, Plaintiff was required to respond to emergencies, secure trains after collisions, coordinate with first responders, and interface with law enforcement and medical examiners following serious incidents. (See **Exhibits 3, 8, and 9**.)

42. Brightline's on-call rules required conductors to be able to report to work within approximately one hour when on call. When Plaintiff asked his supervisor whether he could continue living in West Palm Beach while based in Miami, the supervisor told him that some employees from Orlando "live in their cars" on their on-call days in order to meet the one-hour reporting rule. This comment illustrates the extreme availability and fatigue pressures Defendants placed on crews operating high-speed passenger trains.

43. Plaintiff faithfully complied with Brightline's demands, often rearranging his personal life and sleep schedule to meet these on-call expectations, even as he was repeatedly exposed to traumatic events in the course of his duties. (See **Exhibit 1**.)

## B. Fatality Incidents and Zone-of-Danger Exposure

44. Between approximately late 2018 and 2022, Plaintiff served as conductor on multiple trains that struck and killed pedestrians along the Brightline corridor.

Official police reports, crime-scene supplements, and medical-examiner findings in at least seven separate cases identify Plaintiff by name as the conductor and document that these trains were traveling between approximately 65 and 79 miles per hour at the time of impact. These incidents are summarized in Plaintiff's composite fatal-incident table. (See **Exhibits 8 and 9.**)

45. Representative incidents include, without limitation, the following fatal events, as documented in law-enforcement and medical-examiner records and summarized in **Exhibit 8:**

a. A December 6, 2018 pedestrian strike in Lantana, Florida, where a man walked onto the tracks near a quiet zone and was struck by Plaintiff's southbound train at approximately 71 mph. Police and crime-scene investigators documented blood, shoe fragments, a shattered cell phone, and other remains scattered along the right-of-way, and later confirmed via onboard video that the man deliberately remained on the tracks as the train approached.

b. A December 13, 2018 fatality in Pompano Beach involving David Ulmer, where Plaintiff was the conductor of a northbound train traveling about 78 mph. Broward Sheriff's Office crime-scene reports record a debris field extending over 3,000 feet, with body parts, clothing, and personal items located hundreds of feet apart, demonstrating the violence of the impact and the extent of the scene Plaintiff was required to traverse.

c. A November 23, 2018 incident in Hollywood, Florida, where pedestrian Dennis Conrad dove headfirst in front of Plaintiff's train at approximately 79 mph. Hollywood Police

reports describe Conrad intentionally diving onto the tracks and being dismembered by the train. The associated "second-train" incident is documented in the Hollywood fatality file. (See **Exhibit 9**.)

d. An April 12, 2019 Pompano Beach incident involving Donald Krinkie, in which Plaintiff observed Krinkie and his bicycle on the tracks, sounded the horn multiple times, and nonetheless witnessed Krinkie remain in the train's path and suffer extreme mutilation.

e. An August 29, 2019 fatality in Pompano Beach involving Greg Williams, where Plaintiff's train struck Williams as he walked westbound on the tracks with his head down despite horn warnings, causing fatal trauma documented in Broward Sheriff's reports.

f. A December 20, 2019 incident in West Palm Beach involving Jose Roibal, who attempted to beat Plaintiff's northbound train at a crossing near Nottingham Boulevard and Miller Avenue. West Palm Beach Police reports note that Plaintiff and his engineer saw Roibal running toward and onto the tracks, sounded the horn, went into emergency braking, and still could not prevent a fatal collision at approximately 65 mph.

g. A November 23, 2021 suicide at the Atlantic Avenue crossing in Delray Beach involving Kimberly Rae Haase, where Plaintiff's train was traveling at 79 mph with the crossing gates down. Delray Beach Police and CSI describe Haase walking around the lowered gate, standing in the middle of the tracks, and being struck despite Plaintiff's emergency brake application and horn use. Investigators recorded a stopping distance of approximately 840

feet and documented extensive dismemberment and biological debris along the right-of-way.

h. An August 9, 2022 suicide near 10th Avenue North and G Street in Lake Worth Beach involving Lee Meyers, where eyewitnesses and onboard video confirmed that Meyers ran onto the tracks and remained standing in the path of Plaintiff's northbound train. Palm Beach County Sheriff's Office reports state that Plaintiff dumped the brakes and sounded the horn but could not stop the train before impact.

i. On February 16, 2022, Plaintiff was the conductor on a southbound Brightline train that struck a 1999 Honda Civic at a grade crossing near Railroad Avenue and Latona Avenue in Lake Worth Beach, Florida. The train was traveling approximately 79 miles per hour. Surveillance video from the train's nose camera, later released publicly by Brightline, shows that the crossing gates were down and red lights flashing when a driver approached from a side street, bypassed the lowered gate, and entered the tracks to beat the train. Moments earlier, a northbound Florida East Coast (FEC) freight train had cleared the crossing on the adjacent track, possibly obscuring the oncoming Brightline train from the driver's view. Plaintiff and his engineer engaged the horn and emergency braking but were unable to stop. The train struck the vehicle at full speed, **splitting it in two!**

Immediately after the collision, Plaintiff was ordered to leave the cab and run back to the scene through smoldering car parts and burning debris. He found the vehicle ripped in half and the driver, 55-year-old Luis Manuel Paez, crushed and pinned inside, screaming in agony. Plaintiff stood feet away as first responders worked frantically to stabilize the

15

wreckage and extract the victim using the Jaws of Life. The driver was eventually airlifted in critical condition. Brightline released the video publicly as part of a campaign to warn the public about the dangers of disobeying railroad signals.

This traumatic event occurred during an especially deadly week for Brightline crews in Palm Beach County: within the same four-day span, two other collisions occurred nearby, including a fatal crash in Lake Worth Beach just three days earlier and a pedestrian fatality the night before in Hallandale Beach. The February 2022 incident, and the cluster of similar crashes that week, reinforced Plaintiff's awareness that high-speed operations through unfenced, high-risk corridors created constant exposure to violence and death. This incident became one of the most vivid and distressing memories of Plaintiff's rail career and contributed significantly to his cumulative PTSD.

46. In each of these cases, responding agencies documented graphic scenes involving dismemberment, blood and tissue spatter, scattered clothing and personal items, and long debris fields measured in hundreds or thousands of feet. Plaintiff was routinely ordered to participate in post-incident inspections and scene management, which required him to walk along and around the train through these debris fields, observe remains and body parts at close range, and communicate with investigators about what he had seen. (See **Exhibits 8 and 9**.)

47. These official reports also confirm that Brightline trains carry onboard video cameras that capture the impact and preceding moments, and that investigators

from local agencies often viewed these recordings with the assistance of Brightline representatives. On multiple occasions, Brightline personnel informed investigators that the company retained exclusive custody of the recordings and would not release copies without formal legal process, underscoring Brightline's control over vivid evidence of the traumatic events Plaintiff experienced. (See Exhibit 9.)

48. These documented fatalities are in addition to the November 2018 Conrad incident in which Brightline's dispatch cleared a second train through the active fatality scene while first responders were still present on the track and the victim's body remained on the rails. That second train re-ran over the body and narrowly missed emergency personnel, an event Plaintiff and others described as reckless and nearly deadly for first responders. (See Exhibit 9.)

49. Plaintiff was therefore not dealing with an isolated tragedy but with a recurring pattern of high-speed impacts, suicides, and near-misses on his trains over a period of years. Each incident placed him squarely in the zone of physical danger contemplated by FELA's "zone-of-danger" test for emotional injuries and contributed cumulatively to his PTSD.

50. Florida East Coast Railway's recent court filings have put Defendants on further notice that Brightline's safety and financial problems stem from Fortress's decisions. In an amended complaint filed on September 26, 2025, FECR the owner of Brightline's rail corridor, described Brightline as "a failure almost from the outset" due to the lack of a "sufficient funding commitment" from Fortress. FECR's lawsuit warns that Brightline now "sits on the brink of bankruptcy," carrying roughly

17

$5.5 billion in debt to bondholders. Brightline has even failed to pay its share of basic track maintenance costs, leaving that burden to fall on FECR. These allegations by Brightline's business partner (FECR) underscore that Fortress's chronic underinvestment left Brightline financially crippled and unable to adequately ensure safety.

51. FECR's amended complaint also highlights how Brightline (under Fortress's direction) resorted to elaborate financial maneuvers instead of fixing safety issues. Brightline created a web of "shell" companies for "the so-called designee defendants" to circumvent its obligations and funnel public dollars into its debt rather than safety improvements. FECR accuses Brightline and Fortress of conducting a fraudulent scheme to secure hundreds of millions in county funding as a "near-term liquidity event to pay bondholders, stabilize cash flow and paper over mounting financial distress," instead of investing in necessary infrastructure upgrades. In other words, Fortress's plan was to prop up Brightline's finances using taxpayer money while neglecting critical safety enhancements. Such misuse of funds further contributed to the dangerous conditions on the railway.

52. Notably, FECR's September 2025 filing added Fortress Investment Group as a defendant, underscoring that Brightline's parent company was the driving force behind these policies. The industry itself recognized Fortress's hands-on role in Brightline's operations. FECR's complaint explicitly links Brightline's dismal safety record to Fortress's tight-fisted control of the purse strings, remarking that the railroad's safety issues were "perhaps unsurprising" given that "a safe operation

necessitates proper funding," which Fortress failed to provide. Indeed, Brightline's operational record is the worst in the nation for a passenger railroad averaging about one fatality every 13 days of service, a tragic rate directly attributable to Defendants' cost-cutting approach.

53. The foregoing facts strengthen Plaintiff's claims that Fortress so dominated and controlled Brightline's operations to incur liability under FELA. By persistently underfunding safety measures, delaying necessary upgrades, and prioritizing Fortress's financial goals over risk reduction, Defendants created an unreasonably hazardous work environment for Brightline Crews. This pattern of conscious disregard for known dangers was not mere negligence; it was willful, wanton mismanagement. Such egregious conduct, as alleged in the FECR Amended Complaint and borne out by public investigations, evidences a reckless indifference to employee safety. It supports a finding that Fortress is a de facto employer under FELA (retaining extensive control over the instrumentalities of Brightline's railroad operations) and that Defendants' conduct warrants the imposition of punitive damages. Plaintiff will rely on these updated allegations public and industry admissions of Brightline's safety failures and Fortress's role to establish FELA coverage, to prove Defendants' notice of the risk that led to his PTSD injuries, and to seek all available damages in this case.

54. (See **Exhibits 8, 10, 11, 13, 14, and 17**.)

## C. Inadequate Post-Crash Protocols and Decontamination

51. Brightline did not have or enforce a consistent, comprehensive critical-incident protocol for train crews exposed to fatalities. Instead, the focus was on quickly securing the scene, performing minimal inspection, and returning the train to service to limit delays and bad publicity. (See **Exhibit 3**.)

52. Plaintiff was not provided with adequate PPE, such as disposable coveralls, proper gloves, masks, or protective footwear, when ordered to walk through blood and bodily fluids. He was not given a structured decontamination process or access to showers or replacement clothing after such exposures. (See **Exhibit 3**.)

53. Plaintiff often re-boarded the train and remained near passengers and other crew while still wearing clothing that had been exposed to biological matter, vehicle fluids, and hazardous debris, creating additional health and safety risks for everyone aboard.

54. Brightline's written policies, including its "Train Crew Guardrails," looked more protective on paper than in practice. Employees were expected to comply with OCC's pressure to get trains moving again rather than insist on full isolation of the scene, extended decompression time, or thorough decontamination. (See **Exhibit 3**.)

55. These practices were inconsistent with basic bloodborne-pathogen controls and workplace safety principles and materially contributed to Plaintiff's trauma and fear of contamination.

## D. One-Size-Fits-All Trauma Leave and Mental-Health Policies

56. Brightline publicly touted "trauma-aware" practices and Employee Assistance Program ("EAP") benefits for employees involved in critical incidents. In reality, the leave and support offered were limited, perfunctory, and conditioned on company convenience and staffing needs. (See **Exhibits 2 and 3**.)

57. Typically, engineers and conductors involved in a fatal incident were offered one paid day off under EAP. Additional days (usually up to two more) were contingent on the employee speaking promptly with Brightline's contracted therapist and receiving that therapist's approval.

58. This system failed to account for incident severity or cumulative trauma. A conductor who struck and dismembered a pedestrian received essentially the same leave as someone who hit a shopping cart. Employees who had been exposed to multiple fatalities, like Plaintiff, received no enhanced support. (See **Exhibits 2, 3, and 4**.)

59. The requirement that employees speak with a company-selected clinician as a condition for additional days off created a coercive dynamic. Many employees were hesitant to fully disclose their symptoms out of fear that information shared in EAP sessions would influence assignments, promotions, or discipline. (See **Exhibit 2**.)

60. Onboard attendants and hospitality staff who witnessed or were exposed to the same fatalities often received no formal trauma leave at all, reinforcing the

impression that Brightline's focus was on keeping trains running, not on long-term psychological welfare.

61. Management communications and text messages further show that "mental-health days" were treated as a staffing variable, not a health entitlement. Supervisors repeatedly conditioned mental-health time off on "manpower," telling Plaintiff that requests would be denied if coverage was tight, regardless of his mental state. (See **Exhibit 7**.)

62. Brightline's 2021 Teammate Handbook promised employees an open-door communication culture, equal employment opportunity, reasonable accommodation for disabilities under the Americans with Disabilities Act, compliance with the Family and Medical Leave Act ("FMLA"), and strict prohibitions against retaliation for requesting accommodations or raising health and safety concerns. (See **Exhibit 2**.)

63. In practice, however, these commitments were not honored in Plaintiff's case, particularly with respect to his PTSD-related needs and requests for leave. (See **Exhibits 2, 6, and 7**.)

64. As a result, Plaintiff frequently returned to work while still experiencing intense symptoms, feeling that he had no safe or reliable way to obtain the time off and accommodations he clinically needed without jeopardizing his position.

## E. Mental-Health Diagnosis, Testing, and Exacerbation

65. By 2023, after years of repeated fatal incidents and inadequate recovery time, Plaintiff began suffering significant psychological symptoms, including insomnia, nightmares (reported by his partner), intrusive memories, panic while driving or riding in cars (especially at intersections or near trains), hypervigilance, irritability, difficulty concentrating, and avoidance of certain locations and activities. (See **Exhibits 4 and 5**.)

66. At the time of his October 2023 evaluation, Plaintiff had already been documented as the conductor on at least seven separate Brightline fatalities between late 2018 and 2022, in addition to other traumatic near-miss and collision events. These incidents are memorialized in police reports, crime-scene supplements, and medical-examiner files from multiple jurisdictions and summarized in **Exhibit 8**.

67. On or about October 5, 2023, Plaintiff underwent a detailed intake evaluation with Brightline's contracted trauma clinician, Anthony Gonzalez, LCSW, who documented escalating symptoms consistent with PTSD. Plaintiff reported that symptoms had been "moderately present" for approximately a year and had markedly worsened over the preceding three months. (See **Exhibit 4**.)

68. As part of this evaluation and follow-up, Mr. Gonzalez administered standardized assessments. Plaintiff scored 56 on the PTSD Checklist for DSM-5 (PCL-5), well above the accepted cut point of approximately 31–33 for probable PTSD; 10 on the GAD-7, indicating moderate anxiety; and 8 on the PHQ-9, consistent with mild but

clinically relevant depressive symptoms. These scores, paired with the clinical interview, confirmed a diagnosis of chronic PTSD and associated anxiety and mood disturbance. (See **Exhibit 5**.)

69. In the formal medical certification Mr. Gonzalez completed for Plaintiff's FMLA request, he identified the onset of Plaintiff's serious health condition as approximately September 1, 2023, stated that the condition was expected to last at least six months, and documented that Plaintiff had experienced more than ten work-related critical incidents over five years. He described symptoms including intrusive thoughts, nightmares, dread at reminders, strong physiological responses, anxiety, anhedonia, concentration difficulty, irritability, hypervigilance, and sleep disturbance, all directly related to Plaintiff's repeated exposure to Brightline fatalities. (See **Exhibit 6**.)

70. Mr. Gonzalez further recorded that Plaintiff's new work assignment significantly exacerbated his symptoms because it increased the number of "close calls" and provided "far less recuperation time" between incidents. He specifically recommended that Plaintiff be limited from performing the full Miami–Orlando trip, identified that assignment as a primary exacerbating factor, and advised that Plaintiff should have the ability to adjust his schedule and receive intermittent leave when symptoms flared. (See **Exhibit 6**.)

71. Mr. Gonzalez diagnosed Plaintiff with chronic PTSD and recommended a multi-month course of evidence-based trauma therapy, including EMDR, exposure-based therapies, and cognitive-behavioral or dialectical-behavioral interventions, with

regular weekly sessions for at least three months and ongoing care thereafter. (See **Exhibit 4**.)

72. Defendants did not implement meaningful changes in Plaintiff's assignment pattern, did not provide adequate decompression time, and continued to treat mental-health days as a limited, staffing-contingent resource rather than an ongoing medical necessity, despite this clear and detailed clinical guidance. (See **Exhibits 2, 3, 6, and 7**.)

## F. FMLA Leave, Mismanagement, and Denial

73. In September 2023, while experiencing active PTSD symptoms and under Mr. Gonzalez's care, Plaintiff applied for FMLA leave for his mental-health condition.

74. On or about September 27, 2023, Brightline's leave administrator, The Standard, issued an FMLA Eligibility Notice confirming that Plaintiff satisfied the federal eligibility criteria and had approximately nine weeks of job-protected FMLA leave available for his own serious health condition. The Standard's packet enclosed the official Department of Labor FMLA rights notice, explained that approved leave for a serious health condition would be job-protected, and directed Plaintiff to have his treating provider complete the medical certification. The packet stated that once properly certified, leave could be applied retroactively to cover qualifying days already missed. (See **Exhibit 6**.)

75. Mr. Gonzalez promptly completed the FMLA medical certification, confirming Plaintiff's PTSD diagnosis, recommending weekly therapy and intermittent leave,

and advising that Plaintiff's schedule and assignment to the full Miami–Orlando run should be modified to reduce exacerbating stressors. This certification was sent to The Standard and, by extension, Brightline as Plaintiff's employer. (See **Exhibit 6**.)

76. Despite this, during the certification period Plaintiff's supervisor Jonathan White told Plaintiff by text that he could not "cover any subsequent days" off until the FMLA was officially approved, effectively denying interim protections and suggesting that time off would be treated as unexcused if Plaintiff stayed home while paperwork was pending—even though federal law and The Standard's own letter contemplated retroactive coverage once certification was received. (See **Exhibit 7**.)

77. After Plaintiff pushed back, explaining what The Standard had told him and that Mr. Gonzalez was preparing the certification, White abruptly shifted course and stated that Brightline would "treat it as an emergency" situation and protect Plaintiff's job through an initial period. This about-face confirms that Defendants' first reaction was improper and non-compliant and that Plaintiff had to advocate for himself while already in a fragile state. (See **Exhibit 7**.)

78. By contrast, in 2022, when Plaintiff requested FMLA leave around the anticipated birth of his son, supervisors and HR processed the leave smoothly and even granted an extra week when the baby's arrival was delayed. That history shows that Brightline knew how to correctly administer FMLA when it wished to do so and underscores how differently it treated Plaintiff's PTSD-related request.

79. Plaintiff also sought one-day mental-health breaks through his supervisor Manny, but those requests were explicitly tied to staffing levels. In late 2021, when Plaintiff requested a specific Saturday as a mental-health day, Manny responded that the date was denied due to manpower and offered a different date instead. In March 2022, when Plaintiff asked to use his "2022 mental-health day," Manny replied that he "couldn't support PTO for tomorrow," again framing mental-health rest as contingent on staffing rather than clinical need. In 2023, after additional trauma, Manny again denied a requested mental-health day because of manpower. (See **Exhibit 7**.)

80. These communications demonstrate that, despite written promises in Brightline's handbook to comply with FMLA, provide reasonable accommodations, and prohibit retaliation for health-related requests, Defendants in practice subordinated Plaintiff's mental-health needs to day-to-day staffing concerns and created confusion and stress around his leave rights. (See **Exhibits 2, 6, and 7**.)

81. Feeling that he was not safe, not supported, and that his condition would continue to deteriorate if he stayed, Plaintiff ultimately left Brightline. This departure was a constructive discharge driven by unsafe working conditions and Defendants' refusal to provide and honor appropriate mental-health protections and FMLA rights.

## G. Conflicts of Interest and Management Culture

82. Plaintiff's trauma was compounded by a workplace culture that mixed conflicts of interest, favoritism, and retaliatory dynamics into safety-sensitive decisions.

83. Supervisor Jonathan White simultaneously held a supervisory role over conductors and worked as a real-estate agent. On information and belief, White sold homes to several Brightline employees whose assignments and advancement opportunities he controlled, creating a structural conflict between his financial interests and his responsibilities as a neutral safety manager.

84. Within the crew base, employees perceived that those who bought homes through White received favorable schedules or advancement, while those who did not— including Plaintiff—were more vulnerable to unfavorable assignments and scrutiny.

85. Employees also perceived that speaking up about safety or mental-health concerns could lead to scrutiny over issues such as hours-of-service compliance or scheduling, which discouraged candid reporting and requests for help.

86. As Plaintiff navigated his PTSD, he began to feel that asserting his rights and voicing concerns about leave and trauma exposures made him a target for management rather than a person to be protected.

87. This culture of conflicts and perceived retaliation further undermined Plaintiff's trust in management and contributed to his decision to leave rather than remain in a hostile and unsafe environment.

## H. Federal Regulators' Warnings and Safety Grants

88. During Plaintiff's tenure, federal regulators repeatedly called attention to the Brightline corridor's extraordinary collision and fatality record and provided funds specifically to address those hazards. (See **Exhibits 11, 13, 14, and 17**.)

28

89. The NTSB investigated multiple Brightline incidents and, in 2024 congressional testimony, NTSB Chair Jennifer Homendy reported that in just five years there had been more than thirty fatalities and more than thirty injuries at Brightline grade crossings, across more than one hundred incidents. She emphasized that many of these collisions were preventable with better engineering and enforcement. (See **Exhibit 13**.)

90. FRA and DOT awarded multiple grants to address trespassing, crossing safety, and corridor protections along the Brightline route. Despite these awards, implementation lagged; key locations remained unfenced, crossings lacked four-quadrant gates or raised medians, and second-train warning systems were limited or absent. (See **Exhibits 11 and 17**.)

91. Investigative reporting later highlighted that the deployment of these safety upgrades trailed years behind the grant awards, even as fatalities continued in the same general areas where improvements were planned but not yet installed. (See **Exhibits 14 and 17**.)

92. In 2025, DOT publicly acknowledged that delays in obligating and deploying these grants had "put Brightline's three million annual passengers and Florida communities in unnecessary danger." That statement confirmed at the highest levels of federal transportation leadership that operating Brightline trains through this corridor without timely safety upgrades created serious, known risks. (See **Exhibit 17**.)

93. Defendants continued to run high-speed passenger service through these dangerous segments and to schedule Plaintiff on those routes, thereby exposing him to repeated traumatic events that federal regulators had clearly identified as foreseeable and preventable. (See **Exhibits 8, 11, 13, 14, and 17**.)

## I. National Media Scrutiny and Public Awareness

94. From at least 2018 onward, Brightline's safety record was the subject of extensive national and local media coverage, including news articles, investigative series, and television segments branding Brightline the "deadliest train" in America. (See **Exhibits 14, 15, and 17**.)

95. A joint "Killer Train" series by the Miami Herald and WLRN reported that, by 2025, Brightline had killed approximately 182 people and injured nearly 100 since 2017—more deaths than any other U.S. passenger railroad—with a fatality occurring roughly every 13 days of operation. (See **Exhibit 14**.)

96. A detailed methodological article in the Killer Train series explained that about 41% of Brightline deaths were classified as suicides, while the majority were accidents or undetermined. This contradicted Brightline's public strategy of dismissing most fatalities as "suicides" or "reckless trespassers" and underscored that many deaths were not self-inflicted. (See **Exhibit 14**.)

97. National outlets such as the Associated Press, Newsweek, The Atlantic, and Inside Edition reported that Brightline's per-mile death rate was several times higher than comparable systems and that its accident rate per million miles far exceeded that

of other commuter and intercity railroads. Some coverage referred to Brightline as a "Death Train," noting crew "golden ticket" jokes and public comments that the train needed to be "fed" fatalities. (See **Exhibits 14 and 17**.)

98. In 2025, WLRN and the Miami Herald published and aired a feature titled "Haunted by Brightline" focused on Plaintiff, describing his involvement in numerous fatalities, his nightmares and hypervigilance, and the inadequate support he received from Brightline. That story quoted Brightline's own trauma clinician acknowledging Plaintiff's PTSD and documented how repeated exposure to fatalities had changed his life. (See **Exhibit 15**.)

99. These widely distributed reports ensured that Defendants were fully aware of the corridor's dangers, the impact on crews, and the reputational and legal risks of continuing high-speed service without robust safety and trauma measures. Defendants' refusal to change course in the face of this scrutiny demonstrates conscious disregard of known dangers. (See **Exhibits 13, 14, 15, and 17**.)

## J. Representative Grade-Crossing Litigation and Notice to Defendants

100. In addition to federal investigations and media scrutiny, multiple civil lawsuits have been filed in Florida state courts arising from Brightline collisions, citing defective crossing equipment, inadequate quiet-zone protections, and failures to comply with FRA regulations. These suits further demonstrate

Defendants' notice of systemic grade-crossing hazards along the Brightline

corridor. (See **Exhibit 11**.)

101.     For example, in **Heydi Morales-Chacón v. Brightline Trains Florida LLC, et

al.**, a passenger injured on an April 12, 2023 Brightline train alleges that Brightline,

as a common carrier, owed passengers the highest degree of care, foresight,

prudence, and diligence, and that Brightline negligently failed to operate the train at

a safe speed, maintain a proper lookout, and use reasonable precautions to warn

motorists at the Hollywood crossing where a semi-truck was struck.

102.     In **Ryan Alfieri v. Brightline Trains Florida LLC, Florida East Coast Railway,

LLC, Florida East Coast Industries, LLC, Joyce Silvaleger, and Brody Macera**,

filed in Palm Beach County, the plaintiff alleges that on December 16, 2023, a

Brightline train collided with his vehicle at the intersection of West Hidden Valley

Boulevard and North Dixie Highway in Boca Raton after the crossing gate failed to

activate. The complaint alleges that Brightline and related entities violated FRA

grade-crossing regulations, including 49 C.F.R. § 234.253 (inspections and tests of

highway-rail grade-crossing warning systems) and 49 C.F.R. § 234.257(a) (warning-

time requirements), by allowing the gate and warning devices to remain defective

for an unreasonable period of time, and further alleges violations of the Train Horn

Rule, 49 C.F.R. Part 222.

103.     In **Carol Ostrowski, as Personal Representative of the Estate of James

Ostrowski v. Brightline Trains Florida LLC, Brightline Holdings, Florida East

Coast Railway, Florida East Coast Industries, and RailPros Field Services**,

arising from a fatal collision at the SW 18th Street crossing in Boca Raton, the plaintiff alleges that repeated political and public warnings prompted Brightline to promise safety measures "beyond the minimum federal requirements," including additional signage and quiet-zone improvements, but that those promises were not fulfilled and critical warning signs were missing or poorly maintained.

104.     In **Stephanie Michelle Fernandez, as Personal Representative of the Estate of Dyanna Marie Fernandez v. Brightline** and related entities, filed in Broward County, the plaintiff alleges that Dyanna Fernandez was killed at the Northeast 6th Street crossing in 2023 after walking along a sidewalk that ended near the tracks and being struck by a Brightline train, and further alleges that at this same crossing, a person was killed in March 2020 and another in May 2022 and that quad gates and adequate pedestrian protection still were not installed.

105.     These representative lawsuits, while focused on individual victims, collectively illustrate a consistent pattern: defective or inadequate crossing protection, delayed implementation of safety improvements, recurrent fatalities at the same locations, and alleged violations of FRA grade-crossing and horn-sounding regulations. Defendants have therefore long been on notice that their grade-crossing and quiet-zone practices are dangerous and that continued high-speed operations without robust safeguards expose both the public and crew members like Plaintiff to repeated traumatic events. (See **Exhibits 11, 13, 14, and 17.**)

33

106.     Plaintiff operated trains through this same corridor and was directly exposed to the aftermath of many such failures. Each additional crash and lawsuit further increased the foreseeability that Brightline's systemic safety shortcomings would inflict emotional and psychological injuries on employees tasked with operating trains and responding to the resulting scenes.

## K. FRA Part 219 Toxicology Compliance Failures

107.     Brightline is required by 49 C.F.R. Part 219 to conduct post-accident drug and alcohol testing after certain qualifying events, including fatalities and significant property damage, unless strict exemption criteria are met and documented. (See **Exhibit 10**.)

108.     In June 2021, Brightline submitted and FRA approved a Part 219 Railroad Compliance Plan, effective June 15, 2021, in which Brightline adopted FRA's model program, identified its Designated Employer Representative, and agreed to conduct post-accident, reasonable-suspicion, reasonable-cause, and random testing in accordance with Part 219. The plan expressly requires Brightline supervisors to make testing decisions based on objective, documented facts, to complete required documentation whenever an exemption is used, and to maintain those records for FRA inspection. (See **Exhibit 10**.)

109.     On information and belief, Brightline failed to conduct required toxicology testing after several qualifying incidents, including events in which trains failed to stop or slow near active scenes or where the cause of the incident was not clearly

34

and immediately attributable to trespasser behavior. In many such cases, Brightline did not generate the written documentation required by Part 219 and its own plan to justify any claimed exemption.

110.    Brightline routinely labeled fatalities as "trespassers" or "suicides" and treated that label as a justification for skipping testing and documentation, without performing the individualized, fact-specific analysis required by Part 219. (See **Exhibit 10**.)

111.    By failing to conduct required testing and failing to generate and retain exemption documentation, Defendants violated FRA rules designed to ensure accountability and to prevent unsafe practices from going unexamined. (See **Exhibit 10**.)

112.    These regulatory violations not only endangered the public but also deprived Plaintiff and other crews of the structure, scrutiny, and temporary removal from service that often accompany formal post-accident procedures, thereby increasing trauma and reducing opportunities for recovery.

113.    Under FELA, violation of a safety regulation intended to protect employees constitutes negligence per se, strengthening Plaintiff's claims of employer negligence. (See **Exhibits 10 and 16**.)

## L. Internal Culture of Suppressed Recovery and Pressure to Work

114.    Defendants fostered a culture that normalized frequent fatalities, minimized emotional responses to trauma, and stigmatized requests for mental-health support.

115.    After fatal incidents, management often urged crews to "just take it to the next station," "keep things moving," or "do it as a favor," framing continued operation as a sign of toughness and loyalty.

116.    Employees joked darkly about "golden tickets" (fatalities on Fridays that yielded a three-day trauma protocol including the weekend) and about the train needing to be "fed" fatalities. These remarks reflected the frequency of fatal incidents and the lack of constructive, institutionalized coping mechanisms. (See **Exhibits 14 and 15**.)

117.    Many engineers and conductors privately warned one another that taking trauma leave or pushing too hard on safety and mental-health issues could jeopardize their assignments or advancement. This created a strong disincentive to seek help or to report the full extent of symptoms.

118.    Plaintiff internalized this culture and repeatedly forced himself back to work despite nightmares, panic, and exhaustion, believing that using too much leave or insisting on accommodations would brand him as a problem employee. (See **Exhibits 4, 5, and 15**.)

119.     As his PTSD worsened and he struggled to obtain consistent, respectful treatment from management regarding his FMLA and mental-health needs, Plaintiff came to believe that his only realistic options were to continue absorbing trauma without proper support or to leave Brightline.

120.     Ultimately, Plaintiff chose his health and safety. He left the job, accepting significant economic loss rather than remain in conditions that were destroying his mental health.

121.     Under FELA's lenient causation standard, Defendants' negligence need only play any part, even the slightest, in producing Plaintiff's injury. Here, Defendants' conduct was a substantial factor in causing Plaintiff's PTSD and the resulting economic and non-economic damages described above. (See **Exhibit 16.**)

122.     Plaintiff's injuries were not an unavoidable byproduct of railroading. They were the predictable result of Defendants' decisions to run high-speed trains through inadequately protected corridors, to ignore federal warnings and repeated collisions, to disregard established psychiatric knowledge about PTSD in train crews, and to deny crews the basic trauma support, accommodations, and leave they needed to recover. (See **Exhibits 10, 11, 13, 14, 15, and 17.**)

# V. CAUSES OF ACTION

## Count I: FELA – General Negligence (Unsafe Work Environment)

**Against Brightline Trains Florida LLC and Fortress Investment Group LLC**

123.  Defendants, as common carriers under FELA, had a non-delegable duty to furnish Plaintiff with a reasonably safe place to work. See 45 U.S.C. § 51.

124.  Defendants breached this duty through multiple acts and omissions that collectively created an unreasonably dangerous workplace, including excessive exposure to traumatic fatalities, failure to provide protective gear, and unsafe post-incident procedures. (See Exhibits 8 and 9.)

125.  These failures foreseeably caused Plaintiff's physical and psychological injuries, including chronic PTSD. Brightline's own trauma clinician, Anthony Gonzalez, LCSW, confirmed causation. (See Exhibit 4-6.)

126.  Defendants' negligence directly contributed, in whole or in part, to Plaintiff's injury. See Rogers v. Mo. Pac. R.R., 352 U.S. 500, 506 (1957).

## Count II: FELA – Zone-of-Danger Emotional Distress

127.  Plaintiff re-alleges all prior paragraphs.

128.     Under Consolidated Rail Corp. v. Gottshall, 512 U.S. 532 (1994), FELA

permits recovery for emotional injury when an employee is placed within the

immediate zone of danger due to the employer's negligence.

129.     Plaintiff was involved in at least eight fatal incidents and narrowly escaped

harm during the 2018 Conrad incident, when a second train passed through a crash

scene with first responders present. (See Exhibits 1 and 8.)

130.     Each incident involved grave physical risk and required Plaintiff to act amid

hazardous, bloodborne biohazards, fire, and debris without protective equipment.

131.     These exposures meet the Gottshall test, and the emotional injuries Plaintiff

suffered as a result including flashbacks, panic attacks, and hypervigilance are

compensable under FELA.

## Count III: FELA – Negligence Per Se (Regulatory Violations)

132.     Plaintiff re-alleges all prior paragraphs.

133.     Defendants violated multiple safety statutes and regulations, including but

not limited to:

- 49 C.F.R. § 219.201, 219.11: Failure to perform post-accident toxicology testing.
  (See Exhibit 10.)

- 29 C.F.R. § 1910.1030: Failure to provide bloodborne pathogen protections.

- 49 C.F.R. Part 243: Inadequate training in trauma response and safety.

134.     Violations of these statutes constitute negligence per se under FELA when they result in injury to an employee the statute was designed to protect.

135.     These breaches directly caused Plaintiff's injuries, reinforcing Defendants' liability.

## Count IV: FELA – Negligent Supervision and Retaliatory Culture

136.     Plaintiff re-alleges all prior paragraphs.

137.     Brightline management, including supervisors like Assistant Superintendent Jonathan White and Superintendent "Manny Couto," created a retaliatory culture that suppressed psychological care, threatened FMLA requests, and pressured traumatized employees to remain on duty. (See Exhibits 2,6,7,15)

138.     Employees were discouraged from taking leave after fatalities and mocked for showing vulnerability. This cultural suppression led directly to Plaintiff's cumulative psychological injury.

139.     Fortress Investment Group, through its operational oversight and budgetary control, permitted this unsafe and retaliatory system to persist. (See Exhibit 2.)

## Count V: FMLA – Interference

140.     Plaintiff re-alleges all prior paragraphs.

141.     In 2023, Plaintiff submitted a qualifying FMLA request for PTSD-related medical leave. (See Exhibit 6).

142.    Brightline failed to honor that leave request, required additional documentation beyond federal requirements, and continued scheduling Plaintiff despite eligibility and notice constituting interference under 29 U.S.C. § 2615(a)(1).

143.    Plaintiff was denied necessary rest and medical care during his peak symptoms.

## Count VI: FMLA – Retaliation

144.    Plaintiff re-alleges all prior paragraphs.

145.    After invoking his FMLA rights, Plaintiff experienced hostile treatment and threats of schedule disruption and career harm. He was told that further leave "couldn't be covered due to manpower" and was pressured to work while his leave request was pending.

146.    These actions constitute retaliation under 29 U.S.C. § 2615(a)(2), as they were causally linked to Plaintiff's protected activity.

## Count VII: Declaratory Relief (FELA Coverage and Preemption)

147.    Plaintiff re-alleges all prior paragraphs.

148.    Plaintiff seeks a judicial declaration under 28 U.S.C. § 2201 that Brightline and Fortress are subject to FELA, as federally governed rail carriers under 49 U.S.C. § 22905(b).

149.    Brightline's acceptance of CRISI and other FRA grants required compliance with federal safety laws and FELA coverage. (See Exhibit 11.)

150.    This declaration is necessary to confirm Plaintiff's exclusive federal remedy and preclude any defense based on state workers' compensation exclusivity.

WHEREFORE, Plaintiff respectfully requests judgment as outlined in the Prayer for Relief.

# VIII. PRAYER FOR RELIEF

151.    WHEREFORE, Plaintiff Darren J. Brown Jr. respectfully requests that this Court enter judgment in his favor and against Defendants Brightline Trains Florida LLC and Fortress Investment Group LLC, jointly and severally, and award the following relief:

152.    **Declaratory Relief:** A declaration that:

153.    a. At all relevant times, Plaintiff was an "employee" of Brightline within the meaning of the Federal Employers' Liability Act (FELA);

b. Brightline is a "common carrier by railroad" (i.e., a rail carrier) subject to the provisions of FELA; and

c. FELA governs Plaintiff's claims and preempts any inconsistent application of state workers' compensation laws or other state-law schemes that would bar or limit his FELA rights.

154.    **Compensatory Damages**: An award of compensatory damages in an amount to be determined by the jury but in no event less than $60,000,000 for the following categories of harm:

155.    a. *Past and Future Lost Earnings*: Lost wages and diminished earning capacity (reflecting Plaintiff's permanent loss of a high-earning railroad career and reduced future employability);

b. *Medical and Psychological Expenses*: Past and future medical, psychological, and rehabilitative treatment costs (including therapy, counseling, medication, and other care required to treat Plaintiff's PTSD and related conditions);

c. *Pain and Suffering*: Past and future physical pain, mental anguish, emotional distress, and loss of enjoyment of life (resulting from the severe and ongoing psychological trauma caused by Defendants' negligence); and

d. *Other Economic and Non-Economic Losses*: All other losses proved at trial, including any out-of-pocket costs and intangible harms not otherwise enumerated.

**Injunctive and Equitable Relief**: Appropriate injunctive and equitable relief to prevent similar harm in the future, which may include measures such as:

156.    a. Requiring Defendants to implement comprehensive critical-incident response and trauma care protocols for train crews (e.g., immediate psychological first aid, counseling, and support services following fatal incidents);

b. Requiring trauma-informed leave policies including sufficient paid leave and job protections for employees who experience or witness traumatic on-duty events,

and prohibiting any retaliation against workers for seeking mental-health support or taking leave (including leave under the Family and Medical Leave Act) to address trauma;

c. Requiring Defendants to comply with federal safety regulations and commitments designed to protect employees' mental health, including full adherence to all applicable Federal Railroad Administration (FRA) rules and any FRA-approved critical incident stress plans for Brightline's operations (as mandated by 49 C.F.R. Part 272), as well as compliance with any pertinent federal grant safety conditions; and

d. Requiring independent safety and mental-health audits of Brightline's operations at reasonable intervals to be conducted by qualified third-party auditors – in order to monitor Defendants' implementation of the above injunctive measures and to ensure ongoing compliance with FRA standards.

157.   **Costs and Attorneys' Fees**: An award of Plaintiff's taxable court costs, and where authorized by law his reasonable attorneys' fees and expert witness fees. (For example, if any injunctive or equitable relief is granted under statutes or rules that provide for an award of fees, or if Defendants engage in litigation misconduct justifying fees, Plaintiff seeks such recovery.)

158.   **Pre- and Post-Judgment Interest**: An award of pre-judgment interest from the date of Plaintiff's injury and post-judgment interest from the date of judgment, at the maximum rates allowed by law, to fully compensate Plaintiff for the time value of money and the delay in receiving justice.

159.    **Such Other and Further Relief**: Such other and further relief as the Court

deems just, proper, and equitable, including any declaratory or injunctive remedies

or supplemental relief proven appropriate at trial.

160.    **Demand for Jury Trial**: Plaintiff hereby demands a trial by jury on all issues

so triable.

DATED: __12 | 16 | 25__, 2025

Respectfully submitted,

**Darren J. Brown Jr.**
931 Village Blvd, Suite 901-438
West Palm Beach, FL 33409
Email: DarrenBrown@advantagefc.com
Phone: (708) 705-3214

**Pro Se Plaintiff**

**EXHIBIT INDEX**

**Exhibit 1 – Plaintiff's Rail Career Résumé and Brightline Employment Documents**
 Description / Purpose: Plaintiff's rail résumé/CV together with his Brightline offer letter
and conductor job description, demonstrating nearly two decades of railroad service, high-
speed passenger operations, and his role and base as a Brightline conductor.

**Exhibit 2 – Brightline "Teammate Handbook" (Selected Pages)**
 Description / Purpose: Relevant pages addressing FMLA, ADA/mental-health
accommodations, open-door policy, and anti-retaliation language, showing Brightline's
written commitments regarding employee safety, mental health, and leave protections.

**Exhibit 3 – "Train Crew Guardrails" and Critical-Incident Policies**
Description / Purpose: Brightline policy and related procedures describing how train crews are supposed to be protected after traumatic incidents (critical incidents / fatalities), including removal from service, debriefing, and support measures, contrasted with how those policies were applied in practice.

**Exhibit 4 – Initial PTSD Intake Evaluation – Anthony Gonzalez, LCSW (October 5, 2023)**
Description / Purpose: Clinical intake evaluation documenting Plaintiff's symptoms, history of multiple Brightline fatalities, clinical impressions, and diagnosis of chronic PTSD and related conditions tied to his work as a Brightline conductor.

**Exhibit 5 – PTSD / Anxiety / Depression Test Results (PCL-5, GAD-7, PHQ-9)**
Description / Purpose: Standardized test forms and scores (including PCL-5, GAD-7, and PHQ-9) confirming clinically significant PTSD, anxiety, and depressive symptoms consistent with repeated work-related trauma exposures.

**Exhibit 6 – FMLA Medical Certification – Anthony Gonzalez, LCSW**
Description / Purpose: Completed FMLA mental-health certification sent to The Standard/Brightline documenting Plaintiff's PTSD diagnosis, expected duration of the condition, need for intermittent leave, and clinical limitations on certain high-stress assignments (including Miami–Orlando operations).

**Exhibit 7 – Text Messages with Supervisors Regarding FMLA and "Mental-Health Days"**
Description / Purpose: Text-message screenshots with supervisors (including Jonathan White and Manny) regarding Plaintiff's efforts to use FMLA and request "mental-health days," including statements conditioning leave on "manpower" and coverage and treating mental-health days as discretionary.

**Exhibit 8 – Composite Fatal-Incident Summary Table (Prepared by Plaintiff)**
Description / Purpose: Table summarizing each Brightline fatality Plaintiff worked (date, location, victim name, agency case number, train speed, Plaintiff's role, and brief description of the scene), illustrating the number, frequency, and severity of traumatic incidents to which he was exposed.

**Exhibit 9 – Hollywood / Dennis Conrad "Second-Train" Fatality File**
Description / Purpose: Key portions of the police, crime-scene, and medical-examiner file for the November 23, 2018 Hollywood fatality involving Dennis Conrad, including documentation of the suicide, the debris field, and the second Brightline train being cleared through the active scene while responders and Plaintiff were on foot.

**Exhibit 10 – Brightline FRA Part 219 Railroad Compliance Plan (Effective June 15, 2021)**
Description / Purpose: FRA-approved alcohol and drug testing plan adopted by Brightline, showing adoption of the FRA model plan, designation of the employer representative, and requirements for post-accident toxicological testing and documentation of any exemptions.

**Exhibit 11 – FRA / DOT CRISI Grant Awards and 49 U.S.C. § 22905(b) Conditions**
Description / Purpose: Federal grant award documents and associated terms incorporating 49 U.S.C. § 22905(b), establishing that passenger operators over the funded infrastructure are "rail carriers" subject to federal rail safety law and conditions, and specifically identifying funding for safety improvements along the Brightline corridor.

**Exhibit 12 – National Mediation Board 2024 Decision – Brightline as "Carrier"**
Description / Purpose: National Mediation Board decision classifying Brightline Trains Florida LLC as a "carrier" under the Railway Labor Act and recognizing onboard personnel as "employees," supporting Plaintiff's allegation that Brightline is a federally regulated rail carrier and his employer for purposes of FELA.

**Exhibit 13 – NTSB Chair Jennifer Homendy Testimony on Brightline Collisions**
Description / Purpose: Congressional testimony excerpts from NTSB Chair Jennifer Homendy describing Brightline's collision and fatality record and the safety concerns associated with the corridor, supporting Plaintiff's allegations of an extraordinary and well-known risk profile.

**Exhibit 14 – Miami Herald / WLRN "Killer Train" Overview Article**
Description / Purpose: Lead investigative article from the Miami Herald / WLRN "Killer Train" series documenting Brightline's fatality rate, total deaths and injuries, and systemic corridor safety issues, supporting notice, foreseeability, and the allegation that Brightline operates the deadliest passenger railroad in the United States.

**Exhibit 15 – Miami Herald / WLRN Feature on Plaintiff**
Description / Purpose: Investigative feature focused on Plaintiff's experience as a Brightline conductor, including repeated exposure to fatalities, the "second-train" event, ongoing PTSD symptoms, and the lack of adequate support, corroborating Plaintiff's emotional injuries, damages, and Brightline's notice of his condition.

**Exhibit 16 – Federal Employers' Liability Act (45 U.S.C. §§ 51–60) – Selected Sections**
Description / Purpose: Official copy or certified printout of the Federal Employers' Liability Act, including at minimum 45 U.S.C. §§ 51–53, 55–56, showing the statutory basis for Plaintiff's claim, the scope of railroad employer liability, and the abolition of certain common-law defenses.

**Exhibit 17 – U.S. Department of Transportation / FRA Brightline Safety Funding and Public Statements (Including Comments by Sean Duffy)**
Description / Purpose: Compilation of U.S. Department of Transportation and Federal Railroad Administration press releases, grant announcements, and public statements (including comments by DOT officials such as Sean Duffy) regarding safety funding for the Brightline / Florida East Coast Railway corridor and the need to address the danger posed

by repeated collisions and fatalities, supporting notice, foreseeability, and federal recognition of the corridor's safety problems.