**EXHIBIT 2**

42728           SERVICE DATE – LATE RELEASE DECEMBER 21, 2012
EB

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 35680

ALL ABOARD FLORIDA – OPERATIONS LLC AND ALL ABOARD FLORIDA – STATIONS—CONSTRUCTION AND OPERATION EXEMPTION—IN MIAMI, FLA. AND ORLANDO, FLA.

Digest:[1]  All Aboard Florida – Operations LLC and its corporate affiliate propose to build a 230-mile rail line between Miami, Fla., and Orlando, Fla.  The proposed rail line does not require Board approval, as it would be constructed and operated entirely within the state of Florida and would not be part of the interstate rail network.  Accordingly, the Board is dismissing the request for authority to construct and operate the proposed line because these intrastate passenger operations are outside the Board's jurisdiction.

Decided:  December 21, 2012

On October 9, 2012, All Aboard Florida - Operations LLC (AAF-O) and its corporate affiliate, All Aboard Florida - Stations LLC (AAF-S) (collectively, AAF), filed a petition under 49 U.S.C. § 10502 for an exemption from the prior approval requirements of 49 U.S.C. § 10901 to construct and operate approximately 230 miles of passenger rail line between Miami, Fla., and Orlando, Fla. (Line).  The Line would operate primarily on tracks to be constructed within an existing right-of-way along the east coast of Florida, which is owned by the Florida East Coast Railway LLC (FECR).

Concurrent with the filing of the petition for an exemption, AAF filed a motion to dismiss the petition for lack of jurisdiction.  AAF asserts that the proposed line is not subject to the Board's jurisdiction because the Line would be located entirely within the state of Florida and would not be part of the interstate rail network.  AAF filed a letter supplementing its petition on October 26, 2012.  No replies to AAF's filings were received.  We will grant the motion to dismiss the petition.

---

[1] The digest constitutes no part of the decision of the Board but has been prepared for the convenience of the reader.  It may not be cited to or relied upon as precedent.  Policy Statement on Plain Language Digests in Decisions, EP 696 (STB served Sept. 2, 2010).

BACKGROUND

<u>AAF Project</u>.  AAF-O plans to construct and operate an approximately 230-mile rail line that will run between Miami and Orlando.  The Line would have stations in Miami, Fort Lauderdale, Orlando, and West Palm Beach.  AAF-S plans to develop and manage the passenger stations to be constructed along the route.  AAF states that approximately 200 miles of the Line, between Miami and Cocoa, Fla., would be built and operated within the existing FECR right-of-way along the east coast of Florida (the FEC Corridor), alongside FECR's existing tracks.[2]  AAF intends to obtain any additional land needed for construction of the east-west segment of the Line connecting Cocoa and Orlando through the negotiation of leases or other rights to use certain rights-of-way owned by the Florida Department of Transportation (FDOT) and the Orlando Orange County Expressway Authority (OOCEA).[3]  AAF states that it would also acquire the rights to minor segments of other land, where necessary, to optimize travel time.

According to AAF, the FEC Corridor originally consisted of double-track rail that supported both freight and passenger service, although FECR ceased passenger operations in 1968, and much of the double-track rail has been removed.  AAF further states that the existing right-of-way widths are typically at least 100 feet throughout the FEC Corridor, and that the system was built and maintained to Federal Railroad Administration (FRA) Class IV track standards, permitting 60 mph freight and 79 mph passenger operations.  Within the FEC Corridor, the plan is to use both tracks for freight and passenger service.  In addition, AAF states that a new dispatch district controlled by FECR is planned between Miami and West Palm Beach for unified control of freight and passenger services.

AAF states that the Line would have frequently scheduled trains, consisting of approximately 16-19 roundtrip trains daily that would be about 900 feet long.  AAF plans to have hourly train service in each direction during peak periods.  The trains would operate up to 79 miles-per-hour between Miami and West Palm Beach, and up to 110 miles-per-hour on the newly constructed passenger tracks between West Palm Beach and Orlando.  AAF states that it would provide amenities such as meal service and wireless internet.

In its petition, AAF states that the Line would serve an important public need by providing viable intercity passenger rail service in Florida, and that FDOT believes that there is a need for new infrastructure to address rising highway congestion in Florida.  AAF states that the Line would remove more than three million cars from Florida's roadways annually, thus mitigating traffic congestion and reducing carbon emissions.  As an existing rail corridor will be

---

[2] AAF-O and AAF-S are wholly-owned subsidiaries of Florida East Coast Industries, Inc. (FECI).  FECI and FECR are owned by equity funds that are controlled by Fortress Investment Group LLC and its affiliates.

[3] AAF states that it will submit a response to FDOT concerning its October 3, 2012 Request for Proposals for Leasing of FDOT and OOCEA Rights of Way for Intercity Passenger Rail System, in order to obtain access to the right-of-way for the Cocoa to Orlando segment of the Line.

used for most of the Line, AAF also asserts that adverse impacts on the environment and local communities would be reduced.

AAF states that although the Line would be privately owned, maintained, and operated, AAF is exploring the possibility of obtaining financing for parts of the project. AAF states that it is currently in discussions with the FRA regarding the possibility of obtaining financing under the FRA's Railroad Rehabilitation and Improvement Financing program (RRIF). In connection with its RRIF application, AAF states that it has been working with FRA to prepare an environmental assessment (EA) for a phase of the Line, consistent with the National Environmental Policy Act (NEPA), and has submitted extensive environmental documentation to FRA. AAF further states that this proceeding is a prerequisite for FRA to act on AAF's RRIF application, as FRA has requested that AAF obtain a Board ruling as to whether AAF requires Board authorization to construct and operate the Line. AAF therefore seeks expedited action and asks the Board to serve a decision before December 31, 2012.

Board Jurisdiction. In its motion to dismiss, AAF asserts that we do not have jurisdiction over its proposed construction and operation of the Line because this intrastate transportation will not be "part of the interstate rail network."[4] See 49 U.S.C. § 10501(a)(2)(A). It explains that the proposed Line would not connect with Amtrak or any other interstate passenger rail service provider, and that AAF has no plans to provide through ticketing with Amtrak or any other interstate rail passenger operator for transportation beyond Florida. AAF also states that, although the Line's tracks may physically cross over or connect with the adjacent tracks within the FECR freight corridor, AAF would not participate in any intrastate or interstate freight movements, and the Line would not connect with the tracks of any freight railroad other than FECR.

In its letter filed on October 26, 2012, AAF advises that the Orlando station planned for the Line is currently expected to be located at or near the Orlando International Airport. It asserts however that, even if the Line were used by some of its passengers to make an interstate journey by multimodal transportation, such usage alone would not render its proposed Line "part of the interstate rail network," which is required to trigger Board jurisdiction under the statute.

DISCUSSION AND CONCLUSIONS

Under 49 U.S.C. 10501(a)(2)(A), we have jurisdiction over transportation by rail carriers (1) between a place in a state and a place in another state, and (2) between a place in a state and another place in the same state, as long as that intrastate transportation is carried out as "part of the interstate rail network."[5] The determination of whether an intrastate passenger rail service is part of the interstate rail network is a fact-specific determination. Here, AAF has moved to dismiss its petition for exemption, explaining that these particular passenger operations would be solely intrastate and would not be a part of the interstate rail network. No one opposed the

---

[4] AAF at 4, citing DesertXpress Enterprises, LLC—Pet. for Declar. Order, FD 34914 (DesertXpress), slip op. at 11 (STB served May 6, 2010).

[5] See DesertXpress at 9.

motion to dismiss, and there is nothing in the record to show that AAF's proposed construction and intrastate operations would be part of the interstate rail network. Therefore, we conclude that we have no jurisdiction over the proposed Line under § 10501(a)(2)(A), and the motion to dismiss will be granted.

It is undisputed that the proposed Line is to be used solely as an intrastate passenger service. AAF would transport passengers between stations on the Line within the state of Florida, with passengers boarding and deboarding at four local stations for unspecified local travel purposes. As AAF states, the proximity of a planned station at or near an airport does not make the proposed intrastate passenger rail service a part of the interstate rail network. The fact that some passengers may travel outside of Florida by air does not transform this proposed intrastate rail passenger service into an interstate rail service that would be within the Board's jurisdiction under § 10501(a)(2)(A). In addition, AAF's plan to use tracks owned and operated by FECR is not sufficient to bring the proposed Line under our jurisdiction. See Magner-O'Hara Scenic Ry. v. ICC, 692 F.2d 441, at 443-44 (6th Cir. 1982), aff'g Magner-O'Hara Scenic Ry.—Operation—In the State of Michigan, FD 29161 (ICC served May 12, 1981) (where the court affirmed a determination of our predecessor, the Interstate Commerce Commission (ICC), that the planned use of tracks owned by interstate freight carriers was insufficient to bring under the ICC's jurisdiction an application to operate a scenic passenger railway entirely within Michigan that would not connect with any other rail carriers).

FECR's plan to dispatch AAF's trains together with its own freight services within the FEC Corridor also does not make AAF's proposed operations jurisdictional. In Fun Trains, the Board held that the intrastate carrier's use of Amtrak crews and locomotives to provide rail operations was not sufficient for the agency to assert jurisdiction over the carrier's operations.[6] Similarly, we find here that AAF's allowing FECR to control the dispatching over the Line would not be sufficient to make the proposed intrastate passenger rail operations part of the interstate rail network. This proceeding also differs from American Orient Express Railway—Petition for Declaratory Order, FD 34502 (STB served Dec. 29, 2005), aff'd sub nom. American Orient Express Railway v. STB, 484 F.3d 554 (D.C. Cir. 2007). Here, as in Fun Trains, the proposed passenger service would take place entirely in Florida. In contrast, American Orient Express involved interstate passenger service that was being performed using the locomotive power, and train and engine crews of Amtrak, an interstate passenger carrier.

In short, based on the facts presented here, we conclude that AAF's construction and operation of the proposed Line would not be part of the interstate rail network and therefore would not come within the Board's jurisdiction. Accordingly, we will grant AAF's motion to dismiss this proceeding.

This action will not significantly affect either the quality of the human environment or conservation of energy resources.

---

[6] See Fun Trains, Inc.—Operation Exemption—Lines of CSX Transportation, Inc., FD 33472 (STB served Feb. 24, 1998).

Docket No. FD 35680

It is ordered:

1. The motion to dismiss is granted.  This proceeding is dismissed for lack of jurisdiction.

2. This decision is effective on the date of service.

By the Board, Chairman Elliott, Vice Chairman Mulvey, and Commissioner Begeman.  Vice Chairman Mulvey dissented with a separate expression.

_____

VICE CHAIRMAN MULVEY, dissenting:

I cannot support the Board's decision to disclaim jurisdiction over the construction of this 230-mile rail line.  The line proposed by AAF is clearly related to the movement of passengers in interstate commerce, and as such, should be subject to regulatory approval by the Board.

In DesertXpress Enterprises, LLC – Petition for Declaratory Order, FD 34914 (STB served May 7, 2010), the Board interpreted 49 U.S.C. § 10501(a) and clarified that it has jurisdiction over passenger rail construction, even if it is between two points in the same state, "as long as it was *related to interstate commerce* -  i.e., performed as part of the interstate rail network." Slip op. at 8 (emphasis added).  The Board rejected arguments that, in order to be part of the "interstate rail network," a passenger line would have to connect to existing freight lines or be part of a line that also served freight shippers.  Instead, the Board found that the phrase "interstate rail network" should be broadly construed "to include (but not be limited to) facilities that are part of the general system of rail transportation and are related to the movement of passengers or freight in interstate commerce." Id. at 11.  While the proposed rail line in DesertXpress crossed state lines and thus presented an easier question for resolution, the Board's statutory interpretations are generally applicable.

Applying this framework, I believe that there are multiple indicia to support a finding that the transportation on this line will be related to interstate commerce.  First, unlike many cases cited in the Board's decision, AAF's proposed line is designed to provide transportation.  This is no "wine train" or a "fun train" – it is intercity transportation covering the entire region of South Florida.  Second, although not necessary for the Board to find jurisdiction, it is noteworthy that the vast majority of the anticipated passenger service will be performed on a newly constructed line within an existing interstate freight rail line right-of-way.  The newly constructed line will carry both AAF's passenger traffic and FECR's freight traffic.

Third, the proposed new line will have a terminus at or near a hub for interstate commerce, the Orlando International Airport.  Thus, it seems designed to capture passengers moving in interstate commerce, in addition to providing transportation for Florida residents moving between points in the state.  Publicly available documents indicate that the airport authority is using the prospect of the AAF line to market the Orlando airport as an emerging

5

"intermodal gateway."[1]  Also, according to AAF's website, the project will provide access to ports in West Palm Beach, Fort Lauderdale and Miami, presumably to capture cruise ship travelers.[2]  Fourth, although AAF asserts that it has "no current plans" to partner with Amtrak or "any other interstate passenger operator" to offer through ticketing, from a business perspective, it is difficult to understand why AAF would not be expected to pursue such arrangements in the future.  Indeed, Amtrak reportedly is considering a realignment of its own South Florida route that would use much of the same FECR line that AAF will use.[3]

Finally, at no point in its application does AAF state that it intends to only market its services inside the state of Florida.  AAF's Vice President describes the line as "an important new transportation option to Floridians *and visitors to Florida*."[4]  One would expect considerable marketing outside the state and on the Internet, as with any business catering to tourists.  At the very least, the proposed AAF service will be a competitive option for out-of-state tourists to Amtrak's interstate service and Florida's busy interstate highways.

With its very narrow view of interstate commerce, the Board errs by relying primarily on Interstate Commerce Commission (ICC) and court decisions that predate the ICC Termination Act of 1995 (ICCTA).  Prior to ICCTA, section 10501(b) expressly stated that the ICC did not have jurisdiction over "the transportation of passengers or property . . . entirely in a State."  Given this statutory prohibition, as the 1982 Magner-O'Hara decision cited by the Board aptly demonstrates, in order to find that a passenger rail line located in one state was nonetheless subject to the agency's jurisdiction, one would have to overcome the "unambiguous exclusion of jurisdiction over transportation entirely in a state" in order to find that a line was somehow "inextricably intertwined with interstate commerce."  692 F.2d at 444 (quotations omitted).  Over the years, the ICC considered various factors to determine whether a passenger line located within one state could meet that high bar, with courts and the agency apparently recognizing that only the exceptional line showing extraordinary links to the freight rail system or Amtrak could do so.

But the statutory exclusion of jurisdiction over passenger lines between two points in the same state was eliminated in 1995.  In ICCTA, Congress provided a "new, explicit statutory

---

[1] *Orlando International Airport Moves Closer to Becoming an Intermodal Gateway*, June 20, 2012 News Release from Greater Orlando Aviation Authority, available at allaboardflorida.com/news-releases.

[2] A rail line located within one state but with stations at airports and ocean ports, thus capturing interstate and international travelers and carrying them up to 200 additional miles, could be characterized as "clearly part of the stream of interstate commerce," as articulated by the Supreme Court in United States v. Yellow Cab Co., 332 U.S. 218, 228 (1947).

[3] *East Coast Passenger Train Venture Waiting on Amtrak*, Sunshine State News, Mar. 31, 2012 (noting that the Florida legislature has passed liability-related legislation favorable to Amtrak's possible route change and citing an Amtrak official's statement that there would be no conflict between the AAF project and an Amtrak route using the FECR line).

[4] V.S. of P. Michael Reininger at 1 (emphasis added).

grant of jurisdiction to the agency over intrastate rail transportation." DesertXpress, slip op. at 9. The goal of this federal jurisdictional expansion was to limit state regulation over intrastate lines that related to interstate commerce. Id. at 10. Despite this clear statutory change, which the agency painstakingly analyzed quite recently, the Board's decision in this case continues to operate as if it is 1985. The statutory expansion cited in DesertXpress seems to have no impact at all. If a 230-mile line that traverses an entire region, starts at an international airport and serves ocean ports, operates over shared interstate freight lines, and may have future synergies with Amtrak is not interstate in nature, I am not sure whether any intrastate line could be found to be within the Board's jurisdiction.

With Congress' unambiguous grant of authority to the Board to regulate single state rail lines that relate to interstate commerce, we no longer need to grapple with whether there are extraordinary connections to interstate commerce sufficient to overcome a statutory exclusion. Rather, if a proposed rail line uses facilities that are in the general system of rail transportation and is related to the movement of passengers in interstate commerce, Congress has determined that the Board should regulate its proposed construction. Because the Board's decision fails to properly apply the statute and our recent precedent, I must dissent.

As an alternative, AAF has given the Board the information necessary to make a determination as to whether the proposed line should be exempted from regulation under our normal criteria. Moreover, because AAF is seeking federal funds for the project via the RRIF program, FRA is in the midst of an environmental review that the Board could join. I believe that examining this project under our exemption process and joining the existing environmental review is the proper course.