# Exhibit 1

FRA Temporary PTC Outage Letter

December 2, 2025

Signed by Brightline VP Michael Lefevre. Confirms Brightline's corridor is used for Freight, Passenger, and Mixed operations. Contradicts Defendants' claim of isolated intrastate status.

**brightline**

Brightline Trains Florida
350 NW 1st Ave, Suite 200
Miami, FL 33128

December 2, 2025

Ms. Carolyn Hayward-Williams
Director, Office of Railroad Systems and Technology
Federal Railroad Administration
1200 New Jersey Avenue SE
Washington, DC 20590

**Subject: Request for Temporary PTC Outage for Emergency Response to Potential Cyber Threat**

Ms. Carolyn Hayward-Williams:

Brightline Trains Florida, LLC ("Brightline") requests a temporary PTC Outage per 49 CFR 236.1021(m)(2)(i). Brightline respectfully requests a temporary, emergency outage from the requirement to operate trains under an active and functioning Positive Train Control (PTC) system after an attempted PTC initialization has failed due to network disruptions on its territory per the PTC Outage request, for a period not to exceed (30) consecutive days, beginning Tuesday 12/2/2025 and ending Thursday 1/1/2026. Brightline will notify FRA prior to the expiration of this period regarding its status and intent to restore normal PTC service or to request an outage extension.

**1. Reason for the PTC Outage Request**

On Monday, November 24, Brightline was notified by Florida DispatchCo and Florida East Coast Railway of a malicious data breach. The nature and extent of the breach are currently being investigated, but there exists the potential that the TMDS (dispatch system) and the back-office servers in Jacksonville and Miami may not function as intended under 49 CFR Part 236 Subpart I. The systems are currently functional with reduced hardware availability. A cybersecurity incident response team is onsite securing connections, closing attack vectors and inspecting the equipment to preserve the remaining data. It is unclear whether additional data loss or encryption will occur. New servers are being commissioned to replace the compromised systems, but this effort will take a period of several weeks. During the interim, Brightline is preparing continuity of operations plans in the event that there is a loss of PTC functionality.

If a back-office system fails preventing Brightline from initializing into PTC at departure with a normally functioning Traffic Control System with ATC, Brightline is requesting a PTC Outage and to operate at 79mph or timetable maximum authorized speed, whichever is less. With the TCS and ATC systems functioning as intended and at a maximum speed of 79mph, no additional safety risks have been identified to the service, passengers, or employees. For avoidance of doubt, please accept this request



as an RFA to the PTC System. There are no software release notes associated with this PTC Outage request.

## 2. Extent of Affected Operations

- Affected line segment: FECR Mainline MP 170.54 to MP 361, FECR Port Lead MP 0.00 to MP 4.51, & Brightline OX MP 0.00 to MP 39.07
- Type of operations: Freight, Passenger, Mixed
- Typical daily movements: BL 40, FECR 14, SFRTA 28
- FECR (host), Brightline (host/tenant), and SFRTA (tenant) have all been notified of the requested PTC Outage

## 3. Safety Mitigations During the PTC Outage Period

To ensure continued safe operation during this temporary period without active PTC enforcement, Brightline will implement the following risk-mitigation protocols:

1. Crews will attempt to initialize PTC and proceed with the trip per 49 CFR Part 236. If a train is unable to initialize PTC, the trip will be restricted to 79mph and will require a normally functioning Traffic Control System with ATC system.
2. Mandatory directives will continue to be issued to train crews per FECR Operating Rules
3. Enhanced communication requirements between train crew and dispatcher at critical points including adhering to Brightline's Speed Limit Action Plan (SLAP)
4. Additional crew briefings on the temporary operating conditions and protections
5. Brightline will continue to operate with 2-person crews (a conductor is always in locomotive cab with the engineer), enhancing verbal communications
6. Use of existing block signals (CTC & ATC Operating Rules)
7. Immediate suspension of operations if the above conditions cannot be satisfied

## 4. Duration and Restoration Plan

Brightline anticipates full PTC functionality will be restored no later than Thursday 1/1/2026, barring unforeseen complications. Florida Dispatch Company technical teams are currently rebuilding a Back Office System, including new servers with identical services and applications to the existing build with enhanced security. Deployment of the new Back Office System will replace all existing potentially compromised hardware due to the data breach.

Once again, all systems are currently operating as intended with limited hardware access, and the parties do not anticipate any disruptions. Brightline submits this PTC Outage request out of an abundance of caution and in order to ensure a shared understanding between FRA and Brightline of a continuity of operations plan.

*www.GoBrightline.com*

**brightline**

Brightline respectfully requests FRA's approval of this temporary PTC Outage to maintain limited but essential operations while ensuring safety through the alternative protections described above.

Sincerely,

Michael Lefevre
Vice President of Operations
Brightline Trains Florida

CC: Jim Donegan, Director of Operations, South Florida Regional Transportation Authority; Brook Hartzog, Chief Operating Officer, Florida East Coast Railway

# Exhibit 2

Florida House Bill 867 (2025)

Codifies Brightline's role as a joint operator in the Coastal Link corridor with FECR and SFRTA.

Establishes a legal framework for shared infrastructure, funding, and liability.

## FLORIDA HOUSE OF REPRESENTATIVES
## BILL ANALYSIS

*This bill analysis was prepared by nonpartisan committee staff and does not constitute an official statement of legislative intent.*

| BILL #: CS/HB 867 | COMPANION BILL: CS/SB 916 (Rodriguez) |
|---|---|
| TITLE: Indemnification and Insurance Obligations of Commuter Rail Transportation Providers | LINKED BILLS: None |
| | RELATED BILLS: None |
| SPONSOR(S): Lopez, V. | |

### Committee References

| Economic Infrastructure 18 Y, 0 N, As CS | > | Civil Justice & Claims 13 Y, 0 N | > | Commerce 24 Y, 0 N |
|---|---|---|---|---|

## SUMMARY

### Effect of the Bill:

The bill establishes the Coastal Link Commuter Rail Service Act. Under the bill, a state, county, municipality, district, authority, or other separate unit of government that has entered into an agreement with Brightline to operate commuter rail service on the Coastal Link corridor may assume indemnification and insurance obligations in certain circumstances. Thus, the bill provides a legal framework for suits involving incidents which arise from commuter rail services along the Coastal Link Corridor.

### Fiscal or Economic Impact:

None.

JUMP TO          SUMMARY          ANALYSIS          RELEVANT INFORMATION          BILL HISTORY

## ANALYSIS

### EFFECT OF THE BILL:

The bill creates s. 343.811, F.S., referred to as the Coastal Link Commuter Rail Service Act. Under the bill, a state, county, municipality, district, authority, or other separate unit of government that has entered into an agreement with Brightline to operate commuter rail service on the Coastal Link corridor may assume indemnification and insurance obligations in certain circumstances. (Section 1).

### Assumption of Obligations

The bill provides that in association with the development or operation of a commuter rail service on the Coastal Link corridor, an agency may assume certain obligations.

The bill states that an agency may assume obligations by contract to protect, defend, indemnify, and hold harmless both Florida East Coast Railway (FECR), Brightline, and either entity's officers, agents, and employees from and against:

- Any liability, cost, and expense, including, but not limited to, the agency's passengers and other rail corridor invitees on the Coastal Link corridor, regardless of whether the loss, damage, destruction, injury, or death is caused in whole or in part by the fault, failure, negligence, misconduct, nonfeasance, or misfeasance of such freight rail operator or Brightline, its successors, or its officer, agents, and employees, or any other person.
- Any loss, injury, or damages incurred by other rail corridor invitees up to a self-insurance retention amount of $5 million with respect to limited covered accidents caused by the agency. (Section 2).

STORAGE NAME: h0867e.COM
DATE: 4/7/2025

1

The bill provides that an agency may not contract to assume liability in any instance that exceeds the following parameters of allocation of risk:

- The agency may be solely responsible for any loss, injury, or damage to the agency's passengers, or rail corridor invitees, third parties, or trespassers, regardless of circumstances or cause, subject to the other provisions of the bill.
- In the event of a limited covered accident caused by FECR or Brightline, the authority of an agency to protect, defend, and indemnify FECR or Brightline for all liability, cost, and expense, including punitive or exemplary damages, in excess of the self-insurance retention amount exists only if FECR or Brightline agrees, with respect to such accident, to protect, defend, and indemnify the agency for the amount of the self-insurance retention amount. (Section 2).

Under the bill, when only one train is involved in an incident, including an incident with trespassers or at-grade crossings, and the train is an agency train, the agency may be solely responsible for any loss, injury, or damage. When only one train is involved in an incident and the train belongs to either FECR or Brightline, the owning entity is solely responsible for any loss, injury, or damage, except for the agency's passengers and other rail corridor invitees, which are the responsibility of the agency. The entity's passengers and other rail corridor invitees are the responsibility of the entity. (Section 2).

The bill states that when an incident involves more than one operator, each operator is responsible for:

- Its property, passengers, employees (excluding employees who are, at the time of the incident, rail corridor invitees of another operator), and other rail corridor invitees.
- Its proportionate share of any loss or damage to the joint infrastructure.
- Its proportionate share of any loss, injury, or damage to rail corridor invitees who are not rail corridor invitees of operators[1] and trespassers or third parties outside the Coastal Link corridor as a result of the incident. (Section 2).

Under the bill, any contractual duty of an agency to protect, defend, indemnify, and hold harmless FECR or Brightline with respect to claims by rail passengers must expressly include a cap which may not exceed $323 million per occurrence, unless legislative approval is provided. This amount must be adjusted in accordance with the federal limitation on rail passenger transportation liability, 49 U.S. Code § 28103, or any successor provision. (Section 2).

The bill states that the liabilities of the agency to the state or any other agency shall be as set forth in an agreement among such entities and limited by s. 768.28(19), F.S. (Section 2).

**Purchase of Insurance**

Additionally, the bill provides that in association with the development or operation of a commuter rail service on the Costal Link corridor, an agency may purchase liability insurance. (Section 2).

Under the bill, if an agency purchases liability insurance, the insured amount may not exceed $323 million per occurrence. This amount will be adjusted in accordance with the aggregate allowable award to all rail passengers, against all defendants, for all claims, including punitive damages, arising from a single accident or incident under the federal limitation on rail passenger transportation liability, 49 U.S. Code § 28103, and any successor provisions. (Section 2).

The bill provides that an agency may also establish a self-insurance retention fund for the purpose of paying the deductible limit for the insurance policies the agency may obtain, including coverage for a county agency, freight rail operators that access the Coastal Link corridor pursuant to a contract with FECR, Brightline, commuter rail service providers, governmental entities, or any ancillary development. The bill provides that any self-insurance retention fund or deductible may not exceed the self-insurance retention amount of $5 million. (Section 2).

---

[1] The bill provides that the agency shall always be responsible for its passengers and its rail corridor invitees regardless of whether the agency was involved in the incident.

The bill states that if an agency elects to purchase liability insurance, such insurance and self-insurance retention fund may provide coverage for all damages, including, but not limited to compensatory, special, and exemplary damages. The insurance and self-insurance retention fund may be maintained to provide adequate funds to cover claims and liabilities for loss, injury, or damage arising out of or connected with the ownership, operation, maintenance, and management of the Coastal Link corridor. (Section 2).

Any self-insured retention account obtained in accordance with the provisions of the bill must be a segregated account of the agency and must be subject to the same conditions, restrictions, exclusions, obligations, and duties included in any and all of the policies of liability insurance purchased under the bill. (Section 2).

**Sovereign Immunity**

The bill provides that the purchase of insurance, the establishment of a self-insurance retention fund, and the assumption by contract to protect, defend, indemnify, and hold harmless may not be deemed a waiver of any defense of sovereign immunity for tort claims or deemed to increase the limits of the agency's liability for tort claims provided under current law. (Section 2).

The bill clarifies that unless specifically provided by law, FECR and Brightline, and their respective officers, agents, and employees, are not officers, employees, or subdivisions of the state and are not entitled to sovereign immunity. (Section 2).

**Definitions Provided Under the Bill**

The bill defines "agency" as a state, county, municipality, district, authority, or other separate unit of government created or established by law which has entered into an agreement with Brightline allowing the government entity to operate commuter rail service on the Coastal link corridor. (Section 2).

Under the bill, "Brightline" means Brightline Trains Florida, LLC, or its successors and assigns, or any of its affiliates that is a party to an agreement with an agency in connection with the Coastal Link corridor. The bill states that for the purposes of its status as an indemnitee, "Brightline" include Florida East Coast Dispatch, LLC. (Section 2).

The bill defines the "Coastal Link corridor" as the rail transit system, including the intercity passenger rail service stations and vehicle maintenance facilities, located on or adjacent to the Florida East Coast Railway (FECR) and Brightline rail corridor in Miami-Dade County, Broward County, and Palm Beach County.[2] (Section 2).

Under the bill, "commuter rail service" means the operation of a train transporting passengers[3] and making frequent stops within urban areas and the immediate suburbs along the rail corridor for the purpose of transporting passengers, including boarding and alighting and the nonrevenue movement of passenger trains for

---

[2] The bill states that the "Coastal Link corridor" includes structures essential to railroad operations, including land, structures, improvements, rights-of-way, easements, rail lines, rail beds, guideway structures, switches, yards, parking facilities, power relays, switching houses, rail stations, any ancillary development, and any other facilities or equipment used for the purpose of construction, operation, or maintenance of a railroad that provides rail service.

[3] The bill states that, with respect to intercity passenger rail service or commuter rail service, "passenger" means a person, ticketed or unticketed, using the rail service on the rail Coastal Link corridor:

- Onboard trains, locomotives, rail cars, or rail equipment employed in such intercity passenger rail service or commuter rail service or boarding or alighting therefrom;
- On or about the Coastal Link corridor for any purpose related to such intercity passenger rail service or commuter rail service, including parking or purchasing tickets therefor and coming to, waiting for, and leaving from locomotives, rail cars, or rail equipment; or
- Meeting, assisting, or in the company of a person described in subparagraph 1. or subparagraph 2.

storage, maintenance, or repairs. The bill states that the term does not include the operation of trains by Brightline transporting passengers in intercity passenger rail service between Brightline stations[4]. (Section 2).

Under the bill, "FECR" means the Florida East Coast Railway, LLC, or its successors and assigns. For the purposes of its status as an indemnitee, the term "FECR" includes Florida East Coast Dispatch, LLC, or its successors and assigns. (Section 2).

The bill defines "intercity passenger rail service" as all passenger service on the Coastal Link corridor other than commuter rail service and is characterized by trains making less frequent stops along the Coastal Link corridor that the commuter rail service makes. (Section 2).

Under the bill, "joint infrastructure" means any portion or segment of the Coastal Link corridor which does not contain tracks or infrastructure designated for the exclusive use of one operator.[5] (Section 2).

"Limited covered accident" is defined in the bill as a collision directly between the trains, locomotives, rail cars, or rail equipment of more than one operator on the Costal Link corridor, where the collision is caused by or arising from the willful misconduct of one of the responsible operators[6], as adjudicated pursuant to a final and unappealable court order, or if punitive damages or exemplary damages are awarded due to the conduct of the responsible operator, as adjudicated pursuant to a final and unappealable court order. (Section 2).

Under the bill, the term "operator" includes:
- Brightline, including any passenger rail operators that access the Coastal Link corridor pursuant to a contract with Brightline, other than an agency;
- FECR, including Amtrak or any freight rail operators that access the Coastal Link corridor pursuant to a contract with FERC;
- An agency, including any commuter rail operators that access the Coastal Link corridor pursuant to a contract with an agency; or
- The South Florida Regional Transportation Authority (SFRTA), with respect to its operation contemplated under s. 343.545, F.S. (Section 2).

The bill defines "proportionate share" as, with respect to a loss, injury, or damage for which operators share responsibility, a percentage in proportion to the number of operators involved in the relevant incident.
- When one or more agencies are jointly operating a commuter rail service, such agencies are considered a single operator for the purposes of computing and assessing the proportionate share.
- When two operators are involved in the incident, each is responsible for one-half of such loss, injury, or damage; when three operators are involved in the incident, each is responsible for one-third, and so on.
- When more than one agency shares responsibility with respect to loss, injury, or damage, each agency is considered a separate entity for purposes of determining its proportionate share. (Section 2).

Under the bill, "rail corridor invitee" means a passenger who is on or about the Coastal Link corridor or a person otherwise present on the Coastal Link corridor at the request of, pursuant to a contract with, or otherwise for the purpose of doing business with or at the behest of an operator. The bill states that this term does not include patrons at any station who are not also passengers, commercial or residential tenants at any station or the developments in and around the stations or their invitees, or third parties performing work at a station or in the Coastal Link corridor, including any utilities or fiber optic companies. The bill further provides that:

---

[4] For the purpose of the "commuter rail service" definition, the bill states that "Brightline stations" means the Brightline-owned intercity passenger rail service stations in Miami located near Aventura, Fort Lauderdale, Boca Raton, and West Palm Beach, as well as any future stations developed by Brightline in connection with its intercity passenger rail service.
[5] Train stations, including, but not limited to, pedestrian bridges, stairs, or conveyance systems, do not constitute part of the joint infrastructure.
[6] The bill states that for the purpose of the definition of "limited covered accident," "responsible operator" means an operator or its subsidiaries, agents, licenses, employees, officers, or directors which has caused a collision as a result of willful misconduct.

- A rail corridor invitee of an agency may not be considered an invitee of Brightline or FECR.
- A rail corridor invitee of Brightline or FECR may not be considered an invitee of an agency.
- An employee of an operator is not a rail corridor invitee of such operator at any time the employee is a passenger or is otherwise present on the Coastal Link corridor at the request of, pursuant to a contract with, or otherwise for the purpose of doing business with or at the behest of another operator.
- When a passenger is transferring from the service of one operator to another, the passenger is a rail corridor invitee of the first operator until the passenger has left the first operator's platform, at which time the passenger is then a rail corridor invitee of the other operator. (Section 2).

The bill reenacts existing law, s. 341.302(17), F.S., for the purpose of incorporating changes made by the bill. (Section 3).

The effective date of the bill is July 1, 2025. (Section 4).

# RELEVANT INFORMATION

## SUBJECT OVERVIEW:

Rail Service in Florida

The Florida Department of Transportation (DOT) must develop and implement a rail program designed to ensure its proper maintenance, safety, revitalization, and expansion to assure its continued and increased availability, and to respond to statewide mobility needs. DOT's statutory rail requirements include:
- Providing the overall leadership, coordination, and financial and technical assistance necessary to assure the effective responses of the state's rail system to mobility needs.
- Promoting and facilitating the implementation of advanced rail systems.
- Developing and administering state standards concerning the safety and performance of rail systems.[7]

Most of Florida's rail mileage is owned by freight railroads. Roughly 60 percent of the rail mileage in the state is owned by CSX Transportation, Inc., (CSX) and Florida East Coast Railway (FECR). The remaining rail mileage in the state is owned by Norfolk Southern Railway, short lines railroads, and the state of Florida.[8]

In 1988, DOT and CSX entered into an agreement whereby DOT purchased approximately 81 miles of CSX track and right-of-way[9] in order to operate commuter rail in South Florida.[10] The commuter rail system, known as Tri-Rail, operates in Miami-Dade, Broward, and Palm Beach counties.[11]

Brightline

Brightline Trains Florida (Brightline) is the only privately owned and operated intercity railroad in the United States.[12] Brightline operates hourly intercity passenger rail service on a 235-mile corridor between Miami and Orlando.[13] Brightline is also actively planning a further extension from Orlando to Tampa.[14] As of July 2024,

---

[7] S. 341.302, F.S.
[8] Florida Rail System Plan, Executive Summary (Nov. 2023) at 3, https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/rail/plans/rail/rail-system-plan-2023/rsp-october-version/fdot_rsp_ch-1_ada-(nov).pdf?sfvrsn=606135b_4 (last visited Mar. 11, 2025).
[9] This is commonly known as the South Florida Rail Corridor. FDOT Florida Freight & Passenger Rail Plan, 2-1 n. 1.; https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/rail/publications/plans/rail/06visionplan/flrail06.pdf?sfvrsn=ce111160_0 (last visited March 12, 2025).
[10] Id. at 5-34.
[11] Tri-Rail System Map, https://www.tri-rail.com/ (last visited March 12, 2025)
[12] Brightline, About Us, https://www.gobrightline.com/about (last visited Mar. 11, 2025).
[13] Florida Rail System Plan, Executive Summary (Nov. 2023) at 5, https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/rail/plans/rail/rail-system-plan-2023/rsp-october-version/fdot_rsp_ch-1_ada-(nov).pdf?sfvrsn=606135b_4 (last visited Mar. 11, 2025).
[14] Id. at 6.

Brightline offers sixteen daily round trips between South Florida and Orlando, departing from the Orlando International Airport and ending in Miami with stops in West Palm Beach, Boca Raton, Fort Lauderdale, and Aventura.[15]

Florida East Coast Railway (FECR)

FECR is a regional railroad in Florida which owns all 351-mile mainline track from Jacksonville to Miami. The railway connects to the national railway system in Jacksonville, allowing it to provide rail service in and out of Georgia, Tennessee, South Carolina, and North Carolina. FECR is the exclusive rail provider for Port Miami, Port Everglades, and Port of Palm Beach.[16]

Coastal Link Commuter Rail Service

Since 2021, DOT and Broward County Transit have been evaluating the implementation of commuter rail along the FECR corridor from Aventura in Miami-Dade County into Broward County. This evaluation is a direct result of a previous study known as the "Coastal Link" that evaluated 85 miles of commuter rail in Miami-Dade, Broward, and Palm Beach counties.[17]

In August 2022, the Broward County Commission adopted a Locally Preferred Alternative for Broward Commuter Rail South (BCR South) to extend commuter rail service on the FECR corridor from Aventura north to Fort Lauderdale. In February 2023, the Broward Metropolitan Planning Organization voted to amend its Metropolitan Transportation Plan to include BCR South as a Priority I project within the fiscally constrained portion of the plan, with project development funding programmed and approved by both Broward County and DOT in 2022.[18]

Miami-Dade County is also studying the implementation of commuter rail service in the FECR corridor from Downtown Miami to Aventura, known as the Northeast Corridor.[19] The Northeast Corridor will establish a new rapid transit route from Miami Central Station in downtown Miami to West Aventura Station, utilizing the existing railroad corridor shared with Brightline and freight rail services. This project will utilize Brightline's existing stations and add five additional stations.[20]

DOT Rail Liability

DOT is authorized to implement a statewide rail program.[21] In the event of an accident in a DOT-owned rail corridor, DOT may assume detailed obligations to specific parties who may be involved.[22] These provisions relate to DOT trains, the National Railroad Passenger Corporation (AMTRAK) trains, and freight trains. DOT may agree to assume the obligations to indemnify and insure, pursuant to s. 343.545, F.S., freight rail service, intercity passenger rail service, and commuter rail service on a DOT-owned rail corridor, whether the ownership is in fee or by easement, or on a rail corridor where DOT has the right to operate.[23]

DOT's duty to indemnify a freight rail operator or Amtrak is capped at $200 million.[24] DOT is required to purchase up to $200 million in liability insurance and establish a self-insurance retention fund to cover

---

[15] Megan Dubois, *Taking the Brightline Train from Orlando to Boca Raton: Here's What It's Like*, Condé Nast Traveler (July 18, 2024), https://www.cntraveler.com/story/brightline-train-orlando-to-boca-raton (last visited Mar. 11, 2025).
[16] Florida East Coast Railway, *Who We Are*, https://fecrwy.com/ (last visited Mar. 11, 2025).
[17] Florida Department of Transportation, *Broward Commuter Rail South*, https://www.fdot.gov/projects/broward-commuter-rail-south/home (last visited March 11, 2025)
[18] *Id.*
[19] *Id.*
[20] Miami-Dade County, Northeast Corridor, https://www.miamidade.gov/global/transportation/smart-plan-northeast-corridor.page (last visited March 11, 2025).
[21] S. 341.302, F.S.
[22] S. 341.302(17), F.S.
[23] S. 341.302(17)(d), F.S.
[24] S. 341.302(17)(a)6., F.S.

any deductible, provided that any parties covered under the insurance must pay a reasonable monetary contribution to cover the cost of the insurance.[25] The self-insurance fund or deductible is capped at $10 million.[26] Neither the purchase of insurance nor the establishment of a self-insurance retention fund constitutes a waiver of sovereign immunity.[27]

## Sovereign Immunity

Sovereign immunity is a principle under which a government cannot be sued without its consent.[28] Article X, section 13 of the Florida Constitution allows the Legislature to waive this immunity. In accordance with article X, section 13 of the Florida Constitution, Florida law allows for suits in tort against the state and its agencies and subdivisions for damages resulting from the negligence of government employees acting in the scope of employment.[29] This liability exists only where a private person would be liable for the same conduct. The waiver of sovereign immunity provided under s. 768.28, F.S., applies only to "injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment."[30]

Section 768.28(5), F.S., caps tort recovery from a governmental entity at $200,000 per person and $300,000 per incident.[31] Although a court may enter an excess judgment, a claimant may not collect more than the caps provide, absent a claim bill passed by the Legislature.[32]

Individual government employees, officers, or agents are immune from suit or liability for damages caused by any action taken in the scope of employment, unless the damages result from the employee's acting in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard for human rights, safety, or property.[33] A government entity is not liable for any damages resulting from actions by an employee outside the scope of his or her employment and is not liable for damages resulting from actions committed by the employee in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard for human rights, safety, or property.[34]

---

[25] *Id.*

[26] S. 341.302(17)(b), F.S.

[27] S. 341.302(17), F.S.

[28] *Sovereign immunity*, Legal Information Institute, https://www.law.cornell.edu/wex/sovereign_immunity (last visited Mar. 7, 2025).

[29] s. 768.28(1), F.S.

[30] *City of Pembroke Pines v. Corrections Corp. of America, Inc.*, 274 So. 3d 1105, 1112 (Fla. 4th DCA 2019) (quoting s. 768.28(1), F.S.) (internal punctuation omitted).

[31] S. 768.28(5), F.S.

[32] *Breaux v. City of Miami Beach,* 899 So. 2d 1059 (Fla. 2005).

[33] S. 768.28(9)(a), F.S.

[34] *Id.*

## Political Subdivisions

A political subdivision is a separate legal entity of the State which usually has specific governmental functions.[35] Section 218.077(2)(f), F.S., defines a political subdivision as a county, municipality, department, commission, district, board, or other public body, whether corporate or otherwise, created by or under state law. Local governments are incorporated by special acts of the Florida Legislature and include counties, municipalities, school districts, and special districts.[36]

Some examples of different types of political subdivisions of the State of Florida include, but are not limited to:

- Cities;
- Counties;
- Municipalities;
- School boards; and
- Special districts established by the Legislature.

## **Federal Limitation on Rail Passenger Transportation Liability**

In the event of conduct giving rise to a claim for damages or liability arising from or in connection with the provision of rail passenger transportation, federal law provides a monetary cap on awards to all rail passengers. Under 49 U.S. Code § 28103, the aggregate allowable award to all rail passengers, against all defendants, for all claims, including punitive damages, arising from a single accident or incident may not exceed $200,000,000.[37] In 2021, this cap was adjusted in accordance with inflation to $322,864,228.[38]

## **Tort Law**

One of the goals of the civil justice system is to redress tortious conduct, or "torts." A tort is a wrong for which the law provides a remedy. Torts are generally divided into two categories, as follows:

- An intentional tort, examples of which include an assault, a battery, or a false imprisonment.
- Negligence, which is a tort that is unintentionally committed. To prevail in a negligence lawsuit, the party seeking the remedy, the "plaintiff," must demonstrate that the:
  - Defendant had a legal duty of care requiring the defendant to conform to a certain standard of conduct for the protection of others, including the plaintiff, against unreasonable risks;
  - Defendant breached his or her duty of care by failing to conform to the required standard;
  - Defendant's breach caused the plaintiff to suffer an injury; and
  - Plaintiff suffered actual damage or loss resulting from such injury.[39]

## Negligence

"Negligence" is the failure to use reasonable care, which is the care that a reasonably careful person would use under like circumstances.[40] Negligence is doing something that a reasonably careful person would not do under like circumstances or failing to do something that a reasonably careful person would do under like circumstances.[41]

---

[35] Social Security Administration, *How to Determine an Entity's Legal Status*, https://www.ssa.gov/section218training/advanced_course_9.htm#3 (last visited Feb. 11, 2025).
[36] Susan A. MacManus, et al, *Politics in Florida*, (4th ed. 2015).
[37] 49 U.S.C. § 28103 (1997).
[38] Adjustment to Rail Passenger Transportation Liability Cap, 86 Fed. Reg. 11571 (Feb. 22, 2021) (amending 49 U.S.C. § 28103).
[39] 6 *Florida Practice Series* s. 1.1; *see Barnett v. Dept. of Fin. Serv.*, 303 So. 3d 508 (Fla. 2020).
[40] 38 Fla. Jur 2d Negligence s. 1.
[41] Fla. Standard Jury Instruction 401.4 at 57.

### Duty of Care

The first of the four elements a plaintiff must show to prevail in a negligence action is that the defendant owed the plaintiff a "duty of care" to do something or refrain from doing something. The existence of a legal duty is a threshold requirement that, if satisfied, "merely opens the courthouse doors."[42] Whether a duty sufficient to support a negligence claim exists is a matter of law[43] determined by the court.[44] A duty may arise from various sources, including:

- Legislative enactments or administrative regulations;
- Judicial interpretations of such enactments or regulations;
- Other judicial precedent; and
- The general facts of the case.[45]

In determining whether a duty arises from the general facts of the case, courts look to whether the defendant's conduct foreseeably created a "zone of risk" that posed a general threat of harm to others—that is, whether there was a likelihood that the defendant's conduct would result in the type of injury suffered by the plaintiff.[46] Such zone of risk defines the scope of the defendant's legal duty, which is typically to either lessen the risk or ensure that sufficient precautions are taken to protect others from the harm the risk poses.[47] However, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, the defendant's conduct must create or control the risk before liability may be imposed.[48]

### Breach of the Duty of Care

The second element a plaintiff must prove is that the defendant "breached," or failed to discharge, the duty of care. Whether a breach occurred is generally a matter of fact for the jury to determine.[49]

### Causation

The third element a plaintiff must prove is that the defendant's breach of the duty of care "proximately caused" the plaintiff's injury. Whether or not proximate causation exists is generally a matter of fact for the jury to determine.[50] Florida follows the "more likely than not" standard in proving causation; thus, the inquiry for the factfinder is whether the defendant's negligence probably caused the plaintiff's injury.[51] In making such a determination, the factfinder must analyze whether the injury was a foreseeable consequence of the danger created by the defendant's negligent act or omission.[52] It is not required that the defendant's conduct must be the exclusive cause, or even the primary cause, of the plaintiff's injury suffered; instead, the plaintiff must only show that the defendant's conduct substantially caused the injury.[53]

---

[42] Kohl v. Kohl, 149 So. 3d 127 (Fla. 4th DCA 2014).
[43] A matter of law is a matter determined by the court, unlike a matter of fact, which must be determined by the jury. Matters of law include issues regarding a law's application or interpretation, issues regarding what the relevant law is, and issues of fact reserved for judges to resolve. Legal Information Institute, *Question of Law*, https://www.law.cornell.edu/wex/question_of_law (last visited March 12, 2025); Legal Information Institute, *Question of Fact*, https://www.law.cornell.edu/wex/Question_of_fact (last visited March 12, 2025).
[44] Kohl, 149 So. 3d at 135; Goldberg v. Fla. Power & Light Co., 899 So. 2d 1110 (Fla. 2005).
[45] Goldberg, 899 So. 2d at 1105 (citing Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182 (Fla. 2003)).
[46] Kohl, 149 So. 3d at 135 (citing McCain v. Fla. Power Corp., 593 So. 2d 500 (Fla. 1992); Whitt v. Silverman, 788 So. 2d 210 (Fla. 2001)).
[47] Kohl, 149 So. 3d at 135; Whitt, 788 So. 2d at 217.
[48] Bongiorno v. Americorp, Inc., 159 So. 3d 1027 (Fla. 5th DCA 2015) (citing Demelus v. King Motor Co. of Fort Lauderdale, 24 So. 3d 759 (Fla. 4th DCA 2009)).
[49] Wallace v. Dean, 3 So. 3d 1035 (Fla. 2009).
[50] Sanders v. ERP Operating Ltd. P'ship, 157 So. 3d 273 (Fla. 2015).
[51] Ruiz v. Tenent Hialeah Healthsystem, Inc., 260 So. 3d 977 (Fla. 2018).
[52] Id. at 981-982.
[53] Id. at 982.

Negligence is a tort that is unintentionally committed. To prevail in a lawsuit for negligence, the plaintiff (the party seeking the remedy) must demonstrate that:

- The defendant had a legal duty of care requiring the defendant to conform to a certain standard of conduct for the protection of others, including the plaintiff, against unreasonable risks;
- The defendant breached his or her duty of care by failing to conform to the required standard;
- The defendant's breach caused the plaintiff to suffer an injury; and
- The plaintiff suffered actual damage or loss resulting from such injury. [54]

Section 95.11(3)(a), F.S., currently provides that general actions against a private citizen or entity founded on negligence are subject to a two-year statute of limitations.

### *Liability*

Liability refers to the legal concept whereby a party is held legally responsible for an action. A person can be held liable based on his or her own actions, inactions, or the actions of people or animals for which he or she is legally responsible for.[55] Generally, once a party to a lawsuit has been found to have been liable, the party will likely be required to pay monetary damages.[56] In certain cases, the party may also be required to complete specific performance of an action; that is, the party may be ordered to fulfill his or her obligations under a contract as closely as possible to what was originally promised in the contract.[57]

In the event multiple parties are legally responsible for the same thing (i.e. liable), ch. 768, Florida Statutes, provides that each party's individual responsibility will be determined based on the comparative fault of each liable party. That is, a percentage of fault will be assigned to each liable party and the damages will be split between the parties based upon the percentage of fault that was attributed to the respective party.

## **Damages**

### *Compensatory Damages*

Actual damages, also called compensatory damages, are damages the plaintiff actually suffered as the result of the injury.[58] Juries award compensatory damages to compensate an injured person for a defendant's negligent acts.[59] Compensatory damages consist of both:

- "Economic damages," which typically consist of financial losses that can be easily quantified, such as lost wages, the cost to replace damaged property, or the cost of medical treatment; and
- "Non-economic damages," which typically consist of nonfinancial losses that cannot be easily quantified, such as pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, and loss of the capacity to enjoy life.[60]

### *Punitive or Exemplary Damages*

In certain limited situations, a court may also award "punitive damages," the purpose of which is to punish a defendant for bad behavior and deter future bad conduct, rather than to compensate the plaintiff for a loss.[61] Punitive damages are sometimes referred to as "exemplary damages," but both terms convey the same idea; that is,

---

[54] 6 *Florida Practice Series* s. 1.1; *see Barnett v. Dept. of Fin. Serv.*, 303 So. 3d 508 (Fla. 2020).

[55] Cornell Law School, Legal Information Institute, *Liability*, https://www.law.cornell.edu/wex/liability (last visited March 21, 2025).

[56] *Id.*

[57] *Id.*

[58] *Birdsall v. Coolidge*, 93 U.S. 64 (1876).

[59] *St. Regis Paper Co. v. Watson*, 428 So. 2d 243 (Fla. 1983).

[60] *Cf.* s. 766.202(8), F.S.

[61] *See* ss. 768.72, 768.725, and 768.73, F.S. (providing standards and requirements for awarding punitive damages).

extra damages awarded beyond that actually incurred by the plaintiff.[62] Under Florida Law, an award of punitive damages generally may not exceed three times the value of the compensatory damages awarded, or $500,000.[63] In order to be awarded punitive damages, a plaintiff must prove by clear and convincing evidence that he or she is entitled to such (the burden of proof for a determination of regular, non-punitive damages is by the greater weight of the evidence, which is a lower burden than clear and convincing evidence).[64]

**OTHER RESOURCES:**

Florida Department of Transportation, Florida Rail System Plan (2023).

## BILL HISTORY

| COMMITTEE REFERENCE | ACTION | DATE | STAFF DIRECTOR/ POLICY CHIEF | ANALYSIS PREPARED BY |
|---|---|---|---|---|
| Economic Infrastructure Subcommittee | 18 Y, 0 N, As CS | 3/12/2025 | Keating | Bauldree |
| THE CHANGES ADOPTED BY THE COMMITTEE: | Clarifies that Florida East Coast Railway and Brightline, and their respective officers, agents, and employees, are not entitled to sovereign immunity, unless specifically provided by law. | | | |
| Civil Justice & Claims Subcommittee | 13 Y, 0 N | 3/27/2025 | Jones | Mathews |
| Commerce Committee | 24 Y, 0 N | 4/7/2025 | Hamon | Bauldree |

----------------------------------------------------------------------
**THIS BILL ANALYSIS HAS BEEN UPDATED TO INCORPORATE ALL OF THE CHANGES DESCRIBED ABOVE.**
----------------------------------------------------------------------

[62] Cornell Law School, *Exemplary Damages*, https://www.law.cornell.edu/wex/exemplary_damages (last visited March 23, 2025).

[63] S. 768.73, F.S. provides for an increased limit to punitive damages under certain situations such as motivation or intent of the defendant.

[64] S. 768.725, F.S.

# Exhibit 3

Declaration of Darren J. Brown, Jr.

Sworn under 28 U.S.C. § 1746. Describes firsthand experiences of physical danger, Brightline safety violations, and denied FMLA leave following a PTSD diagnosis. Supports FELA and FMLA claims.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Darren J. Brown, Jr.,

    Plaintiff,

v.

Brightline Trains Florida LLC and Fortress Investment Group LLC,

    Defendants.

Case No. 9:25-cv-81571-BER

## DECLARATION OF DARREN J. BROWN JR.

### (Pursuant to 28 U.S.C. § 1746)

1. I, Darren J. Brown Jr., declare under penalty of perjury that the following is true and correct:

2. I am over the age of 18 and competent to make this declaration. I was employed by Brightline Trains Florida LLC from August 2017 through December 2023 as a conductor. I submit this declaration based on my personal knowledge.

3. During my employment at Brightline, I was directly involved in multiple fatal train strikes in which trains I was operating or assigned to struck pedestrians or vehicles. After such incidents, I was routinely instructed by supervisors to exit the train and walk along active tracks to confirm

fatalities or assess the scene. These duties were carried out before the area was secured by emergency responders. I was not provided protective equipment or decontamination support.

4. In one incident where I was the conductor on the train that struck the individual, I later became aware that a second Brightline train was cleared through the same crash site while emergency personnel were still present in the right-of-way. I was required to visually inspect the damage and report back to the Operations Control Center. At no time was I offered counseling, psychological support, or formal trauma relief following these events.

5. In 2023, I was diagnosed with work-related post-traumatic stress disorder (PTSD) by a licensed mental health clinician under contract with Brightline. I subsequently submitted a request for leave under the Family and Medical Leave Act (FMLA), but Brightline did not approve or process the request. Following this, I experienced adverse treatment and pressure from management.

6. I am aware that the Federal Railroad Administration (FRA) issued multiple civil penalties against Brightline for violations of federal safety regulations. These include four violations of 49 C.F.R. Part 219 for failing to conduct required post-accident drug and alcohol testing, three violations under Part 234 for grade crossing signal defects, two violations under Part 236 for signal and train control inspection failures, and one violation under Part 225 for failure to report a qualifying accident. One signal system violation in 2020 (Case No. BLF 2020-001(SI)) resulted in a civil penalty of $29,192. These enforcement findings are publicly available in FRA enforcement reports.

7. I am also aware that Brightline operates on a shared-use corridor with freight and commuter rail service. Specifically, Brightline shares infrastructure with the South Florida Regional

Transportation Authority (Tri-Rail) and Florida East Coast Railway. Contrary to public claims by Brightline representatives, including those made in sworn declarations, Brightline's operations are not isolated.

8. I submit this declaration to provide factual context regarding my experience and knowledge as a former employee. All statements herein are based on firsthand knowledge or publicly available regulatory records.

Executed on January 23, 2026.

Darren J. Brown Jr.

931 Village Blvd, Suite 905-438

West Palm Beach, FL 33409

(708) 705-3214

DarrenBrown@advantagefc.com

# Exhibit 4

FRA Civil Penalties Issued to Brightline (2019-2024)

Summarized from official Federal Railroad Administration enforcement reports confirming regulatory violations by Brightline under Parts 219, 225, 234, and 236.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Darren J. Brown, Jr.,**
    Plaintiff,

v.

**Brightline Trains Florida LLC and Fortress Investment Group LLC,**
    Defendants.

**Case No. 9:25-cv-81571-BER**

**Exhibit 4**
**FRA Civil Penalties Issued to Brightline (2019–2024)**
*Summarized from official FRA enforcement records*

1. **March 25, 2020 – Case No. BLF 2020-001(SI)**
   Violation of 49 C.F.R. Part 236.
   Brightline failed to conduct required daily or pre-departure signal system inspection and testing under §236.586. These inspections are essential for ensuring safe train control operations.
   **Penalty:** $29,192

2. **August 10, 2021 – Case No. BLF 2019-002(GC)**
   Violation of 49 C.F.R. Part 234.
   Brightline failed to report or correct a grade crossing warning system activation failure, in violation of §234.9.
   **Penalty:** $4,250

3. **August 10, 2021 – Case No. BLF 2019-003(GC)**
   Violation of 49 C.F.R. Part 234.
   Repeat grade crossing signal defect involving maintenance or reporting under §234.9.
   **Penalty:** $4,250

4. **August 10, 2021 – Case No. BLF 2021-001(GC)**
   Violation of 49 C.F.R. Part 234.
   Brightline failed to address a grade crossing signal system issue as required under

§234.9.
**Penalty:** $4,250

5. **May 24, 2023 – Case No. BLF 2023-001(AD)**
   Violation of 49 C.F.R. Part 219.
   Brightline failed to conduct a post-accident drug and alcohol test following a qualifying accident, as required by §219.201 and §219.203.
   **Penalty:** $2,500

6. **May 23, 2023 – Case No. BLF 2023-002(AD)**
   Violation of 49 C.F.R. Part 219.
   Brightline failed to test an employee after a qualifying train incident in violation of §219.201.
   **Penalty:** $2,500

7. **May 3, 2024 – Case No. BLF 2023-003(AD)**
   Violation of 49 C.F.R. Part 219.
   Brightline did not conduct the required toxicology testing after a crash, violating FRA post-accident protocols.
   **Penalty:** $4,500

8. **May 3, 2024 – Case No. BLF 2023-004(AD)**
   Violation of 49 C.F.R. Part 219.
   A fourth failure to perform post-accident testing, reinforcing a pattern of noncompliance with §219.201.
   **Penalty:** $4,500

9. **June 2019 – Case No. BLF 2019-001(AR)**
   Violation of 49 C.F.R. Part 225.
   Brightline failed to report a qualifying accident or incident to FRA in violation of §225.11.
   **Penalty:** $2,000

10. **April 15, 2024 – Case No. BLF 2024-001(SI)**
    Violation of 49 C.F.R. Part 236.
    Brightline again failed to inspect or maintain its train control system as required by §236.586 — a repeat violation.
    **Penalty:** $2,000