UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:25-cv-81571-BER

DARREN J. BROWN,
Plaintiff,

v.

BRIGHTLINE TRAINS FLORIDA LLC,
and
FORTRESS INVESTMENT GROUP LLC,

Defendants.

_____/

**PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

**EXHIBIT A**

**PROPOSED AMENDED COMPLAINT**

Submitted by:

Darren J. Brown
Plaintiff, Pro Se
931 Village Blvd., Suite 905-438
West Palm Beach, Florida 33409
Email: darrenbrown@advantagefc.com

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:25-cv-81571-BER**

**DARREN BROWN,**

 **Plaintiff,**

**v.**

**BRIGHTLINE TRAINS FLORIDA LLC,**

 **and**

 **FORTRESS INVESTMENT GROUP LLC,**

**Defendants.**

_____/

**AMENDED COMPLAINT**

**Plaintiff Darren Brown, proceeding pro se, alleges:**

## I.  JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

1. This action arises under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

1

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 45 U.S.C. § 56, which provides for concurrent jurisdiction in federal district courts over FELA claims.

**B. FELA Common Carrier Status – Brightline Trains Florida LLC**

3. At all relevant times, Defendant Brightline Trains Florida LLC ("Brightline") was a common carrier by railroad engaged in interstate commerce within the meaning of 45 U.S.C. § 51.

4. Brightline operates a federally regulated passenger rail system subject to oversight by the Federal Railroad Administration ("FRA"). Brightline has applied for and received federal financial assistance and federally authorized financing instruments administered through agencies of the United States Department of Transportation.

5. Although Brightline's rail corridor is physically located within Florida, its operations form part of a continuous channel of interstate commerce by transporting passengers connecting to interstate and international travel hubs, including commercial airports serving interstate and international routes. Brightline operates within a nationally regulated rail system subject to federal authority

**C. Personal Jurisdiction – Fortress Investment Group LLC**

6. This Court has personal jurisdiction over Defendant Fortress Investment Group LLC ("Fortress") pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, because Fortress purposefully directed activities toward the State of Florida through its governance

authority, financial oversight, and capital allocation control relating to the Brightline rail enterprise operating within this District.

7. Upon information and belief, Fortress exercised sponsor-level governance authority through Brightline Holdings LLC and affiliated entities, which functioned as the parent-level strategic and financial control structure for Brightline Trains Florida LLC. Public financing disclosures, bond-related materials, and offering documents reflect centralized authority over capital deployment, infrastructure expenditures, enterprise risk management, and other major financial commitments affecting rail operations conducted in Florida, indicating that such decisions were subject to approval above the local operating-subsidiary level.

8. Those same disclosures reflect a multi-entity enterprise structure in which capital funding, operational financing, and resource allocation were coordinated through parent-level and affiliated entities rather than solely by the local operating railroad. Upon information and belief, Fortress maintained authority over capital allocation, infrastructure funding, and enterprise-level decision-making affecting Brightline operations, including decisions bearing on staffing, safety-related expenditures, and operational priorities.

9. Publicly produced excess liability policies for the relevant period were procured at the holdings or enterprise level, naming Brightline Holdings LLC or predecessor Brightline holding-company entities as named insureds rather than Brightline Trains Florida LLC alone, and extending additional insured coverage or affiliate-based coverage through enterprise-level policy structures.

3

**D. Venue**

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Palm Beach County, Florida.

11. Venue is further proper pursuant to 45 U.S.C. § 56 because Defendant Brightline does business in this District and maintains substantial rail operations within the Southern District of Florida.

## II. PARTIES

12. Plaintiff, DARREN J. BROWN, JR., is a resident of the State of Florida. From approximately August 2017 through December 2023, Plaintiff was employed by Defendant Brightline Trains Florida LLC as a railroad conductor engaged in safety-sensitive rail operations.

13. Defendant, BRIGHTLINE TRAINS FLORIDA LLC ("Brightline"), is a limited liability company authorized to conduct business in the State of Florida and operates intercity passenger rail service over the Florida East Coast Railway corridor.

14. At all relevant times, Brightline functioned as a common carrier by railroad engaged in interstate commerce, operating over rail infrastructure utilized for freight and passenger operations and subject to federal railroad safety regulations.

15. Defendant, FORTRESS INVESTMENT GROUP LLC ("Fortress"), is an investment management firm that, upon information and belief, exercised ownership, governance,

4

and operational oversight through Brightline Holdings LLC and affiliated entities within the Brightline rail enterprise.

16. Public financing documents further reflect that the Brightline enterprise operates pursuant to indentures, loan agreements, security documents, and guaranty arrangements governing the allocation of capital, repayment obligations, and operational funding. These agreements impose centralized financial controls and conditions affecting the allocation of resources necessary for rail operations, including infrastructure investment, staffing, and safety-related expenditures.

## III. FACTUAL ALLEGATIONS

### A. Brightline's High-Speed Urban Operations

17. During Plaintiff's employment from approximately 2018 through late 2023, Brightline operated passenger trains at speeds approaching 79 miles per hour through densely populated urban corridors containing numerous at-grade crossings.

18. These corridors included areas in Palm Beach County and surrounding municipalities where pedestrian trespass and vehicle incursions were recurrent.

19. During Plaintiff's tenure, the corridor experienced a repeated pattern of pedestrian-versus-train and vehicle-versus-train fatal incidents.

20. These incidents were publicly reported and investigated by law enforcement and regulatory authorities.

21. The frequency and speed of these incidents made the risk of catastrophic strike events foreseeable.

5

### B. Plaintiff's Direct Exposure to High-Speed Fatal Impacts

22. As a conductor, Plaintiff was assigned to trains operating through the same high-risk corridor where repeated pedestrian strike fatalities occurred during his tenure.

23. In one documented incident (Case No. 11-1812-003981), Plaintiff served as the conductor aboard a Brightline train traveling approximately 78 miles per hour at the time of a pedestrian strike.

24. In the Dennis Lee Conrad incident, official medical examiner records state that, due to a communication error while investigators and police personnel were still on the tracks conducting the scene investigation, a second Brightline train suddenly approached at approximately 79 miles per hour before the decedent's body had been removed from within the rail gauge, requiring personnel to immediately get off the tracks and resulting in the body being run over by the second train. The same record further reflects that Brightline requested permission to release the first train southbound, and that law enforcement agreed to release it.

25. Following emergency braking in strike events, Plaintiff was directed by supervisory personnel, consistent with Brightline operating procedures, to exit the locomotive and enter the track area to perform required post-incident duties. These duties included visual inspection of the locomotive and rail area, communication with dispatch, coordination with law enforcement and emergency responders, and confirmation of track conditions.

26. Plaintiff was not merely a witness to these incidents. As a train conductor, Plaintiff was required to serve as the on-scene incident commander following fatal and catastrophic

6

collisions. In this role, Plaintiff was responsible for controlling the accident scene, coordinating with emergency responders, ensuring passenger safety, and directing operational decisions while physically present within active and hazardous environments. Plaintiff could not withdraw from these hazardous conditions without abandoning his assigned operational responsibilities, requiring him to remain within dangerous environments despite ongoing risks.

27. Plaintiff did not have the ability to decline or delay entry into the track area without violating operational rules and abandoning required safety responsibilities. Plaintiff was required to enter and remain within hazardous environments as part of his assigned duties, despite the presence of ongoing and uncontrolled risks.

28. Plaintiff was required to remain within hazardous post-collision environments for extended periods, including areas involving burning vehicles, active fire conditions, shattered glass, exposed metal fragments, and unstable wreckage. These environments presented immediate risks of burns, lacerations, puncture wounds, and crushing injuries. Plaintiff was required to physically traverse these areas on foot without protective equipment or hazard mitigation measures.

29. Plaintiff was not permitted to remain inside the locomotive during these procedures.

30. These assignments required Plaintiff to physically dismount onto active rail infrastructure immediately following high-speed impact events. The strike locations remained on mainline track segments used for continuing rail operations.

31. Plaintiff was routinely required to walk through areas containing human blood, bodily fluids, and biological remains following fatal incidents. Despite this exposure, Brightline failed to provide personal protective equipment, biohazard containment measures, or

7

decontamination protocols. This exposure created a direct risk of physical injury through transmission of bloodborne pathogens and infectious disease, a recognized occupational hazard under 29 C.F.R. § 1910.1030, and constituted an unsafe working condition involving biological contamination.

32. Plaintiff's required entry into the track area following strike events placed him within the immediate zone of physical danger, including exposure to active mainline tracks without confirmed dispatcher protection, absence of physical barriers or flagging, and proximity to adjacent track movements where trains could and did continue operating at speed. These conditions created a direct and immediate risk of being struck by passing trains, rail equipment, or debris, constituting a recognized risk of serious bodily injury or death.

33. At all relevant times, Plaintiff was required to remain on or immediately adjacent to active railroad tracks that were not fully secured or taken out of service. Plaintiff was not provided confirmation of track authority protection, was not shielded by dedicated flagging personnel, and was exposed to ongoing train movements and uncontrolled hazards. This exposure placed Plaintiff in a position where a collision or secondary incident could occur without warning, creating an immediate threat of physical harm.

34. Regarding the incident involving Dennis Lee Conrad, Plaintiff was the conductor aboard the Brightline train that struck the decedent. Following the strike, Plaintiff was required to remain at the incident scene to perform post-incident duties while the scene remained active and unsecured. During this period, Brightline authorized a second Brightline train to traverse the same corridor at speed while Plaintiff and emergency personnel were physically occupying the foul of the track. This authorization was contrary to Restricted

8

Speed requirements under GCOR 6.27, which require movement at a speed permitting a train to stop within half the range of vision short of men or equipment fouling the track. Brightline's failure to protect the scene was further inconsistent with federal safety standards governing adjacent track protection, including 49 C.F.R. § 214.336, which recognize the danger of train movements in proximity to ground personnel. The movement of the second train through the unsecured scene forced first responders and investigators to take immediate evasive action to avoid being struck and resulted in the decedent's remains being run over a second time. Brightline failed to implement a block or speed restriction while Plaintiff and emergency personnel were within the foul of the track, exposing Plaintiff to a direct and immediate risk of serious bodily injury or death.

35. At each of the incidents described herein, Plaintiff was not merely a witness but was physically present within active rail corridors and hazardous environments where he faced immediate risks of bodily harm, including the risk of being struck by trains, injured by debris, or exposed to dangerous conditions.

36. The conditions present at post-collision scenes included active train movement, live rail corridors, fire hazards, unstable wreckage, sharp debris, and biological contamination. These conditions collectively exposed Plaintiff to immediate risks of serious bodily injury or death, including being struck by trains, burned, cut, crushed, or exposed to hazardous substances.

## C. Repeated Traumatic Exposure and Cumulative Risk

9

37. During approximately five years of employment, Plaintiff was directly involved in over ten (10) separate train-versus-pedestrian and train-versus-vehicle strike incidents occurring along Brightline's South Florida corridor.

38. Each of these incidents required Plaintiff to enter active rail corridors and hazardous post-collision environments, exposing him on multiple occasions to immediate risks of physical injury, including being struck by trains, encountering unstable wreckage, and exposure to dangerous conditions.

39. These incidents were not isolated events but part of a recurring operational pattern involving high-speed pedestrian and vehicle strikes along the same corridor.

40. Plaintiff's occupational duties required him to operate through locations associated with prior fatal strike events and to participate in mandatory post-incident procedures following catastrophic impacts.

41. The incidents included intentional pedestrian strike events and high-speed vehicle-versus-train collisions occurring at or near at-grade crossings.

42. Plaintiff initially continued performing his assigned duties without formal mental health treatment despite repeated exposure to these traumatic events.

43. By October 2023, Plaintiff reported escalating psychological symptoms, including hypervigilance, avoidance behaviors, anxiety while driving, irritability, sleep disturbance, and impaired concentration.

44. During clinical assessment, Plaintiff scored a 56 on the PTSD Checklist for DSM-5 (PCL-5), well above the clinical threshold for PTSD diagnosis.

45. Plaintiff was formally diagnosed with Chronic Post-Traumatic Stress Disorder (F43.12).

10

46. Plaintiff also reported that a subsequent work assignment significantly increased operational demands, resulted in more "close calls," and reduced recuperation time between critical incidents, further exacerbating symptoms.

47. The cumulative and repetitive nature of Plaintiff's occupational trauma exposure contributed materially to the development and progression of his diagnosed PTSD.

### D. Objective PTSD Diagnosis and Medical Necessity

48. On October 5, 2023, Plaintiff underwent a comprehensive clinical evaluation conducted by Anthony Gonzalez, LCSW, at Alere Emotional Health LLC.

49. During the intake assessment, Plaintiff reported experiencing multiple critical incidents in his role as a railroad conductor, including observing pedestrian fatalities and serious vehicle collisions.

50. Plaintiff reported involvement in over ten (10) such critical strike incidents within the preceding five years.

51. Plaintiff endorsed escalating symptoms including hypervigilance, elevated anxiety while driving, avoidance behaviors, irritability, restlessness, nightmares, impaired concentration, and physiological reactivity to trauma reminders.

52. Plaintiff completed the PTSD Checklist for DSM-5 (PCL-5) and scored a total of 56.

53. A PCL-5 score of 31–33 or higher suggests the presence of PTSD and the need for clinical intervention; Plaintiff's score of 56 substantially exceeded that threshold.

11

54. Plaintiff also completed standardized anxiety and depression screening instruments, including the GAD-7 (score: 10, indicating moderate anxiety) and the PHQ-9 (score: 8, indicating mild depressive symptoms).

55. On October 5, 2023, Anthony Gonzalez, LCSW, documented that Plaintiff scored 56 on the PCL-5 and reported elevated anxiety while driving or riding in cars, hypervigilance, avoidance, nightmares, irritability, and concentration problems after more than ten critical incidents at work over five years. Gonzalez further documented that Plaintiff's new work assignment significantly exacerbated these symptoms by increasing "close calls" and allowing far less recuperation time.

56. Based upon clinical evaluation and DSM-5-TR criteria, Plaintiff was formally diagnosed with F43.12 Post-Traumatic Stress Disorder, Chronic.

57. The clinician documented that Plaintiff's occupational exposure to repeated railroad strike fatalities materially contributed to the development and escalation of his PTSD symptoms.

58. A formal treatment plan was initiated, including trauma-focused interventions such as Prolonged Exposure Therapy, Cognitive Processing Therapy, EMDR, and related therapeutic modalities.

59. The clinician certified that the services were medically necessary and appropriate for Plaintiff's diagnosed condition.

**E. Regulatory Notice and Foreseeability**

60. During Plaintiff's employment from approximately 2018 through late 2023, Brightline operated passenger trains at speeds approaching 79 miles per hour along the Florida East

Coast Railway corridor through densely populated municipalities in South Florida containing numerous at-grade crossings.

61. During this period, the corridor experienced a recurring pattern of pedestrian-versus-train and vehicle-versus-train fatal incidents that were publicly reported and investigated by law enforcement authorities.

62. Official law-enforcement and medical-investigator records identify Plaintiff by name as the conductor or involved train crew member in multiple separate fatality investigations during his Brightline employment, including the David Ulmer, Gregory Williams, Jose Roibal, and Dennis Lee Conrad incidents.

63. Throughout Plaintiff's tenure, Brightline was subject to enforcement authority by the Federal Railroad Administration ("FRA") and received civil penalties for violations of federal railroad safety regulations.

64. FRA enforcement records during the relevant period reflect violations including, but not limited to:

65. (a) 49 C.F.R. Part 219 (post-accident toxicological testing requirements), which governs mandatory testing procedures following qualifying train accidents involving fatalities; and

66. (b) 49 C.F.R. Part 225 (railroad accident and incident reporting requirements), which governs mandatory reporting and documentation of accidents involving injury or death.

67. These enforcement actions concerned compliance obligations directly triggered by catastrophic strike events and placed Brightline on formal regulatory notice regarding deficiencies in post-incident procedures and safety-related administrative controls.

13

68. In the official securities disclosure entitled "Revenue Bonds, Brightline Florida Passenger Rail Expansion Project, Series 2025B," the offering document acknowledged that the operation of high-speed passenger trains through densely populated corridors with at-grade crossings presents ongoing risks of trespasser incursions, vehicle collisions, fatalities, service disruptions, and liability exposure.

69. The disclosure further reflects that such incidents are inherent operational risks associated with the design and execution of the rail system, demonstrating that catastrophic strike events were foreseeable and anticipated as a recurring consequence of the operating environment, rather than isolated or unpredictable occurrences.

70. The same disclosures acknowledge that the Project Owner has limited operating history and financial uncertainty associated with passenger rail operations, further underscoring that operational risks, including safety-related incidents, were known and inherent to the system at the time of Plaintiff's employment.

71. That offering document further disclosed that strike incidents could materially affect operations and finances, reflecting institutional awareness that such events were recurring operational hazards rather than isolated anomalies.

72. During the relevant period, Brightline pursued and implemented safety mitigation initiatives, including fencing installation, crossing improvements, and federally supported safety funding measures aimed at reducing corridor fatalities.

73. Upon information and belief, similar catastrophic incidents had previously resulted in injuries to other Brightline conductors and crew members, including injuries requiring extended medical treatment and hospitalization. Despite knowledge of these prior

14

incidents and hazardous post-collision conditions, Brightline failed to implement adequate safety protocols or modify operational practices.

74. Despite this institutional awareness of recurring high-speed fatal strike events, Brightline required train crews, including Plaintiff, to dismount locomotives following catastrophic impacts, conduct mandatory post-incident inspections in active rail corridors, visually assess damaged equipment in proximity to wreckage and remains, and resume service operations without implementation of enhanced mitigation protocols addressing cumulative trauma exposure.

75. Brightline did not modify operational procedures to reduce crew proximity to fatal scenes, did not implement structured extended relief periods following catastrophic incidents, and did not establish systematic cumulative trauma monitoring for train crews despite the documented recurrence of fatal strike events along the corridor.

76. In light of the frequency of high-speed strike fatalities, FRA enforcement actions under Parts 219 and 225, public scrutiny, the disclosures contained in the Revenue Bonds, Brightline Florida Passenger Rail Expansion Project, Series 2025B offering, and ongoing mitigation initiatives, the risk of repeated catastrophic exposure to train crews — and the resulting psychological injury — was reasonably foreseeable to Brightline during Plaintiff's employment.

**F. Failure to Provide a Reasonably Safe Workplace**

15

77. Under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., Brightline owed Plaintiff a non-delegable duty to provide a reasonably safe workplace and to protect employees from foreseeable risks of harm arising out of their employment.

78. Brightline knew, or should have known, from public incident reports, internal operations, and regulatory oversight, that repeated exposure to catastrophic strike events in an urban, at-grade corridor at near-maximum authorized operating speeds created a significant risk of both physical and psychological injury to train crews.

79. Brightline regularly operated trains at approximately 79 miles per hour through densely populated corridors with frequent at-grade crossings. During Plaintiff's employment, multiple publicly reported pedestrian and vehicle strike fatalities occurred along these same operational routes in Broward County and Palm Beach County.

80. Despite this pattern of recurring fatal incidents, Brightline failed to implement structured mandatory recovery or decompression periods for train crews following catastrophic strike events. Instead, crews like Plaintiff were routinely required to resume operational duties immediately or within short intervals after exposure to multiple traumatic scenes, without mandated rest, rotation, or cumulative exposure limits.

81. Brightline did not establish or enforce consistent deployment of replacement or relief crews following fatal impact incidents, resulting in crews being required to continue service despite recent exposure to traumatic events. This practice departed from safety norms in other high-risk transportation sectors where crew rotation and recovery are standard.

82. Although Brightline provided access to contracted mental health resources, it failed to adopt and implement a proactive, structured **Critical Incident Stress Management**

**(CISM)** program or other standardized psychological risk mitigation protocols calibrated to the frequency, severity, and cumulative nature of fatal strike exposures experienced by operating crews.

83. Rail industry guidance and federal safety advisories (including those recognized by the Federal Railroad Administration) encourage structured post-incident psychological support and extended recovery relief for crews exposed to repeated fatal events. Brightline did not adopt such structured mitigation measures proportional to the recurrent fatal strike incidents along its corridors.

84. Brightline did not develop protocols to limit cumulative trauma exposure, such as crew rotation away from high-frequency strike corridors, mandatory psychological assessments after multiple incidents, incremental relief thresholds, peer support structures, or mandatory extended leave options for employees with repeated fatal exposure.

85. Brightline did not establish cumulative trauma monitoring standards, did not require extended psychological recovery intervals following multiple strike exposures, and did not adjust training or operational assignments to mitigate continuous exposure to fatal incidents, despite documented recurrence and obvious correlation between such exposures and psychological impairment.

86. Brightline's failure to adopt operational protocols tailored to cumulative trauma — including but not limited to structured rest and recovery periods, crew rotation, mandatory post-incident psychological evaluation with duty release, and extended post-incident relief policies — departed from the standard of care reasonably required of a common carrier under FELA.

17

87. Brightline's operational omissions disproportionately exposed Plaintiff to repeated catastrophic fatal events without proportionate safeguards, directly heightening his risk of psychological injury.

88. As a direct and reasonably foreseeable consequence of these operational omissions, Plaintiff experienced repeated exposure to fatal strike scenes and traumatic events without adequate mitigation or recovery mechanisms, contributing materially to the development and chronic progression of his Post-Traumatic Stress Disorder. The pattern, frequency, and severity of these incidents were repeated along the same operational corridor during Plaintiff's employment, requiring protective measures commensurate with the risk.

89. The cumulative effect of these failures was a repeated pattern of workplace practices that exposed Plaintiff to the same hazardous conditions across multiple incidents during the relevant period.

### G. FMLA Request and Constructive Discharge

90. At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act.

91. Plaintiff's chronic PTSD constituted a "serious health condition" under 29 U.S.C. § 2611.

92. Before Plaintiff's formal PTSD leave request, Brightline managers denied at least one requested mental-health day due to manpower, reflecting that staffing concerns were being prioritized over psychological recovery time.

93. In October 2023, following formal diagnosis, Plaintiff notified Brightline of his need for medical leave due to PTSD.

18

94. Clinical records confirm ongoing treatment and medical necessity.

95. Brightline failed to provide required eligibility and rights notices under 29 C.F.R. § 825.300.

96. Brightline continued to schedule Plaintiff for work and required him to report for duty despite knowledge of his medical condition and pending leave request.

97. In late September and early October 2023, Plaintiff communicated with treating clinician Anthony Gonzalez regarding leave and assessment for work-related PTSD. Gonzalez advised Plaintiff that leave requests are not approved immediately and are typically processed retrospectively, and after Plaintiff reported that Brightline was still scheduling him and attempting to force his return to work, Gonzalez confirmed that he had already informed Bridgette that FMLA leave was appropriate and that the assessment and paperwork were in progress.

98. Rather than facilitating protected leave, Brightline imposed conditions that rendered continued employment untenable.

99. Plaintiff was forced to separate from employment, constituting constructive discharge.

## IV. FORTRESS CONTROL, INSTRUMENTALITY, AND ALTER-EGO ALLEGATIONS

100. Publicly produced excess liability insurance for the relevant period was procured at the Brightline holdings or enterprise level, naming Brightline Holdings LLC or related holding-company entities as the Named Insured and extending coverage to subsidiaries and affiliated entities whose financial results were consolidated under U.S. Generally

19

Accepted Accounting Principles ("GAAP"). The policy's definition of "Insured" included such consolidated subsidiaries or affiliates, reflecting enterprise-level risk management and liability protection structured above Brightline Trains Florida LLC rather than procured independently by the operating railroad.

101.     Public financing disclosures and bond-related materials further reflect that the Brightline enterprise operated pursuant to indentures, loan agreements, guaranties, and security documents executed at the parent and affiliate level, governing project funding, repayment obligations, collateral, liquidity, and other material financial terms. These financing arrangements reflect centralized control over major financial commitments affecting the rail enterprise, rather than a structure in which such matters were determined solely by the local operating subsidiary.

102.     Upon information and belief, Fortress exercised sponsor-level governance authority through that holding structure by controlling or materially influencing capital allocation, liquidity management, and approval of significant expenditures affecting Brightline operations. Those enterprise-level financial decisions necessarily affected the availability and timing of resources for infrastructure improvements, corridor safety enhancements, staffing, post-incident relief staffing, maintenance, and other safety-related measures.

103.     Upon information and belief, Brightline Trains Florida LLC lacked independent authority to make enterprise-level decisions concerning material expenditures affecting infrastructure investment, staffing, post-incident mitigation, and other safety-critical resources, and instead operated subject to centralized approval and capital governance exercised through the parent and affiliate structure. The centralized insurance, financing,

20

and consolidated reporting structure is consistent with a system in which significant financial and operational decisions were controlled above the subsidiary level.

104.     That centralized control materially affected the workplace conditions under which Plaintiff performed his duties. Decisions concerning safety budgeting, staffing, post-incident relief resources, hazard mitigation, and implementation of protective measures directly influenced whether train crews were provided adequate safeguards, replacement personnel, recovery time, and other protections following catastrophic strike incidents. Upon information and belief, the working conditions alleged herein were shaped in part by those enterprise-level funding and governance decisions.

105.     Upon information and belief, Fortress's centralized governance authority, capital-allocation control, and influence over enterprise-level safety budgeting affected the availability of safety-related resources and protections, and thereby contributed to the hazardous working environment in which Plaintiff was repeatedly exposed to catastrophic strike incidents without proportionate mitigation measures. These enterprise-level structures operated in conjunction with Brightline's day-to-day rail operations, such that operational decisions affecting Plaintiff were carried out within the financial and governance framework described above.

## V. COUNT I – FELA NEGLIGENCE

**(This Count is brought against Defendant Brightline Trains Florida LLC only)**

106.     Plaintiff re-alleges and incorporates paragraphs 14 and 17–89 to the extent relevant to this Count.

21

107.     At all relevant times, Defendant Brightline Trains Florida LLC ("Brightline") was a common carrier by railroad engaged in interstate commerce and owed Plaintiff a non-delegable duty under the Federal Employers' Liability Act, 45 U.S.C. § 51, to provide a reasonably safe place to work.

108.     Brightline knew, or in the exercise of reasonable care should have known, that its operations consisting of high-speed passenger trains operating through densely populated, at-grade corridors with a documented pattern of recurring fatal pedestrian and vehicle strike incidents—created a foreseeable risk of both physical and psychological injury to train crews, including Plaintiff.

109.     Plaintiff was repeatedly exposed to traumatic incidents in the course of his employment, including multiple fatal strike events and serious collisions. Over time, this repeated exposure resulted in cumulative psychological trauma.

110.     Medical evaluation confirmed that Plaintiff suffers from chronic Post-Traumatic Stress Disorder, with clinically significant symptoms including hypervigilance, avoidance, intrusive recollections, and impaired concentration, directly associated with his occupational exposure to repeated traumatic incidents.

111.     Despite this foreseeable risk, Brightline breached its duty of care through acts and omissions including, but not limited to:

112.     a. Failing to implement adequate post-incident safety protocols following high-speed fatal strike events;

113.     b. Failing to provide timely relief crews or remove Plaintiff from service following repeated exposure to traumatic incidents;

114.       c. Failing to implement any system, policy, or protocol to monitor, limit, or mitigate cumulative trauma exposure despite repeated and foreseeable exposure to catastrophic events;

115.       d. Failing to establish structured recovery periods, rotation practices, or decompression protocols following critical incidents;

116.       e. Requiring Plaintiff to dismount and perform inspections in active rail corridors immediately following strike events, exposing him to additional operational hazards;

117.       f. Continuing unsafe operational practices despite a known pattern of recurring fatal incidents along the corridor;

118.       g. Ignoring or failing to adequately respond to regulatory notice, internal awareness, and publicly documented safety concerns regarding corridor hazards and their impact on crew safety.

119.       h. Defendant was aware, or should have been aware, of a recurring pattern of fatal incidents along the corridor and failed to implement reasonable corrective measures in response.

120.       i. Failing to prevent Plaintiff from being required to perform duties in active rail corridors immediately following catastrophic strike events, thereby placing Plaintiff within the zone of physical danger and exposing him to ongoing operational hazards including moving trains, live track conditions, and uncontrolled scene environments;

121.       j. Failing to correct a systemic corporate policy and practice of prioritizing operational continuity and schedule adherence over crew safety, including the failure to implement safety stand-downs, operational pauses, or enhanced protective measures.

23

122.    k. Failing to provide adequate protective equipment, decontamination procedures, and safety protocols for exposure to biological hazards including bloodborne pathogens;

123.    l. Failing to protect employees from known hazards associated with post-collision environments, including fire, sharp debris, unstable wreckage, and contaminated accident scenes;

124.    m. Failing to implement adequate safety measures despite prior incidents involving injury to conductors and crew members;

125.    n. Failing to provide adequate training, support, relief procedures, and hazard mitigation protocols for employees required to serve as incident commanders in hazardous post-collision environments;

126.    o. Brightline maintained a systemic practice of requiring train crews to remain on scene and continue operations following fatal incidents without implementing adequate safety stand-down procedures, thereby exposing conductors to repeated and foreseeable physical hazards despite a known and documented pattern of such incidents.

127.    Brightline's negligence placed Plaintiff within the zone of physical danger by requiring him to enter and remain in active rail corridors and post-collision environments where he faced imminent risks of being struck by moving trains, injured by fire, crushed by unstable wreckage, cut by sharp debris, and exposed to hazardous biological materials. These risks constituted immediate threats of physical harm recognized within the railroad industry, and Defendant's negligence played a part no matter how slight in causing and aggravating Plaintiff's injuries.

128.     As a direct and proximate result of Defendant's negligence, Plaintiff sustained physical and psychological injuries arising from repeated exposure to immediate risks of bodily harm, including hazardous post-collision environments and active rail operations, along with resulting economic losses and other damages recoverable under FELA.

## VI. COUNT II

## FELA LIABILITY – ENTERPRISE CONTROL / INSTRUMENTALITY

## (Against Fortress Investment Group LLC only)

129.     Plaintiff re-alleges and incorporates paragraphs 14–16, 17–89, and 100–105 to the extent relevant to this Count.

130.     At all relevant times, Fortress Investment Group LLC ("Fortress") participated in the enterprise-level governance and financial structuring of the Brightline rail system operating within the State of Florida through affiliated holding-company entities.

131.     Upon information and belief, Fortress managed and controlled Brightline Holdings LLC, which functioned as the intermediate parent and strategic decision-making entity for Brightline Trains Florida LLC, including with respect to financing structures, capital allocation, and enterprise-level operational planning.

132.     Public bond offering materials and financing disclosures reflect that capital expenditures for rail infrastructure, system expansion, and operational initiatives were implemented through centralized financing structures in which funding, allocation, and approval mechanisms operated at the parent or holding-company level.

25

133.     These financing arrangements governed the allocation of resources necessary for rail operations, including infrastructure investment, staffing support, and operational systems, rather than being determined solely at the local operating entity level.

134.     Through these structures, Fortress-affiliated entities participated in enterprise-level decisions concerning capital deployment, financial priorities, and resource allocation affecting rail operations conducted within this District.

135.     The safety environment in which Plaintiff worked, including staffing levels, post-incident response resources, infrastructure investment, and risk management protocols, was shaped in part by these enterprise-level financial and operational frameworks.

136.     Upon information and belief, Fortress's involvement in these systems was not limited to passive ownership, but included participation in financial and governance structures that influenced how operational resources and safety-related measures were allocated across the Brightline enterprise.

137.     Those enterprise-level decisions affected the availability of staffing, post-incident response resources, infrastructure investment, and other safety-related measures bearing on Plaintiff's working conditions.

138.     As a result of these enterprise-level structures and decisions, Plaintiff was subjected to working conditions that included repeated exposure to traumatic incidents, inadequate post-incident support, and hazardous operational environments. Fortress's participation in these enterprise-level financial and governance systems played a part in creating the conditions that contributed to Plaintiff's injuries and maintaining the conditions that contributed to Plaintiff's injuries.

139.     WHEREFORE, Plaintiff demands judgment against Fortress consistent with the relief requested herein.

## VII. COUNT III – FMLA INTERFERENCE

### (Against Defendant Brightline Trains Florida LLC)

140.     Plaintiff re-alleges and incorporates paragraphs 48–59 and 90–99 solely to the extent they describe Plaintiff's condition, treatment, leave request, and resulting damages relevant to this Count.

141.     At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., and Defendant Brightline Trains Florida LLC ("Brightline") was an employer subject to the requirements of the FMLA.

142.     Plaintiff suffered from a serious health condition within the meaning of the FMLA, including chronic Post-Traumatic Stress Disorder, which required ongoing medical treatment and rendered Plaintiff unable to safely perform the essential functions of his position at times.

143.     On or about September 23, 2023, and again in or about October 2023 following formal diagnosis, Plaintiff provided notice to Brightline of his need for medical leave, including leave approved by a treating medical provider.

144.     Despite this notice, Brightline failed to provide the required Notice of Eligibility and Rights & Responsibilities as mandated by 29 C.F.R. § 825.300 and failed to properly process or designate Plaintiff's leave as FMLA-protected.

27

145. Brightline, through its management and supervisory personnel, including but not limited to Plaintiff's supervisor Jonathan White, failed to process, approve, or facilitate Plaintiff's request for protected leave despite knowledge of Plaintiff's qualifying condition.

146. Instead of allowing Plaintiff to take protected leave, Brightline continued to require Plaintiff to perform job duties despite knowledge of his medical condition and need for leave, and failed to make any reasonable inquiry into his eligibility for FMLA protection.

147. Additionally, following Plaintiff's request for leave, Brightline communicated conditions regarding Plaintiff's continued employment that had the effect of discouraging or interfering with the exercise of FMLA rights.

148. As a direct and proximate result of Brightline's interference, Plaintiff was denied the opportunity to take protected leave, was forced to continue working under unsafe conditions, and experienced a worsening and aggravation of his medical condition.

149. Plaintiff has suffered damages including lost compensation and benefits, worsening of his medical condition, emotional distress, and other damages recoverable under the FMLA. Defendant's conduct interfered with, restrained, and denied Plaintiff's exercise of rights guaranteed under the FMLA.

**VIII. COUNT IV – FMLA RETALIATION**

**(Against Brightline Trains Florida LLC)**

28

150.     Defendant's retaliatory conduct was willful and not in good faith. Plaintiff is entitled to liquidated damages equal to lost compensation and benefits, plus interest, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

151.     This Count is brought against Defendant Brightline Trains Florida LLC only.

152.     Plaintiff re-alleges and incorporates paragraphs 48–59 and 90–99 to the extent relevant to this Count.

153.     Plaintiff engaged in protected activity under the Family and Medical Leave Act by requesting and attempting to utilize leave for serious health conditions arising from workplace trauma, including symptoms consistent with post-traumatic stress disorder.

154.     Defendant, through its managers and human resources personnel, had actual knowledge of Plaintiff's protected activity. This includes, but is not limited to, communications involving Defendant's Director of Transportation, who acknowledged Plaintiff's FMLA-related request and indicated that it required internal confirmation and review.

155.     Despite this knowledge, Defendant subjected Plaintiff to adverse employment actions, including but not limited to:

156.     a. Escalating Plaintiff to Final Notice status;

b. Denying or delaying leave associated with Plaintiff's medical condition;

c. Discouraging the use of protected leave by recharacterizing such leave as discretionary "PTO" or "mental health days";

d. Imposing continued work expectations despite knowledge of Plaintiff's diminished

29

fitness for duty; and

e. Creating working conditions that led to Plaintiff's constructive discharge.

157. The temporal proximity between Plaintiff's protected activity and the adverse actions, combined with Defendant's direct knowledge of Plaintiff's condition and leave requests, establishes a causal connection between the protected activity and the adverse employment actions.

158. Defendant's stated reasons for its actions were not the true reasons for those actions. Instead, Defendant acted with the intent to interfere with, discourage, and retaliate against Plaintiff for exercising rights protected under the FMLA.

159. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered damages including lost wages, loss of employment, emotional distress, and other economic and non-economic harms.

## IX. PRAYER FOR RELIEF

160. Defendant's violations of the FMLA were willful and not made in good faith. Defendant knew or showed reckless disregard for whether its conduct violated the FMLA, thereby entitling Plaintiff to liquidated damages equal to the amount of economic damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

161. WHEREFORE, Plaintiff, DARREN J. BROWN, JR., respectfully requests that the Court enter judgment in his favor and award the following relief:

162.     **A.** Compensatory damages in an amount to be determined at trial, including all past and future economic losses, loss of earning capacity, and loss of employment-related benefits;

163.     **B.** Damages for pain, suffering, mental anguish, emotional distress, and loss of enjoyment of life resulting from Plaintiff's injuries;

164.     **C.** Back pay, including lost wages, overtime, bonuses, retirement contributions, and employment benefits from the date of the adverse action through judgment;

165.     **D.** Plaintiff has suffered significant economic losses, including past and future lost wages, loss of earning capacity, and the loss of creditable service months and diminished future annuity benefits under the Railroad Retirement Board (RRB) system, resulting in a permanent reduction in Plaintiff's long-term financial security.

166.     **E.** Compensation for loss of retirement and long-term employment benefits, including the diminution and loss of creditable service months under the Railroad Retirement Board (RRB) system, including Tier I and Tier II benefits, resulting in a permanent reduction of Plaintiff's retirement annuity and long-term financial security, including railroad retirement-related losses;

167.     **F.** Liquidated damages under the Family and Medical Leave Act in an amount equal to Plaintiff's economic damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), based on Defendant's willful violations;

168.     **G.** Pre-judgment and post-judgment interest as allowed by law;

169.     **H.** Costs of this action; and

170.     **I.** Such other and further relief as the Court deems just and appropriate.

31

## X. JURY DEMAND

171.     Plaintiff, DARREN J. BROWN, JR., hereby demands a trial by jury on all issues

so triable as of right.

Respectfully submitted,

Darren J. Brown

Plaintiff, Pro Se

931 village Blvd., Suite 905-438

West Palm Beach, Florida 33409

Email: darrenbrown@advantagefc.com

32

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of April, 2026, I served the foregoing Amended Complaint on all counsel of record via electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) at the email addresses listed below:

Eric L. Leach, Esq. – eleach@miltonleach.com

C. Ryan McKay Eslinger, Esq. – reslinger@miltonleach.com

Amy Austin, Esq. – aaustin@miltonleach.com

Karen Miller, Paralegal – kmiller@miltonleach.com

33

I declare under penalty of perjury that the foregoing is true and correct.

Darren J. Brown

Plaintiff, Pro Se