

FILED BY ___ D.C.

MAY 29 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:25-cv-81571-BER**

**DARREN J. BROWN, JR.,**

**Plaintiff,**

**v.**

**BRIGHTLINE TRAINS FLORIDA LLC,**
**and**
**FORTRESS INVESTMENT GROUP LLC,**

**Defendants.**

_____/

**AMENDED COMPLAINT**

**Plaintiff Darren J. Brown, Jr., proceeding pro se, alleges:**

**I. JURISDICTION AND VENUE**

**A. Subject Matter Jurisdiction**

1. This action arises under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 45 U.S.C. § 56, which provides for concurrent jurisdiction in federal district courts over FELA claims.

**B. FELA Common Carrier Status – Brightline Trains Florida LLC**

1

3. At all relevant times, Defendant Brightline Trains Florida LLC ("Brightline") was a common carrier by railroad engaged in interstate commerce within the meaning of 45 U.S.C. § 51.

4. Brightline operates a federally regulated passenger rail system subject to oversight by the Federal Railroad Administration ("FRA"). Brightline has applied for and received federal financial assistance and federally authorized financing instruments administered through agencies of the United States Department of Transportation.

5. Although Brightline's rail corridor is physically located within Florida, its operations form part of a continuous channel of interstate commerce by transporting passengers connecting to interstate and international travel hubs, including commercial airports serving interstate and international routes. Brightline operates within a nationally regulated rail system subject to federal authority.

## C. Personal Jurisdiction – Fortress Investment Group LLC

6. This Court has personal jurisdiction over Defendant Fortress Investment Group LLC ("Fortress") pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, because Fortress purposefully directed activities toward the State of Florida through its governance authority, financial oversight, and capital allocation control relating to the Brightline rail enterprise operating within this District.

7. Upon information and belief, Fortress exercised sponsor-level governance authority through Brightline Holdings LLC and affiliated entities, which functioned as the parent-level strategic and financial control structure for Brightline Trains Florida LLC. Public financing disclosures, bond-related materials, and offering documents reflect centralized authority over capital deployment, infrastructure expenditures, enterprise risk management, and other major financial commitments affecting rail operations conducted in Florida, indicating that such decisions were subject to approval above the local operating-subsidiary level.

8. Those same disclosures reflect a multi-entity enterprise structure in which capital funding, operational financing, management services, staffing support, and

2

resource allocation were coordinated through parent-level and affiliated entities rather than solely by the local operating railroad. Upon information and belief, Fortress maintained authority over capital allocation, infrastructure funding, management structure, and enterprise-level decision-making affecting Brightline operations, including decisions bearing on staffing, safety-related expenditures, post-incident relief, and operational priorities.

9. Publicly produced excess liability policies for the relevant period were procured at the holdings or enterprise level, naming Brightline Holdings LLC or predecessor Brightline holding-company entities as named insureds rather than Brightline Trains Florida LLC alone, and extending additional insured coverage or affiliate-based coverage through enterprise-level policy structures.

### D. Venue

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Palm Beach County, Florida.

11. Venue is further proper pursuant to 45 U.S.C. § 56 because Defendant Brightline does business in this District and maintains substantial rail operations within the Southern District of Florida.

## II. PARTIES

12. Plaintiff, Darren J. Brown, Jr., is a resident of the State of Florida. From approximately August 2017 through December 2023, Plaintiff worked as a Brightline conductor engaged in safety-sensitive rail operations.

13. Defendant Brightline Trains Florida LLC ("Brightline") is a limited liability company authorized to conduct business in the State of Florida and operates intercity passenger rail service over the Florida East Coast Railway corridor.

14. At all relevant times, Brightline functioned as a common carrier by railroad engaged in interstate commerce, operating over rail infrastructure utilized for freight and

3

passenger operations and subject to federal railroad safety regulations. In Brightline Trains Florida LLC v. National Mediation Board, Case No. 1:24-cv-24734-DPG, the United States District Court for the Southern District of Florida granted summary judgment to the National Mediation Board and denied Brightline's motion for summary judgment, holding that Brightline is a carrier subject to the Railway Labor Act because it conducts rail operations over infrastructure constructed or improved with federal CRISI funds under 49 U.S.C. § 22905(b). The court rejected Brightline's argument that lack of Surface Transportation Board jurisdiction prevented carrier status and found that Brightline qualifies as a rail carrier under 49 U.S.C. § 10102(5). Plaintiff alleges this federal rail-carrier determination further supports Brightline's status as a federally regulated rail carrier for purposes of Plaintiff's FELA allegations.

15. Defendant Fortress Investment Group LLC ("Fortress") is an investment management firm that, upon information and belief, exercised ownership, governance, financial oversight, and operational influence through Brightline Holdings LLC, Florida Investment Holdings LLC, Brightline Management LLC, and affiliated entities within the Brightline rail enterprise.

16. Public financing documents further reflect that the Brightline enterprise operates pursuant to indentures, loan agreements, security documents, management agreements, guaranty arrangements, and flow-of-funds restrictions governing the allocation of capital, repayment obligations, operational funding, reserve accounts, staffing resources, and safety-related expenditures.

## III. FACTUAL ALLEGATIONS

A. Brightline's High-Speed Urban Operations

17. During Plaintiff's employment from approximately 2018 through late 2023, Brightline operated passenger trains at speeds approaching 79 miles per hour

4

through densely populated urban corridors containing numerous at-grade crossings.

18. These corridors included areas in Palm Beach County, Broward County, Miami-Dade County, and surrounding municipalities where pedestrian trespass and vehicle incursions were recurrent.

19. During Plaintiff's tenure, the corridor experienced a repeated pattern of pedestrian-versus-train and vehicle-versus-train fatal incidents.

20. These incidents were publicly reported and investigated by law enforcement, medical examiner offices, regulatory authorities, and railroad personnel.

21. The frequency and speed of these incidents made the risk of catastrophic strike events foreseeable.

## B. Plaintiff's Direct Exposure to High-Speed Fatal Impacts

22. As a conductor, Plaintiff was assigned to trains operating through the same high-risk corridor where repeated pedestrian strike fatalities, vehicle collisions, and near-miss events occurred during his tenure.

23. In one documented incident, Case No. 11-1812-003981, Plaintiff served as the conductor aboard a Brightline train traveling approximately 78 miles per hour at the time of a pedestrian strike.

24. In the Dennis Lee Conrad incident, official medical examiner records state that, due to a communication error while investigators and police personnel were still on the tracks conducting the scene investigation, a second Brightline train suddenly approached at approximately 79 miles per hour before the decedent's body had been removed from within the rail gauge, requiring personnel to immediately get off the tracks and resulting in the body being run over by the second train. The same record further reflects that Brightline requested permission to release the first train southbound, and that law enforcement agreed to release it.

25. Following emergency braking in strike events, Plaintiff was directed by supervisory personnel, consistent with Brightline operating procedures, to exit the locomotive

5

and enter the track area to perform required post-incident duties. These duties included visual inspection of the locomotive and rail area, communication with dispatch, coordination with law enforcement and emergency responders, and confirmation of track conditions.

26. Plaintiff was not merely a witness to these incidents. As a train conductor, Plaintiff was required to serve as the on-scene incident commander following fatal and catastrophic collisions. In this role, Plaintiff was responsible for controlling the accident scene, coordinating with emergency responders, ensuring passenger safety, and directing operational decisions while physically present within active and hazardous environments. Plaintiff could not withdraw from these hazardous conditions without abandoning his assigned operational responsibilities, requiring him to remain within dangerous environments despite ongoing risks.

27. Plaintiff did not have the ability to decline or delay entry into the track area without violating operational rules and abandoning required safety responsibilities. Plaintiff was required to enter and remain within hazardous environments as part of his assigned duties, despite the presence of ongoing and uncontrolled risks.

28. Plaintiff was required to remain within hazardous post-collision environments for extended periods, including areas involving burning vehicles, active fire conditions, shattered glass, exposed metal fragments, unstable wreckage, and post-impact debris fields. These environments presented immediate risks of burns, lacerations, puncture wounds, and crushing injuries. Plaintiff was required to physically traverse these areas on foot without adequate protective equipment or hazard mitigation measures.

29. Plaintiff was not permitted to simply remain inside the locomotive during these procedures.

30. These assignments required Plaintiff to physically dismount onto active rail infrastructure immediately following high-speed impact events. The strike locations remained on mainline track segments used for continuing rail operations.

6

31. Plaintiff was routinely required to walk through areas containing human blood, bodily fluids, and biological remains following fatal incidents. Despite this exposure, Brightline failed to provide adequate personal protective equipment, biohazard containment measures, or decontamination protocols. This exposure created a direct risk of physical injury through transmission of bloodborne pathogens and infectious disease, a recognized occupational hazard under 29 C.F.R. § 1910.1030, and constituted an unsafe working condition involving biological contamination.

32. Plaintiff's required entry into the track area following strike events placed him within the immediate zone of physical danger, including exposure to active mainline tracks without confirmed dispatcher protection, absence of physical barriers or flagging, and proximity to adjacent track movements where trains could and did continue operating at speed. These conditions created a direct and immediate risk of being struck by passing trains, rail equipment, or debris, constituting a recognized risk of serious bodily injury or death.

33. At all relevant times, Plaintiff was required to remain on or immediately adjacent to active railroad tracks that were not fully secured or taken out of service. Plaintiff was not provided confirmation of track authority protection, was not shielded by dedicated flagging personnel, and was exposed to ongoing train movements and uncontrolled hazards. This exposure placed Plaintiff in a position where a collision or secondary incident could occur without warning, creating an immediate threat of physical harm.

34. Regarding the incident involving Dennis Lee Conrad, Plaintiff was the conductor aboard the Brightline train that struck the decedent. Following the strike, Plaintiff was required to remain at the incident scene to perform post-incident duties while the scene remained active and unsecured. During this period, Brightline authorized a second Brightline train to traverse the same corridor at speed while Plaintiff and emergency personnel were physically occupying the foul of the track. This authorization was contrary to Restricted Speed requirements under GCOR 6.27,

7

which require movement at a speed permitting a train to stop within half the range of vision short of men or equipment fouling the track. Brightline's failure to protect the scene was further inconsistent with federal safety standards governing adjacent track protection, including 49 C.F.R. § 214.336, which recognize the danger of train movements in proximity to ground personnel. The movement of the second train through the unsecured scene forced first responders and investigators to take immediate evasive action to avoid being struck and resulted in the decedent's remains being run over a second time. Brightline failed to implement a block or speed restriction while Plaintiff and emergency personnel were within the foul of the track, exposing Plaintiff to a direct and immediate risk of serious bodily injury or death.

35. On or about February 16, 2022, Plaintiff was the conductor aboard a southbound Brightline train that struck a vehicle at a grade crossing near Railroad Avenue and Latona Avenue in Lake Worth Beach, Florida, while the train was traveling at approximately 79 miles per hour. The vehicle had entered the crossing after the gates were down. After the collision, Plaintiff was required to exit the train and return to the crash scene through smoldering vehicle debris, damaged metal, glass, and wreckage. Plaintiff observed the vehicle ripped apart and the driver trapped and gravely injured while emergency personnel worked to stabilize and remove the victim. This incident exposed Plaintiff to immediate risks of fire, sharp debris, unstable wreckage, and traumatic physical danger.

36. At each of the incidents described herein, Plaintiff was not merely a witness but was physically present within active rail corridors and hazardous environments where he faced immediate risks of bodily harm, including the risk of being struck by trains, injured by debris, burned by fire, cut by metal or glass, crushed by wreckage, or exposed to hazardous substances.

37. The conditions present at post-collision scenes included active train movement, live rail corridors, fire hazards, unstable wreckage, sharp debris, and biological contamination. These conditions collectively exposed Plaintiff to immediate risks of

8

serious bodily injury or death, including being struck by trains, burned, cut, crushed, or exposed to hazardous biological materials.

## C. Repeated Traumatic Exposure and Cumulative Risk

38. During approximately five years of employment, Plaintiff was directly involved in over ten separate train-versus-pedestrian and train-versus-vehicle strike incidents occurring along Brightline's South Florida corridor.

39. Official law-enforcement and medical-investigator records identify Plaintiff by name as the conductor or involved train crew member in multiple separate fatality investigations during his Brightline employment, including incidents involving David Ulmer, Gregory Williams, Jose Roibal, Dennis Lee Conrad, and others.

40. These incidents were not isolated events but part of a recurring operational pattern involving high-speed pedestrian and vehicle strikes along the same corridor.

41. Each of these incidents required Plaintiff to enter active rail corridors and hazardous post-collision environments, exposing him on multiple occasions to immediate risks of physical injury, including being struck by trains, encountering unstable wreckage, and exposure to dangerous conditions.

42. Plaintiff's occupational duties required him to operate through locations associated with prior fatal strike events and to participate in mandatory post-incident procedures following catastrophic impacts.

43. The incidents included intentional pedestrian strike events, high-speed vehicle-versus-train collisions, grade-crossing incidents, and post-impact scene-control events occurring at or near at-grade crossings.

44. Plaintiff initially continued performing his assigned duties without formal mental health treatment despite repeated exposure to these traumatic events.

45. By October 2023, Plaintiff reported escalating psychological symptoms, including hypervigilance, avoidance behaviors, anxiety while driving, irritability, sleep disturbance, nightmares, intrusive memories, physiological reactivity to trauma reminders, and impaired concentration.

46. During clinical assessment, Plaintiff scored a 56 on the PTSD Checklist for DSM-5, known as the PCL-5, well above the clinical threshold for PTSD diagnosis.

47. Plaintiff was formally diagnosed with Chronic Post-Traumatic Stress Disorder, F43.12.

48. Plaintiff also reported that a subsequent work assignment significantly increased operational demands, resulted in more "close calls," and reduced recuperation time between critical incidents, further exacerbating symptoms. The cumulative and repetitive nature of Plaintiff's occupational trauma exposure contributed materially to the development and progression of his diagnosed PTSD.

### D. Objective PTSD Diagnosis and Medical Necessity

49. On October 5, 2023, Plaintiff underwent a comprehensive clinical evaluation conducted by Anthony Gonzalez, LCSW, at Alere Emotional Health LLC.

50. During the intake assessment, Plaintiff reported experiencing multiple critical incidents in his role as a railroad conductor, including observing pedestrian fatalities and serious vehicle collisions.

51. Plaintiff reported involvement in over ten such critical strike incidents within the preceding five years.

52. Plaintiff endorsed escalating symptoms including hypervigilance, elevated anxiety while driving, avoidance behaviors, irritability, restlessness, nightmares, impaired concentration, and physiological reactivity to trauma reminders.

53. Plaintiff completed the PTSD Checklist for DSM-5, known as the PCL-5, and scored a total of 56.

54. A PCL-5 score of 31–33 or higher suggests the presence of PTSD and the need for clinical intervention; Plaintiff's score of 56 substantially exceeded that threshold.

55. Plaintiff also completed standardized anxiety and depression screening instruments, including the GAD-7, score 10, indicating moderate anxiety, and the PHQ-9, score 8, indicating mild depressive symptoms.

56. On October 5, 2023, Anthony Gonzalez, LCSW, documented that Plaintiff scored 56 on the PCL-5 and reported elevated anxiety while driving or riding in cars, hypervigilance, avoidance, nightmares, irritability, and concentration problems after more than ten critical incidents at work over five years. Gonzalez further documented that Plaintiff's new work assignment significantly exacerbated these symptoms by increasing "close calls" and allowing far less recuperation time.

57. Based upon clinical evaluation and DSM-5-TR criteria, Plaintiff was formally diagnosed with F43.12 Post-Traumatic Stress Disorder, Chronic.

58. The clinician documented that Plaintiff's occupational exposure to repeated railroad strike fatalities materially contributed to the development and escalation of his PTSD symptoms.

59. A formal treatment plan was initiated, including trauma-focused interventions such as Prolonged Exposure Therapy, Cognitive Processing Therapy, EMDR, and related therapeutic modalities.

60. The clinician certified that the services were medically necessary and appropriate for Plaintiff's diagnosed condition.

### E. Regulatory Notice and Foreseeability

61. During Plaintiff's employment from approximately 2018 through late 2023, Brightline operated passenger trains at speeds approaching 79 miles per hour along the Florida East Coast Railway corridor through densely populated municipalities in South Florida containing numerous at-grade crossings.

62. During this period, the corridor experienced a recurring pattern of pedestrian-versus-train and vehicle-versus-train fatal incidents that were publicly reported and investigated by law enforcement authorities.

63. Throughout Plaintiff's tenure, Brightline was subject to enforcement authority by the Federal Railroad Administration and received civil penalties for violations of federal railroad safety regulations.

11

64. FRA enforcement records during the relevant period reflect violations including, but not limited to, 49 C.F.R. Part 219, post-accident toxicological testing requirements, which governs mandatory testing procedures following qualifying train accidents involving fatalities, and 49 C.F.R. Part 225, railroad accident and incident reporting requirements, which governs mandatory reporting and documentation of accidents involving injury or death.

65. Brightline maintained an FRA-approved Part 219 Railroad Compliance Plan, effective June 15, 2021, under which Brightline adopted FRA's model program and was required to make post-accident testing decisions based on objective facts, complete required documentation when exemptions were used, and maintain records for FRA inspection.

66. Upon information and belief, Brightline failed to consistently conduct required post-accident toxicological testing, failed to consistently document exemptions, or otherwise failed to follow post-accident testing procedures after qualifying or potentially qualifying catastrophic rail events.

67. These enforcement actions and compliance obligations concerned duties directly triggered by catastrophic strike events and placed Brightline on formal regulatory notice regarding deficiencies in post-incident procedures and safety-related administrative controls.

68. In the official securities disclosure entitled "Revenue Bonds, Brightline Florida Passenger Rail Expansion Project, Series 2025B," the offering document acknowledged that the operation of high-speed passenger trains through densely populated corridors with at-grade crossings presents ongoing risks of trespasser incursions, vehicle collisions, fatalities, service disruptions, and liability exposure.

69. The disclosure further reflects that such incidents are inherent operational risks associated with the design and execution of the rail system, demonstrating that catastrophic strike events were foreseeable and anticipated as a recurring consequence of the operating environment, rather than isolated or unpredictable occurrences.

12

70. The same disclosures acknowledge that the Project Owner has limited operating history and financial uncertainty associated with passenger rail operations, further underscoring that operational risks, including safety-related incidents, were known and inherent to the system at the time of Plaintiff's employment.

71. That offering document further disclosed that strike incidents could materially affect operations and finances, reflecting institutional awareness that such events were recurring operational hazards rather than isolated anomalies.

72. During the relevant period, Brightline pursued and implemented safety mitigation initiatives, including fencing installation, crossing improvements, and federally supported safety funding measures aimed at reducing corridor fatalities.

73. Federal regulators, public authorities, and media reporting repeatedly identified Brightline's corridor as having an extraordinary pattern of grade-crossing incidents, trespasser strikes, pedestrian fatalities, and public-safety concerns.

74. Upon information and belief, similar catastrophic incidents had previously resulted in injuries to other Brightline conductors and crew members, including injuries requiring extended medical treatment and hospitalization. Despite knowledge of these prior incidents and hazardous post-collision conditions, Brightline failed to implement adequate safety protocols or modify operational practices.

75. Despite institutional awareness of recurring high-speed fatal strike events, Brightline required train crews, including Plaintiff, to dismount locomotives following catastrophic impacts, conduct mandatory post-incident inspections in active rail corridors, visually assess damaged equipment in proximity to wreckage and remains, and resume service operations without implementation of enhanced mitigation protocols addressing cumulative trauma exposure.

76. Brightline did not modify operational procedures to reduce crew proximity to fatal scenes, did not implement structured extended relief periods following catastrophic incidents, and did not establish systematic cumulative trauma monitoring for train crews despite the documented recurrence of fatal strike events along the corridor.

13

77. Brightline's own train-crew and critical-incident materials acknowledged that employees directly involved in critical incidents could request relief from duty for up to three workdays under a Critical Incident Stress Plan, but Brightline failed to implement a cumulative-trauma protocol reasonably adapted to employees repeatedly exposed to multiple fatalities and catastrophic strike scenes.

78. Brightline treated mental-health recovery time and critical-incident relief as dependent on staffing and operational availability rather than as mandatory safety measures responsive to known traumatic exposure.

79. In light of the frequency of high-speed strike fatalities, FRA enforcement actions under Parts 219 and 225, public scrutiny, the disclosures contained in the Revenue Bonds, Brightline Florida Passenger Rail Expansion Project, Series 2025B offering, and ongoing mitigation initiatives, the risk of repeated catastrophic exposure to train crews — and the resulting psychological injury — was reasonably foreseeable to Brightline during Plaintiff's employment.

## F. Failure to Provide a Reasonably Safe Workplace

80. Under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., Brightline owed Plaintiff a non-delegable duty to provide a reasonably safe workplace and to protect employees from foreseeable risks of harm arising out of their employment.

81. Brightline knew, or should have known, from public incident reports, internal operations, law enforcement investigations, medical examiner reports, regulatory oversight, and its own operating experience, that repeated exposure to catastrophic strike events in an urban, at-grade corridor at near-maximum authorized operating speeds created a significant risk of both physical and psychological injury to train crews.

82. Brightline regularly operated trains at approximately 79 miles per hour through densely populated corridors with frequent at-grade crossings. During Plaintiff's employment, multiple publicly reported pedestrian and vehicle strike fatalities

14

occurred along these same operational routes in Broward County and Palm Beach County.

83. Despite this pattern of recurring fatal incidents, Brightline failed to implement structured mandatory recovery or decompression periods for train crews following catastrophic strike events. Instead, crews like Plaintiff were routinely required to resume operational duties immediately or within short intervals after exposure to multiple traumatic scenes, without mandated rest, rotation, or cumulative exposure limits.

84. Brightline did not establish or enforce consistent deployment of replacement or relief crews following fatal impact incidents, resulting in crews being required to continue service despite recent exposure to traumatic events.

85. Although Brightline provided access to contracted mental health resources, it failed to adopt and implement a proactive, structured Critical Incident Stress Management program, known as CISM, or other standardized psychological risk mitigation protocols calibrated to the frequency, severity, and cumulative nature of fatal strike exposures experienced by operating crews.

86. Brightline did not develop protocols to limit cumulative trauma exposure, such as crew rotation away from high-frequency strike corridors, mandatory psychological assessments after multiple incidents, incremental relief thresholds, peer support structures, or mandatory extended leave options for employees with repeated fatal exposure.

87. Brightline did not establish cumulative trauma monitoring standards, did not require extended psychological recovery intervals following multiple strike exposures, and did not adjust training or operational assignments to mitigate continuous exposure to fatal incidents, despite documented recurrence and obvious correlation between such exposures and psychological impairment.

88. Brightline's failure to adopt operational protocols tailored to cumulative trauma, including but not limited to structured rest and recovery periods, crew rotation, mandatory post-incident psychological evaluation with duty release, and extended

15

post-incident relief policies, departed from the standard of care reasonably required of a common carrier under FELA.

89. Brightline failed to provide adequate protective equipment, decontamination procedures, and safety protocols for exposure to biological hazards including bloodborne pathogens, vehicle fluids, smoke, fire, sharp debris, and contaminated accident scenes.

90. Brightline failed to adequately protect employees from known hazards associated with post-collision environments, including fire, sharp debris, unstable wreckage, contaminated accident scenes, ongoing train movements, and unsecured track conditions.

91. Brightline failed to provide adequate training, support, relief procedures, and hazard mitigation protocols for employees required to serve as incident commanders in hazardous post-collision environments.

92. Brightline maintained a systemic practice of requiring train crews to remain on scene and continue operations following fatal incidents without implementing adequate safety stand-down procedures, thereby exposing conductors to repeated and foreseeable physical hazards despite a known and documented pattern of such incidents.

93. Brightline's operational omissions disproportionately exposed Plaintiff to repeated catastrophic fatal events without proportionate safeguards, directly heightening his risk of psychological injury.

94. As a direct and reasonably foreseeable consequence of these operational omissions, Plaintiff experienced repeated exposure to fatal strike scenes and traumatic events without adequate mitigation or recovery mechanisms, contributing materially to the development and chronic progression of his Post-Traumatic Stress Disorder.

**G. FMLA Request and Constructive Discharge**

16

95. At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act. At the time Plaintiff requested FMLA leave, Plaintiff had worked for Brightline for more than five years, had worked at least 1,250 hours during the preceding twelve-month period, and worked at or reported to a location where Brightline employed at least fifty employees within seventy-five miles.

96. Plaintiff's chronic PTSD constituted a serious health condition under 29 U.S.C. § 2611.

97. Before Plaintiff's formal PTSD leave request, Brightline managers denied or discouraged requested mental-health days due to manpower or staffing concerns, reflecting that staffing concerns were being prioritized over psychological recovery time.

98. In September 2023 and October 2023, following formal diagnosis and escalating PTSD symptoms, Plaintiff notified Brightline and its leave administrator of his need for medical leave due to PTSD.

99. On or about September 27, 2023, Brightline's leave administrator, The Standard, issued an FMLA eligibility notice confirming that Plaintiff satisfied FMLA eligibility criteria and had job-protected FMLA leave available for his own serious health condition.

100. The eligibility notice directed Plaintiff to submit medical certification and reflected that qualifying leave could be protected once properly supported.

101. Treating clinician Anthony Gonzalez, LCSW, completed medical certification supporting Plaintiff's PTSD-related need for treatment, intermittent leave, and work restrictions or schedule modifications, including relief from assignments that significantly exacerbated Plaintiff's PTSD symptoms.

102. Brightline, through its managers, supervisors, human resources personnel, and leave-related agents, had actual notice of Plaintiff's PTSD diagnosis, serious health condition, and need for protected leave.

103. Despite this notice, Brightline management communicated that Plaintiff's additional days could not be covered or protected until FMLA was formally

17

approved, creating pressure on Plaintiff to continue working while the certification and leave process was pending.

104.    Brightline continued to schedule Plaintiff for work and required him to report for duty despite knowledge of his medical condition and pending leave request.

105.    Brightline failed to timely process, approve, designate, and administer Plaintiff's qualifying leave in a manner consistent with the FMLA, the eligibility notice, and the medical certification submitted by Plaintiff's treating provider.

106.    Rather than facilitating protected leave, Brightline imposed conditions affecting Plaintiff's continued employment and continued to place operational pressure on Plaintiff to work despite his medical condition.

107.    As Plaintiff's PTSD worsened and he was unable to obtain reliable protected leave, recovery time, or safe assignment modifications, Plaintiff was forced to separate from employment to protect his health.

108.    Plaintiff's separation constituted constructive discharge because Brightline's failure to provide safe working conditions, properly administer FMLA leave, and protect Plaintiff from continued medically unsafe assignments made continued employment untenable.

## IV. FORTRESS CONTROL AND INSTRUMENTALITY ALLEGATIONS

109.    Publicly produced excess liability insurance for the relevant period was procured at the Brightline holdings or enterprise level, naming Brightline Holdings LLC or related holding-company entities as the Named Insured and extending coverage to subsidiaries and affiliated entities whose financial results were consolidated under U.S. Generally Accepted Accounting Principles. The policy's definition of "Insured" included such consolidated subsidiaries or affiliates, reflecting enterprise-level risk management and liability protection structured above Brightline Trains Florida LLC rather than procured independently by the operating railroad.

18

110.     Public bond materials state that Brightline Holdings LLC, the indirect parent of the Borrower and the Project Owner, develops, builds, and operates high-speed passenger rail systems in the United States and is primarily owned, indirectly, by funds managed by an affiliate of Fortress Investment Group LLC. The same materials state that Fortress-managed funds and their affiliates have invested approximately $2.2 billion into the Brightline project.

111.     The organizational structure disclosed in the bond materials places funds managed by an affiliate of Fortress Investment Group LLC at the top of the Brightline enterprise and shows a chain of affiliated entities running through FIHP LLC, Florida Investment Holdings LLC, Brightline Holdings LLC, BL Florida LLC, Brightline Florida Holdings LLC, AAF Operations Holdings LLC, Brightline East LLC, BLTF Holdings LLC, and Brightline Trains Florida LLC.

112.     The same bond materials state that Florida Investment Holdings LLC is a majority member of Brightline Holdings LLC, which owns BL Florida LLC and its subsidiaries, including Brightline Florida Holdings LLC, AAF Operations Holdings LLC, Brightline East LLC, and Brightline Trains Florida LLC. Upon information and belief, this ownership chain reflects sponsor-level authority above the local rail operating entity.

113.     Public bond materials further state that the Project Owner's senior management team and other personnel were made available through Brightline Management LLC, an affiliate of the Project Owner and Borrower, and that the Manager and its affiliates supplied personnel for rail operations, maintenance support, station operations, safety and security, and related functions. Plaintiff does not allege this disclosure negates Brightline's status as Plaintiff's FELA employer; rather, Plaintiff alleges that it reflects enterprise-level management and staffing coordination affecting the operational environment in which Plaintiff performed his duties.

114.     The bond materials describe a Project Owner management agreement entered in December 2017 and amended and restated effective April 18, 2019,

19

under which Brightline Management LLC agreed to provide day-to-day management and operation of the Project Owner, including financial and accounting management and services relating to the Project Owner's assets, operations, and the Project. This management structure overlapped Plaintiff's employment period. Public bond materials further state that the Project Owner's development and operations depend on senior management employed by and made available through the Manager, and that certain members of the Project Owner's senior management team also provide services to related Brightline enterprise projects and are involved in enterprise-level business strategy, government approvals, rail operations, and project development. Plaintiff alleges that this shared-management structure further supports the conclusion that Brightline Trains Florida LLC did not operate as an isolated railroad with independent management over safety-critical resource decisions, but instead operated within a centralized enterprise management system.

115.     Public financing disclosures and bond-related materials further reflect that the Brightline enterprise operated pursuant to indentures, loan agreements, guaranties, collateral agency agreements, pledge agreements, security documents, and related financing documents executed at the parent and affiliate level, governing project funding, repayment obligations, collateral, liquidity, reserve accounts, and other material financial terms.

116.     The bond materials disclose required-deposit provisions under which the Borrower was required, upon receipt of certain equity proceeds or subsidiary distributions, to direct funds to funded-interest or redemption accounts for the benefit of bondholders before funds could be used elsewhere. These provisions show that cash movement within the enterprise was not left solely to the operating railroad but was controlled by parent-level financing requirements.

117.     The bond materials also disclose flow-of-funds restrictions and conditions affecting transfers to capital project accounts, project reserve accounts, parent reserve accounts, distributions from the Project Owner, and movement of funds

20

through parent and affiliate entities. These restrictions support Plaintiff's allegation that safety-related resources, infrastructure investment, staffing, post-incident relief, and operational support were subject to enterprise-level financial controls rather than independent local control by Brightline Trains Florida LLC alone. Public bond materials further state that the Borrower does not expect to repay the Series 2025B Bonds with revenue generated by the Project Owner's railroad operations. Plaintiff alleges that this disclosure supports the conclusion that Brightline Trains Florida LLC was structurally dependent on parent-level financing, subsidiary distributions, equity events, and liquidity decisions above the local operating railroad for material funding decisions affecting rail operations and safety-related resources.

118.    The bond materials disclose collateral and guaranty structures involving Brightline Florida Holdings LLC, BL Florida Commuter LLC, BL Expansion LLC, MDC Commuter LLC, BRWD Commuter LLC, PBC Commuter LLC, AAF Operations Holdings LLC, and other related entities, including pledges of equity interests and security interests in commuter access rights. These structures reflect that the Brightline rail system was financed, pledged, insured, managed, and operated as an integrated enterprise rather than as a set of isolated entities.

119.    The bond materials further disclose restrictions on additional indebtedness, asset sales, distributions, optional prepayments, and affiliate transactions. Affiliate transactions involving payments or assets with a fair market value exceeding $5,000,000 required approval by Majority Bondholders, subject to defined exceptions. These provisions demonstrate that major financial and affiliate-level decisions were subject to centralized governance and approval mechanisms above the local operating railroad.

120.    Plaintiff does not allege that bondholders are Defendants or that bondholders themselves are liable under FELA. Plaintiff alleges that the financing documents reveal a centralized enterprise structure through which Fortress-managed funds, Fortress-affiliated entities, Brightline Holdings LLC, Brightline

21

Management LLC, and related parent entities controlled or materially influenced management structure, resource allocation, and funding decisions affecting rail operations.

121. Upon information and belief, Fortress exercised sponsor-level governance authority through that holding and management structure by controlling or materially influencing capital allocation, liquidity management, approval of significant expenditures, management services, and enterprise-level operational priorities affecting Brightline operations.

122. Upon information and belief, Brightline Trains Florida LLC lacked independent authority to make enterprise-level decisions concerning material expenditures affecting infrastructure investment, staffing, post-incident mitigation, mental-health resources, and other safety-critical resources, and instead operated subject to centralized approval, capital governance, management agreements, and financial restrictions exercised through the parent and affiliate structure.

123. That centralized control materially affected the workplace conditions under which Plaintiff performed his duties. Decisions concerning safety budgeting, staffing, post-incident relief resources, hazard mitigation, PPE, decontamination, critical-incident response, and implementation of protective measures directly influenced whether train crews were provided adequate safeguards, replacement personnel, recovery time, and other protections following catastrophic strike incidents.

124. Upon information and belief, Fortress's centralized governance authority, capital-allocation control, management-structure influence, and influence over enterprise-level safety budgeting affected the availability of safety-related resources and protections, and thereby contributed to the hazardous working environment in which Plaintiff was repeatedly exposed to catastrophic strike incidents without proportionate mitigation measures.

## V. COUNT I – FELA NEGLIGENCE

**(Against Defendant Brightline Trains Florida LLC only)**

22

125.     Count I is a FELA negligence claim against Defendant Brightline Trains Florida LLC for failing to provide Plaintiff a reasonably safe workplace. Plaintiff re-alleges and incorporates paragraphs 14, 17–37, 38–48, 49–60, and 61–94 into this Count. Paragraph 14 alleges Brightline's common-carrier status. Paragraphs 17–37 allege the operating environment and Plaintiff's direct exposure to immediate physical danger in active rail corridors and hazardous post-collision scenes. Paragraphs 38–48 allege repeated traumatic exposure and cumulative risk. Paragraphs 49–60 allege Plaintiff's PTSD diagnosis, medical treatment, and work-related injury. Paragraphs 61–94 allege Brightline's notice of recurring hazards, regulatory notice, foreseeability, and failure to provide a reasonably safe workplace.

126.     Plaintiff's FELA negligence claim is based on Brightline's alleged failure to protect him from foreseeable physical hazards and cumulative trauma arising from repeated fatal strike incidents, active-track exposure, post-collision scene duties, inadequate protective equipment, lack of relief crews, failure to comply with post-incident regulatory obligations, and failure to provide reasonable post-incident recovery procedures.

127.     At all relevant times, Brightline was a common carrier by railroad engaged in interstate commerce and owed Plaintiff a non-delegable duty under the Federal Employers' Liability Act, 45 U.S.C. § 51, to provide a reasonably safe place to work.

128.     Brightline knew, or in the exercise of reasonable care should have known, that its operations consisting of high-speed passenger trains operating through densely populated, at-grade corridors with a documented pattern of recurring fatal pedestrian and vehicle strike incidents created a foreseeable risk of both physical and psychological injury to train crews, including Plaintiff.

129.     Plaintiff was repeatedly exposed to traumatic incidents in the course of his employment, including multiple fatal strike events, serious vehicle collisions, and hazardous post-collision scenes. Over time, this repeated exposure resulted in cumulative psychological trauma.

23

130. Medical evaluation confirmed that Plaintiff suffers from chronic Post-Traumatic Stress Disorder, with clinically significant symptoms including hypervigilance, avoidance, intrusive recollections, nightmares, anxiety, physiological reactivity, irritability, and impaired concentration, directly associated with his occupational exposure to repeated traumatic incidents.

131. Despite this foreseeable risk, Brightline breached its duty of care through acts and omissions including, but not limited to:

132. Failing to implement adequate post-incident safety protocols following high-speed fatal strike events;

133. Failing to provide timely relief crews or remove Plaintiff from service following repeated exposure to traumatic incidents;

134. Failing to implement any system, policy, or protocol to monitor, limit, or mitigate cumulative trauma exposure despite repeated and foreseeable exposure to catastrophic events;

135. Failing to establish structured recovery periods, rotation practices, or decompression protocols following critical incidents;

136. Requiring Plaintiff to dismount and perform inspections in active rail corridors immediately following strike events, exposing him to additional operational hazards;

137. Continuing unsafe operational practices despite a known pattern of recurring fatal incidents along the corridor;

138. Ignoring or failing to adequately respond to regulatory notice, internal awareness, and publicly documented safety concerns regarding corridor hazards and their impact on crew safety;

139. Failing to implement reasonable corrective measures despite awareness, actual or constructive, of a recurring pattern of fatal incidents along the corridor;

140. Failing to prevent Plaintiff from being required to perform duties in active rail corridors immediately following catastrophic strike events, thereby placing Plaintiff within the zone of physical danger and exposing him to ongoing operational hazards

24

including moving trains, live track conditions, and uncontrolled scene environments;

141.    Failing to correct a systemic corporate policy and practice of prioritizing operational continuity and schedule adherence over crew safety, including the failure to implement safety stand-downs, operational pauses, or enhanced protective measures;

142.    Failing to provide adequate protective equipment, decontamination procedures, and safety protocols for exposure to biological hazards including bloodborne pathogens;

143.    Failing to protect employees from known hazards associated with post-collision environments, including fire, sharp debris, unstable wreckage, and contaminated accident scenes;

144.    Failing to implement adequate safety measures despite prior incidents involving injury to conductors and crew members;

145.    Failing to provide adequate training, support, relief procedures, and hazard mitigation protocols for employees required to serve as incident commanders in hazardous post-collision environments;

146.    Failing to consistently comply with post-accident regulatory and documentation obligations under 49 C.F.R. Parts 219 and 225; and

147.    Maintaining a systemic practice of requiring train crews to remain on scene and continue operations following fatal incidents without implementing adequate safety stand-down procedures, thereby exposing conductors to repeated and foreseeable physical hazards despite a known and documented pattern of such incidents.

148.    Brightline's negligence placed Plaintiff within the zone of physical danger by requiring him to enter and remain in active rail corridors and post-collision environments where he faced imminent risks of being struck by moving trains, injured by fire, crushed by unstable wreckage, cut by sharp debris, and exposed to hazardous biological materials. These risks constituted immediate threats of

25

physical harm recognized within the railroad industry, and Brightline's negligence played a part, no matter how slight, in causing and aggravating Plaintiff's injuries.

149.     As a direct and proximate result of Brightline's negligence, Plaintiff sustained physical and psychological injuries arising from repeated exposure to immediate risks of bodily harm, including hazardous post-collision environments and active rail operations, along with resulting economic losses and other damages recoverable under FELA.

## VI. COUNT II – FELA NEGLIGENCE AGAINST FORTRESS UNDER ENTERPRISE-CONTROL / INSTRUMENTALITY THEORY

### (Against Defendant Fortress Investment Group LLC only)

150.     Count II is a FELA negligence claim against Defendant Fortress Investment Group LLC under an enterprise-control and instrumentality theory. Plaintiff re-alleges and incorporates paragraphs 14–16, 17–37, 38–48, 49–60, 61–79, and 109–124 into this Count. Paragraphs 14–16 allege Brightline's rail operations and Fortress's relationship to the Brightline rail enterprise. Paragraphs 17–37 allege the hazardous operating environment in which Plaintiff worked. Paragraphs 38–48 allege Plaintiff's repeated exposure to catastrophic strike incidents. Paragraphs 49–60 allege Plaintiff's resulting PTSD diagnosis and work-related injury. Paragraphs 61–79 allege foreseeability, regulatory notice, public disclosures, and recurring safety hazards. Paragraphs 109–124 allege Fortress's enterprise-level governance, financial control, shared management structure, capital-allocation authority, flow-of-funds control, structural financing dependence, and influence over safety-related resources affecting Brightline's rail operations.

151.     Plaintiff's claim against Fortress is based on Fortress's alleged enterprise-level financial and governance control over capital allocation, staffing resources, safety-related expenditures, management structures, flow-of-funds restrictions, and risk-management systems that shaped the working conditions under which Plaintiff performed his duties.

26

152. At all relevant times, Fortress participated in the enterprise-level governance and financial structuring of the Brightline rail system operating within the State of Florida through Fortress-managed funds and affiliated holding-company entities.

153. Upon information and belief, Fortress managed funds and affiliates that indirectly owned and controlled Brightline Holdings LLC through Florida Investment Holdings LLC, which public bond materials identify as a majority member of Brightline Holdings LLC, and thereby exercised sponsor-level influence over Brightline Florida Holdings LLC and Brightline Trains Florida LLC.

154. Public bond offering materials and financing disclosures reflect that capital expenditures for rail infrastructure, system expansion, operational initiatives, management services, and enterprise risk management were implemented through centralized financing structures in which funding, allocation, and approval mechanisms operated at the parent or holding-company level.

155. The management structure disclosed in public bond materials reflects that Brightline Management LLC supplied management and personnel functions, including day-to-day management and operation, financial and accounting management, rail operations, maintenance support, station operations, safety, and security functions.

156. These financing and management arrangements governed or materially influenced the allocation of resources necessary for rail operations, including infrastructure investment, staffing support, operational systems, post-incident relief resources, mental-health response, and safety-related measures, rather than being determined solely at the local operating entity level.

157. Through these structures, Fortress-affiliated entities participated in enterprise-level decisions concerning capital deployment, financial priorities, management structure, resource allocation, liquidity, reserve funding, and related-party transactions affecting rail operations conducted within this District.

158. The safety environment in which Plaintiff worked, including staffing levels, post-incident response resources, infrastructure investment, risk management

27

protocols, and operational support systems, was shaped in part by these enterprise-level financial, management, and operational frameworks.

159. Upon information and belief, Fortress's involvement in these systems was not limited to passive ownership, but included participation in financial and governance structures that influenced how operational resources, staffing support, and safety-related measures were allocated across the Brightline enterprise.

160. Those enterprise-level decisions affected the availability of staffing, post-incident response resources, infrastructure investment, management support, and other safety-related measures bearing on Plaintiff's working conditions.

161. As a result of these enterprise-level structures and decisions, Plaintiff was subjected to working conditions that included repeated exposure to traumatic incidents, inadequate post-incident support, insufficient relief staffing, and hazardous operational environments.

162. Fortress's participation in these enterprise-level financial and governance systems played a part in creating, maintaining, or failing to correct the unsafe conditions that contributed to Plaintiff's injuries.

163. Fortress's alleged control and influence extended beyond passive investment because the public financing and management disclosures reflect sponsor-level ownership, enterprise-level management structure, centralized flow-of-funds restrictions, required upstream distributions, reserve-account restrictions, and approval mechanisms for major financial decisions affecting the rail enterprise.

164. As a direct and proximate result of Fortress's enterprise-level control, influence, and participation in the financial and management structures governing the Brightline enterprise, Plaintiff sustained injuries and damages recoverable under FELA.

## VII. COUNT III – FMLA INTERFERENCE

**(Against Defendant Brightline Trains Florida LLC only)**

28

165.    Count III is an FMLA interference claim against Defendant Brightline Trains Florida LLC. Plaintiff re-alleges and incorporates paragraphs 49–60 and 95–108 into this Count. Paragraphs 49–60 allege Plaintiff's PTSD diagnosis, medical treatment, symptoms, and serious health condition. Paragraphs 95–108 allege Plaintiff's FMLA eligibility, notice to Brightline of his need for medical leave, The Standard's eligibility notice, Plaintiff's medical certification, Brightline's knowledge of Plaintiff's qualifying condition, Brightline's failure to properly process and administer protected leave, continued scheduling despite the pending leave request, and Plaintiff's resulting separation.

166.    Plaintiff's FMLA interference claim is based on Brightline's alleged failure to properly process, designate, administer, and facilitate medical leave after Brightline knew Plaintiff had a serious health condition and needed protected leave.

167.    At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., and Brightline was an employer subject to the requirements of the FMLA.

168.    Plaintiff suffered from a serious health condition within the meaning of the FMLA, including chronic Post-Traumatic Stress Disorder, which required ongoing medical treatment and rendered Plaintiff unable to safely perform the essential functions of his position at times.

169.    In September 2023 and October 2023, Plaintiff provided notice to Brightline and its leave administrator of his need for medical leave due to PTSD.

170.    Brightline's leave administrator confirmed Plaintiff's FMLA eligibility and available leave, and Plaintiff's treating clinician provided medical certification supporting Plaintiff's need for PTSD-related leave and assignment modification.

171.    Despite notice of Plaintiff's serious health condition and protected leave request, Brightline failed to properly administer Plaintiff's FMLA leave, failed to timely and properly designate qualifying leave as FMLA-protected, and failed to facilitate leave in a manner consistent with Plaintiff's medical certification and rights under the FMLA.

29

172. Brightline, through its management and supervisory personnel, including but not limited to Plaintiff's supervisor Jonathan White and other transportation managers, failed to process, approve, or facilitate Plaintiff's protected leave despite knowledge of Plaintiff's qualifying condition.

173. Instead of allowing Plaintiff to take protected leave without interference, Brightline continued to require Plaintiff to perform job duties despite knowledge of his medical condition and need for leave, and placed operational pressure on Plaintiff to continue working while the leave process was pending.

174. Brightline also discouraged or interfered with Plaintiff's exercise of FMLA rights by communicating that leave or additional days could not be covered until approval was complete and by treating mental-health leave as dependent on manpower rather than medical necessity.

175. Following Plaintiff's request for leave, Brightline communicated conditions regarding Plaintiff's continued employment that had the effect of discouraging or interfering with the exercise of FMLA rights.

176. As a direct and proximate result of Brightline's interference, Plaintiff was denied the opportunity to take protected leave when needed, was forced to continue working under unsafe conditions, suffered economic loss, and experienced worsening and aggravation of his medical condition.

177. Plaintiff has suffered damages including lost compensation and benefits, interest, liquidated damages, and other relief recoverable under the FMLA. Brightline's conduct interfered with, restrained, and denied Plaintiff's exercise of rights guaranteed under the FMLA.

## VIII. COUNT IV – FMLA RETALIATION

### (Against Defendant Brightline Trains Florida LLC only)

178. Count IV is an FMLA retaliation claim against Defendant Brightline Trains Florida LLC. Plaintiff re-alleges and incorporates paragraphs 49–60 and 95–108 into this Count. Paragraphs 49–60 allege Plaintiff's PTSD diagnosis, medical treatment,

30

symptoms, and serious health condition. Paragraphs 95–108 allege Plaintiff's request for medical leave, Brightline's knowledge of Plaintiff's protected activity, Brightline's continued work scheduling and employment pressure after the leave request, and Plaintiff's resulting separation and damages.

179. Plaintiff's FMLA retaliation claim is based on Brightline's alleged adverse employment actions after Plaintiff requested or attempted to use protected medical leave for his serious health condition.

180. Plaintiff engaged in protected activity under the Family and Medical Leave Act by requesting and attempting to utilize leave for serious health conditions arising from workplace trauma, including chronic PTSD.

181. Brightline, through its managers, supervisors, leave administrator, human resources personnel, and transportation management personnel, had actual knowledge of Plaintiff's protected activity.

182. This knowledge included communications involving Brightline's transportation management, Plaintiff's treating clinician, and Brightline's leave-administration process regarding Plaintiff's PTSD-related FMLA request and medical certification.

183. Despite this knowledge, Brightline subjected Plaintiff to adverse employment actions, including but not limited to:

184. Escalating Plaintiff to Final Notice status;

185. Denying, delaying, discouraging, or failing to properly facilitate leave associated with Plaintiff's medical condition;

186. Recharacterizing protected medical leave or mental-health leave as discretionary leave dependent on manpower or operational coverage;

187. Imposing continued work expectations despite knowledge of Plaintiff's diminished fitness for duty and pending medical leave request;

188. Failing to provide safe assignment modifications or reliable leave protection after receiving medical notice of Plaintiff's PTSD; and

189. Creating working conditions that led to Plaintiff's constructive discharge.

31

190. The temporal proximity between Plaintiff's protected activity and the adverse actions, combined with Brightline's direct knowledge of Plaintiff's condition and leave requests, establishes a causal connection between the protected activity and the adverse employment actions.

191. Brightline's stated reasons for its actions were not the true reasons for those actions. Instead, Brightline acted with the intent to interfere with, discourage, and retaliate against Plaintiff for exercising rights protected under the FMLA.

192. As a direct and proximate result of Brightline's retaliation, Plaintiff suffered damages including lost wages, loss of employment, lost benefits, interest, liquidated damages, and other relief recoverable under the FMLA.

193. Brightline's retaliatory conduct was willful and not in good faith. Plaintiff is entitled to liquidated damages equal to lost compensation and benefits, plus interest, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

## IX. PRAYER FOR RELIEF

194. Brightline's violations of the FMLA were willful and not made in good faith. Brightline knew or showed reckless disregard for whether its conduct violated the FMLA, thereby entitling Plaintiff to liquidated damages equal to the amount of economic damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

195. WHEREFORE, Plaintiff, Darren J. Brown, Jr., respectfully requests that the Court enter judgment in his favor and award the following relief:

196. Compensatory damages recoverable under FELA, including past and future economic losses, loss of earning capacity, and loss of employment-related benefits;

197. Damages recoverable under FELA for pain, suffering, mental anguish, emotional distress, and loss of enjoyment of life resulting from Plaintiff's injuries;

198. Back pay and other economic relief recoverable under the FMLA, including lost wages, overtime, bonuses, retirement contributions, employment benefits, interest, and liquidated damages;

32

199. Compensation for economic losses including past and future lost wages, loss of earning capacity, loss of employment-related benefits, and loss of retirement benefits, including diminished Railroad Retirement Board benefits;

200. Liquidated damages under the Family and Medical Leave Act in an amount equal to Plaintiff's economic damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), based on Brightline's willful violations;

201. Pre-judgment and post-judgment interest as allowed by law;

202. Costs of this action; and

203. Such other and further relief as the Court deems just and appropriate.

## X. JURY DEMAND

204. Plaintiff, Darren J. Brown, Jr., hereby demands a trial by jury on all issues so triable as of right.

Respectfully submitted,

Darren J. Brown, Jr.
Plaintiff, Pro Se
931 Village Blvd., Suite 905-438
West Palm Beach, Florida 33409
Email: darrenbrown@advantagefc.com
Telephone: (708) 705-3214

33

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of May, 2026, I served the foregoing Amended Complaint on all counsel of record via electronic mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) at the email addresses listed below:

Eric L. Leach, Esq.
Counsel for Defendants
Email: eleach@miltonleach.com

C. Ryan McKay Eslinger, Esq.
Counsel for Defendants
Email: reslinger@miltonleach.com

Amy Austin, Esq.
Counsel for Defendants
Email: aaustin@miltonleach.com

Karen Miller, Paralegal
Paralegal for Counsel for Defendants
Email: kmiller@miltonleach.com

I declare under penalty of perjury that the foregoing is true and correct.

34



Darren J. Brown, Jr.
Plaintiff, Pro Se