# EXHIBIT A

*Targeted Bond / Offering Materials - Enterprise Structure, FELA Risk, Management Agreements*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says it is only a non-railroad investment company, not a FELA employer. | A-3-A-4; A-15-A-18 | Shows the Fortress/FIH/Brightline structure, Fortress-managed funds, Brightline Management, and the no-employee Project Owner structure. |
| Fortress says there are no facts showing control or right to control Plaintiff's work. | A-7-A-12; A-18; A-22-A-26 | Identifies project documents, intercompany access, JUA/DispatchCo, management agreements, and shared-services systems that make control discovery concrete. |
| Fortress says Plaintiff's enterprise allegations are conclusory. | A-9-A-17; A-22-A-26 | Shows financial restrictions, affiliate transactions, Majority Bondholder approvals, organizational chart, sponsor structure, and related-party agreements. |
| Fortress relies on Kelley and argues no master-servant / significant supervisory role facts. | A-18; A-22-A-26 | Shows personnel and management functions were structured through Brightline Management and formal management/shared-services agreements. |
| Fortress says discovery is unnecessary and dismissal with prejudice is proper. | A-19-A-21; A-22-A-26 | Shows rail-liability insurance, FELA employee-injury risk, and named agreements in Defendants' possession that should be examined before dismissal. |

## WHY THESE PAGES MATTER

Exhibit A is the main enterprise/FELA exhibit. It does not ask the Court to decide final liability from bond materials. It shows that Fortress's 'passive investor' and 'no control facts' arguments cannot be resolved fairly before targeted discovery because the public bond materials identify specific financing, staffing, risk-management, rail-liability, FELA, management, shared-services, JUA/DispatchCo, and intercompany systems.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| A-1 | Replacement cover sheet and motion-response roadmap. | Shows the Court why the bond pages are attached and how they respond to Fortress's Rule 12 arguments. |
| A-2 | Original bond document cover / source identification. | Authenticates the public offering source from which the targeted excerpts are taken. |
| A-3-A-4 | Borrower, Project Owner, Sponsors, Fortress Investment, FIH, Brightline Holdings, and approx. $2.2B Fortress-related investment. | Addresses the 'passive investor' framing by showing the top-level sponsor/funding structure. |
| A-5-A-6 | South Florida commuter rail, FECR coordination, RTC/capacity model, Shared Service Committee, and access/funding context. | Shows railroad operations depended on structured corridor, capacity, and access systems. |
| A-7-A-8 | Project Documents, passenger easement, Joint Use Agreement, DispatchCo, FECR/SFRTA access/funding, intercompany access agreements. | Identifies specific documents and entities relevant to control, dispatch, access, and operations discovery. |
| A-9-A-12 | Required deposits, debt/distribution restrictions, asset sales, affiliate transactions, Majority Bondholder approval, FIH covenant. | Shows financial-control mechanisms beyond simple stock ownership. |
| A-13-A-14 | Sources of repayment, pledge/security, distribution restrictions, and borrower dependency. | Supports discovery into flow-of-funds, liquidity, and enterprise-level financial gatekeeping. |
| A-15-A-17 | Organizational chart and business section showing Fortress-managed funds, Brightline Holdings, related entities, and investment structure. | Shows the corporate chain the Motion asks the Court to disregard as too remote. |
| A-18 | Employees section: Project Owner has no employees; senior management/personnel made available through Brightline Management LLC. | Directly relevant to employer/control inquiry and the need to inspect management/staffing agreements. |
| A-19-A-21 | Aon insurance, rail liability, employee injury, catastrophic loss, and FELA risk disclosures. | Shows FELA and employee-injury risk were recognized enterprise risks, not speculative pleading themes. |
| A-22-A-26 | Project Owner Management Agreement, Parent Management Agreement, Master Shared Services Agreement, FECR/JUA/DispatchCo and access/development agreements. | Core discovery roadmap: named agreements may show who controlled staffing, safety, risk, budgets, and operations. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

**Not a New Issue—Book Entry Only**

*Assuming the accuracy of the certifications of Florida Development Finance Corporation (the "Issuer"), Brightline Florida Holdings LLC (the "Borrower"), Brightline Trains Florida LLC (the "Project Owner") and their continued compliance with their respective covenants in the Indenture, the Loan Agreement and with the Tax Certificate (each, as defined herein) pertaining to the requirements of the Internal Revenue Code of 1986, as amended (the "Code"), Greenberg Traurig, P.A., Miami, Florida ("Bond Counsel") is of the opinion that (i) interest on the Series 2025B Bonds (as defined below) is excludable from gross income for purposes of federal income taxation under existing laws as enacted and construed on the date hereof (except for interest on any Series 2025B Bonds while held by a "substantial user" of the Project (as defined herein) or a "related person," as those terms are defined in Section 147(a) of the Code), and (ii) interest on the Series 2025B Bonds is a preference item for purposes of determining federal alternative minimum tax imposed on individuals. In the case of the alternative minimum tax imposed by Section 55(b)(2) of the Code on "applicable corporations" (as defined in Section 59(k) of the Code), interest on the Series 2025B Bonds is not excluded from the determination of adjusted financial statement income. Bond Counsel is also of the opinion that the Series 2025B Bonds and the interest thereon are not subject to taxation under the laws of the State of Florida, except as to estate taxes and taxes under Chapter 220, Florida Statutes, on interest, income or profits on debt obligations owned by corporations as defined therein. See "TAX MATTERS" herein.*

**$985,000,000**
**FLORIDA DEVELOPMENT FINANCE CORPORATION**
**Revenue Bonds**
**(Brightline Florida Passenger Rail Expansion Project),**
**Series 2025B**

| | | |
|---|---|---|
| **Dated: Date of Delivery** | | **Due: July 1, 2057** |
| **Price: 100.00%** | **Scheduled Mandatory Tender Date: June 15, 2026\*** | **CUSIP No. +: 340618EB9** |
| **Interest Rate Mode: Term Rate** | **Earliest Optional Mode Change Date: September 14, 2025** | **Term Rate: 10.000%** |

The Florida Development Finance Corporation Revenue Bonds (Brightline Florida Passenger Rail Expansion Project), Series 2025B (the "Series 2025B Bonds") are being remarketed pursuant to the Fifth Supplemental Indenture of Trust, to be dated as of the date of the remarketing and delivery of the Series 2025B Bonds (the "Remarketing Date") (the "Fifth Supplemental Indenture"), between the Issuer and Deutsche Bank National Trust Company, as trustee (the "Trustee"), supplementing and amending the Indenture of Trust, dated as of August 25, 2022, as previously supplemented and amended by the First Supplemental Indenture of Trust, dated as of March 7, 2023, the Second Supplemental Indenture of Trust, dated as of October 3, 2023, the Third Supplemental Indenture of Trust, dated as of April 1, 2024, and the Fourth Supplemental Indenture of Trust, dated as of August 15, 2024 (as previously supplemented and amended, the "Prior Indenture" and, together with the Fifth Supplemental Indenture, the "Indenture"), each between the Issuer and the Trustee. The net proceeds of the Series 2025B Bonds were loaned to the Borrower pursuant to the Loan Agreement, dated as of August 25, 2022, as supplemented and amended by the First Supplemental Loan Agreement, dated as of March 7, 2023, the Second Supplemental Loan Agreement, dated as of October 3, 2023, the Third Supplemental Loan Agreement, dated as of April 1, 2024, and the Fourth Supplemental Loan Agreement, dated as of August 15, 2024 (as previously supplemented and amended, the "Prior Loan Agreement"), each between the Issuer and the Borrower, and as further supplemented by the Fifth Supplemental Loan Agreement, to be dated as of the Remarketing Date (the "Fifth Supplemental Loan Agreement" and, together with the Prior Loan Agreement, the "Loan Agreement"), between the Issuer and the Borrower and accepted and agreed to by Florida Investment Holdings LLC, ("FIH") an affiliate of the Borrower, as to certain provisions thereto, to, directly or indirectly, (i) finance or refinance the Project, (ii) fund certain reserves related to the Project and the financing for the Project, and (iii) pay costs of issuance and capitalized interest. The Issuer's Revenue Bonds (Brightline Florida Passenger Rail Expansion Project), Series 2025A (the "Series 2025A Bonds"), which were issued pursuant to the Prior Indenture, are being redesignated as "Series 2025B Bonds" and remarketed in their entirety pursuant hereto.

The Series 2025B Bonds will bear interest at the Term Rate set forth above during the applicable Term Rate Period described herein, and thereafter may be converted to another Term Rate Period or to another interest rate mode, as described herein. Interest on the Series 2025B Bonds will be payable on the mandatory tender date at the end of the applicable Term Rate Period. The Series 2025B Bonds are subject to redemption and mandatory tender prior to maturity as described herein.

The Series 2025B Bonds are being remarketed as fully-registered bonds in denominations of $250,000 and integral multiples of $5,000 in excess thereof and, when remarketed, the Series 2025B Bonds will be registered in the name of Cede & Co., as nominee for The Depository Trust Company of New York ("DTC"). DTC will act as securities depository for the Series 2025B Bonds. Purchases of beneficial interests in the Series 2025B Bonds will be made in book-entry form only, and purchasers will not receive certificates representing their interests in the Series 2025B Bonds except as described herein. The Remarketing Agent (as defined herein) is remarketing the Series 2025B Bonds only to "qualified institutional buyers" under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"). Please see "NOTICE TO INVESTORS," "DESCRIPTION OF THE SERIES 2025B BONDS" and "APPENDIX C—FORM OF INVESTOR LETTER" for additional information about eligible offerees and transfer restrictions.

**This Limited Remarketing Memorandum is intended to provide disclosure to the purchasers of the Series 2025B Bonds only with respect to the Term Rate Period described herein. In the event the Borrower, at the end of the Term Rate Period described herein, elects to have any Series 2025B Bonds continue to bear interest at a Term Rate for a new Term Rate Period or convert the Series 2025B Bonds to a different interest rate mode, the Borrower will, to the extent necessary, circulate or cause to be circulated, a revised disclosure document relating thereto.**

Investing in the Series 2025B Bonds involves certain risks. Investors should read this Limited Remarketing Memorandum in its entirety and the forms of the various financing and security documents referenced in this Limited Remarketing Memorandum before making an investment decision. In making an investment decision, investors must rely on their own examination of the Borrower, the Project Owner, the Project, the South Florida Commuter Rail Project (as defined herein), the Orlando-Tampa Project (as defined herein), the security for the Series 2025B Bonds, and the terms of this remarketing, including the merits and risks involved.

**THE SERIES 2025B BONDS ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER PAYABLE FROM AND SECURED SOLELY BY THE TRUST ESTATE (AS DEFINED HEREIN) AND THE COLLATERAL (AS DEFINED HEREIN). THE SERIES 2025B BONDS DO NOT CONSTITUTE INDEBTEDNESS OF THE ISSUER, THE STATE OF FLORIDA (THE "STATE"), MIAMI-DADE, BROWARD, PALM BEACH, BREVARD, ORANGE, OSCEOLA OR HILLSBOROUGH COUNTIES (COLLECTIVELY, THE "COUNTIES"), OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE, WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NOT CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE ISSUER, THE STATE, THE COUNTIES, OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE, AND NEITHER THE FULL FAITH AND CREDIT OF THE ISSUER NOR THE FULL FAITH AND CREDIT OR THE TAXING POWER OF THE STATE, THE COUNTIES, OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF OR INTEREST OR PREMIUM, IF ANY, ON THE SERIES 2025B BONDS. NO COVENANT OR AGREEMENT CONTAINED IN THE SERIES 2025B BONDS OR THE INDENTURE SHALL BE DEEMED TO BE A COVENANT OR AGREEMENT OF ANY MEMBER OF THE GOVERNING BODY OF THE ISSUER NOR SHALL ANY OFFICIAL OF THE ISSUER EXECUTING SUCH SERIES 2025B BONDS BE LIABLE PERSONALLY ON THE SERIES 2025B BONDS OR BE SUBJECT TO ANY PERSONAL LIABILITY OR ACCOUNTABILITY BY REASON OF THE REMARKETING OF THE SERIES 2025B BONDS. THE ISSUER HAS NO TAXING POWER.**

*The Series 2025B Bonds are being remarketed and offered subject to receipt of opinions on certain legal matters of Greenberg Traurig, P.A., Miami, Florida, as Bond Counsel, and to certain other conditions. Certain legal matters will be passed upon for the Issuer by its special counsel, Nelson Mullins Riley & Scarborough LLP, Attorneys at Law, Orlando, Florida; for the Borrower by its special counsels, Skadden, Arps, Slate, Meagher & Flom LLP and Greenberg Traurig, P.A., Miami, Florida; and for the Remarketing Agent by its special counsel, Mayer Brown LLP. It is expected that delivery of the Series 2025B Bonds will be made through the facilities of DTC on or about August 13, 2025.*

**Morgan Stanley**

August 11, 2025
_____

\* Subject to adjustment as provided herein.

+ Copyright 2025, American Bankers Association.

Exhibit A-2 of 26

**THE PROJECT, THE SOUTH FLORIDA COMMUTER RAIL PROJECT AND RELATED PARTIES**

The Borrower.....................................

Brightline Florida Holdings LLC, a Delaware limited liability company, is an indirect parent entity of the Project Owner and the borrower of the proceeds of the Series 2025B Bonds, which are being remarketed in their entirety by this offering.

The Guarantors ...............................

The payment and performance of the Series 2025B Bonds will be guaranteed by MDC Commuter LLC ("MDC Commuter"), BRWD Commuter LLC ("BRWD Commuter"), PBC Commuter LLC ("PBC Commuter" and, together with MDC Commuter and BRWD Commuter, the "Commuter SPVs"), BL Florida Commuter LLC ("BL Florida Commuter") and BL Expansion LLC ("BL Expansion" and, together with the Commuter SPVs and BL Florida Commuter, the "Guarantors"), each of which are a direct or indirect subsidiary of the Borrower.

The Project Owner ..........................

Brightline Trains Florida LLC is the Project Owner and the borrower of certain senior indebtedness. See "DESCRIPTION OF OTHER INDEBTEDNESS AND PREFERRED EQUITY." The Series 2025B Bonds are structurally subordinated with respect to the assets of the Project Owner and to all existing and future indebtedness of the Project Owner and each other subsidiary of the Borrower (other than the Guarantors). The Loan Agreement includes limitations on the ability of the Project Owner to create, incur, issue or assume additional indebtedness for borrowed money. See "THE SERIES 2025B BONDS—Restrictions on Certain Additional Indebtedness and Equity Issuances" and "SECURITY AND SOURCES OF REPAYMENT FOR THE SERIES 2025B BONDS—Additional Indebtedness."

The Sponsors....................................

To date, Fortress Investment Group LLC and its affiliates, including Florida Investment Holdings LLC ("FIH"), a member of Brightline Holdings, LLC ("Brightline Holdings"), the Project Owner's indirect parent company, have contributed approximately $2.2 billion of equity in cash and assets to finance the Project (the "Fortress Investment"). In January 2024, AAF Operations Holdings LLC ("AAFOH"), a subsidiary of the Borrower, issued $245 million aggregate liquidation preference of preferred equity (the "Initial AAFOH Preferred Equity") to BLH Investment LLC, an affiliate of the Borrower (the "Initial AAFOH Preferred Equity Issuance"). The net cash proceeds of the Initial AAFOH Preferred Equity Issuance were contributed directly or indirectly to the Project Owner. See "DESCRIPTION OF OTHER INDEBTEDNESS AND PREFERRED EQUITY—Existing Indebtedness and Preferred Equity of AAFOH."

As part of the Refinancing Transactions (as defined below), on May 9, 2024, AAFOH issued $499 million aggregate liquidation preference of additional preferred equity (the "New AAFOH Preferred Equity" and, together with the Initial AAFOH Preferred Equity, the "AAFOH Preferred Equity"), the net cash proceeds of which were contributed to the Project Owner, for a total of $775 million of AAFOH Preferred Equity, inclusive of the contribution of net proceeds from the Initial AAFOH Preferred Equity Issuance and $31 million of paid-in-kind distributions and fees. As of June 30, 2025, there is a total of approximately $907.3 million aggregate liquidation preference of AAFOH Preferred Equity, which includes paid-in-kind distributions. See "DESCRIPTION OF OTHER INDEBTEDNESS AND PREFERRED EQUITY—Existing Indebtedness and Preferred Equity of AAFOH." The

Series 2025B Bonds will be (i) structurally subordinated to all debt and liabilities of the Borrower's subsidiaries (including the debt or preferred equity issued or sold by certain subsidiaries of the Borrower in the Refinancing Transactions) and (ii) structurally senior to the Fortress Investment. See "SUMMARY STATEMENT—Security For The Series 2025B Bonds—Security Interests."

BL Florida LLC, the immediate parent of the Borrower, is expected to provide the Borrower with an equity contribution at or prior to the Remarketing Date, which, together with the proceeds from the remarketing of the Series 2025B Bonds and the funds in the prefunded interest account for the Series 2025A Bonds, will be used to pay in full the tender price of the remarketed Series 2025A Bonds at the purchase price of 104.25% of the aggregate principal amount of Series 2025A Bonds outstanding, plus accrued interest to the mandatory tender date, and to pay expenses related to the offering. See "BORROWER SOURCES AND USES." The Series 2025B Bonds will be structurally senior to such equity contribution.

**Florida Investment Holdings LLC.**  FIH is a majority member of Brightline Holdings which owns BL Florida LLC and its subsidiaries, including the Borrower, AAFOH, the Parent and the Project Owner. Brightline Holdings also owns a 100% interest in DTS DT Retail LLC, the holder of the retail assets adjacent to the Miami station, and holds a 40% interest in BL West Holdings LLC, the parent of DesertXpress Enterprises LLC d/b/a Brightline West and 40% of LV TOD Property Holdings LLC, which owns certain land located near the proposed Las Vegas station. Pursuant to the Fifth Supplemental Loan Agreement, FIH will agree (i) not to make any distribution with funds received from any of its subsidiaries prior to the date that the Series 2025B Bonds are tendered or redeemed in full and all accrued interest and premium on the Series 2025B Bonds is paid in full, subject to certain exceptions and (ii) to comply with its obligations under the covenant described in "DESCRIPTION OF THE SERIES 2025B BONDS—Required Deposits." As of June 30, 2025, the total debt of FIH and its subsidiaries that is held by third parties is approximately $7.0 billion (which includes the $985 million aggregate principal amount of the Series 2025A Bonds and does not include $2.5 billion incurred by BL West Holdings LLC and its subsidiaries) which will be structurally senior to FIH's obligation to the Owners of the Series 2025B Bonds under to the Fifth Supplemental Loan Agreement.

**The Project**.......................................  As used herein, the Project consists of a privately owned and operated express intercity passenger rail system extending from Miami to Tampa, Florida, with stations located or potentially located in Miami, Aventura, Fort Lauderdale, Boca Raton, West Palm Beach, Martin County, Brevard County, Orange County and Tampa, Florida, and elsewhere along the hereinafter described rail corridor. The portion of the Project from Miami to Orlando, Florida (the "Miami-Orlando Project") is in operation. The Miami-Orlando Project is owned by the Project Owner.

The Project Owner has developed an express intercity passenger rail system to connect the key business, leisure and residential centers of Southeast and Central Florida. The segment between Miami and West Palm Beach, Florida (the "South Segment") commenced operations in 2018 and the service to the station in the Orlando International Airport (the "North Segment") began on September 22, 2023. The additional in-line stations at Aventura and Boca Raton (the "Additional In-Line Stations") opened for service in December 2022. On March 4, 2024, the Project Owner announced its plans to build a

11

release of such equity interests and assets from the AAFOH Bond Collateral unless the Brightline Tampa Release Condition is satisfied. See "DESCRIPTION OF OTHER INDEBTEDNESS AND PREFERRED EQUITY—Existing Indebtedness and Preferred Equity of AAFOH" and "DESCRIPTION OF THE SERIES 2025B BONDS—The Indenture and the Loan Agreement—Brightline Tampa." If the Project Owner does not exercise its repurchase option, Brightline Tampa may independently finance, construct and operate the Orlando-Tampa Project. The Project Owner expects that ultimately, the entire Miami to Tampa system will be owned and operated by Project Owner. Any acquisition of the Orlando-Tampa Project or financing with the Project Owner debt in connection with such ownership and operation would require either a written confirmation from each of the nationally recognized rating agencies then rating the Project Owner Bonds (a "Rating Confirmation") or a refinancing of the Project Owner Bonds.

See "BUSINESS."

**South Florida Commuter Rail Project** ...........................................

The Borrower is currently developing the South Florida Commuter Rail Project to expand convenient access to the Project Owner's express intercity passenger rail service, to drive increased long-distance ridership and to generate high-quality cash flow through payments from Miami-Dade, Broward and Palm Beach Counties.

Two of the Guarantors, MDC Commuter and BRWD Commuter, hold the rights to operate commuter rail service on the Project Owner's rail corridor in Miami-Dade and Broward Counties, respectively. In May 2024, MDC Commuter substantially completed negotiations with Miami-Dade County on the terms of definitive agreements for the MDC Commuter Project. The economic terms that were negotiated reflect a series of milestone payments to be made by the County as the MDC Commuter Project advances, including (i) the entry of the MDC Commuter Project into the Engineering Phase of the New Starts grant program, which has already been achieved, (ii) execution of full funding grant agreement between Miami-Dade County and the Federal Transit Administration ("FTA"), (iii) obtaining notice to proceed, (iv) submission of invoices for 50% of project costs, (v) upon substantial completion and (vi) upon commencement of operations. The Borrower expects that the Miami-Dade County Board of County Commissioners will vote on approval and execution of the agreements once the Project Owner receives concurrence from all parties on the agreements and after Florida East Coast Railway ("FECR"), the freight operator on the corridor, the Project Owner and Miami-Dade County finalize the rail infrastructure capacity requirements and corresponding infrastructure to be added to the system to ensure the new operations do not unreasonably interfere with FECR or the Project Owner operations. MDC Commuter, the Project Owner, Miami-Dade County and FECR have been meeting to finalize the rail infrastructure alignment, and on March 7, 2025, the Project Owner, at the direction of MDC Commuter, submitted the rail traffic controller ("RTC") model to FECR and the Shared Service Committee ("SSC") for review and approval. As recently as April 29, 2025, the parties, including FECR, Miami-Dade County, Broward County, the Project Owner and the Commuter SPVs, met to review the RTC model and the rail infrastructure alignment and, at such meeting, FECR requested the Project Owner submit an RTC model to FECR and the SSC covering the entire proposed commuter segment spanning Miami-Dade, Broward and Palm Beach Counties. On July 18, 2025, the Project Owner was served by FECR with a lawsuit seeking

13

declaratory relief and supplemental injunctive relief, to the extent required, regarding the parties' rights and obligations under the Joint Use Agreement and the related passenger easements. For more information, see "BUSINESS—Legal Proceedings."

BRWD Commuter is in the process of finalizing negotiations with Broward County, Broward County has continued to participate in meetings along with Miami-Dade County and therefore definitive documents should be able to be completed in a short time frame thereafter. In parallel with the ongoing review of documentation and technical submittals to the SSC and FECR, and in light of resulting delays, MDC Commuter and BRWD Commuter have substantially advanced discussions with Miami-Dade County and Broward County, respectively, for an alternate transaction structure that could move forward without reaching agreement on documentation with FECR. Under the alternate transaction structure, MDC Commuter and BRWD Commuter would raise financing to pay construction costs (which financing of the MDC Commuter Project is expected to be repaid through additional milestone payments by Miami-Dade County with the repayment source for a financing of the BRWD Commuter Project under ongoing discussions) and would be responsible for the ongoing operation and maintenance of the MDC Commuter Project and BRWD Commuter Project (each as defined herein), respectively. In order to effectuate this structure, MDC Commuter has commenced discussions with SFRTA of a possible operations and maintenance subcontract and related access agreements. While MDC Commuter and BRWD Commuter continue to work toward definitive documentation based on the original transaction structure described above, the alternate structure eliminates the need for FECR to execute the definitive documentation in connection with the transaction, makes MDC Commuter the designee and the direct operator of the commuter service and limits the role of FECR and the SSC to review of the RTC model and related technical submittals in accordance with the parameters set forth in the Joint Use Agreement (as defined herein). PBC Commuter, also a Guarantor, expects to negotiate a commuter project with Palm Beach County. The MDC Commuter Project would enable Miami-Dade County to provide commuter rail service to up to five new stations between the MiamiCentral and Aventura stations on the Project Owner's rail corridor. The Broward Commuter Project would run northward from Miami-Dade County approximately 25 additional miles and is currently contemplated to include up to six new stations, from Aventura to the north end of Broward County. Broward County plans to open the project in two phases, Broward County South as the initial phase and then following on with Broward County North. The PBC Commuter Project (as defined herein), historically identified by Palm Beach County as the Coastal Link Project, is expected to run northward from Broward County approximately 45 miles and is currently contemplated to include three commuter stations between Boca Raton and West Palm Beach and three commuter stations between West Palm Beach and Jupiter. See "CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS."

Subject to the process discussed above and finalization of the rail infrastructure to be built, the Borrower expects MDC Commuter and BRWD Commuter or its affiliates to enter into long-term access rights and development agreements with Miami-Dade County in Q4 2025 and Broward County shortly thereafter. A similar long-term access rights and development agreement is contemplated with Palm Beach County, but formal negotiations are not expected to commence until after execution of definitive

14

substantially all personal property of the Borrower, including all of the equity interests in BL Florida Commuter and AAFOH, (ii) a further amended and restated pledge and security agreement by BL Florida Commuter in respect of substantially all personal property of BL Florida Commuter, including all of the equity interests in BL Expansion, (iii) a further amended and restated pledge and security agreement by BL Expansion in respect of substantially all personal property of BL Expansion, including all of the equity interests of MDC Commuter, BRWD Commuter and PBC Commuter, (iv) a further amended and restated security agreement by MDC Commuter, granting a security interest in and lien on substantially all of its personal property, whether now owned or hereafter acquired, including its interests in the MDC Commuter Access Rights, (v) a further amended and restated security agreement by BRWD Commuter, granting a security interest in and lien on substantially all of its personal property, whether now owned or hereafter acquired, including its interests in the BRWD Commuter Access Rights, and (vi) a further amended and restated security agreement by PBC Commuter, granting a security interest in and lien on substantially all of its personal property, whether now owned or hereafter acquired, including its interests in the PBC Commuter Access Rights. In connection with the grant of security in the Commuter Access Rights, the Project Owner has executed and delivered to the Trustee acknowledgments of the collateral assignment of such Commuter Access Rights. See "APPENDIX I—PLEDGE AND SECURITY AGREEMENTS."

**The Project Documents** ................... Various agreements related to the Project affect the use of the rail corridor including, but not limited to, (i) a passenger easement granted by FECR, which provides that the Project Owner has the exclusive right to operate passenger trains, and that FECR has the exclusive right to operate freight trains, in each case along the entirety of FECR's existing Miami to Cocoa, Florida rail corridor, (ii) a joint use agreement entered into by the Project Owner with FECR, which provides for the shared use of the FECR corridor and maintenance of the rail corridor, (iii) a dispatching services agreement, whereby Florida DispatchCo LLC (a 50-50 joint venture between the Project Owner and FECR; "DispatchCo") is responsible for providing dispatch services to the Project Owner and FECR, and (iv) an access, operating and funding agreement entered into by the Project Owner, FECR and South Florida Regional Transportation Authority ("SFRTA"), and other agreements, with respect to the shared use of the MiamiCentral Station and the implementation of SFRTA's commuter rail service on the rail corridor (collectively, the "Project Documents").

**Existing South Florida Commuter**
**Rail Project Documents** ............ The Project Owner has entered into (i) (a) the Access Agreement (Miami-Dade), dated as of February 10, 2022 (as amended, the "MDC Intercompany Access Agreement") with MDC Commuter (as designee of BL Expansion) and (b) the Development Agreement (Miami-Dade), dated as of February 10, 2022 (as amended, the "MDC Intercompany Development Agreement" and, together with the MDC Intercompany Access Agreement, the "MDC Project Documents") with MDC Commuter (as designee of BL Expansion), each with respect to the segment of the Project Owner's existing rail corridor between its stations in downtown Miami and Aventura, Florida (the "MDC Segment"), (ii) (a) the Access Agreement (Broward), dated as of February 10, 2022 (as amended, the "BRWD Intercompany Access Agreement") with BRWD Commuter (as designee of BL Expansion) and (b) the Development Agreement (Broward), dated as of February 10, 2022 (as amended, the "BRWD Intercompany Development Agreement" and, together with the BRWD

Intercompany Access Agreement, the "BRWD Project Documents") with BRWD Commuter (as designee of BL Expansion), each with respect to the segment of the Project Owner's existing rail corridor between its stations in Aventura, Florida, and the northernmost commuter station anticipated at Hillsboro Boulevard in Deerfield, Florida (the "BRWD Segment"), and (iii) an access agreement (as amended, the "PBC Intercompany Access Agreement" and, together with the MDC Intercompany Access Agreement and the BRWD Intercompany Access Agreement, the "Intercompany Access Agreements") and a development agreement (as amended, the "PBC Intercompany Development Agreement" and, together with the PBC Intercompany Access Agreement, the "PBC Project Documents"), each with respect to the segment of the Project Owner's existing rail corridor between Deerfield Beach and Jupiter, Florida (the "PBC Segment" and, together with the MDC Segment and the BRWD Segment, the "Commuter Segments"). The MDC Intercompany Development Agreement, the BRWD Intercompany Development Agreement and the PBC Intercompany Development Agreement are collectively referred to as the "Intercompany Development Agreements"). See "CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS" herein.

**Commuter Access Rights** ...............   The Project Owner has sold the access rights on the MDC Segment for a term ending February 2115 to MDC Commuter (as designee of the Project Owner through an assignment from BL Expansion) for the operation of commuter rail service under the Project Owner's existing passenger easement pursuant to the terms of the MDC Project Documents, and has agreed to not designate a further commuter rail service provider on the MDC Segment (except with respect to access to the Project Owner's station in Aventura, Florida, which will be shared with the holder of the BRWD Commuter Access Rights). Subject to the terms of the MDC Project Documents, MDC Commuter is entitled (with the Project Owner acting as construction manager) to develop the additional infrastructure necessary for the implementation of commuter rail service on the MDC Segment, and the development of up to five commuter stations, as well as use of MiamiCentral and Aventura stations. The rights of MDC Commuter under the MDC Project Documents are collectively referred to as the "MDC Commuter Access Rights."

The Project Owner has sold the access rights on the BRWD Segment for a term ending February 2115 to BRWD Commuter (as designee of the Project Owners through an assignment from BL Expansion) for the operation of a commuter rail service under the Project Owner's existing passenger easement pursuant to the terms of the BRWD Project Documents, and has agreed to not designate a further commuter rail service provider on the BRWD Segment (except with respect to access to the Project Owner's station in Aventura, Florida, which will be shared with the holder of the MDC Commuter Access Rights). Subject to the terms of the BRWD Project Documents, BRWD Commuter is entitled (with the Project Owner acting as construction manager) to develop the additional infrastructure necessary for the implementation of commuter rail service on the BRWD Segment, and the development of up to six (6) commuter stations. The rights of BRWD Commuter under the BRWD Project Documents are collectively referred to as the "BRWD Commuter Access Rights."

The Project Owner has sold the access rights on the PBC Segment for a term ending March 2116 to PBC Commuter (as designee of the Project Owner through an assignment from BL Expansion) for the operation of a commuter rail service under the Project Owner's existing passenger easement pursuant to the terms of the PBC Project Documents, and has agreed to not designate a

23

Proceeds). See "DESCRIPTION OF THE SERIES 2025B BONDS–Mandatory Tender for Purchase";

(iii) the incurrence by AAFOH of the loan of the proceeds of the AAFOH Bonds and, with the consent of the holders of a majority in principal amount of the Series 2025B Bonds, additional indebtedness;

(iv) the incurrence by Parent of the Parent Notes;

(v) the incurrence by Project Owner of (a) the loan of the proceeds of the Project Owner Bonds and (b) the Project Owner Credit Facility; and

(vi) certain refinancing indebtedness in respect of the foregoing.

### *Requirement to Cause Project Owner, Parent and AAFOH to Distribute Funds to the Borrower*

Pursuant to the Fifth Supplemental Loan Agreement, the Borrower will not permit Project Owner to (i) make any transfers to the "Capital Projects Account" pursuant to clause Twelfth or clause Eighteenth of the Project Owner Collateral Agency Agreement (x) unless, as of the date thereof, all transfers and distributions required to be made pursuant to clauses First through Eighth of the Flow of Funds on or prior to such date shall have been satisfied in full and (y) in excess of $1,000,000 in the aggregate in any fiscal year, (ii) make any optional prepayments or redemptions of any indebtedness of Project Owner other than with the proceeds from any indebtedness incurred to amend, supplement, modify, extend, renew, restate, replace, refund, exchange or refinance such Indebtedness of Project Owner constituting Permitted Indebtedness, (iii) make any transfers to the "Project Reserve Account" pursuant to clause Eighteenth of the Project Owner Collateral Agency Agreement unless, as of the date thereof, all transfers and distributions required to be made pursuant to clauses First through Eighth of the flow of funds set forth in the AAFOH Collateral Agency Agreement on or prior to such date shall have been satisfied in full, and (iv) fail to distribute sufficient funds to Pledgor (which shall distribute such funds to Parent) from the Project Owner Distribution Account, to the extent such funds are available in the Project Owner Distribution Account or otherwise permitted to be distributed.

Pursuant to the Fifth Supplemental Loan Agreement, the Borrower also will not permit Parent to (i) make any transfers to the "Parent Reserve Account" pursuant to clause Twelfth of the Parent Collateral Agency Agreement, (ii) make any optional prepayments or redemptions of any indebtedness of Parent other than with the proceeds from any indebtedness incurred to amend, supplement, modify, extend, renew, restate, replace, refund, exchange or refinance such indebtedness of Parent constituting Permitted Indebtedness and (iii) fail to distribute sufficient funds to AAFOH from the Parent Distribution Account, to the extent such funds are available in the Parent Distribution Account or otherwise permitted to be distributed.

In addition, pursuant to the Fifth Supplemental Loan Agreement, the Borrower will also not permit AAFOH to fail to distribute funds to the Borrower from the Distribution Account (as defined in the AAFOH Collateral Agency Agreement) on no worse than a pro rata basis with respect to holders of the equity interests of AAFOH and any other funds AAFOH is permitted to distribute to the Borrower under the terms of the AAFOH Financing Documents and the BLH Credit Agreement as in effect as of the Remarketing Date.

### *Permitted Security Interests*

The Fifth Supplemental Loan Agreement will provide that the Borrower will not, and will not permit any of its subsidiaries to, create, incur, assume or permit to exist any security interest on any property or asset, including its revenues (including accounts receivable) or rights in respect of any thereof, now owned or hereafter acquired by it or any such subsidiary, except for Permitted Security Interests (as defined in the Loan Agreement). See "APPENDIX F—FORM OF LOAN AGREEMENT."

### *Restrictions on Amendments to the Project Owner Financing Documents, the Parent Financing Documents and the AAFOH Financing Documents*

Pursuant to the Fifth Supplemental Loan Agreement, the Borrower will not permit (a) Project Owner to enter into any amendment, restatement, supplement, modification, replacement or refinancing of the Project Owner

32

Financing Documents or any documentation governing any other indebtedness of Project Owner if the effect thereof would be to make the Project Owner Financing Documents or such other documentation, taken as a whole, more restrictive in any material respect with respect to Project Owner's ability to distribute funds, directly or indirectly, to the Borrower, (b) Parent to enter into any amendment, restatement, supplement, modification, replacement or refinancing of the Parent Financing Documents or any documentation governing any other indebtedness of Parent if the effect thereof would be to make the Parent Financing Documents or such other documentation, taken as a whole, more restrictive in any material respect with respect to Parent's ability to distribute funds, directly or indirectly, to the Borrower, or (c) AAFOH to enter into any amendment, restatement, supplement, modification, replacement or refinancing of the AAFOH Financing Documents or any documentation governing any other indebtedness of AAFOH if the effect thereof would be to make the AAFOH Financing Documents or such other documentation, taken as a whole, more restrictive in any material respect with respect to AAFOH's ability to distribute funds, directly or indirectly, to the Borrower.

### Permitted Investments

The Fifth Supplemental Loan Agreement will provide that (i) the Borrower and the Guarantors shall not make or direct the Trustee to make any investments of moneys credited to any of the Funds or Accounts other than Permitted Investments (as defined in the Indenture) and under no circumstances shall the Trustee be required to make a determination as to whether an investment is a Permitted Investment (as defined in the Indenture).

### Limitation on Sale of Assets

Pursuant to the Fifth Supplemental Loan Agreement, the Borrower shall not, nor shall the Borrower permit any of its subsidiaries to, sell, assign or dispose of any material assets of the Project in excess of $15,000,000 per year in the aggregate, except for "Permitted Sales and Dispositions" (as defined in the Loan Agreement).

In addition, the Borrower shall not (i) convey, sell, assign, transfer or otherwise dispose of, or cause or permit the issuance or conveyance, sale, assignment, transfer or other disposition of, any equity interests of any Guarantor, or the creation, incurrence, issuance or assumption of any indebtedness by any Guarantor, other than in connection with a Commuter Monetization that has received the prior written consent of the Majority Bondholders, (ii) convey, sell, assign, transfer or otherwise dispose of, or cause or permit the issuance or conveyance, sale, assignment, transfer or other disposition of, any equity interests of any subsidiary of the Borrower, including AAFOH or any of its subsidiaries, to any person, other than (x) the AAFOH Preferred Equity, (y) Management Equity or (z) with the consent of the Majority Bondholders, (iii) (A) convey, sell, assign, transfer or otherwise dispose of, or cause or permit the issuance or conveyance, sale, assignment, transfer or other disposition of, any equity interests in Brightline Tampa or permit Brightline Tampa to issue any new equity interests, other than to AAFOH (if the equity interests of Brightline Tampa remains part of the AAFOH Bond Collateral) or the Borrower, unless the Brightline Tampa Release Condition has been satisfied or is satisfied in connection therewith or (B) cause or permit any transaction which would result in (I) the Borrower ceasing to directly own 100% of the equity interests of BL Florida Commuter and AAFOH (other than the AAFOH Preferred Equity and Management Equity), (II) BL Florida Commuter ceasing to directly own 100% of the equity interests of BL Expansion, (III) BL Expansion ceasing to directly own 100% of the equity interests of MDC Commuter, BRWD Commuter and PBC Commuter, other than pursuant to the terms of a Commuter Monetization entered into with the prior written consent of the Majority Bondholders, or (IV) AAFOH ceasing to directly own 100% of the equity interests of Parent; (iv) issue any equity interests unless (x) such equity interests provide that any payments, distributions or dividends on, paid or completed with respect to such equity interests (including by purchasing or otherwise acquiring or retiring for value such equity interests of the Borrower or any direct or indirect parent of the Borrower, including in connection with any merger or consolidation) while the Series 2025B Bonds remain outstanding, including pursuant to an acceleration of the maturity or due date of such amounts, shall only be made in compliance with the covenant described in "—Restrictions on Distributions and Optional Prepayments" and (y) all net cash proceeds of such equity interests are directly deposited with the Trustee and applied in accordance with the provisions described in "DESCRIPTION OF THE SERIES 2025B BONDS—Required Deposits" or (v) form or acquire (or permit any of its subsidiaries to form or acquire) any non-wholly owned subsidiary (other than a subsidiary that is not wholly owned solely as a result of an issuance, conveyance, sale, assignment, transfer or other disposition of equity interests permitted by clause (ii) above); provided that the issuance of the AAFOH Preferred Equity and Management Equity shall not constitute a breach of this covenant. "Brightline Tampa Release Condition" will be defined in the Loan Agreement to mean that (i) sufficient funds are made available to AAFOH and the Borrower for the purpose of (and are in fact used for) first making a redemption of the AAFOH

33

Bonds to the extent of such funds (until the AAFOH Bonds are no longer outstanding) and then the Series 2025B Bonds to the extent of any remaining funds (exclusive of any prior or other redemptions of the AAFOH Bonds or Series 2025B Bonds, including any redemptions that would otherwise be required to be made at such time or on any future date) in an aggregate principal amount, collectively, of at least $650,000,000 provided that such redemption is funded with the proceeds of amounts that would not otherwise have been required under the AAFOH Financing Documents to be distributed to AAFOH by Project Owner and Parent and deposited in the AAFOH Revenue Account, (ii) any amounts not used to redeem the AAFOH Bonds in compliance with the AAFOH Financing Documents are distributed to the Borrower to redeem the Series 2025B Bonds and (iii) the Borrower is not otherwise required to cause AAFOH to distribute Brightline Tampa to the Borrower pursuant to the covenant described under "—Brightline Tampa" in connection therewith.

### *Restrictions on Distributions and Optional Prepayments*

The Fifth Supplemental Loan Agreement will require that (i) the Borrower not declare or pay dividends or make any distributions (including any payments, distributions or dividends in respect of any equity interests of the Borrower and including by purchasing or otherwise acquiring or retiring for value any equity interests of the Borrower or any direct or indirect parent of the Borrower, including in connection with any merger or consolidation) while the Series 2025B Bonds remain outstanding and (ii) the Borrower not cause or permit any subsidiary of the Borrower to declare or pay dividends or make any distributions (including any payments, distributions or dividends in respect of any equity interests of such subsidiary and including by purchasing or otherwise acquiring or retiring for value any equity interests of such subsidiary or any direct or indirect parent of the subsidiary, including in connection with any merger or consolidation) to any person other than (i) dividends or distributions to the Borrower or any subsidiary of the Borrower that is the immediate parent entity of such subsidiary and (ii) dividends or distributions by AAFOH on the AAFOH Preferred Equity that are both (i) permitted by the AAFOH Financing Documents and (ii) required by the BLH Credit Agreement.

The Fifth Supplemental Loan Agreement will also require that Borrower shall not, without the prior written consent of the Majority Bondholders, permit any of its subsidiaries to make any optional prepayments or redemptions of any indebtedness other than (i) with the proceeds from any indebtedness constituting Permitted Indebtedness incurred to amend, supplement, modify, extend, renew, restate, replace, refund, exchange or refinance such indebtedness constituting Permitted Indebtedness or (ii) payments required in respect of the AAFOH Bonds under the terms of the AAFOH Financing Documents.

### *AAFOH Bonds*

The Fifth Supplemental Loan Agreement will require the Borrower to cause AAFOH to make a cash interest payment on the AAFOH Bonds on or prior to the next Interest Payment Date (as defined in the AAFOH Bonds Indenture) following the Remarketing Date in an amount not less than six months of interest.

### *Transactions with Affiliates*

The Fifth Supplemental Loan Agreement will require that the Borrower shall not, and shall not permit any of its subsidiaries to, enter into any transaction with any affiliate of the Borrower or such subsidiary unless (a) such transaction (or, if applicable, the series of related transactions to which such transaction is related) is on terms no less favorable to the Borrower or such subsidiary, as the case may be, than it would obtain in a comparable arm's-length transaction (as reasonably determined by the Borrower) with a person or entity that is not an affiliate and (b) if such transaction or series of related transactions involves payments or assets with a fair market value in excess of $5,000,000, such transaction has been approved by the Majority Bondholders, other than (a) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants in the ordinary course of business, (b) the incurrence of any Permitted Indebtedness in which none of the lenders are affiliates of the Borrower or any of its subsidiaries, (c) the making of any investment or contribution permitted by the Loan Agreement, (d) the payment of any dividends or making of any distributions permitted by the Loan Agreement, (e) the specific agreements described in "CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS" and (f) transactions between or among the Borrower and its subsidiaries.

*FIH Covenant*

The Fifth Supplemental Loan Agreement will contain a covenant by FIH that (i) it will not make any distribution with funds received from any of its subsidiaries prior to the date that the Series 2025B Bonds are tendered or redeemed in full and all accrued interest and premium on the Series 2025B Bonds is paid in full, other than distributions to pay or reimburse federal, state and local taxes payable by any direct or indirect owner of FIH that are attributable to the taxable income, revenue, receipts or profits of FIH and its subsidiaries for any taxable period, in an aggregate amount not to exceed $10,000,000 per year and (ii) it will comply with its obligations under the covenant described in "—Required Deposits."

*Brightline Tampa*

Upon the release of the equity interests in and assets of Brightline Tampa from the AAFOH Bond Collateral and the release of the guaranty by Brightline Tampa of the obligations with respect to the AAFOH Bonds, the Borrower will be required to cause AAFOH to distribute Brightline Tampa to the Borrower and cause Brightline Tampa to guaranty the obligations with respect to the Series 2025B Bonds and to grant a security interest in substantially all of its assets (subject to Excluded Assets) to secure such guaranty obligations to the extent such distribution, guaranty and grant of a security interest are not prohibited pursuant to the terms of any agreement, instrument or other undertaking to which any subsidiary of the Borrower is a party as of the Remarketing Date.

*Post-Closing Obligations*

The Fifth Supplemental Loan Agreement will require the Borrower to use its commercially reasonable efforts to promptly solicit, or cause FIH and/or its applicable subsidiaries to solicit, consents from such proportion of lenders or bondholders (if any) necessary under any applicable documentation governing indebtedness of FIH and/or its applicable subsidiaries, to permit the Borrower to consummate, and promptly upon obtaining such consents the Borrower shall cause the consummation of, the following:

(a)    the granting of a pledge by BL West Holdings LLC of a security interest in the common equity interests in BL West Intermediate Holdings LLC, on a junior-lien basis subordinate to any existing security interests on such common equity interests, to secure the obligations of the Borrower in respect of interest and premium on the Series 2025B Bonds (the "BL West Second-Lien Pledge") pursuant to documentation reasonably acceptable to the Majority Bondholders; and

(b)    the granting of a guaranty by Brightline Tampa and a security interest in its personal property (other than Excluded Assets), on a junior-lien basis subordinate to any existing security interests in such property, to secure the obligations of the Borrower in respect of the Series 2025B Bonds in forms substantially the same as the guaranty and security agreement originally provided by Brightline Tampa in respect of the AAFOH Bonds in 2024 and otherwise reasonably acceptable to the Majority Bondholders, which guaranty and security interest shall automatically assume a first priority and senior-lien basis upon any release of the guaranty and security agreement of Brightline Tampa in respect of the AAFOH Bonds.

Upon the funding of the Series 2025B Funded Interest Account in an amount equal to the interest payable on the Series 2025B Bonds through the Scheduled Mandatory Tender Date and the premium payable thereon, the BL West Second-Lien Pledge shall be automatically released or, if not yet granted pursuant to clause (a) above, the requirement set forth in clause (a) above shall no longer be applicable.

*Default Provisions; Remedies*

Upon the occurrence of certain events specified in the Indenture, including the events of default described in the Fifth Supplemental Loan Agreement and failure to pay any portion of the principal or purchase price of any outstanding Series 2025B Bond (or any Additional Bond) when due and payable or failure to pay any portion of interest on any outstanding Series 2025B Bond (or any Additional Bond) within ten (10) business days after such interest payment is due and payable, an Event of Default will occur under the Indenture. Upon the occurrence and continuance of an Event of Default, the Series 2025B Bonds shall bear interest at a rate equal to the interest rate per annum that would otherwise be in effect, plus 2% per annum. If an Event of Default has occurred and is continuing, the holders of a majority of the aggregate principal amount of outstanding Bonds (the "Majority Bondholders") shall

35

## SECURITY AND SOURCES OF REPAYMENT FOR THE SERIES 2025B BONDS

### Sources of Payment Generally

The Series 2025B Bonds have been issued pursuant to the Act, and will be secured under the Security Documents. The Series 2025B Bonds are special, limited obligations of the Issuer and upon remarketing will be solely payable from and secured by the Trust Estate and the Collateral.

The Borrower is obligated under the Loan Agreement to pay or cause to be paid to the Trustee amounts sufficient to pay, when due, the principal and purchase price of and interest on the Series 2025B Bonds and other amounts required by the Indenture. The Borrower will be dependent on potential future equity contributions, distributions from its subsidiaries, including the Project Owner, subject to the provisions of the Brightline Trains Florida Collateral Agency Agreement, or other liquidity events (including any Commuter Monetization) to pay principal and purchase price of and interest on the Series 2025B Bonds. The Borrower does not expect to repay the Series 2025B Bonds with distributions from the Project Owner. The Borrower's obligations to make such payments are guaranteed by the Guarantors and secured by the grant of a lien on and security interest in the Collateral described below. See "—Collateral Generally" below. The Borrower may incur additional indebtedness secured by the Collateral, subject to certain restrictions set forth in the Loan Agreement. See "—Additional Indebtedness" below.

### Special and Limited Obligations

Except for revenues payable from the Trust Estate and the Collateral, the Owners may not look to any assets, revenues or other sources of payment of the Issuer for repayment of the Series 2025B Bonds. The only sources of repayment of the Series 2025B Bonds are payments provided by the Borrower to the Issuer pursuant to the Loan Agreement and the Security Interests that are part of the Trust Estate and the Collateral.

**THE SERIES 2025B BONDS ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER PAYABLE FROM AND SECURED SOLELY BY THE TRUST ESTATE AND THE COLLATERAL. THE SERIES 2025B BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE ISSUER, THE STATE OR ANY POLITICAL SUBDIVISION OF THE STATE, WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NOT CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE ISSUER, THE STATE OR ANY POLITICAL SUBDIVISION OF THE STATE, AND NEITHER THE FULL FAITH AND CREDIT OF THE ISSUER NOR THE FULL FAITH AND CREDIT OR TAXING POWER OF THE STATE OR ANY POLITICAL SUBDIVISION OF THE STATE IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON THE SERIES 2025B BONDS. NO COVENANT OR AGREEMENT CONTAINED IN THE SERIES 2025B BONDS OR THE INDENTURE SHALL BE DEEMED TO BE A COVENANT OR AGREEMENT OF ANY MEMBER OF THE GOVERNING BODY OF THE ISSUER NOR SHALL ANY OFFICIAL EXECUTING SUCH SERIES 2025B BONDS BE LIABLE PERSONALLY ON THE SERIES 2025B BONDS OR BE SUBJECT TO ANY PERSONAL LIABILITY OR ACCOUNTABILITY BY REASON OF THE REMARKETING OF THE SERIES 2025B BONDS. THE ISSUER HAS NO TAXING POWER.**

The Borrower and the Guarantors will be the sole revenue source for the repayment of the Series 2025B Bonds, except to the extent that certain of the transactions described in "DESCRIPTION OF THE SERIES 2025B BONDS—The Indenture and the Loan Agreement—Post-Closing Obligations" are consummated. Except as set forth in the prior sentence, no affiliate or equity holder of the Borrower will have any liabilities with respect to the Series 2025B Bonds, other than the Guarantors, and neither their credit nor their assets will support the Series 2025B Bonds, other than the Collateral. The Borrower operates solely as a holding company and has no business or assets except as described herein.

### Indenture

#### *General*

The Series 2025B Bonds have been issued pursuant to the Indenture. For additional information relating to the terms of the Indenture, see "APPENDIX E—INDENTURE."

37

**Pledge and Security Agreements**

The Borrower and the Guarantors (other than MDC Commuter, BRWD Commuter and PBC Commuter) have each previously entered into an Amended and Restated Pledge Agreement with the Trustee, pursuant to which it has pledged to the Trustee, for the benefit of the Owners and the other Secured Parties, a security interest in (i) all of its right, title and interest in the equity interests of its subsidiaries, including such subsidiary's limited liability company interests, other than with respect to AAFOH, equity interests issued in connection with a Permitted Offering, (ii) all accounts, chattel paper, instruments, letters of credit and payment intangibles owed to the Borrower or such Guarantor, as applicable, by such pledged subsidiaries from time to time, (iii) all proceeds of the foregoing, and (iv) all books and records relating to any of the foregoing, in order to secure the timely payment in full when due of the Series 2025B Bonds and the other Secured Obligations, as further detailed in such Security Document; provided that the Borrower's obligations with respect to the Series 2025B Bonds under the Loan Agreement are not secured by the Series 2025B Rebate Fund. On the Remarking Date, those Amended and Restated Pledge Agreements will be further amended and restated to grant security on substantially all personal property of the Borrower, BL Florida Commuter and BL Expansion, except to the extent that any such property constitutes an Excluded Asset. See "APPENDIX I—PLEDGE AND SECURITY AGREEMENTS."

**Restrictions on Distributions by the Project Owner**

The covenants contained in the Project Owner Loan Agreement and the Project Owner Credit Agreement contain limitations on the ability of the Project Owner to declare or pay dividends or make any distributions, except in accordance with the "Flow of Funds" as defined and set forth in the Brightline Trains Florida Collateral Agency Agreement. Such Flow of Funds requires the "Senior Restricted Payment Conditions," as defined in the Brightline Trains Florida Collateral Agency Agreement, to be satisfied on the applicable date of such dividend or distribution, which include as of the Remarketing Date (i) the payment of due and payable fees, expenses, the Project Owner senior secured obligations and obligations with respect to its permitted subordinated debt, and funding of reserve account required balances, (ii) either (a) the "Project Owner Total Senior DSCR" as defined in the Brightline Trains Florida Collateral Agency Agreement being at least 1.30:1.00, and the Project Owner Total Senior DSCR for the following 12-month period projected by the Project Owner to be at least equal to 1.30:1.00, or (b) the aggregate amount held in the "Project Reserve Account," the "Major Maintenance Reserve Account" and the "Ramp-Up Reserve Account" (each, as defined in the Brightline Trains Florida Collateral Agency Agreement), after giving effect to all prior transfers of the Flow of Funds, being at least $50,000,000 in excess of the "Project Reserve Required Balance" as defined in the Brightline Trains Florida Collateral Agency Agreement, and (iii) that no default shall have occurred and be outstanding under the Project Owner's financing documents, permitted subordinated indebtedness documents and other senior or subordinated indebtedness documents. Additionally, such Flow of Funds requires the "Senior Subordinated Restricted Payment Conditions," as defined in the Brightline Trains Florida Collateral Agency Agreement, to be satisfied on the applicable date of such dividend or distribution, which include as of the Remarketing Date (i) the payment of due and payable fees, expenses, the Project Owner senior secured obligations and obligations with respect to its permitted subordinated debt, and funding of reserve account required balances, (ii) the Project Owner Total Senior DSCR being at least 1.30:1.00, and the Project Owner Total Senior DSCR for the following 12-month period projected by the Project Owner to be at least equal to 1.30:1.00, (iii) the "Project Owner Total DSCR" as defined in the Brightline Trains Florida Collateral Agency Agreement being at least equal to 1.10:1.00, and the Project Owner Total DSCR for the following 12-month period projected by the Project Owner to be at least equal to 1.10:1.00, and (iv) that no default shall have occurred and be outstanding under the Project Owner's financing documents, permitted subordinated indebtedness documents and other senior or subordinated indebtedness documents. The "Brightline Trains Florida Collateral Agency Agreement" is the Collateral Agency, Intercreditor and Accounts Agreement, dated as of May 9, 2024, as amended, supplemented or otherwise modified from time to time, by and among the Project Owner, Deutsche Bank National Trust Company, as bond trustee, note trustee, collateral agent and account bank, and each other secured party thereto from time to time. The Brightline Trains Florida Collateral Agency Agreement is available as Appendix L to the AAFOH Bonds limited offering memorandum on the MSRB's EMMA website at https://emma.msrb.org/P21877660-P21436494-P21882117.pdf.

**Restrictions on Distributions by Parent**

The covenants contained in the Parent Notes Indenture (as defined herein) and the Parent Credit Agreement contain limitations on the ability of the Parent to declare or pay dividends or make any distributions, except in accordance with the "Flow of Funds" as defined and set forth in the Brightline East Collateral Agency Agreement.

41

## ORGANIZATIONAL STRUCTURE



43

---

(1)     There are other equity holders with minority interests at this entity.

(2)     The preferred equity of AAFOH is pledged to secure the $775 million BLH Investment Credit Agreement.

(3)     There are preferred equity holders that hold a minority interest in AAFOH. See "DESCRIPTION OF OTHER INDEBTEDNESS AND PREFERRED EQUITY—Existing Indebtedness and Preferred Equity of AAFOH."

(4)     Grupo Mexico Transportes S.A. de C.V. and Florida East Coast Railway, L.L.C. are not affiliates of the Project Owner.

(5)     BL West Holdings LLC is owned by (a) BL West Investment LLC, an entity controlled by Wesley Edens, the co-founder of Fortress, (b) Brightline Holdings LLC and (c) another third-party.

(6)     The common equity of BL West Intermediate Holdings LLC is pledged to secure the $775 million BLH Investment Credit Agreement.

**C:** FIH covenant for the benefit of the Series 2025B Bonds

**B:** Borrower of the Series 2025B Bonds

**G:** Guarantor of the Series 2025B Bonds

**P:** Pledgor of equity interests of subsidiaries in the chain of Series 2025B Bonds

**E:** Equity interest in such entity is pledged to secure the Series 2025B Bonds. The preferred equity interests in AAFOH are not pledged to secure the Series 2025B Bonds.

**SM:** Grantor of security over the Miami-Dade County commuter rail access rights

**SB:** Grantor of security over the Broward County commuter rail access rights

**SP:** Grantor of security over the Palm Beach County commuter rail access rights

44

## BUSINESS

*The Project Owner has provided the following information regarding the Project Owner, certain of its affiliates, the Project, the South Florida Commuter Rail Project, the Orlando -Tampa Project, and certain other pertinent information, for inclusion in this Limited Remarketing Memorandum relating to the Series 2025B Bonds. Unless otherwise indicated, the source of the information set forth herein is the Project Owner's records. Unless the context otherwise requires, for purposes of this "BUSINESS" section, r eferences to "we," "us," "our" and the "Company" refer to the Project Owner.*

### Brightline Holdings

Brightline Holdings, the indirect parent of the Borrower and the Project Owner, develops, builds and operates high-speed passenger rail systems in the United States. Brightline Holdings was formed in 2012 to develop America's first privately funded major intercity express passenger rail service in over a century. Brightline Holdings' mission is to mimic the success of similar high-speed rail systems globally by bringing convenient, comfortable and environmentally friendly passenger train travel to the United States market. Brightline Holdings is primarily owned, indirectly, by funds managed by an affiliate of Fortress Investment Group ("Fortress"). Fortress is a global investment manager that oversees more than $51 billion of assets under management, as of March 31, 2025, and has a long history of investing across the transportation and infrastructure space. To date, Fortress-managed funds and their affiliates have invested approximately $2.2 billion into the Project. Brightline Holdings believes that several major travel markets throughout the U.S. represent opportunities for it to introduce its passenger rail systems for faster, safer, more environmentally sustainable, more reliable, less expensive, more productive and more enjoyable travel compared to travel by car or air. Brightline Holdings is separately pursuing a passenger rail project from Southern California to Las Vegas, Nevada called Brightline West.

### The Borrower

The Borrower is a holding company and is the parent of BL Florida Commuter and the indirect parent of MDC Commuter, BRWD Commuter, PBC Commuter and the Project Owner. See "ORGANIZATIONAL STRUCTURE" herein.

### Overview of the Project

We own and operate a high-speed passenger rail system connecting major populations in Florida. Our system runs a total of approximately 235 miles from Miami to Orlando, one of the largest and most congested travel corridors in the U.S., serving a total of six stations in the heart of downtown cities and major transit hubs, including the Orlando International Airport. We operate up to 36 one-way trains daily that are capable of speeds of up to 125 miles per hour.

We provide high-speed "intercity" passenger rail transportation, which is characterized as service operating within medium-distance travel corridors, generally between 200 to 300 miles, that connect large population centers and experience high and increasing volumes of travelers. Intercity passenger rail services in the U.S. and globally are typically highly profitable. Such services have the ability to offer faster travel times with greater convenience at a lower cost when compared to other available modes of travel in their markets (such as car and air). Examples of these intercity rail services comparable to our business include Amtrak's Acela service in the northeastern U.S. and several privately owned European services, such as the Eurostar service operating between London and Paris, and Italo, which operates between several major cities in Italy.

We built and own or control our entire 235-mile rail system, including our track and systems, land, trains, stations and maintenance facilities. On September 22, 2023, we completed construction and opened our Orlando station, culminating years of development and representing the investment of approximately $6.2 billion in total capital (funded with debt and equity). We currently have stations in Miami, Aventura, Fort Lauderdale, Boca Raton, West Palm Beach and Orlando. On March 4, 2024, we announced plans to build a new in-line Treasure Coast station in downtown Stuart which is located within Martin County. The Project Owner expects the construction of the station, but not its maintenance or operations, to be 100% funded by sources other than Brightline. On November 12, 2024, the Martin County Commission unanimously approved funding up to $15 million dollars towards the project and agreed to pursue grant funding for the balance of the funds. In December 2024, Martin County submitted a grant

57

appraiser arrived at a value of $330 million, or a lease amount of $19.8 million per year for Broward County's access rights, not including the value of the shared improvements existing on the corridor. The estimated value of the shared improvements existing on the corridor, at cost, adjusted by the shared occupancy percentage, is approximately $103 million. These results will inform the upfront and/or annual access fees to be negotiated for a proposed commuter access agreement with Broward County, which the Project Owner believes will include similar economic terms as for the Miami-Dade County agreement.

In February 2023, the Project Owner engaged an independent appraiser to estimate the annual unimproved corridor value of the access rights to be provided to Palm Beach County for the purposes of operating the proposed commuter service. As a component of the Palm Beach County Appraisal, the appraiser estimated the current unimproved corridor value of the 45-mile segment between Deerfield Beach and the northern end of Palm Beach County based on across-the-fence property value multiplied by a corridor enhancement factor. The land value equaled approximately $917 million and after applying an enhancement factor, bundle of rights, shared occupancy percentage and cap rate for market rent, the appraiser arrived at a value of $755 million, or a lease amount of $47.2 million per year for Palm Beach County's access rights, not including the value of the shared improvements existing on the corridor. The estimated value of the shared improvements existing on the corridor, at cost, adjusted by the shared occupancy percentage is approximately $204 million. These results will inform the upfront and/or annual access fees to be negotiated for a proposed commuter access agreement with Palm Beach County, which the Borrower believes will include similar operational and development terms as for the Miami-Dade and Broward County agreements. Based on the appraised value, the Borrower expects annual access payments for the Palm Beach County commuter rights starting at approximately $23 million or milestone payments of similar present value.

Although the Miami-Dade Appraisal, Broward Appraisal and the Palm Beach County Appraisal for the commuter access rights are independent, the respective corridors are contiguous, and together the Commuter Access Rights on the corridors, exclusive of the value of the shared improvements are valued at approximately $1.4 billion, or an aggregate annual lease payment starting at $86 million and escalating at CPI. The estimated value of the combined shared improvements existing on the corridor, at cost, adjusted by the shared occupancy percentages is approximately $493 million, for a total estimated value of the Miami-Dade, Broward and Palm Beach Counties Commuter Access Rights of $1.9 billion.

### *Employees*

We do not have any employees. Services of the Project's senior management team, as well as other personnel described below, are made available to us by Brightline Management LLC, a Delaware limited liability company and an affiliate of the Project Owner and the Borrower (the "Manager"). See "CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS—Parent Management Agreement" for additional information.

As of June 30, 2025, the Manager and its affiliates, collectively, have 551 full-time equivalent employees, 16 of which are in support matters unrelated to the Project. At stabilized operations for the Project, we expect the Manager and its affiliates, collectively, to have approximately 570 full-time equivalent employees for our Florida passenger rail system, of which we expect the majority to be allocated to rail operations (including onboard staff and maintenance support staff) and stations and hospitality operations (including station managers, station engineers, safety and security staff, ticket counter/guest services agents and baggage agents, in-station cafe attendants and commissary employees). As part of the 570 full-time employees, we expect the Manager and its affiliates, collectively, to have approximately 95 employees in support of corporate functions and 475 in support of train operations.

Our Florida passenger rail system operations are based in Miami. None of our Florida passenger rail system operations employees are covered by any collective bargaining agreements, and we have not lost a day of operations for a labor-related cause. We are confident in our ability to continue to staff, train and retain a highly productive and engaged workforce, including sufficient engineers, conductors, and train-related labor.

### Regulations

### *Railroad Regulations*

Based on the decision, dated December 21, 2012, of the Surface Transportation Board ("STB") a federal economic regulatory agency that is charged with resolving railroad rate and service disputes and reviewing proposed

84

During the FRA's four-year environmental review of our proposed passenger rail system comprising the South Segment and the North Segment, the FRA, as lead agency, coordinated the efforts of all other cooperating agencies responsible for issuing the final environmental permits for the North Segment. This process allowed each agency to appropriately assess the various permitting options of our Florida passenger rail system as presented under our plan submitted in connection with such environmental review. Such agencies were given the opportunity to, and did, provide input to the FRA in connection with this environmental review.

We have covenanted to the U.S. Department of Transportation to complete and implement the measures specifically set forth in the final EIS and record of decision to avoid, minimize, or mitigate any adverse effects of our Florida passenger rail system on the environment.

We have obtained all material permits and governmental authorizations required for the operation of the North Segment and received FRA certification in September 2023. We will be required to obtain similar permits and authorizations, which will require, among other things, the performance of additional environmental impact studies, for the expansion to Tampa.

We obtained all permits required for the Additional In-line Stations within the construction timeline. The Additional In-line Stations trackwork and operations are covered under the existing National Environmental Policy Act, EIS and record of decision approvals.

### *Rolling Stock Regulations*

Our trains and stations are designed to be compliant with regulations issued pursuant to the ADA, with seating, bathrooms, level board platforms and walkways designed to accommodate wheelchair and other special physical needs of the disabled. Our locomotives comply with both the U.S. Environmental Protection Agency's Tier Four emissions standards as well as the various regulations and guidelines set forth in the PRIIA mandate. Our rolling stock complies with FRA regulations, including CEM, which provides a standard of structural integrity designed to better protect passengers and employees in the event of a collision, and the new PTC standards, which require a centrally monitored and controlled monitoring system to bring trains safely to a stop if certain operating safety parameters are exceeded. For the currently operating segment of our railroad between Miami and Orlando, we have received a Safety Certification from the FRA for our PTC system. We installed PTC in our North Segment between West Palm Beach and Orlando, which allows our trains to operate within a dynamic safety environment that constantly monitors speed restrictions, compliance with dispatch directives, train separation and similar items and can intervene to stop a train before it reaches an unsafe condition. The PTC system is procured and managed by Brightline and supplied by Wabtec. Wabtec also installs the system in our Siemens locomotives. Similarly, the in-cab signaling system and the voice radio system were procured by us and installed in our locomotives by Wabtec.

### Insurance

We commissioned Aon Risk Solutions ("Aon") to develop the Insurance Report Construction and Operations and Maintenance Commencing 2019 through Operations 2022 of Brightline Holdings (the "Insurance Report"), which provides an independent overview of our insurance program related to the Project. The following is a summary of Aon's findings in the Insurance Report. As of 2023, construction was materially concluded, as a result, the construction policies noted below expired during or by year-end 2024. The Operations policies remain in place.

Our comprehensive insurance program for the Project includes the following coverages:

*Operations policies:*

(a) *General Liability Non Rail*: This policy provides liability insurance coverage, including defense costs, for damages resulting from bodily injury (including death), property damage, personal injury or advertising injury resulting from our non-railroad operations. This would include retail, food and beverage services, office, vacant land, etc. The policy includes a $2,000,000 limit per occurrence and a general aggregate limit of $2,000,000.

(b) *Excess Casualty including Rail Liability*: This policy provides liability insurance coverage, including defense costs, for damages resulting from bodily injury (including death), property damage, personal

86

injury or advertising injury resulting from our railroad operations. This would include employee injury, passenger injury and accidents involving train stations, crossings, trespassers, maintenance activities, derailments, and terrorism. This insurance will consist of a retention and an excess liability policy with a $323,000,000 combined single limit for bodily injury, personal injury and property damage per occurrence (limit may be provided by a combination of primary and excess/umbrella coverage).

(c) *Property*: This policy provides coverage for physical damage to assets owned, leased or used by it, including buildings, contents, rolling stock equipment, and certain infrastructure assets, which include track and bridges or tunnel structures. Due to the location of Project assets on Florida's eastern seaboard, windstorm and earthquake coverage will be maintained. Coverage will include the loss of business income following an insured event. Insured events would be on an "all risks" basis, including collision, upset and overturn, flood, earthquake, and terrorism. The property program limit is $200,000,000 subject to certain deductibles and includes sublimits including the following: (i) $60,000,000 for named windstorm, (ii) $25,000,000 for flood and (iii) $10,000,000 for business interruption.

(d) *Corporate*: Various other policies are expected to be in place, including workers compensation, pollution liability, cybersecurity, food borne illness, crime and fiduciary liability, auto liability and director and officer protection.

The Insurance Report found that the insurance terms, generally, are similar to those in use for other projects of this size and scope. Additionally, the available benchmarking data suggests that an excess liability program inclusive of a self-insured retention of $323,000,000 should be adequate during passenger operations is appropriate for the size and nature of the Project and consistent with federal passenger liability requirements. We currently carry and intend to carry a minimum excess liability program inclusive of a self-insured retention of $323,000,000.

**Legal Proceedings**

On November 15, 2018, Brightline Holdings entered into a Trade Mark License Agreement ("TMLA") with Virgin Enterprises Limited ("VEL"). Pursuant to the TMLA, VEL granted to Brightline Holdings the right to use the Virgin brand, in connection with the operation of an intercity passenger rail service in Florida and along certain other routes in the United States. In July 2020, Brightline Holdings terminated the TMLA. VEL disputed the validity of the termination notice and in February 2021 filed a claim against Brightline Holdings in U.K. courts. Following a trial in July 2023, the judge entered an order finding in favor of VEL on October 12, 2023. Brightline Holdings filed a notice for permission to appeal with the appellate court on November 1, 2023, which was denied on February 5, 2024. Brightline Holdings has paid the initial judgment. The judge deferred consideration of an additional claim by VEL that the amount of the contractually agreed damages should be increased by approximately $94,000,000, with the larger sum applicable only if VEL can show that a change of control of Brightline Holdings would have occurred prior to November 2024. VEL was granted permission to amend its claim to plead the change of control, which is now subject to further discovery and trial has been set for January 20, 2026. Brightline Holdings believes this claim is without merit and will vigorously defend against it. The Project Owner and the Borrower are not parties to the TMLA or this litigation.

On September 18, 2023, Knighthead Opportunities Fund I, L.P. and Knighthead Capital Management LLC (collectively, "Knighthead"), Certares Opportunities Fund LLC ("Certares") and certain entities managed or co-managed by Knighthead and Certares (collectively, the "Plaintiffs"), filed a complaint in the Supreme Court of the State of New York against Morgan Stanley Senior Funding, Inc. ("MSSF"), an affiliate of Morgan Stanley & Co. LLC, the Remarketing Agent for the Series 2025B Bonds, and Brightline Holdings, an indirect member of the Project Owner and certain of its affiliates. The Plaintiffs are lenders or purported lenders under a credit agreement (the "Brightline Holdings Credit Agreement") pursuant to which Brightline Holdings is the borrower and MSSF is the administrative agent and a lender. Certain of the Plaintiffs purchased from MSSF approximately $191 million aggregate principal amount of the Brightline Holdings loan. The Plaintiffs are seeking declaratory relief, specific performance, monetary damages and injunctive relief, including the reinstatement of released subsidiary guarantees from certain of the Project Owner's affiliates. Brightline Holdings believes the claims are without merit. While motions to dismiss were pending, on August 30, 2024, Plaintiffs filed an Amended Complaint alleging additional breaches of the Credit Agreement and asserting a new cause of action against MSSF. On September 30, 2024, Brightline Holdings moved to dismiss the Amended Complaint, which motion is now fully briefed and pending before the Court.

87

ability to satisfy its obligations under the Loan Agreement and the Indenture, thereby adversely impacting the payment of debt service on the Series 2025B Bonds when due.

***Future acts of terrorism or war, as well as the threat of war, may cause significant disruptions in the Project Owner's business operations.***

Terrorist attacks, such as those that occurred on September 11, 2001, as well as the attacks on the transportation systems in Madrid and London, and the government response to those types of attacks and war or risk of war, may adversely affect the Project Owner's results of operations, financial condition or liquidity. The Project could be a direct target or indirect casualty of an act or acts of terror. Such acts could cause significant business interruption and result in increased costs and liabilities and decreased revenues, which could have an adverse effect on the Project Owner's operating results and financial condition. Any act of terror, retaliatory strike, sustained military campaign or war or risk of war may have an adverse effect on the Project Owner's operating results and financial condition by causing or resulting in unpredictable operating or financial conditions, including disruptions of rail lines, volatility or sustained increase of fuel prices, fuel shortages, general economic decline and instability or weakness of financial markets which could restrict the Project Owner's ability to raise capital. In addition, insurance premiums charged for some or all of the Project Owner's coverage could increase dramatically or certain coverage may not be available to the Project Owner in the future. Any such terrorist attack, whether or not insured, could materially and adversely affect the Project Owner's business, contracts, financial condition, operating results, cash flows, liquidity and prospects, and adversely affect the Project Owner's ability to make distributions (via Parent and AAFOH) to the Borrower, which may impact the Borrower's ability to satisfy its obligations under the Loan Agreement and the Indenture, thereby adversely impacting the payment of debt service on the Series 2025B Bonds when due.

***The Project Owner faces the inherent risk of catastrophic loss and liability, and its insurance may not be sufficient to cover its damages or liability to others.***

The operation of any railroad carries with it an inherent risk of catastrophe, mechanical failure, collision and property loss, notwithstanding the safety protocols the Project Owner has in place. Personal injury claims by the Project Owner's employees, including claims alleging occupational disease and work-related injuries, are subject to the provisions of the Federal Employers' Liability Act. In the course of the operation of the Project Owner's passenger rail service, spills or other environmental mishaps, cargo loss or damage, as well as labor disputes or strikes and adverse weather conditions, could result in a loss of revenues or increased liabilities and costs. Collisions, derailments, accidents, including those caused by reckless drivers or attempted suicides, leaks, explosions, environmental mishaps, or other accidents can cause serious bodily injury, death and extensive property damage, particularly when such accidents occur in heavily populated areas. The Project Owner intends to maintain insurance or otherwise insure against hazards in a manner that is consistent with industry practice against the accident-related risks involved in the conduct of its business and business interruption due to natural disaster. In addition, due to the location of the Project Owner's assets on Florida's eastern seaboard, it also intends to maintain windstorm coverage. However, the Project Owner expects that this insurance will be subject to a number of limitations on coverage and substantial deductibles or self-insured retentions, depending on the nature of the risk insured against. This insurance may not be sufficient to cover the Project Owner's damages or damages to others and this insurance may not continue to be available at commercially reasonable rates. In particular, the market for windstorm coverage remains very limited and costly. It is unknown how much windstorm coverage the Project Owner will purchase in the future and it is possible that the Project Owner's property will experience windstorm damage and utility service interruption in excess of insurance limits. In addition, the Project Owner is subject to the risk that one or more of its insurers may become insolvent and would be unable to pay a claim that may be made in the future. Even with insurance, if any catastrophic interruption of service occurs, the Project Owner may not be able to restore service without a significant interruption to operations which could have an adverse effect on its financial condition, and adversely affect the Project Owner's ability to make distributions (via Parent and AAFOH) to the Borrower, which may impact the Borrower's ability to satisfy its obligations under the Loan Agreement and the Indenture, thereby adversely impacting the payment of debt service on the Series 2025B Bonds when due. For additional information regarding the Project Owner's insurance program, see "BUSINESS—Insurance."

In addition, certain losses may be either uninsurable or not economically insurable, in whole or in part. If there is a complete or partial loss of any of the Collateral, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the Series 2025B Bonds and the guarantees thereof. Insurance proceeds may not

105

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

*The Borrower and its subsidiaries entered into a series of agreements with their respective affiliates. The most significant of these agreements are summarized below. All of these agreements with affiliates were negotiated on an arm's length basis and are subject to terms and conditions substantially similar to those that would be available in agreements with unaffiliated third parties, as reasonably determined by the Borrower in good faith.*

### Project Owner Management Agreement

On December 19, 2017, the Project Owner entered into a general operations, management and administrative services agreement with the Manager in which the Manager agreed to provide for the Project Owner's day-to-day management and operation, as amended and restated effective as of April 18, 2019 (the "Management Agreement"). The Management Agreement requires the Manager to manage the Project Owner's business affairs in conformity with the policies and the strategy that are approved and monitored by it.

The Manager's duties include: (i) performing all of the Project Owner's day-to-day functions, including the design, acquisition, development, construction, installation, equipping, ownership and operation of the Project, and (ii) providing financial and accounting management services. The Manager is responsible for the Project Owner's day-to-day management and operations and for performing (or causing to be performed) such services and activities relating to the Project Owner's assets, operations and the Project as may be necessary or desirable in connection with the Project.

The initial term of the Management Agreement expires on December 19, 2027, and the Management Agreement will be renewed automatically thereafter for successive five-year periods unless the Project Owner or the Manager elects to terminate the Management Agreement upon 90 days' prior written notice. In January 2024, the Management Agreement was amended in order to provide 180 days' prior written notice for either the Project Owner or the Manager to elect to terminate the agreement.

The Project Owner pays the Manager an arm's length charge equal to the costs incurred with respect to the services provided plus an annual premium equal to $500,000 (subject to increase for inflation based on the Consumer Price Index) and also reimburses the Manager for certain expenses.

The Project Owner's internal controls over financial reporting and the related accounting processes are designed to identify and appropriately classify and record costs incurred for each separate legal entity within the consolidated group comprising Brightline Holdings. Expenses associated with expansion activities outside of the Miami-Orlando corridor are incurred by and reported within other subsidiaries of Brightline Holdings (for example, the Manager and Brightline Holdings' Brightline West subsidiaries) or Brightline Holdings directly to the extent the costs are associated with exploratory activities prior to formation of a separate legal entity. Accordingly, such expenses are excluded from the Project Owner's books and records.

### Parent Management Agreement

In connection with the Refinancing Transactions, the Parent entered into a general operations, management and administrative services agreement with the Manager in which the Manager agreed to provide for the Parent's day-to-day management and operation and manage the Parent's business affairs in conformity with the policies and the strategy that are approved and monitored by it. The Manager's duties include providing legal, financial and accounting management services. The Manager is also responsible for the Parent's day-to-day management and operations and for performing (or causing to be performed) such services and activities relating to the Parent's assets and operations.

The Parent pays the Manager an arm's length charge equal to the costs incurred with respect to the services provided plus an annual premium equal to $50,000 (subject to increase for inflation based on the Consumer Price Index) and also reimburses the Manager for certain expenses.

### Master Shared Services Agreement

On November 1, 2022, the Project Owner entered into a master shared services agreement (the "Shared Services Agreement") with Brightline Holdings, the Manager, DesertXpress Enterprises LLC, a Nevada limited

130

liability company and affiliate of the Project Owner ("DXE"), DXE Management LLC, a Delaware limited liability company and affiliate of the Project Owner, and FECI, in which the parties thereto have agreed to provide each other with certain human resources and information technology services pursuant to the terms of the Shared Services Agreement and individual service contracts entered into between the applicable parties. The Shared Services Agreement governs common terms relating to, among other things, (i) the provision of services and payment of fees and taxes, (ii) dispute resolution procedures, and (iii) mutual confidentiality and indemnification obligations.

The Shared Services Agreement shall remain in effect until terminated by the mutual consent of the parties thereto and may not be amended except by the written agreement of all the parties thereto.

**Other Contracts**

The Project Owner has certain agreements with its affiliates governing, among other things, (i) owned real property comprising the stations located in West Palm Beach built on its fee-owned land and its station located in Miami built within its owned air rights and (ii) a leasehold interest in all or a portion of parking garages used in connection with such stations.

**Transactions with FECR**

On June 30, 2017, FECR, formerly the Project Owner's affiliate and a subsidiary of funds managed by an affiliate of Fortress, was acquired by GMéxico Transportes, S.A.B. de C.V. As a result, FECR is now a subsidiary of Grupo México, a large Mexico-based conglomerate, and is not an affiliate of FECI or the Project Owner.

In connection with the FECR sale, the Project Owner entered into certain amendments and/or new agreements with FECR involving the maintenance, use and operation of the shared rail corridor on which the Project's trains will operate. The Project Owner believes these amendments and agreements will provide it with certainty and clarity of operational and cost items for the Project's operations. Below is a description of the material terms of these agreements. For arrangements that were not assigned, the terms and conditions specified within the arrangements with FECR described below remained in effect. Since the rail track corridor from Cocoa to Orlando is not part of the FECR transactions, it is not subject to FECR agreements. Accordingly, the Project Owner selected another third party to maintain the Cocoa-to-Orlando rail track corridor.

*Shared Services and Other Arrangements*

In 2015, the Project Owner entered into various shared services, joint use, operating, infrastructure, maintenance and other related arrangements with FECR, certain of which have been periodically amended, extended or terminated (collectively, the "Shared Services Arrangements"), whereby each party provides support to the other for certain activities at cost plus a markup to support the construction, development and operation of passenger rail service and for other purposes. The Shared Services Arrangements also provide for the rehabilitation and improvement of existing track infrastructure and the construction and installation of rail related capital improvements, necessary for the passenger rail service. Pursuant to these arrangements, certain equipment and other assets installed on existing rail will be funded by the Project Owner and jointly used by the parties.

*Joint Use Agreement*

The Second Amended and Restated Joint Use Agreement, dated December 27, 2016, by and between FECR and the Project Owner (the "Joint Use Agreement"), provides that the Project Owner has the exclusive right to operate passenger trains, and that FECR has the exclusive right to operate freight trains, in each case along the entirety of the Shared Corridor. The Project Owner and FECR are authorized for the operation of up to 36 passenger trains and 24 freight trains per day, respectively.

On June 30, 2017, when FECR ceased to be a related party, the Project Owner and FECR amended the Joint Use Agreement to continue the joint use agreement as unrelated third parties.

Under the Joint Use Agreement, an eight-person Service Standards Committee (four appointees each) is responsible for overseeing construction and improvements on the Shared Corridor, monitoring passenger and freight rail operations, and considering possible future expansion of the Shared Corridor (an extension to Cocoa and

131

construction of a track for Tri-Rail service to Miami have already been contemplated under the agreement). FECR will provide maintenance services from West Palm Beach to Cocoa, Florida.

The Joint Use Agreement provides that the Project Owner will be responsible for the first 15% of ordinary operating and maintenance expenses along the Shared Corridor for each calendar month, with the remaining 85% of such expenses apportioned between the Project Owner and FECR on the basis of percentage of total gross ton miles operated on, along and over the Shared Corridor. Costs related to signals and communications will be apportioned between the Project Owner and FECR on the basis of the percentage of the total number of train miles operated under the Shared Corridor. However, if FECR fails to perform maintenance to achieve the Project Owner's on-time performance standards, the Project Owner has the right to perform maintenance at its own cost. Dispatching services of the passenger and freight trains will be the responsibility of the Project Owner's and FECR's 50-50 joint venture as described below. The cost and expense of any capital improvements required by law or governmental regulation are borne entirely by the Project Owner if useful solely in connection with passenger services, borne entirely by FECR if useful solely in connection with freight services and shared 50-50 if useful in connection with both.

The Project Owner will reimburse FECR for its allocable share of costs and expenses, calculated on a per-ton-mile formula for ordinary operations and maintenance, and on a per-train-mile formula for signal maintenance. The Project Owner will also pay FECR an annual management fee of $500,000, with a 2% annual escalator. Before June 30, 2017, when FECR ceased to be a related party, the Project Owner paid to FECR an aggregate amount of $1.7 million under the Joint Use Agreement.

The Joint Use Agreement also provides for the allocation of liability between FECR and the Project Owner in the case of accidents. The Project Owner is solely responsible for any liability to rail passengers in connection with passenger services. Otherwise, any liability solely on the account of the Project Owner's equipment or solely on account of FECR's equipment is assumed solely by the Project Owner or FECR, respectively. Both carriers are required to maintain appropriate insurance coverage, and the failure to obtain or maintain such insurance coverage would result in a default under the Joint Use Agreement.

### Dispatching Services Agreement

In December 2016, the Project Owner and FECR formed a 50-50 joint venture, DispatchCo. DispatchCo is responsible for providing dispatch services to FECR and the Project Owner under a Dispatching Services Agreement, dated as of December 27, 2016, among FECR, DispatchCo and the Project Owner, as amended in June 2017 and August 2017. Dispatching protocols provide that DispatchCo must make reasonable best efforts to dispatch in a manner maximizing the number of the Project Owner's and FECR's trains achieving on-time performance standards; however, passenger trains have priority over freight trains. Both the Project Owner and FECR will bear 50% of DispatchCo's dispatching expenses and its general and administrative expenses, as well as 50% of a monthly service fee. DispatchCo charged the Project Owner approximately $4.1 million and $2.9 million for the years ended December 31, 2024 and 2023, respectively.

### Agreements with FECR and South Florida Regional Transportation Authority

The Project Owner has entered into various construction, operating and other related agreements with SFRTA that obligate the public agency to reimburse the incremental infrastructure costs to construct a downtown Miami commuter rail station over a fixed period of time. Tri-Rail, which is operated by SFRTA, operates 50 weekday trains along 72 miles of track connecting Miami, Fort Lauderdale and West Palm Beach. Its commuter rail operations offer a travel time from Miami to West Palm Beach of two hours, with stops at 18 stations along the way. In 2019, Tri-Rail had approximately 4.5 million passengers. Due to the COVID-19 pandemic, ridership decreased in 2020 and 2021, but it has been recovering. In April 2025, Tri-Rail reported that average weekday ridership exceeded 15,000 passengers per day.

The Project Owner and SFRTA worked together to have 26 Tri-Rail trains serve the Miami station daily rather than ending service at the existing Tri-Rail station at the Miami Intermodal Center adjacent to Miami International Airport. SFRTA has reimbursed the Project Owner for incremental infrastructure costs. The Project Owner executed an operating agreement with SFRTA and has finalized associated ancillary agreements to allow SFRTA to expand Tri-Rail commuter rail service and establish a new commuter rail service on a shared rail corridor which commenced service on January 13, 2024. See "RISK FACTORS—Risks Related to the Business of the Project

132

Owner, the Borrower and the Guarantors—Shared use of the Project Owner's corridor with freight operations and FECR could have an adverse effect on its ability to utilize its railway efficiently, which could impact its operations and financial condition." In Florida Statutes Chapter 343.545 (Public Law 2017-138), SFRTA was specifically authorized by Florida to enter into contractual indemnification agreements with FECR and the Project Owner with respect to rail corridors where all three entities provide rail service.

**South Florida Commuter Rail Project**

*Intercompany Access Agreements*

Pursuant to the Intercompany Access Agreements, the Project Owner has granted each of MDC Commuter, BRWD Commuter and PBC Commuter the right to operate commuter rail service and to have access to certain stations on the MDC Segment, the BRWD Segment, and the PBC Segment, respectively, as the Project Owner's designee for a period of 93 years, in consideration, in case of each of the MDC Segment and the BRWD Segment, for an upfront payment of $245 million, and in the case of the PBC Segment, for an upfront payment of $135 million. The Project Owner was also paid $175 million for its option to repurchase the access rights in Miami-Dade and Broward Counties, effectively terminating the option. The Project Owner has agreed not to designate any other commuter passenger rail service provider on the Commuter Segments other than the Commuter SPVs. The Commuter SPVs are entitled to grant their respective rights to operate commuter rail service to certain third parties, including Miami-Dade County, Broward County and Palm Beach County, with respect to the MDC Segment, the BRWD Segment, and the PBC Segment, respectively, as set forth in the Intercompany Access Agreements. The costs of the South Florida Commuter Rail Project will be the sole responsibility of the Commuter SPVs and the Counties, as applicable.

Commuter rail service on the applicable Commuter Segment will only commence after certain conditions under the applicable Intercompany Access Agreement are satisfied (the "Availability Conditions"), including achievement of substantial completion of the required additional infrastructure necessary to operate each Commuter Segment and confirmation by the FRA that such commuter rail service is and will be in accordance with applicable law.

After satisfaction of the applicable Availability Conditions, each of the Commuter SPVs will be entitled to operate and set and collect all fares in connection with such operation of commuter rail service on the applicable Commuter Segment. MDC Commuter may run hourly, bi-directional service on the MDC Segment, and, subject to certain conditions, up to seven additional half-hourly, bi-directional services during peak hours. BRWD Commuter may run hourly, bi-directional service on the BRWD Segment, and, subject to certain conditions, up to seven additional half-hourly, bi-directional services during peak hours. The PBC Intercompany Access Agreement permits PBC Commuter to run hourly, bi-directional service on the PBC Segment, and, subject to certain conditions, up to seven additional half-hourly, bi-directional services during peak hours. The Project Owner and the applicable Commuter SPV will agree to a proposed schedule for the applicable commuter rail service in accordance with the terms of the applicable Intercompany Development Agreement, and, once such schedule is approved by the Service Standards Committee under the Joint Use Agreement, such schedule shall constitute the baseline schedule for the applicable commuter rail service.

Maintenance of the Commuter Segments will be performed in accordance with certain agreements related to the Project. In connection with its operation of commuter rail service on the applicable Commuter Segment, each of the Commuter SPVs will be responsible for payment of its share of maintenance and capital expenses with respect to shared rail infrastructure (calculated on a per-ton-mile formula for ordinary operations and maintenance, and on a per-train-mile formula for signal maintenance and otherwise as set forth in the Intercompany Access Agreements) and shared commuter stations.

*Intercompany Development Agreements*

Pursuant to the Intercompany Development Agreements, the Project Owner has granted each of MDC Commuter, BRWD Commuter and PBC Commuter, the right to design and construct certain additional rail infrastructure and station improvements necessary for commuter rail service on the MDC Segment (which will include up to five additional commuter stations), the BRWD Segment (which will include up to six additional commuter stations), and the PBC Segment (which may include up to six additional commuter stations), respectively. All

133

improvements constructed under the MDC Intercompany Development Agreement, the BRWD Intercompany Development Agreement and the PBC Intercompany Development Agreement, will be owned by the Project Owner.

The Project Owner will act as the construction manager under the Intercompany Development Agreements with respect to the South Florida Commuter Rail Project. In consideration of its services as the construction manager, each of the Commuter SPVs shall pay the Project Owner an amount equal to the 2.8% of any costs associated with design, engineering, construction, environmental, permitting, testing and commissioning under any construction contract in respect of the applicable commuter project (the "Commuter Project Management Fee"). The Commuter Project Management Fee will be payable from time to time concurrently with payments by the applicable Commuter SPV under any construction contract in respect of the applicable commuter project.

As between the Commuter SPVs and the Project Owner, the Commuter SPVs will be responsible for the design, construction, testing and commissioning of the applicable commuter project and securing any required FRA acceptance.

### Orlando-Tampa Project Agreements

#### *Brightline Tampa Management Agreement*

As of September 1, 2024, Brightline Tampa entered into a general operations, management and administrative services agreement with the Manager in which the Manager agreed to provide for Brightline Tampa's day-to-day management and operation and manage Brightline Tampa's business affairs in conformity with the policies and the strategy that are approved and monitored by it. The Manager's duties include providing legal, financial and accounting management services. The Manager is also responsible for Brightline Tampa's day-to-day management and operations and for performing (or causing to be performed) such services and activities relating to Brightline Tampa's assets and operations.

Brightline Tampa pays the Manager an arm's length charge equal to the costs incurred with respect to the services provided plus an annual premium equal to $25,000 (subject to increase for inflation based on the Consumer Price Index) and also reimburses the Manager for certain expenses.

## EXHIBIT B

*Targeted SEC Brightline / Fortress Governance and Control Materials*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

### FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says it is merely a remote investment company with no control. | B-28-B-34 | Brightline SEC materials identify Fortress Funds, Brightline Stockholder control, board designation, registration, merger, and information-right structures. |
| Fortress says there are no plausible control facts under Kelley. | B-31-B-34; B-38-B-43 | Shows documented governance, voting, information, change-of-control, Permitted Holder, Fortress Stockholder, and fund-control provisions. |
| Fortress says Plaintiff's allegations are conclusory and not tied to documents. | B-28-B-43 | These are original SEC/EDGAR materials identifying specific public filings and transaction provisions, not speculation. |
| Fortress says discovery into Fortress/Brightline relationships is unnecessary. | B-32-B-34; B-39-B-43 | Shows concrete governance and transaction documents that can be requested in discovery. |
| Fortress says Brightline/DXE/Benny's HoldCo materials are irrelevant to Florida operations. | B-35-B-43 | Shows Fortress-related rail-control terminology used in Brightline-affiliated transactions; offered as context and discovery targets, not final proof of employment. |

### WHY THESE PAGES MATTER

Exhibit B is the main SEC/Fortress-governance exhibit. It connects Fortress to Brightline through public securities disclosures, stockholder-control language, governance rights, and EX-10.76 transaction terms. It is not offered to prove direct day-to-day supervision by itself; it supports plausibility and targeted discovery into the exact Fortress-related governance and fund-control documents Fortress says do not matter.

### PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| B-27 | Replacement cover sheet and motion-response roadmap. | Gives the Court a single-page guide to the SEC materials and their Rule 12 relevance. |
| B-28 | Brightline Holdings LLC DRS/Form S-1 cover and service-agent information c/o Fortress Investment Group LLC. | Shows Fortress embedded in Brightline's SEC filing structure. |
| B-29 | Brightline Stockholder / AAF Holdings LLC owned primarily by private-equity funds managed by a Fortress affiliate. | Addresses 'passive investor' by identifying Fortress-managed fund ownership at the Brightline level. |
| B-30 | Fortress Funds; Brightline majority ownership; Fortress rail-sector experience. | Shows Fortress-related ownership and rail investment context. |
| B-31 | Principal Stockholder / voting-control disclosure. | Supports discovery into Brightline Stockholder and Fortress-affiliated voting/control rights. |
| B-32 | Stockholders' Agreement; director designation and board-right language. | Addresses governance-control issues relevant to the right-to-control inquiry. |
| B-33 | Registration rights for Brightline Stockholder, Fortress, affiliates, and permitted transferees. | Shows Fortress-related rights were formally recognized in SEC disclosures. |
| B-34 | Fortress merger/restructuring rights and information-right materials. | Supports discovery into information access, restructuring, and ownership-control channels. |
| B-35-B-36 | SEC EX-10.76 title page and Membership Interest Purchase Agreement parties: Brightline Holdings, DesertXpress, Benny's HoldCo. | Links Exhibit B's SEC transaction source to the Brightline/DXE rail transaction. |
| B-37 | STB/BLM/FRA and governmental approval references. | Shows the transaction implicated rail-regulatory approval issues and not only private investment paperwork. |
| B-38 | Change of Control definition. | Addresses Fortress's control framing by showing defined control terms in the transaction documents. |
| B-39 | Permitted Holder definition including Fortress Investment Group LLC, affiliates, and Fortress-managed funds/partnerships. | Directly rebuts the idea that Fortress-related fund control is invented or speculative. |
| B-40-B-43 | Fortress Stockholder, tag-along, drag-along, Change of Control Sale, OpCo, and Fortress-fund-control drafting note. | Identifies precise Fortress-related provisions to request in discovery. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

DRS 1 filename1.htm

TABLE OF CONTENTS

As confidentially submitted to the Securities and Exchange Commission on April 24, 2018. This draft registration statement has not been publicly filed with the Securities and Exchange Commission and all information herein remains strictly confidential.

Registration No. 333-

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM S-1
## REGISTRATION STATEMENT
## UNDER
## THE SECURITIES ACT OF 1933

# Brightline Holdings LLC*

(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 4011 | 36-4893027 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**161 NW 6th Street, Suite 900**
**Miami, FL 33136**
**(305) 521-4800**

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

**Cameron MacDougall, Esq.**
**Ivy Hernandez, Esq.**
**c/o Fortress Investment Group LLC**
**1345 Avenue of the Americas, 45th floor**
**New York, NY 10105**
**(212) 798-6100**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| Michael J. Zeidel, Esq.<br>Michael J. Schwartz, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, New York 10036<br>(212) 735-3000 | Richard D. Truesdell, Jr., Esq.<br>Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>(212) 450-4000 |
|---|---|

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. o

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. o

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. o

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 under the Securities Exchange Act of 1934.

| | |
|---|---|
| Large accelerated filer o | Accelerated filer o |
| Non-accelerated filer ☒ | Smaller reporting company o |
| (Do not check if a smaller reporting company) | Emerging Growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. o

## CALCULATION OF REGISTRATION FEE

TABLE OF CONTENTS

The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion, dated April 24, 2018

Preliminary Prospectus

*Shares*

# Brightline Holdings Inc.
## Common Stock

This is an initial public offering of common stock of Brightline Holdings Inc. We are selling shares of our common stock. After this offering, AAF Holdings LLC (the "Brightline Stockholder"), an entity owned primarily by private equity funds managed by an affiliate of Fortress Investment Group LLC ("Fortress"), will own approximately      % of our common stock, or      % if the underwriters' over-allotment option is fully exercised.

We expect the public offering price to be between $      and $      per share. Currently, no public market exists for the shares. We intend to apply to list our shares of common stock on the New York Stock Exchange ("NYSE") under the symbol "   ."

We are an "emerging growth company" as that term is defined in the Jumpstart Our Business Startups Act of 2012 and, as such, will be subject to certain reduced public company reporting requirements. See "Prospectus Summary—Implications of Being an Emerging Growth Company."

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 11 to read about certain factors you should consider before buying our common stock.**

| | Per Common Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

(1)   See "Underwriting" for additional information regarding underwriting compensation.

To the extent that the underwriters sell more than      shares of common stock, the underwriters have the option to purchase up to an additional      shares from us at the initial public offering price, less underwriting discounts and commissions, for 30 days after the date of this prospectus.

**Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the shares of common stock against payment on or about      , 2018.

Exhibit 3-29 of 53

TABLE OF CONTENTS

along the east coast of Florida, our rail line will be extremely difficult to replicate and creates a significant barrier to entry to the market. Moreover, most passenger rail systems in the United States and globally operate on corridors that they access under temporary leases or similar arrangements and share with other independent third parties operating passenger or freight rail service. These temporary arrangements increase the cost of operating passenger service (requiring rent, access fees or concession payments), place limitations on operators of passenger rail service, and create renewal uncertainty at the end of the term of the lease. Subject to certain limitations, we own the permanent, perpetual and exclusive rights, privileges and easement, and therefore we do not need to make concession payments to operate our business, which increases our profit margins.

### Attractive Station Locations

We currently own our three stations in Miami, Fort Lauderdale and West Palm Beach. In Orlando, our station will be integrated into the Orlando International Airport's new South Terminal and is owned by the airport and leased to us. All of our stations in South Florida are located in cities with dense populations, near government/business locations and major travel destinations and with multiple connections to public and private ground transportation, as well as local transit services. For example, our downtown Miami station is located within a five-block radius of numerous destinations, including PortMiami, American Airlines Arena, the Miami-Dade County government center complex and the Adrienne Arsht Center for the Performing Arts. The location is also served by both Metrorail (a 25-mile metropolitan rail service with approximately 20 million annual riders) and Metromover (a free, elevated automated people mover service for easy access to downtown Miami sites with approximately 9.5 million annual riders), and we expect it to become a stop for Tri-Rail (a commuter rail line with approximately 4.3 million annual riders) in the near future. We believe our station locations are irreplaceable and will result in a high level of passengers given the centralized locations and ease of connectivity.

### Attractive Financial Profile

We expect that ticket sales will account for a significant majority of our revenue upon stabilization, while the remainder of our revenue will be generated from high-margin ancillary revenue attributable to food and beverage sales, merchandise sales, parking fees and long-term contracts relating to advertising, sponsorships and marketing affiliations (including naming rights), commissions from our travel partners and ground transportation extensions and other services. We believe our operating model is highly efficient and benefits from relatively predictable operating expenses. We believe that several features of our operating model enable us to react quickly to market demand, including scalable operations, flexible train and staff schedules and fares determined based on customer demand (as opposed to regulation), which provides us with the flexibility to reduce costs. Our rolling stock, composed of state-of-the art trains, will be maintained by Siemens Industry Inc. ("Siemens") under a 30-year contract at a set price with established cost escalators, providing clarity on this meaningful expense. Additionally, while other express passenger rail operations generate high margins, they incur costs associated with leasing their corridors whereas we do not, which will benefit our margins.

### Strong Private-Equity Sponsorship and Seasoned Management Team

Immediately following the completion of this offering, Brightline will continue to be majority owned by funds managed by an affiliate of Fortress (such funds, the "Fortress Funds"), one of the largest global investment managers in the world with significant experience investing in the rail sector, including prior successful investments in RailAmerica and Florida East Coast Railway. Our senior management team is comprised of seasoned executives with experience launching, developing and growing large-scale, complex projects involving passenger rail transportation, customer-centric business and the hospitality industry. In addition, the management team in previous executive positions has developed a wide range of complex infrastructure and construction projects both within and outside of Florida.

### Corporate Information

We were formed as AAF Holdings B LLC, a limited liability company in Delaware in August 2013 and effected a name change to Brightline Holdings LLC in March 2018. The address of our principal executive offices is currently 161 NW 6th Street, Suite 900, Miami, FL 33136. Our website is currently www.gobrightline.com. Information on or accessible through our website is not part of this prospectus.

Prior to the closing of this offering, we intend to reorganize our existing corporate structure so that the issuer of our common stock is a Delaware corporation named Brightline Holdings Inc. The reorganization will be effected through the statutory conversion.

6

TABLE OF CONTENTS

**Our Principal Stockholder**

We are a wholly-owned subsidiary of the Brightline Stockholder and, prior to the completion of this offering, all of our outstanding equity interests (other than equity incentive awards to our management) are owned by the Brightline Stockholder. Immediately following the completion of this offering, the Brightline Stockholder will own approximately         % of our outstanding common stock, or         % if the underwriters' over-allotment option is fully exercised. This level of share ownership is sufficient to control the vote on matters and transactions requiring stockholder approval. The Brightline Stockholder is owned primarily by private equity funds managed by an affiliate of Fortress, a leading global investment manager. See "Risk Factors— Risks Related to Our Organization and Structure" and "Principal Stockholder."

Immediately prior to the completion of this offering, we and the Brightline Stockholder intend to enter into an agreement that will provide a framework for our ongoing relationship with the Brightline Stockholder. For a description of this agreement, see "Certain Relationships and Related Party Transactions—Stockholders' Agreement."

**Implications of Being an Emerging Growth Company**

We qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As an emerging growth company, we may take advantage of certain reduced disclosure and other requirements that are otherwise applicable generally to public companies. These provisions include:

- not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the "Sarbanes-Oxley Act";

- only two years of audited financial statements are required in addition to any required interim financial statements, and correspondingly reduced disclosure in management's discussion and analysis of financial condition and results of operations; and

- (i) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements and (ii) exemptions from the requirements of holding a non-binding advisory vote on executive compensation, including golden parachute compensation.

We may take advantage of these provisions for up to five years or until such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company upon the earliest to occur of (1) the last day of the fiscal year in which we have more than $1.07 billion in annual revenue; (2) the date we qualify as a "large accelerated filer," with at least $700 million of equity securities; (3) the issuance, in any three-year period, by us of more than $1.07 billion in non-convertible debt securities held by non-affiliates; and (4) the last day of the fiscal year ending after the fifth anniversary of our initial public offering.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can use the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended (the "Securities Act") for complying with new or revised accounting standards. This permits an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the exemptions discussed above. Accordingly, the information contained herein may be different than the information you receive from other public companies.

TABLE OF CONTENTS

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Under SEC rules, a related person is an officer, director, nominee for director or beneficial holder of more than 5% of any class of our voting securities since the beginning of the last fiscal year or an immediate family member of any of the foregoing. We expect our officers and directors to review, approve and ratify transactions with related parties pursuant to the procedures outlined in a policy on related party transactions, which we will adopt prior to the completion of this offering. When considering potential transactions involving a related party that may require board approval, our officers will notify our board of directors in writing of the proposed transaction, provide a brief background of the transaction and schedule a meeting with the full board of directors to review the matter. At such meetings, our Chief Executive Officer, Chief Financial Officer or other members of management, as appropriate, will provide information to the board of directors regarding the proposed transaction. If the board of directors (or specified directors as required by applicable legal requirements) determines that the transaction is in the best interests of the Company, it will vote to approve the Company entering into the transaction with the applicable related party.

Prior to the adoption of the written policy, we did not adopt a formal policy for reviewing related party transactions that were required to be disclosed under the SEC rules.

### Stockholders' Agreement

#### General

Prior to the completion of this offering, we will enter into the Stockholders' Agreement with our direct parent, the Brightline Stockholder.

As discussed further below, the Stockholders' Agreement will provide certain rights to the Brightline Stockholder and its affiliates.

Our Stockholders' Agreement will provide that the parties thereto will use their respective reasonable efforts (including voting or causing to be voted all of our voting shares beneficially owned by each) so that no amendment is made to our certificate of incorporation or bylaws in effect as of the date of the Stockholders' Agreement that would add restrictions to the transferability of our shares by the Brightline Stockholder or its permitted transferees which are beyond those provided for in our certificate of incorporation, bylaws, the Stockholders' Agreement or applicable securities laws, or that nullify the rights set out in the Stockholders' Agreement of the Brightline Stockholder or its permitted transferees unless such amendment is approved by the Brightline Stockholder.

#### Designation and Election of Directors

Our Stockholders' Agreement will provide that, for so long as the Stockholders' Agreement is in effect, we and the Brightline Stockholder shall take all reasonable actions within our respective control (including voting or causing to be voted all of the securities entitled to vote generally in the election of our directors held of record or beneficially owned by the Brightline Stockholder or by Fortress or its affiliates, and, with respect to us, including in the slate of nominees recommended by the board those individuals designated by the Brightline Stockholder) so as to elect to the board, and to cause to continue in office, not more than    directors (or such other number as the Brightline Stockholder may agree in writing), of whom, at any given time:

- a number of directors equal to a majority of the board of directors, plus one director, shall be individuals designated by the Brightline Stockholder, for so long as the Brightline Stockholder directly or indirectly beneficially owns, together with Fortress and its affiliates and permitted transferees, at least    % of our voting power, provided that if the board consists of    or fewer directors, then the Brightline Stockholder shall have the right to designate a number of directors equal to a majority of the board;

- a number equal to a majority of the board of directors, minus one director, shall be individuals designated by the Brightline Stockholder, for so long as the Brightline Stockholder directly or indirectly beneficially owns, together with Fortress and its affiliates and permitted transferees, less than    % but at least    % of our voting power, provided that if the board of directors consists of    or fewer directors, then the Brightline Stockholder shall have the right to designate a number of directors equal to three directors;

- a number of directors (rounded up to the nearest whole number) that would be required to maintain the Brightline Stockholder's proportional representation on the board of directors shall be individuals designated by the Brightline Stockholder for so long as the Brightline Stockholder directly or indirectly

72

5 LMFMX 2      BEVKIXIH A53 2VMKLXPMRI $ 6SVXVIWW 7S IVRERGI ERH 3SRXVVSP      EXIVMEPW           Exhibit B-32 of 43

TABLE OF CONTENTS

beneficially owns, together with Fortress and its affiliates and permitted transferees, less than     % but at least     % of our voting power, provided that if the board of directors consists of     or fewer directors, then the Brightline Stockholder shall have the right to designate     directors; and

- a number of directors (rounded up to the nearest whole number) that would be required to maintain the Brightline Stockholder's proportional representation on the board of directors shall be an individual designated by the Brightline Stockholder for so long as the Brightline Stockholder directly or indirectly beneficially owns, together with Fortress and its affiliates and permitted transferees, less than     % but at least     % of our voting power, provided that if the board of directors consists of     or fewer directors, then the Brightline Stockholder shall have the right to designate     director.

In accordance with the Stockholders' Agreement, the Brightline Stockholder has designated     ,     ,     and          for election to our board of directors.

### Indemnification

The agreement will provide that we will indemnify the Brightline Stockholder and its officers, directors, employees, agents and affiliates against losses arising out of third-party claims (including litigation matters and other claims) based on, arising out of or resulting from:

- the ownership or the operation of our assets or properties, and the operation or conduct of our business, prior to or following this offering; and

- any other activities we engage in.

In addition, we will agree to indemnify the Brightline Stockholder and its officers, directors, employees, agents and affiliates against losses, including liabilities under the Securities Act and the Exchange Act, relating to misstatements in or omissions from the registration statement of which this prospectus is a part and any other registration statement or report that we file, other than misstatements or omissions made in reliance on information relating to and furnished by the Brightline Stockholder for use in the preparation of that registration statement or report, against which the Brightline Stockholder will agree to indemnify us.

### Registration Rights

*Demand Rights.*   Under our Stockholders' Agreement, the Brightline Stockholder will have, for so long as the Brightline Stockholder directly or indirectly beneficially owns, together with Fortress and its affiliates, an amount of our common stock (whether owned at the time of this offering or subsequently acquired) equal to or greater than 1% of our shares of common stock issued and outstanding immediately after the consummation of this offering (a "Registrable Amount"), "demand" registration rights that allow the Brightline Stockholder, for itself and for Fortress and its affiliates and permitted transferees, at any time after 180 days following the consummation of this offering, to request that we register under the Securities Act an amount equal to or greater than a Registrable Amount. The Brightline Stockholder, for itself and for Fortress and its affiliates and permitted transferees, will be entitled to unlimited demand registrations so long as such persons, together, beneficially own a Registrable Amount. We will also not be required to effect any demand registration within one month of a "firm commitment" underwritten offering to which the requestor held "piggyback" rights, described below, and which included at least 50% of the shares of common stock requested by the requestor to be included. We will not be obligated to grant a request for a demand registration within three months of any other demand registration.

*Piggyback Rights.*   For so long as the Brightline Stockholder beneficially owns, together with Fortress and its affiliates and permitted transferees, an amount of our common stock equal to or greater than 1% of our common stock issued and outstanding immediately after the consummation of this offering, the Brightline Stockholder (and Fortress and its affiliates and permitted transferees) will also have "piggyback" registration rights that allow them to include the common stock that they own in any public offering of equity securities initiated by us (other than those public offerings pursuant to registration statements on Forms S-4 or S-8 or pursuant to an employee benefit plan arrangement) or by any of our other stockholders that have registration rights. These "piggyback" registration rights will be subject to proportional cutbacks based on the manner of the offering and the identity of the party initiating such offering.

*Shelf Registration.*   Under our Stockholders' Agreement, we will grant to the Brightline Stockholder or any of its respective permitted transferees, for so long as the Brightline Stockholder, together with Fortress and its affiliates

73

5  LMFMX  2      BEVKIXIH   A53  2VMKLXPMRI  $  6SVXVIWW  7S  IVRERGI  ERH  3SRXVVSP      EXIVMEPW          Exhibit B-33 of 43

TABLE OF CONTENTS

and permitted transferees, beneficially owns a Registrable Amount, the right to request a shelf registration on Form S-3 providing for offerings of our common stock to be made on a continuous basis until all shares covered by such registration have been sold, subject to our right to suspend the use of the shelf registration prospectuses for a reasonable period of time (not exceeding 60 days in succession or 90 days in the aggregate in any 12 month period) if we determine that certain disclosures required by the shelf registration statements would be detrimental to us or our stockholders. In addition, the Brightline Stockholder, for itself and for Fortress and its affiliates and permitted transferees, may elect to participate in such shelf registrations within ten days after notice of the registration is given.

*Indemnification; Expenses; Lock-ups.* Under our Stockholders' Agreement, we will agree to indemnify the applicable selling stockholder and its officers, directors, employees, managers, members partners, agents and controlling persons against any losses or damages resulting from any untrue statement or omission of material fact in any registration statement or prospectus pursuant to which it sells shares of our common stock, unless such liability arose from the applicable selling stockholder's misstatement or omission, and the applicable selling stockholder will agree to indemnify us against all losses caused by its misstatements or omissions. We will pay all registration and offering-related expenses incidental to our performance under the Stockholders' Agreement, and the applicable selling stockholder will pay its portion of all underwriting discounts, commissions and transfer taxes, if any, relating to the sale of its shares of common stock under the Stockholders' Agreement. We have agreed to enter into, and to rights by the Brightline Stockholder, for itself and for Fortress and its affiliates and permitted transferees.

### Merger Right

Under our Stockholders' Agreement, Fortress will have the right (but not the obligation), at any time following the closing of this offering, to cause certain subsidiaries of the Fortress Funds through which our common stock is held (such subsidiaries, the "Fortress Subsidiaries") to merge with and into us or one or more of our wholly-owned subsidiaries (each, a "Merger," and collectively, the "Mergers"). At the effective time of a Merger, the separate corporate existence of the applicable Fortress Subsidiary will cease, and we or our wholly-owned subsidiary, as applicable, will continue as the surviving company. The consummation of any Merger will be subject to certain conditions, including that the only assets of the applicable Fortress Subsidiary at the effective time of the Merger will consist of shares of our common stock. As a result of each Merger, the shares of our common stock held by the applicable Fortress Subsidiary at the effective time of the Merger will be cancelled, and the owner(s) of the applicable Fortress Subsidiary will receive a number of shares of our common stock equal to the number of shares so cancelled. The Fortress Subsidiaries that participate in the Mergers may not be the same Fortress-affiliated entities that will initially own shares of our common stock immediately following this offering, in which case it is expected that, prior to the Mergers, the Fortress Funds and their subsidiaries will undergo certain restructuring transactions to cause each Fortress Subsidiary to become the direct owner of shares of our common stock.

### Information Rights

Under our Stockholders' Agreement, the Brightline Stockholder will have the right to request information from us.

### Assistance in the Sale of the Brightline Stockholder's Shares

Under our Stockholders' Agreement, if the Brightline Stockholder seeks to sell its shares of the Company's common stock other than pursuant to a registration statement, the Company shall use its reasonable best efforts to assist the Brightline Stockholder in the sale process, including by providing information to potential purchasers as requested by the Brightline Stockholder.

In addition, if the Board of the Directors starts and then abandons a sale process and the Brightline Stockholder indicates that it wants to sell its shares of the Company's common stock, the Company shall permit the Brightline Stockholder to engage in discussions with potential purchasers who participated in the abandoned sales process. The Company shall be obligated to assist the Brightline Stockholder in any such sale process to the extent required by the paragraph above.

### Transactions with the Brightline Stockholder

We have entered into certain lease agreements with our direct parent, the Brightline Stockholder, including for our office in Miami, Florida and garages in Miami, Fort Lauderdale and West Palm Beach.

5  LMFMX  2      BEVKIXIH  A53  2VMKLXPMRI  $  6SVXVIWW  7S  IVRERGI  ERH  3SRXVVSP      EXIVMEPW                    Exhibit B-34 of 43

EX-10.76 13 s002218x10_ex10-76.htm EXHIBIT 10.76

**Exhibit 10.76**

MEMBERSHIP INTEREST PURCHASE AGREEMENT

Among

BRIGHTLINE HOLDINGS LLC,

DESERTXPRESS ENTERPRISES, LLC

and

BENNY'S HOLDCO, LLC

Dated as of September 17, 2018

MEMBERSHIP INTEREST PURCHASE AGREEMENT dated as of September 17, 2018 (this "Agreement"), by and among BRIGHTLINE HOLDINGS LLC, a Delaware limited liability company ("Buyer"), DESERTXPRESS ENTERPRISES, LLC, a Nevada limited liability company (the "Company"), and BENNY'S HOLDCO, LLC, a Nevada limited liability Company ("Seller").

WHEREAS Seller is the record and beneficial owner of 100% of the issued and outstanding Membership Interests of the Company; and

WHEREAS Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all the Membership Interests;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

## ARTICLE I

### The Acquisition

Section 1.01      The Acquisition. On the terms and subject to the conditions of this Agreement, at the Closing Seller shall sell, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all the Membership Interests, which Membership Interests shall be sold, transferred and delivered with full legal and beneficial title, free and clear of all Liens (other than transfer restrictions under applicable securities Laws) and together with all rights attached thereto, in exchange for the Closing Date Payment (as such payment may be adjusted pursuant to Article II, as applicable), on the terms and subject to the conditions set forth in Articles II and VII. The purchase and sale of the Membership Interests is referred to in this Agreement as the "Acquisition".

## ARTICLE II

### Closing and Post-Closing Purchase Price Adjustment

Section 2.01      Acquisition Closing.

(a)      The closing of the Acquisition (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019, at 9:00 a.m. New York City time on the second business day following the satisfaction of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or written waiver of those conditions at such time) (or, to the extent permitted by applicable Law, waived in writing by the party entitled to the benefit thereof), or at such other place, time and date as may be agreed by Seller and Buyer. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

(b)      At least three business days prior to the Closing Date, the Company shall provide to Buyer reasonably detailed calculations of (i) the amount of Closing Debt and (ii) the amount of Unpaid Expenses, in each case calculated in accordance with the definition thereof set forth in this Agreement.

(b)     The execution, delivery and performance of this Agreement by Seller and the Company, the consummation by Seller and the Company of the transactions contemplated hereby and the compliance by Seller and the Company with the provisions hereof do not and will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation or to a loss of a benefit under, or result in the creation of any Lien in or upon any of the properties or assets of the Company or any of its subsidiaries under, or give rise to any increased, additional, accelerated or guaranteed rights or entitlements under, any provision of (i) the Company's or any of its subsidiaries' Organizational Documents, (ii) any Contract to which the Company or any of its subsidiaries is a party or any of their properties or assets are subject or (iii) subject to the governmental filings and other matters referred to in Section 3.03(c), any Law, Governmental Approval or Judgment, in each case applicable to the Company or any of its subsidiaries or any of their properties or assets.

(c)     No Consent of, or filing or submission with, or notification to, any Governmental Entity, is required to be obtained or made by or with respect to the Company or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement by the Company, the consummation by the Company of the transactions contemplated hereby or the compliance by the Company with the provisions hereof, other than (i) those set forth on Section 3.03(c) of the Company Disclosure Letter, (ii) the Consents, filings or submissions as may be required under applicable requirements of the STB solely with respect to the STB's approval or exemption of a change of control of the Company (the "Required STB Approvals") and (iii) a decision by the Bureau of Land Management ("BLM"), pursuant to 43 C.F.R 2807.21, approving the assignment of the DesertXpress Right-of Way Grant in connection with the proposed acquisition of control by Buyer of the Company (the "Required BLM Approval").

(d)     No Third-Party Consent is required to be obtained or made by or with respect to the Company or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement by the Company, the consummation by the Company of the transactions contemplated hereby or the compliance by the Company with the provisions hereof.

Section 3.04    Financial Statements. The Company has made available to Buyer (i) the unaudited consolidated balance sheets of the Company and its subsidiaries as of December 31, 2016, December 31, 2015, December 31, 2014 and December 31, 2013 and the related unaudited consolidated statements of operations of the Company and its subsidiaries for the fiscal years ended on December 31, 2016, December 31, 2015, December 31, 2014 and December 31, 2013 (collectively, the "Yearly Financial Statements"), (ii) the unaudited consolidated balance sheets of the Company and its subsidiaries as of the end of each calendar month during the period beginning January 1, 2017 and ending September 30, 2017 and the related unaudited consolidated statements of operations of the Company and its subsidiaries for each calendar month during such period (collectively, the "Company Monthly Financial Statements") and (iii) the unaudited consolidated balance sheets of Seller and its subsidiaries as of the end of each calendar month during the period beginning October 1, 2017 and ending July 31, 2018 and the related unaudited consolidated statements of operations of Seller and its subsidiaries for each calendar month during such period (collectively, the "Seller Monthly Financial Statements" and, together with the Yearly Financial Statements and the Company Monthly Financial Statements, the "Financial Statements"). The Financial Statements (i) are complete and accurate in all material respects, (ii) were derived from and prepared in accordance with the underlying books, records and accounts of the Company and its subsidiaries, (iii) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby (except that the Financial Statements do not contain footnotes that may be required by GAAP, and the Company Monthly Financial Statements and the Seller Monthly Financial Statements are subject to normal and recurring year-end adjustments) and (iv) fairly and accurately present in all material respects the assets, Liabilities (including all reserves) and financial position of the Company and its subsidiaries as of the dates thereof and the results of comprehensive income (loss) of the Company and its subsidiaries for the periods then ended.

8

"Calculation Time" means 12:01 a.m. (New York City time) on the Closing Date.

"Cash Purchase Price" means an amount in cash equal to (a) (i) if all of the Supplemental Approvals have been obtained on or prior to the Closing, $60,000,000, or (ii) if any of the Supplemental Approvals have not been obtained on or prior to the Closing, $30,000,000, minus (b) Closing Debt minus (c) Unpaid Expenses.

"Change of Control" means the occurrence of any of the following events: (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder), other than any Permitted Holder, of equity interests of the Company or Buyer representing more than 50% of either the aggregate ordinary voting power or the aggregate equity value represented by the issued and outstanding equity interests of the Company or Buyer, as applicable; or (ii) the sale, lease, exclusive license or other disposition (x) by the Company of all or substantially all of the Company's assets or properties or (y) by Buyer of all or substantially all of Buyer's assets or properties, in each case, other than any such sale, lease, exclusive license or other disposition to an affiliate of Buyer.

"Closing Date Payment" means an amount (rounded to the nearest whole cent) equal to (a) if Buyer does not make the Closing Date Share Election, (i) the Cash Purchase Price plus (ii) an amount (rounded to the nearest whole cent) equal to the product of (x) the Base Share Closing Date Payment, multiplied by (y) the Buyer Common Share Value, or (b) if Buyer makes the Closing Date Share Election, an amount (rounded to the nearest whole cent) equal to the product of (i) the sum of (x) the Base Share Closing Date Payment and (y) the Optional Share Closing Date Payment, multiplied by (ii) the Buyer Common Share Value.

"Closing Debt" means an amount equal to the aggregate amount of Indebtedness and Guarantees of the Company and its subsidiaries as of the Calculation Time (plus the amount of any Indebtedness or Guarantees incurred between the Calculation Time and the Closing) and calculated in accordance with the Accounting Methodologies.

"Commencement of Construction" means the entry into binding construction agreements by the Company or any of its affiliates for the physical construction of all or substantially all of a passenger rail system along a contiguous corridor between Las Vegas, Nevada and Victorville, California (including with respect to any associated stations, track, switches, infrastructure and other improvements along this route), but excluding any design, surveying or other ancillary services in anticipation of such construction.

"Company Fundamental Representations" means the representations and warranties set forth in Sections 3.01, 3.02, 3.03, 3.15, 3.16 and 3.17.

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement, dated June 14, 2018, by and between the Company and Brightline Investment Holdings, LLC, an affiliate of Buyer, as amended.

"Consent" means any consent, approval, waiver, license, permit, franchise, exemption, certificate, filing, notice, concession, right, grant, administrative decision or finding, certification, memorandum of understanding, right-of-way, easement, encroachment, authorization or order.

53

"Member" has the meaning assigned to such term in the Operating Agreement.

"Membership Interests" has the meaning assigned to such term in the Operating Agreement.

"Operating Agreement" means the Fourth Amended and Restated Operating Agreement of the Company, dated as of October 13, 2017.

"Optional Share Closing Date Payment" means a number of Buyer Common Shares (rounded up to the nearest whole number of limited liability interests) equal to the quotient of (a) (i) (x) if all of the Supplemental Approvals have been obtained on or prior to the Closing, $60,000,000, or (y) if any of the Supplemental Approvals have not been obtained on or prior to the Closing, $30,000,000, minus (ii) the Deposit Amount (if previously paid pursuant to Section 2.03), minus (iii) Closing Debt, minus (iv) Unpaid Expenses, divided by (b) the Buyer Common Share Value.

"Optional Supplemental Share Purchase Price" means a number of Buyer Common Shares equal to the Supplemental Share Purchase Price.

"Organizational Documents" means any charter, certificate, articles or deed of incorporation, articles of organization, certificate of formation, articles of association, bylaws, operating agreement or similar formation or governing documents and instruments, including, for the avoidance of doubt, in the case of the Company, the Company's articles of organization and the Operating Agreement.

"Participant" means any current or former director, employee, individual independent contractor or other individual service provider of the Company or any of its subsidiaries.

"Permitted Holder" means Fortress Investment Group LLC and any affiliate thereof, and investment funds or partnerships managed by any of the foregoing.

"Permitted Liens" means (a) mechanics', materialmen's, carriers', repairers' and other similar Liens arising or incurred in the ordinary course of business consistent with past practice for amounts that are not yet due or are being contested in good faith by appropriate Proceedings, and for which adequate reserves have been made in accordance with GAAP, (b) Liens for taxes, assessments or other governmental charges not yet due and payable as of the Closing Date or which are being contested in good faith by appropriate Proceedings, and for which adequate reserves have been made in accordance with GAAP, (c) encumbrances, restrictions, easements, covenants, conditions, rights of way and similar matters of record affecting title to real property that, individually or in the aggregate, would not reasonably be expected to impair the conduct of the Business and (d) zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property and which are not violated by the conduct of the Business.

(e)      Notwithstanding anything to the contrary contained herein, including the occurrence of the Restricted Period Termination Date or any Third Party Transfer Election, the Stockholder shall not, directly or indirectly, Transfer any Buyer Common Shares other than in accordance with applicable Law and Judgment and Buyer's Organizational Documents. Until the consummation of a Buyer IPO, Buyer shall not, and shall cause its members not to, amend or otherwise modify its Organizational Documents in any manner that would result in any restrictions on Transfer therein becoming more restrictive than any restrictions on Transfer set forth in Buyer's Organizational Documents as of the date of the Purchase Agreement.

(f)      Any Transfer or attempted Transfer of Buyer Common Shares in violation of this Section 2.1 shall, to the fullest extent permitted by applicable Law and Judgment, be null and void *ab initio,* and Buyer shall not, and shall instruct its transfer agent and other third parties not to, record or recognize any such purported transaction on the share register or other books and records of Buyer. Any share certificate or other instrument evidencing the Buyer Common Shares issued to the Stockholder on the Closing Date shall bear a legend detailing the restrictions on transfer set forth in this Agreement.

2.2      Tag Along; Drag Along; Put Right.

(a)      Tag Along Rights. Notwithstanding anything in Section 2.1 to the contrary, if any Fortress Stockholder or group of Fortress Stockholders proposes to effect a Change of Control Sale prior to the consummation of the Buyer IPO, the Stockholder may, at its option, elect to exercise its rights under this Section 2.2(a).

(i)      In the event of a proposed Change of Control Sale, Buyer shall deliver to the Stockholder: (A) a written notice of the terms and conditions of such Change of Control Sale (a "Change of Control Notice") and offer the Stockholder (and any Permitted Transferee that then owns any Buyer Common Shares) the opportunity to participate in such Change of Control Sale on the same terms and conditions, subject to the same agreements and for the same consideration, as the applicable Fortress Stockholders participating in such Change of Control Sale and (B) the purchase agreement (or similar instrument of transfer), including all attachments and schedules, that is the subject of such Change of Control Sale.

6

(ii)     From the date of the delivery of all of the information described in Section 2.2(a)(i), until the date that is 10 business days thereafter (the "Tag Along Election Period"), the Stockholder (and any Permitted Transferee that then owns any Buyer Common Shares) shall have the right, exercisable by written notice delivered by the Stockholder (such participating Stockholder and such other participating Permitted Transferees that then own any Buyer Common Shares, a "Tag Along Stockholder") to Buyer within such Tag Along Election Period, to request that the applicable Fortress Stockholders include in the Change of Control Sale the number of Buyer Common Shares as is specified in such notice; provided, however, that if the aggregate number of Buyer Common Shares proposed to be Transferred by the applicable Fortress Stockholders, the Tag Along Stockholders and any other holder of Buyer Common Shares in the Change of Control Sale exceeds the number of Buyer Common Shares that can be Transferred on the terms and conditions set forth in the Change of Control Notice, then only the Tag Along Portion of Buyer Common Shares held by the applicable Fortress Stockholders and the Tag Along Stockholders shall be Transferred pursuant to the applicable Change of Control Sale. All out-of-pocket costs and expenses incurred by the Tag Along Stockholders in connection with a Change of Control Sale described in this Section 2.2(a) shall be paid by the Tag Along Stockholders. In connection with any Change of Control Sale described in this Section 2.2(a), the closing of the Transfer of Buyer Common Shares held by the applicable Fortress Stockholders and the closing of the Transfer of Buyer Common Shares held by each Tag Along Stockholder shall each occur on the same date.

(iii)     Notwithstanding the foregoing, the Fortress Stockholders may at any time prior to consummation of a Change of Control Sale described in this Section 2.2(a) terminate the proposed Transfer and the related tag along rights of any Tag Along Stockholder with respect to such proposed Transfer. Buyer shall cause the Fortress Stockholders to comply with the provisions of this Section 2.2(a).

(b)     Drag Along. Notwithstanding anything in Section 2.1 to the contrary, if Buyer or any Fortress Stockholder or group of Fortress Stockholders proposes to effect a Change of Control Sale prior to the consummation of a Buyer IPO, Buyer or such Fortress Stockholders may, at their option, require the Stockholder (and any Permitted Transferee that then owns any Buyer Common Shares) to Transfer in such Change of Control Sale all of the Buyer Common Shares then owned by the Stockholder (and such other Permitted Transferees that then own any Buyer Common Shares) (collectively, the "Drag Along Stockholders") on the same terms and conditions, subject to the same agreements and for the same consideration, as the applicable Fortress Stockholders participating in such Change of Control Sale, pursuant to the terms of this Section 2.2(b).

7

(i) In the event Buyer or any Fortress Stockholders elect to exercise their rights pursuant to this Section 2.2(b), Buyer shall provide to the Stockholder a Change of Control Notice not later than the 10th business day prior to the closing of the proposed Change of Control Sale.

(ii) Upon receipt of a Change of Control Notice, the Drag Along Stockholders shall be required to participate in the Change of Control Sale, on the terms and conditions set forth in the Change of Control Notice (subject to this Section 2.2(b)(ii) and Section 2.2(b)(iii)) and, if any such Change of Control Sale involves a merger, consolidation or sale of all or substantially all assets of Buyer and its subsidiaries, the Drag Along Stockholders shall be required to vote in favor of or consent in writing to such merger, consolidation or sale of all or substantially all assets (and, without limiting the foregoing, each Drag Along Stockholder shall (to the extent applicable) waive any dissenters' rights, appraisal rights or similar rights in connection therewith). In connection with the foregoing, each Drag Along Stockholder shall be required to join and become a party to each agreement that is approved by Buyer or any Fortress Stockholder or group of Fortress Stockholders, as applicable (or to which any Fortress Stockholder is a party), in connection with a Change of Control Sale, including any such agreement that provides for representations and warranties, indemnification obligations (including escrows, hold backs or other similar arrangements to support such indemnification obligations), releases, covenants or other obligations, in each case, of the holders of Buyer Common Shares party thereto; provided that (x) except in the case of the following clause (y), the indemnification obligations of each Drag Along Stockholder in connection with a Change of Control Sale shall be the same as those made by the Fortress Stockholders and apportioned based on such Drag Along Stockholder's pro rata portion of the aggregate consideration received by the holders of Buyer Common Shares in such transaction, (y) with respect to breaches of Fundamental Representations made by any Drag Along Stockholder in connection with a Change of Control Sale, such Drag Along Stockholder shall be solely liable, and (z) the aggregate amount of liability for any Drag Along Stockholder shall not in any case exceed the total consideration received by such Drag Along Stockholder in the Change of Control Sale. The Stockholder (i) hereby appoints Buyer or any designee thereof as its representative in connection with any agreement contemplated by this Section 2.2(b) (including the right to resolve any potential indemnification claims or other disputes on behalf of the Fortress Stockholders and the Drag Along Stockholders) and (ii) hereby irrevocably grants to, and appoints, Buyer or any designee thereof, as the Stockholder's proxy and attorney in fact (with full power of substitution), for and in the name, place and stead of each Drag Along Stockholder, to vote the Buyer Common Shares held by each Drag Along Stockholder, or to grant a consent or approval in respect of such Buyer Common Shares, in connection with any meeting of Buyer or any action by written consent in lieu of a meeting of Buyer with respect to a Change of Control Sale. The Stockholder hereby affirms that such irrevocable proxy is given to secure the performance of the duties of the Stockholder under this Agreement, and is coupled with an interest and irrevocable. All out of pocket costs and expenses incurred by any Drag Along Stockholder in connection with a Change of Control Sale described in this Section 2.2(b) shall be paid by such Drag Along Stockholder. In connection with any Change of Control Sale described in this Section 2.2(b), the closing of the Transfer of Buyer Common Shares held by the applicable Fortress Stockholders and the closing of the Transfer of Buyer Common Shares held by each Drag Along Stockholder shall each occur on the same date.

8

"Buyer" has the meaning set forth in the preamble.

"Change of Control Notice" has the meaning set forth in Section 2.2(a).

"Change of Control Sale" means any transaction or series of related transactions in which any Fortress Stockholder or group of Fortress Stockholders proposes to Transfer (whether by merger, consolidation or sale or other Transfer of Buyer Common Shares or otherwise) 50% or more of the then outstanding Buyer Common Shares to any person (other than another Fortress Stockholder or other affiliate of Holdings).

"Delaware Act" means the Delaware Limited Liability Company Act (6 Del. C. Section 18-101, et seq.), as amended from time to time.

"Drag Along Stockholder" has the meaning set forth in Section 2.2(b).

"Fortress" means [●].[2]

"Fortress Stockholder" means Holdings and any affiliate of Fortress (other than Buyer and its subsidiaries) that Beneficially Owns Buyer Common Shares at any time.

"Fundamental Representations" means certain customary "fundamental representations" to be made by the holders of Buyer Common Shares in connection with a Change of Control Sale or a Transfer to Buyer as contemplated by Section 2.2(c), as applicable, including representations with respect to ownership and authority to Transfer, free of liens, claims and encumbrances, the Buyer Common Shares proposed to be Transferred by such holder of Buyer Common Shares, no conflicts and absence of approvals with respect to the Buyer Common Shares proposed to be Transferred by such holder of Buyer Common Shares, the due authorization, execution, delivery and enforceability of the definitive documents entered into by such holder of Buyer Common Shares in connection with such Transfer, no brokers and compliance with applicable Laws and Judgments.

"Governance and Nominating Committee" has the meaning set forth in Section 1.1(c).

"Holdings" means AAF Holdings LLC, a Delaware limited liability company.

"OpCo" means Brightline Trains LLC.

"Permitted Transferee" means each of DX, LLC, Transmax LLC, TXE II, LLC, Rogich Communications Group, Inc. and any affiliate of the foregoing.

"Permitted Transfers" has the meaning set forth in Section 2.1(b).

---

2 Note to Draft: To reference applicable Fortress fund that controls Buyer.

11

# EXHIBIT C

*Targeted SEC AAF Management Agreement and Centralized Service Materials*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says Plaintiff has not pleaded employment/control facts. | C-45-C-47 | Shows management-service, labor, staffing, HR, safety, and day-to-day operations structures existed as formal SEC-disclosed systems. |
| Fortress says enterprise allegations are conclusory. | C-47-C-49 | Identifies AAF Management, the Management Agreement, centralized services, and an SEC exhibit-index entry for the agreement. |
| Fortress says there is no basis for control discovery. | C-45-C-49 | Shows concrete management, staffing, HR, safety, accounting, and operational-support documents to request. |

## WHY THESE PAGES MATTER

Exhibit C fills the management-services layer. It does not argue that AAF Management equals Fortress or that 2018 documents alone prove 2023 control. It shows that the Brightline enterprise used formal management-service and centralized-service structures, making discovery into staffing, HR, safety, accounting, and operational support appropriate.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| C-44 | Replacement cover sheet and motion-response roadmap. | Frames the exhibit as management-service discovery support, not final proof of Fortress employment. |
| C-45 | Labor costs, salaries, benefits, and operating expense categories. | Shows staffing and labor were enterprise operating systems, not vague allegations. |
| C-46 | Operations staffing and support functions, including safety, HR, legal, finance, IT and rail operations support. | Supports discovery into who administered and controlled these support functions. |
| C-47 | AAF Management / Management Agreement; day-to-day management and operation; employee subcontracting language. | Directly addresses whether personnel and operational services were structured through management-company agreements. |
| C-48 | Combined assets and corporate-service allocations. | Supports discovery into centralized service allocation and enterprise-level operational support. |
| C-49 | SEC exhibit index identifying the General Operations, Management and Administrative Services Agreement. | Identifies a specific agreement for production or amendment if the Court wants more detail. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

Exhibit C cover sheet - replacement page C-44

TABLE OF CONTENTS

transportation corridors either rail, highway or a combination of both to cost effectively build our systems, as opposed to developing entirely new corridors at potentially significantly higher costs.

## Expected Sources of Revenue and Income

We expect to generate a significant majority of our revenue and income by selling tickets to passengers traveling on our passenger rail system. We also expect to generate ancillary revenue and income from food and beverage sales, merchandise sales, parking fees, advertising, sponsorships and marketing (including naming rights), commissions from our travel partners and ground transportation service providers and other services.

*Ticket Sales* We expect to generate the substantial majority of our total revenue by selling tickets to passengers traveling on our passenger rail system. Ticketing revenue for any period is calculated as a function of the number of passengers riding our trains for such period and the price of tickets paid by such passengers.

*Food and Beverage Sales* Food and beverages will be available for purchase on our trains, as well as in our stations from Good to Go kiosks that we own and operate. Initially, two of the four passenger cars on each train will have food and beverage carts. Upon commencement of Orlando operations, our trains are expected to include a caf car.

*Merchandise Sales* Merchandise sales will include model trains and accessories, as well as hats, t-shirts and other apparel.

*Parking Garages* We have entered into leases for parking garages in Miami, Fort Lauderdale and West Palm Beach with a total of approximately 1,700 parking spaces for which we will charge a fee to park. We expect the parking spaces to generate demand mostly from passengers on our rail system, with additional demand for street and event parking.

*Advertising* We have contracted with OutFront Media for advertising inside our stations, such as video displays and column wraps, and outside our stations, such as external billboards. Under this contract, OutFront Media has the right and responsibility to market, sell, install, display and remove all third-party advertising and we will receive 60% of revenues, net of initial capital costs and commissions.

*Sponsorships* We have identified many partnership and sponsorship opportunities, including vendors for beverages, Wi-Fi and snacks, arrangements involving passenger lounges, health facilities (e.g., nursing mothers room) and rideshare (e.g., Uber or Lyft) and marketing affiliations with Train Presented by and time clocks. We have secured several sponsorship contracts and are working to arrange additional sponsorships. Some sponsorships are expected to be long-term, based on facility infrastructure commitments, while others such as product placements can be modified over time. We have begun discussing naming rights for our Miami station, which we expect to cover a period of 10 years or more.

*Other Services* We expect to generate revenue and income from, in addition to the above, other services including but not limited to baggage fees, pet fees and business center services.

## Costs of Our Business

We expect the major cost components of our business to include direct labor, maintenance of equipment, maintenance of way, fuel, other operating costs (such as food and beverage costs), lease payments and insurance:

*Labor* includes the cost of salaries, employee benefits and other compensation of employees providing management, security and safety, operating, maintenance, legal, accounting, finance, information technology, human resources, revenue management and sales and marketing services.

*Cost of equipment maintenance* includes the cost of regular ongoing and preventative maintenance pursuant to a 30-year maintenance agreement with Siemens, as well as capital maintenance over the life of the contract. Maintenance will be performed at a set price with an established cost escalator pursuant to the maintenance agreement with Siemens.

*Maintenance of Way* includes the cost of maintaining the portion of our rail corridor from Cocoa to Orlando. For the remainder of our rail corridor, from Miami to Cocoa, maintenance of way is performed by FECR under the Joint Use Agreement. Pursuant to the terms of the Joint Use Agreement, FECR is responsible for maintenance of shared track and signals as well as track security and bridge tenders along the shared corridor. We reimburse FECR for our share of the costs of such services. Maintenance of way also includes costs for dispatch services. Pursuant to the

41

TABLE OF CONTENTS

240 are expected to be allocated to rail operations, including onboard staff and maintenance support staff. Each train will be staffed with an engineer, a train manager/conductor and two onboard attendants. The maintenance facilities will be staffed with the Chief Mechanical Officer, facility manager, facility engineer, train readiness managers, train cleaning staff and custodians.

At stabilized operations for our Florida passenger rail system (including the South Segment, North Segment and Tampa Expansion), we expect stations and hospitality operations to have approximately 190, including station managers, station engineers, safety and security staff, ticket counter/guest services agents, public area attendants and baggage agents, in-station cafe attendants and commissary employees. In addition, we expect to have approximately 70 responsible for sales and marketing, finance, information technology, human resources, legal and safety. Our Florida passenger rail system operations will be based in Miami. None of our Florida passenger rail system operations employees are covered by any collective bargaining agreements.

## Legal Proceedings

In the ordinary course of conducting our business, we may become involved in various legal actions and other claims. Litigation is subject to many uncertainties, the outcome of individual litigated matters is not predictable with assurance, and it is reasonably possible that some of these matters may be decided unfavorably to the Company. It is the opinion of management that the ultimate liability, if any, with respect to our current litigation outstanding will not have a material adverse effect on our financial position, results of operations or cash flows.

Our operations are subject to environmental regulation. There are no material environmental claims currently pending or, to our knowledge, threatened against us or any of our railroads.

## Properties

We own in fee simple title: (i) land in Fort Lauderdale for the Fort Lauderdale station, (ii) land in Fort Lauderdale for surface parking and (iii) land in West Palm Beach for the West Palm Beach station. We also have obtained the rights to cross certain roadways pursuant to an ordinance abandoning a portion of Northwest 2nd Avenue in the City of Fort Lauderdale. Our Miami station is being built within our owned property, air rights, certain aerial easements from the City of Miami and rights to cross certain roadways. We have executed a lease with GOAA for our occupancy within GOAAs Orlando station and our Orlando vehicle maintenance facility which is presently being held in escrow pending satisfaction of the remaining release conditions. See the section entitled Stations for more information.

We also hold leasehold interests in all or a portion of three parking garages used in connection with the South Segment stations and our West Palm Beach running repair facility.

FECR owns the fee simple title in the existing rail right-of-way along Floridas east coast from Miami to Jacksonville and owns the existing railroad infrastructure within our corridor. We own the permanent, perpetual and exclusive rights, privileges and easement for passenger rail purposes over and across the real property within FECRs main line right-of-way located between Miami and Jacksonville. See Certain Relationships and Related Party TransactionsTransactions with FECRJoint Use Agreement and Certain Relationships and Related Party TransactionsTransactions with FECRDispatching Services Agreement for more information.

We have executed lease and easement agreements with FDOT, GOAA and CFX related to the Cocoa to Orlando corridor. We hold a lease agreement with FDOT for approximately 14 miles adjacent to SR528 and easement agreements with CFX for approximately 21 miles. We also have executed a rail easement agreement with GOAA for approximately 5 miles on property of the Orlando International Airport; however, the GOAA easement agreement is subject to the satisfaction of certain conditions in order to be released from escrow or be consummated. We have met all requisite conditions for release, except for the conditions that we must have the financial wherewithal to complete our Florida passenger rail system and obtained all permits. This escrowed agreement is set to expire on June 30, 2018. We plan to request an extension should the conditions to release not be timely met; however, there are no assurances that such extensions will be granted. In addition, we own fee title to certain parcels of land required for the Cocoa to Orlando corridor and have obtained easement rights over certain rights of way or property from the City of Orlando, Board of Trustees of the Internal Improvement Trust Fund, Orlando Utility Commission and Brevard County.

Our principal executive offices and headquarters are located in leased space at 161 NW 6th Street, Suite 900, Miami, Florida 33136. This lease expires on December 31, 2022, unless the term is extended pursuant to the 2 60-month renewal options.

60

amendment to the FTL Storage Area Lease, reducing the square footage of the leased property and decreasing the monthly lease payment payable to FECR to approximately $8,000. This lease expired on September 17, 2017 and was not renewed. The Company has paid to FECR an aggregate amount of $0.1 million in period lease payments under the FTL Storage Area Lease.

**Transactions with AAF Management**

All Aboard Florida Operations Management LLC (AAF Management) is a subsidiary of the Brightline Stockholder. We plan to terminate the Management Agreement (defined below) prior to the completion of this offering. At that time, AAF Management will become our subsidiary.

*Management Agreement*

On December 19, 2017, we entered into a general operations, management and administrative services agreement (the Management Agreement) with AAF Management in which AAF Management agreed to provide day-to-day management and operation for us. Initially, employees will be subcontracted to AAF Management pursuant to an agreement with FECI Holding Corp., a subsidiary of our Parent. The Management Agreement requires AAF Management to manage our business affairs in conformity with the policies and the strategy that are approved and monitored by us.

AAF Managements duties will include: (i) performing all of our day-to-day functions, including the design, acquisition, development, construction, installation, equipping, ownership and operation of our Florida passenger rail system and (ii) providing financial and accounting management services. AAF Management is responsible for our day-to-day management and operations and perform (or cause to be performed) such services and activities relating to our assets, operations and our Florida passenger rail system as may be necessary or desirable in connection with our Florida passenger rail system.

The initial term of the Management Agreement expires on the tenth anniversary of the Management Agreement, and the Management Agreement will be renewed automatically thereafter for successive five-year periods unless we or AAF Management elects to terminate the Management Agreement upon 90 days prior written notice.

We pay AAF Management an arms length charge equal to the costs incurred with respect to the services provided plus an annual premium equal to $500,000 and also reimburse AAF Management for certain expenses. As of December 31, 2017, no payments have been made under the Management Agreement.

78

TABLE OF CONTENTS

## Brightline Holdings

### Notes to Combined Financial Statements
### December 31, 2017

#### Note 1.    Business and Basis of Presentation

*Business*

Brightline Holdings comprises the combined net assets and operations of Brightline Holdings LLC (f/k/a AAF Holdings B LLC, a limited liability company in Delaware that effected a name change in March 2018) and its wholly-owned subsidiaries and certain other wholly-owned subsidiaries of AAF Holdings LLC (the Brightline Stockholder), collectively referred to as the Company or Brightline. The wholly-owned subsidiaries of the Brightline Stockholder referenced above include AAF Jacksonville Segment LLC, All Aboard Florida Operations Management LLC, Brevard County Property Holdings LLC and Space Coast Land Holdings LLC. The Brightline Stockholder is a subsidiary of Florida East Coast Industries, LLC (FECI or our Parent). Brightline Holdings LLC is a wholly-owned subsidiary of the Brightline Stockholder.

The Company is in the business of owning and operating an express passenger rail system connecting major population centers in Florida, with plans to expand operations further in Florida and elsewhere in North America.

The Company currently operates along one of the most heavily traveled and congested regions in the U.S. In January 2018, the Company commenced initial operations between Fort Lauderdale and West Palm Beach, and prior to then, the Company had no operating revenues. The Company expects to commence service to Miami in May 2018. The Company expects to commence construction of the expansion of our Florida passenger rail system to Orlando, Florida, and intends to further expand the rail service to Tampa, Florida. The Company owns stations located in the heart of downtown cities and major transit hubs in Florida. The portion of the passenger rail system running between Miami and West Palm Beach is known as the South Segment. In addition, the Company plans to construct a passenger rail system to Orlando and the portion of the passenger rail system that will run between West Palm Beach and Orlando is known as the North Segment.

The Company manages its operations as a single operating segment for the purposes of assessing performance and making operating decisions. All of the Companys assets are maintained in the United States.

*Basis of Presentation*

The combined financial statements have been prepared on a stand-alone basis in accordance with U.S. generally accepted accounting principles (GAAP) and are derived from the Brightline Stockholders and our Parents accounting records to reflect the Companys financial position, results of operations and cash flows. The combined results are not necessarily indicative of future performance and do not reflect what the Companys financial performance would have been had it been a stand-alone company during the periods presented.

The Brightline Stockholder and our Parent currently provide certain corporate services to the Company and costs associated with these functions have been allocated to the Company. These allocations are necessary to reflect all of the costs of doing business and include costs related to corporate development, finance and accounting, legal, information technology, human resources, treasury, and other services, as well as an allocation of stock-based compensation attributable to employees of our Parent providing services to the Company. The costs of such services have been allocated to the Company on the basis of direct usage when identifiable, with the remainder allocated on the basis of headcount. The Company capitalized $26.2 million and $22.8 million of the allocations that were directly related to capitalizable activities for the construction of its assets and recorded the amounts in Properties and equipment, net and investment in rail in the combined balance sheets as of December 31, 2017 and 2016, respectively. The expense portion of these allocations was $2.2 million and $11.1 million and was recorded in Salaries and benefits and General, administrative and other expense in the combined statements of operations and comprehensive loss for the years ended December 31, 2017 and 2016, respectively. Management believes the basis on which costs have been allocated to be a reasonable reflection of the utilization of services provided to or the benefit received by the Company during the periods presented.

The historical construction activities of Brightline were funded by the Brightline Stockholder, primarily through its borrowings. As such, the Brightline Stockholders interest expense has been allocated to the Company based on the portion of the debt used to support the construction activities of the Company. Management believes the basis of

F-7

**TABLE OF CONTENTS**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| 10.49* | Second Amendment to Sharing Agreement, among DT Miami LLC, 2MC Office, LLC, DT Retail LLC, DT MF South, LLC, DT MFN, LLC, DTS 2MC Office, LLC and All Aboard Florida Operations LLC, dated September 2, 2016 |
| 10.50* | Third Amendment to Sharing Agreement, among DT Miami LLC, DT Retail LLC, DTS 2MC Office LLC, DT MF South LLC, DT MFN, LLC, All Aboard Florida Operations LLC, DT Residential North LLC and DT Residential South LLC, dated March 10, 2017 |
| 10.51* | Fourth Amendment to Sharing Agreement, among DT Miami LLC, DT Retail LLC, DTS 2MC Office LLC, All Aboard Florida Operations LLC, DT Residential North LLC, DT Residential South LLC and DTS DT Retail LLC, dated June 30, 2017 |
| 10.52* | Contract C100 Construction Agreement, between All Aboard Florida Operations LLC and Archer Western Construction, LLC, dated May 26, 2015 |
| 10.53* | Amendment No. 8 to C100 Construction Agreement, between All Aboard Florida Operations LLC and Archer Western Construction, LLC, dated December 15, 2016 |
| 10.54* | Joint Use Agreement, among Florida East Coast Railway, L.L.C., All Aboard Florida Operations LLC and FDG Flagler Station II LLC, dated June 13, 2014 |
| 10.55* | Tri-Rail Downtown Miami Link Access, Operating and Funding Agreement between Florida East Coast Railway, L.L.C., All Aboard Florida Operations LLC and South Florida Regional Transportation Authority, dated August 8, 2016 |
| 10.56* | Development Agreement, between South Florida Regional Transportation Authority and All Aboard Florida Operations LLC, dated August 8, 2016 |
| 10.57* | Escrow Agreement, among All Aboard Florida Operations LLC, Florida East Coast Railway, L.L.C. and South Florida Regional Transportation Authority, dated August 8, 2016 |
| 10.58* | Tri-Rail Trackage Improvements Agreement, between South Florida Regional Transportation Authority and All Aboard Florida Operations LLC, dated April 17, 2017 |
| 10.59* | Vehicle Terms and Conditions Agreement, between All Aboard Florida Operations LLC and Siemens Industry, Inc., dated August 15, 2014 |
| 10.60* | Amendment 1 to the Vehicle Terms and Conditions, between All Aboard Florida Operations LLC and Siemens Industry, Inc., dated July 17, 2015 |
| 10.61* | Amendment 2 to the Vehicle Terms and Conditions, between All Aboard Florida Operations LLC and Siemens Industry, Inc., dated May 15, 2017 |
| 10.62* | Maintenance Terms and Conditions, between All Aboard Florida Operations LLC and Siemens Industry, Inc., dated December 31, 2014 |
| 10.63* | Senior Loan Agreement, between Florida Development Finance Corporation and All Aboard Florida Operations LLC, dated December 1, 2017 |
| 10.64* | General Operations, Management and Administrative Services Agreement, between All Aboard Florida Operations LLC and All Aboard Florida Operations Management LLC, dated December 19, 2017 |
| 10.65* | Aerial Railroad Bridge, Bridge Support and Drainage Easement between All Aboard Florida Operations LLC and Brevard County, Florida, dated January 31, 2017 |
| 21.1* | List of Subsidiaries |
| 23.1* | Consent of Skadden, Arps, Slate, Meagher & Flom LLP (included in Exhibit 5.1) |
| 23.2* | Consent of Ernst & Young LLP |
| 23.3* | Consent of Louis Berger U.S., Inc. |
| 24.1 | Powers of Attorney (included in the signature pages to this registration statement) |
| 99.1 | Brightline Ridership and Revenue Study |
| 99.2 | Brightline Operations and Maintenance Cost and Ancillary Revenue Independent Review |

---

\*    To be filed by amendment.

II-8

# EXHIBIT D

*Targeted STB / Federal Register Rail-Control Materials*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says it is not a railroad/common carrier and is only an investment company. | D-51-D-52 | Official STB/Federal Register notice identifies Fortress as filer in a rail-control exemption involving Brightline, FTAI, DXE, and Fortress-managed affiliates. |
| Fortress says Brightline/DXE/Benny's HoldCo control materials do not matter. | D-51-D-53 | The STB notice confirms the Brightline/DXE/Benny's HoldCo transaction and acquisition history in a federal rail-control record. |
| Fortress says discovery into rail-control relationships is unnecessary. | D-51-D-56 | Shows specific federal rail-control and later Brightline West common-carrier/interstate-network records that can be explored in discovery. |
| Fortress may rely on STB jurisdiction limits. | D-50; D-51-D-52 | Cover expressly states Plaintiff does not equate STB jurisdiction with FELA employer status; the exhibit is used only for public-record control context. |

## WHY THESE PAGES MATTER

Exhibit D is the official-government rail-control exhibit. It does not claim STB jurisdiction equals FELA employer status. It shows that Fortress-related ownership/control/management structures were discussed in official federal rail records, making Fortress's 'passive investor only' presentation too narrow for dismissal before discovery.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| D-50 | Replacement cover sheet, source ID, limited-purpose language, and motion-response roadmap. | Prevents overstatement and tells the Court exactly how the STB material is used. |
| D-51-D-52 | 2018 Federal Register/STB Docket FD 36225: Fortress continuance-in-control notice involving Brightline Holdings, FTAI, DXE, Benny's HoldCo, Brightline Trains, and Fortress-managed affiliates. | Core response to the passive-investor argument; identifies official rail-control relationships and ownership/control terminology. |
| D-53-D-54 | 2023 STB follow-on materials confirming Brightline's acquisition of DesertXpress and later Brightline West/DesertXpress project context. | Shows the 2018 transaction was not theoretical; it led to later federal rail proceedings. |
| D-55-D-56 | Brightline West common-carrier passenger service, interstate rail-network, financing, and STB jurisdiction context. | Helps answer intrastate/private-rail framing and supports rail-control discovery. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

connect with any other railroads in the Durbano corporate family; (2) the continuance in control is not part of a series of anticipated transactions that would connect these rail lines with each other or with any other railroad in the Durbano corporate family; and (3) the transaction does not involve a Class I rail carrier. Therefore, the transaction is exempt from the prior approval requirements of 49 U.S.C. 11323. *See* 49 CFR 1180.2(d)(2).

Under 49 U.S.C. 10502(g), the Board may not use its exemption authority to relieve a rail carrier of its statutory obligation to protect the interests of its employees. Section 11326(c), however, does not provide for labor protection for transactions under sections 11324 and 11325 that involve only Class III rail carriers. Accordingly, the Board may not impose labor protective conditions here because all of the carriers involved are Class III carriers.

If the notice contains false or misleading information, the exemption is void ab initio. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Stay petitions must be filed no later than October 18, 2018 (at least seven days before the exemption becomes effective).

An original and 10 copies of all pleadings, referring to Docket No. FD 36227, must be filed with the Surface Transportation Board, 395 E Street SW, Washington, DC 20423–0001. In addition, one copy of each pleading must be served on William A. Mullins, Baker & Miller PLLC, 2401 Pennsylvania Ave. NW, Suite 300, Washington, DC 20037.

Board decisions and notices are available on our website at *www.stb.gov.*

Decided: October 5, 2018.

By the Board, Scott M. Zimmerman, Acting Director, Office of Proceedings.

**Jeffrey Herzig,**
*Clearance Clerk.*

[FR Doc. 2018–22171 Filed 10–10–18; 8:45 am]

**BILLING CODE 4915–01–P**

## SURFACE TRANSPORTATION BOARD

**[Docket No. FD 36225]**

**Fortress Investment Group LLC—Continuance in Control Exemption—Central Maine & Quebec Railway US Inc., Ohio River Partners Shareholder LLC, and DesertXpress Enterprises, LLC**

Fortress Investment Group LLC (Fortress) has filed a verified notice of exemption pursuant to 49 CFR 1180.2(d)(2) for the benefit of Brightline Holdings LLC (Brightline) and Fortress Transportation and Infrastructure Investors LLC, which are managed by affiliates of Fortress, to continue in control of DesertXpress Enterprises, LLC (DXE) [1] following the acquisition of DXE by Brightline.

According to Fortress, on September 17, 2018, Brightline, DXE, and Benny's HoldCo, LLC, entered into a Membership Interest Purchase Agreement (Purchase Agreement) [2] pursuant to which Brightline will acquire 100% of the member interests of DXE. Upon consummation of the transaction contemplated by the Purchase Agreement, Brightline, a noncarrier, will control DXE. Brightline currently controls Brightline Trains LLC (Brightline Trains) which operates express passenger rail service between Miami, Fla., and West Palm Beach, Fla.[3] Fortress asserts that Brightline can assist DXE in bringing its planned high-speed passenger rail system between Las Vegas and Victorville to fruition.

The parties intend to consummate the proposed control transaction as soon as practicable after the exemption becomes effective (30 days after the verified notice was filed) and the satisfaction of all other conditions precedent to closing set forth in the Purchase Agreement.

Fortress states that two other rail carriers subject to the Board's jurisdiction, Central Maine & Quebec Railway US Inc. (CMQR) and Ohio River Partners Shareholder LLC (ORPS), are currently managed by affiliates of Fortress. CMQR, a Class III carrier, operates approximately 244 miles of rail lines in the States of Maine and Vermont. ORPS, a Class III carrier, operates a 12.2-mile rail line between milepost 60.5 at or near Powhatan Point,

Ohio, and milepost 72.2 at or near Hannibal, Ohio.

Fortress represents that: (1) None of the rail lines of CMQR, ORPS, or DXE connect with the lines of any other United States railroad that is owned or controlled by Fortress; (2) the transaction is not part of a series of anticipated transactions that would connect the DXE Line with the lines of any other rail carrier owned or controlled by Fortress, any affiliate of Fortress, or any investment fund or entity managed by an affiliate of Fortress; and (3) CMQR, ORPS, and DXE are not Class I carriers.[4] Therefore, the transaction is exempt from the prior approval requirements of 49 U.S.C. 11323. *See* 49 CFR 1180.2(d)(2).

Under 49 U.S.C. 10502(g), the Board may not use its exemption authority to relieve a rail carrier of its statutory obligation to protect the interests of its employees. Section 11326(c), however, does not provide for labor protection for transactions under sections 11324 and 11325 that involve only Class III rail carriers. Accordingly, the Board may not impose labor protective conditions here because all the carriers involved are Class III carriers.[5]

If the notice contains false or misleading information, the exemption is void ab initio. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Petitions for stay must be filed no later than October 18, 2018 (at least seven days before the exemption becomes effective).

An original and 10 copies of all pleadings, referring to Docket No. FD 36225, must be filed with the Surface Transportation Board, 395 E Street SW, Washington, DC 20423–0001. In addition, one copy of each pleading must be served on Terence M. Hynes, Sidley Austin LLP, 1501 K Street NW, Washington, DC 20005.

According to Fortress, this action is categorically excluded from environmental review under 49 CFR 1105.6(c) and from historic reporting under 49 CFR 1105.8(b).

Board decisions and notices are available on our website at *www.stb.gov.*

Decided: October 5, 2018.

[1] In *DesertXpress Enterprises—Construction & Operation Exemption—in Victorville, Cal. & Las Vegas, Nev.* (*DesertXpress*), FD 35544 (STB served Oct. 25, 2011), the Board authorized DXE to construct and operate a high-speed passenger rail line between Victorville, Cal., and Las Vegas, Nev. (DXE Line). Fortress states that DXE has been engaged in development and planning for the DXE Line, including obtaining certain federal and state permits, acquiring rights-of-way, and pursuing financing for the project.

[2] Fortress submitted a redacted copy of the Purchase Agreement with its verified notice of exemption. It also submitted an unredacted copy under seal along with a motion for protective order pursuant to 49 CFR 1104.14(b). That motion will be addressed in a separate decision.

[3] Brightline Trains formerly was known as All Aboard Florida-Operations LLC. Citing *All Aboard Florida-Operations LLC—Construction & Operation Exemption—in Miami, Fla., & Orlando, Fla.,* FD 35680 (STB served Dec. 21, 2012), Fortress states that Brightline Trains is not a rail carrier subject to the Board's jurisdiction.

[4] Fortress states that CMQR and ORPS are Class III carriers. In *DesertXpress,* slip op. at 2, the Board noted that DXE anticipated that its operating revenues would qualify it as a Class I carrier; presently, however, according to Fortress, DXE has not commenced operations and does not have any operating employees or revenues. *See* Notice 6.

[5] *See* n. 4, above.

**51542**        **Federal Register** / Vol. 83, No. 197 / Thursday, October 11, 2018 / Notices

By the Board, Scott M. Zimmerman, Acting Director, Office of Proceedings.

**Jeffrey Herzig,**

*Clearance Clerk.*

[FR Doc. 2018–22227 Filed 10–10–18; 8:45 am]

**BILLING CODE 4915–01–P**

## SURFACE TRANSPORTATION BOARD

[Docket No. FD 36226]

### Washington Eastern Railroad, LLC—Change in Operators Exemption—Eastern Washington Gateway Railroad Company

Washington Eastern Railroad, LLC (WERR), a noncarrier, has filed a verified notice of exemption under 49 CFR 1150.31 to assume operations over approximately 107.8 miles of track extending between milepost 1.0 near Cheney, Wash., and the end of the track at milepost 108.8 in Coulee City, Wash. (CW Branch), and over approximately 5.9 miles of track that connects with the CW Branch at Geiger Junction near Medical Lake, Wash. (Geiger Spur) [1] (collectively, the Lines). The verified notice indicates that the CW Branch is currently owned by the State of Washington, Department of Transportation (WDOT) and the Geiger Spur is owned by the County of Spokane, Wash. The Lines are currently leased to Eastern Washington Gateway Railroad Company (EWG). As a result of this transaction, WERR will become a carrier and replace EWG as the Lines' exclusive lessee and operator. According to WERR, EWG is aware that WDOT plans to change operators over the Lines and does not object to the proposed change in operators.

The verified notice indicates that WERR and WDOT have reached an agreement in principle for WERR to replace EWG as the lessee and operator of the Lines upon the effective date of the exemption. WERR states that BNSF Railway Company (BNSF) currently has trackage rights over the CW Branch and that WERR's lease of the Lines will continue to be subject to BNSF's trackage rights.

This transaction is related to a concurrently filed verified notice of exemption in *David L. Durbano—Continuance in Control Exemption—Washington Eastern Railroad, LLC,* Docket No. FD 36227, in which David

[1] The Geiger Spur consists of two segments: The first extends from milepost 2.5 (at the east gate of Fairchild Air Force Base) to milepost 4.93 (at McFarlane and Hayford Roads) near Airway Heights, Wash.; the second extends from milepost 0.0 at Geiger Junction at its connection with the CW Branch to milepost 3.45, where it connects with the first segment at milepost 2.7.

L. Durbano seeks to continue in control of WERR upon WERR's becoming a Class III rail carrier.

WERR certifies that the underlying lease and operation agreement does not contain any provision or agreement that would limit future interchange with a third-party connecting carrier. Further, WERR certifies that its annual rail revenues as a result of this transaction will not exceed $5 million, and it will not result in WERR's becoming a Class I or Class II rail carrier. Under 49 CFR 1150.32(b), a change in operator requires that notice be given to shippers. WERR certifies that notice of the change in operator was served on all known shippers on the Lines.

The earliest this transaction may be consummated is October 25, 2018, the effective date of the exemption (30 days after the verified notice was filed).

If the verified notice contains false or misleading information, the exemption is void ab initio. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Petitions for stay must be filed no later than October 18, 2018 (at least seven days before the exemption becomes effective).

An original and 10 copies of all pleadings, referring to Docket No. FD 36226, must be filed with the Surface Transportation Board, 395 E Street SW, Washington, DC 20423–0001. In addition, one copy of each pleading must be served on William A. Mullins, Baker & Miller PLLC, 2401 Pennsylvania Ave. NW, Suite 300, Washington, DC 20037.

Board decisions and notices are available on our website at *www.stb.gov.*

Decided: October 5, 2018.

By the Board, Scott M. Zimmerman, Acting Director, Office of Proceedings.

**Jeffrey Herzig,**

*Clearance Clerk.*

[FR Doc. 2018–22173 Filed 10–10–18; 8:45 am]

**BILLING CODE 4915–01–P**

## SUSQUEHANNA RIVER BASIN COMMISSION

### Projects Approved for Consumptive Uses of Water

**AGENCY:** Susquehanna River Basin Commission.

**ACTION:** Notice.

**SUMMARY:** This notice lists the projects approved by rule by the Susquehanna River Basin Commission during the period set forth in **DATES.**

**DATES:** July 1–31, 2018.

**ADDRESSES:** Susquehanna River Basin Commission, 4423 North Front Street, Harrisburg, PA 17110–1788.

**FOR FURTHER INFORMATION CONTACT:** Jason E. Oyler, General Counsel, telephone: (717) 238–0423, ext. 1312; fax: (717) 238–2436; email: *joyler@ srbc.net.* Regular mail inquiries may be sent to the above address.

**SUPPLEMENTARY INFORMATION:** This notice lists the projects, described below, receiving approval for the consumptive use of water pursuant to the Commission's approval by rule process set forth in 18 CFR 806.22(e) and 806.22(f) for the time period specified above:

#### Approvals by Rule Issued Under 18 CFR 806.22(f)

1. Seneca Resources Corporation, Pad ID: DCNR Tract 007 Pad D, ABR–201807001; Delmar Township, Tioga County, Pa.; Consumptive Use of Up to 4.0000 mgd; Approval Date: July 12, 2018.

2. Diversified Gas & Oil, LLC, Pad ID: Stubler Pad A, ABR–201305003.R1; Gamble Township, Lycoming County, Pa.; Consumptive Use of Up to 4.0000 mgd; Approval Date: July 13, 2018.

3. SWN Production Company, LLC, Pad ID: GU 04 Williams Aeppli, ABR–201309001.R1; Herrick Township, Bradford County, Pa.; Consumptive Use of Up to 4.9999 mgd; Approval Date: July 18, 2018.

4. SWN Production Company, LLC, Pad ID: Dropp–Range–Pad46, ABR–201308016.R1; Jackson Township, Susquehanna County, Pa.; Consumptive Use of Up to 4.9990 mgd; Approval Date: July 27, 2018.

5. Repsol Oil & Gas USA, LLC, Pad ID: ALDERSON (05 269), ABR–201807002; Pike Township, Bradford County, Pa.; Consumptive Use of Up to 6.0000 mgd; Approval Date: July 25, 2018.

6. Repsol Oil & Gas USA, LLC, Pad ID: BROADLEAF HOLDINGS (01 115), ABR–201807003; Springfield, Troy, and Columbia Townships, Bradford County, Pa.; Consumptive Use of Up to 6.0000 mgd; Approval Date: July 25, 2018.

7. EXCO Resources (PA), LLC, Pad ID: Chaapel Hollow Unit, ABR–201305016.R1; Gamble Township, Lycoming County, Pa.; Consumptive Use of Up to 8.0000 mgd; Approval Date: July 30, 2018.

8. EXCO Resources (PA), LLC, Pad ID: Poor Shot Pad 2 Unit, ABR–201309007.R1; Anthony Township, Lycoming County, Pa.; Consumptive Use of Up to 8.0000 mgd; Approval Date: July 30, 2018.

*Intermarket Competition.* The Exchange believes that the proposed fees do not impose a burden on competition on other exchanges that is not necessary or appropriate; indeed, the Exchange believes the proposed fee changes would have the effect of increasing competition. As described above, exchanges are platforms for market data and trading. In setting the proposed fees, the Exchange is constrained by the availability of substitute platforms also offering market data products and trading, and low barriers to entry mean new exchange platforms are frequently introduced. The fact that exchanges are platforms ensures that no exchange can make pricing decisions for one side of its platform without considering, and being constrained by, the effects that price will have on the other side of the platform. In setting fees at issue here, the Exchange is constrained by the fact that, if its pricing across the platform is unattractive to customers, customers will have its pick of an increasing number of alternative platforms to use instead of the Exchange. Given this intense competition between platforms, no one exchange's market data fees can impose an unnecessary burden on competition, and the Exchange's proposed fees do not do so here.

In addition, the Exchange believes that the proposed fees do not impose a burden on competition or on other exchanges that is not necessary or appropriate because of the availability of numerous substitute market data products. Specifically, as described above, NYSE BQT competes head-to-head with the Nasdaq Basic product and the Cboe One Feed. These products each serve as reasonable substitutes for one another as they are each designed to provide investors with a unified view of real-time quotes and last-sale prices in all Tape A, B, and C securities. Each product provides subscribers with consolidated top-of-book quotes and trades from multiple U.S. equities markets. NYSE BQT provides top-of-book quotes and trades data from five NYSE-affiliated U.S. equities exchanges, while Cboe One Feed similarly provides top-of-book quotes and trades data from Cboe's four U.S. equities exchanges. NYSE BQT, Nasdaq Basic, and Cboe One Feed are all intended to provide indicative pricing and therefore, are reasonable substitutes for one another. Additionally, market data vendors are also able to offer close substitutes to NYSE BQT. Because market data users can find suitable substitute feeds, an exchange that overprices its market data products stands a high risk that users

may substitute another source of market data information for its own. These competitive pressures ensure that no one exchange's market data fees can impose an unnecessary burden on competition, and the Exchange's proposed fees do not do so here.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

No written comments were solicited or received with respect to the proposed rule change.

**III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action**

The foregoing rule change has become effective upon filing pursuant to Section 19(b)(3)(A) [51] of the Act and paragraph (f) of Rule 19b–4 thereunder.[52] At any time within 60 days of the filing of the proposed rule change, the Commission summarily may temporarily suspend such rule change if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Act.

**IV. Solicitation of Comments**

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/ rules/sro.shtml*); or
• Send an email to *rule-comments@ sec.gov.* Please include file number SR–NYSE–2023–42 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–NYSE–2023–42. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/ rules/sro.shtml*). Copies of the submission, all subsequent

amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–NYSE–2023–42 and should be submitted on or before December 13, 2023.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[53]

**Sherry R. Haywood,**
*Assistant Secretary.*
[FR Doc. 2023–25788 Filed 11–21–23; 8:45 am]
**BILLING CODE 8011–01–P**

---

**SURFACE TRANSPORTATION BOARD**

**[Docket No. FD 35544]**

**Desertxpress Enterprises, LLC, and Desertxpress HSR Corporation—Construction and Operation Exemption—In Victorville, Cal., and Las Vegas, Nev.**

In 2019, DesertXpress Enterprises, LLC, (DesertXpress)[1] filed a petition to reopen this proceeding, seeking modification of a 2011 condition concerning the construction of an approximately 190-mile rail line for high-speed passenger rail service between Victorville, Cal., and Las Vegas, Nev. (the LV Line). That condition authorized construction of a designated alignment. DesertXpress seeks authority

---

[51] 15 U.S.C. 78s(b)(3)(A).
[52] 17 CFR 240.19b–4(f).

[53] 17 CFR 200.30–3(a)(12).
[1] On September 17, 2018, DesertXpress' ownership group entered into an agreement to sell the company to Brightline Holdings LLC (Brightline). *Fortress Inv. Grp. LLC—Continuance in Control—Cent. Me. & Que. Ry.,* FD 36225, slip op. at 1–2 (STB served Oct. 11, 2018). Brightline's acquisition of DesertXpress was consummated on March 4, 2019. (Pet. to Reopen 4.)

Federal Register / Vol. 88, No. 224 / Wednesday, November 22, 2023 / Notices    **81519**

PROJECT MODIFICATIONS (SINCE THE SEPTEMBER 2020 REEVALUATION) [9]—Continued

| Project feature | Description of modification |
|---|---|
| Sloan Vehicle Maintenance Facility (VMF) ................................................. | The Project design evaluated in the Deser tXpress EIS included an OMSF in close proximity to the original Victorville Station west of the I–15 freeway and included facilities for maintaining and storing trains. Project modifications evaluated in 2020 included relocating the Victorville Station to the south side of the I–15 freeway at Dale Evans Parkway in Apple Valley. At that time, it was proposed the OMSF would be collocated with the Victorville Station, and a separate location for vehicle maintenance and storage had not been identified. The current Project modifications include locating the vehicle maintenance and storage activities at a site located in Segment 6 west of and within 1.5 miles of the I–15 freeway, and south of Sloan Road; the Victor Valley Station permanent footprint would remain unchanged. An additional freight track corridor will be constructed to connect the VMF to the adjacent UPRR. Brightline West have filed a connection request and are coordinating with UPRR regarding the connection design and operational concepts. UPRR have granted preliminary approval of this rail connection, which would be subject to additional design development. The Sloan VMF and adjacent UPRR connection would require 246 acres of permanent footprint and 105 acres of temporary footprint,6 and includes: <br>• Storage and staging tracks and overhead catenary system from which trains would be mobilized for daily operations.<br>• Equipment and operations associated with the Sloan VMF, including but not limited to a train car wash station, a train performance monitoring station, an Operations Control Center, a power substation and distribution lines, utility connections, circulation system, site control, fencing, and parking.<br>The Sloan VMF will be a permanent workplace for approximately 100 employees related to either the maintenance of the Brightline West train fleet or performing other functions such as driving the trains. These facilities would be located on land under BLM jurisdiction and would therefore require a ROW grant lease from BLM. |
| Temporary Construction Areas (TCAS) ....................................................... | TCAs are areas that would be utilized for   construction staging and storage. No permanent project features would be installed in these areas, and they would be restored/vacated upon completion of construction. The modified Project includes an additional 202 TCAs located within Caltrans/NDOT ROW along the I–15 freeway corridor for construction of the rail alignment. These are in addition to TCAs previously identified in the original project description and the September 2020 Reevaluation. Most of these additional TCAs are areas located within the existing I–15 freeway ROW. The addition of these TCAs adds 1,492 acres of temporary footprint to the project [11] The Sloan VMF facility footprint includes 105 acres of temporary footprint required for constructing the Sloan VMF and UPRR Connection. |

[9] Brightline West Victor Valley, CA to Las Vegas, NV High-Speed Rail Project Reevaluation (September 15, 2023) pgs. 4–7.

[10] This Reevaluation has assumed full reconstruction and replacement of the overpass. Caltrans will determine the necessary modifi    cations to the I–15/Dale Evans interchange which may not include full reconstruction and replacement of the overpass.

[11] As more of the alignment has been shifted to be within the I–15 freeway median, additional TCAs are proposed since room for con    struction within the I–15 freeway median is more limited and needs to be spread out throughout the alignment.

[FR Doc. 2023–25789 Filed 11–21–23; 8:45 am]

BILLING COOE 4915–01–P

---

**SURFACE TRANSPORTATION BOARD**

**[Docket No. FD 36488]**

**Desertxpress Enterprises, LLC— Authority To Construct and Operate— Petition for Exemption From 49 U.S.C. 10901—Passenger Rail Line Between the Victor Valley, Cal. and Rancho Cucamonga, Cal.**

On April 13, 2021, DesertXpress Enterprises, LLC, a Nevada limited liability company, d/b/a Brightline West (DesertXpress),[1] filed a petition under 49 U.S.C. 10502 for an exemption from the prior approval requirements of 49 U.S.C. 10901 to construct and operate an approximately 50-mile high-speed passenger rail line between the Victor Valley, in Southern California, and Rancho Cucamonga, Cal. (the RC Line). DesertXpress plans to operate as a common carrier providing passenger rail service on the rail line to be

[1] On September 17, 2018, DesertXpress' ownership group entered into an agreement to sell the company to Brightline Holdings LLC (Brightline). *Fortress Inv. Grp. LLC—Continuance in Control—Cent. Me. & Que. Ry.*, FD 36225, slip op. at 1–2 (STB served Oct. 11, 2018). Brightline's acquisition of DesertXpress was consummated on March 4, 2019. (DesertXpress Pet. 2 n.2.)

constructed. DesertXpress does not plan to provide freight rail service. No comments opposing the transportation merits of DesertXpress' petition were filed.

On July 12, 2021, the Board instituted a proceeding under 49 U.S.C. 10502.[2] As discussed below, the Board, through the Office of Environmental Analysis (OEA), participated in the environmental and historic review of the RC Line as a cooperating agency

[2] On July 21, 2023, DesertXpress filed a letter requesting that the Board expedite a final decision in this proceeding. On July 27, 2023, U.S. Representative Dina Titus filed a letter urging the Board to expeditiously consider DesertXpress' petition.

**81520**          **Federal Register** / Vol. 88, No. 224 / Wednesday, November 22, 2023 / Notices

under the lead of the Federal Railroad Administration (FRA). This thorough environmental review took a "hard look" at environmental impacts, selected a preferred alternative, and recommended environmental mitigation conditions to avoid or minimize the selected alternative's potential environmental impacts. After considering the entire record on both the transportation and the environmental issues, the Board will grant DesertXpress' petition for exemption, subject to environmental conditions.

**Background**

In *DesertXpress Enterprises, LLC— Construction & Operation Exemption— in Victorville, Cal. and Las Vegas, Nev.,* FD 35544 (STB served Oct. 25, 2011), the Board exempted from the prior approval requirements of 49 U.S.C. 10901 DesertXpress' proposal to construct and operate an approximately 190-mile high-speed passenger rail line between Las Vegas, Nev., and the Victor Valley (the LV Line).[3] The RC Line will extend from a point of connection with the southern terminus of the LV Line in the Victor Valley to Rancho Cucamonga. (DesertXpress Pet. 4.) The RC Line's alignment will be entirely within the I–15 right-of-way except for the final mile at Rancho Cucamonga, which will exit the I–15 right-of-way, proceed west along 8th Street and terminate adjacent to the Southern California Regional Rail Authority's (Metrolink's) Rancho Cucamonga train station on the south side of 8th Street west of Milliken Avenue.[4] (*Id.* at 5.) DesertXpress' Rancho Cucamonga station will link DesertXpress' train services with the passenger services operated by Metrolink and the bus rapid transit system. (*Id.* at 6.) DesertXpress states that connecting its service to Metrolink's rail system in this manner will create a seamless all-rail option for travel between Las Vegas and points throughout the greater Los Angeles, Cal., Orange County, Cal., and San Bernardino, Cal. metropolitan areas. (*Id.* at 14.) The RC Line will be built and operated on a dedicated, fully grade-

separated right-of-way with no at-grade crossings. (*Id.* at 4.) It will consist of a single main-line track with passing sidings and will be dedicated exclusively to high-speed passenger service. (*Id.* at 4, 18.)

DesertXpress currently plans to operate 50 trains per day (25 in each direction) between Las Vegas and Rancho Cucamonga. (*Id.* at 7.) Trains will depart from both Las Vegas and Rancho Cucamonga at 45-minute intervals and will operate at speeds up to 180 miles per hour. (*Id.*) The first trains will depart Rancho Cucamonga and Las Vegas at 5:30 a.m. with the final trains arriving in Rancho Cucamonga and Las Vegas at approximately 11:30 p.m. and 1:00 a.m., respectively. (*Id.*)

The RC Line is forecasted to attract approximately 1.5 million additional passengers to DesertXpress' train service, compared to the LV Line standing alone, by the third year of revenue operations. (*Id.* at 6.) Travelers on the RC Line will include both passengers traveling between Las Vegas and Southern California and passengers traveling between the Victor Valley and Rancho Cucamonga stations. (*Id.*) According to DesertXpress, the service between Victor Valley and Rancho Cucamonga is expected to attract more than half a million riders annually by the second year of service and the RC Line is expected to double the number of westbound passengers who choose DesertXpress train service for their travel from Las Vegas to Southern California. (*Id.*)

DesertXpress plans to commence construction of the RC Line as soon as practicable following approval of its petition. (*Id.* at 11.) According to DesertXpress, the estimated cost of constructing the RC Line is approximately $2 billion and Brightline plans to finance the construction with a blend of tax-exempt bonds, taxable debt, and equity. (*Id.*)

Several parties filed comments in response to DesertXpress' petition. The only comment on the transportation merits was filed on May 13, 2021 by the Allied Rail Unions[5] stating that they support DesertXpress' petition. On May 5, 2021, the San Manuel Band of Mission Indians (San Manuel Band) filed comments on environmental issues and a request for an extension of time to file further comments. The Board granted that request in a decision served

on May 19, 2021. In addition, the San Manuel Band, Morongo Band of Mission Indians (Morongo Band), and the National Parks Conservation Association (NPCA) filed comments regarding environmental issues on June 3, 2021, June 4, 2021, and June 8, 2021, respectively. On June 22, 2021, DesertXpress filed a reply to the comments of San Manuel Band, Morongo Band, and NPCA.

**Discussion and Conclusions**

*Rail Transportation Analysis.* The construction of new rail lines requires prior Board authorization through issuance of a certificate under 49 U.S.C. 10901 or, as requested here, through an exemption under 49 U.S.C. 10502 from the prior approval requirements of section 10901. Section 10901(c) directs the Board to authorize rail line construction proposals unless it finds the proposal "inconsistent with the public convenience and necessity." *See Alaska R.R.—Constr. & Operation Exemption—a Rail Line Extension to Port MacKenzie, Alaska,* FD 35095, slip op. at 5 (STB served Nov. 21, 2011), *aff'd sub nom. Alaska Survival* v. *STB,* 705 F.3d 1073 (9th Cir. 2013). Thus, Congress has established a presumption that rail construction projects are in the public interest unless shown otherwise. *See N. Plains Res. Council* v. *STB,* 668 F.3d 1067, 1091–92 (9th Cir. 2011); *Mid States Coal. for Progress* v. *STB,* 345 F.3d 520, 557 (8th Cir. 2003).

Under section 10502(a), the Board "shall exempt" a proposed rail line construction from the detailed application procedures of section 10901 when it finds that: (1) those procedures are not necessary to carry out the rail transportation policy of 49 U.S.C. 10101 (RTP); and (2) either (a) the proposal is of limited scope, or (b) the full application procedures are not necessary to protect shippers from an abuse of market power.

Based on the record in this proceeding, the Board concludes that the proposed construction qualifies for an exemption from the section 10901 prior approval requirements. Simply put, this is a project with a lot of upside and little, if any, downside, one that has the potential for broad public benefits, and one for which no issues about the project's current or future financial viability, including any negative effects of financial nonviability, have been raised.[6] Extending DesertXpress' previously approved service between Las Vegas and Victor Valley further south to Rancho Cucamonga and

---

[3] The LV Line has not yet been constructed. On March 27, 2019, DesertXpress filed a petition to reopen the Board's October 25, 2011 decision, in which DesertXpress requested that the Board approve changes to the alignment of the LV Line, including moving the proposed terminus approximately four miles from the City of Victorville to the Town of Apple Valley, both situated in the Victor Valley. The Board will address the proposed alignment changes to the LV Line in a separate decision.

[4] An additional DesertXpress station in the City of Hesperia, Cal. (south of Victorville) is also planned. (DesertXpress Pet. 5.)

[5] The Allied Rail Unions is a group of unions composed of the Brotherhood of Maintenance of Way Employes Division/IBT; Brotherhood of Railroad Signalmen; International Association of Sheet Metal, Air, Rail and Transportation Workers-Mechanical Division; and National Conference of Firemen and Oilers, 32BJ/SEIU.

[6] *See Mid States Coal. for Progress* v. *Surface Transp. Bd.,* 345 F.3d 520, 552 (8th Cir. 2003).

environmental and historic review process with respect to the proposed modified alignment of the LV Line. (San Manuel Band Comments 1–2, May 5, 2021; Morongo Band Comments 1–2; NPCA Comments 1.) The LV Line is not at issue in this proceeding and parties were given the opportunity in *DesertXpress Enterprises, LLC,* Docket No. FD 35544, to provide comments in the LV Line proceeding. *See DesertXpress Enters., LLC,* FD 35544, slip op. 1–2 (STB served Dec. 3, 2020) (providing 20-day period for filing of public comments). Accordingly, comments regarding the modified alignment of the LV Line will not be considered in this proceeding.

In addition, San Manuel Band and NPCA urge the Board not to permit an exemption from review under the California Environmental Quality Act (CEQA). (San Manuel Band Comments 2–3, June 3, 2021; NPCA Comments 2.) However, the only issue for the Board in this case is whether to grant DesertXpress' petition seeking an exemption from 49 U.S.C. 10901. Moreover, state permitting or preclearance requirements like CEQA are categorically preempted under 49 U.S.C. 10501(b) as to any lines and facilities that are an integral part of the national rail transportation system. *EPA—Pet. for Declaratory Ord.,* FD 35803, slip op. at 7 (STB served Dec. 30, 2014); *see also City of Auburn* v. *United States,* 154 F.3d 1025, 1031 (9th Cir. 1998). Indeed, the Board previously found that section 10501 preempted the application of CEQA to the LV Line.[9] *DesertXpress Enters., LLC—Pet. for Declaratory Ord.,* FD 34914, slip op. at 5 (STB served June 27, 2007). Because CEQA's permitting requirements could be used to deny or significantly delay construction of the RC Line, CEQA review is preempted in this proceeding as well.[10]

---

[9] Although the California High-Speed Rail Authority conducted an environmental review under CEQA as well as NEPA for the California High-Speed Train System—a project within the Board's jurisdiction—it "elected" to apply CEQA on its own volition and, in its environmental documentation, reserved the right to assert federal preemption in response to any potential legal challenge to its CEQA compliance. *Cal. High-Speed Rail Auth.—Pet. for Declaratory Ord.,* FD 35861, slip op. at 1–2, 11 (STB served Dec. 12, 2014); *see also Cal. High-Speed Rail Auth.—Constr. Exemption—in Merced, Madera, & Fresno Cntys., Cal.,* FD 35724 et al., slip op. at 3 n.6 (STB served Dec. 20, 2022) (finding that the "Board is only required to comply with NEPA" and related federal environmental laws despite FRA and California High-Speed Rail Authority conducting joint NEPA and CEQA review).

[10] While the RC Line will be an intrastate line located completely within California, it will connect to the LV Line, which will extend into Nevada. Therefore, the RC Line will be part of the

The project's transportation merits—expanding the broader DesertXpress passenger service to provide more seamless transportation to and from Southern California and Las Vegas, as well as providing a passenger rail option between Rancho Cucamonga and Victor Valley—are manifest. And the environmental and historic impacts have been thoroughly analyzed as required under NEPA and NHPA, with environmental mitigation imposed as appropriate. Accordingly, the Board grants DesertXpress' petition for exemption.

This action, as conditioned, will not significantly impact the quality of the human environment or the conservation of energy resources.

*It is ordered:*

1. Under 49 U.S.C. 10502, the Board exempts DesertXpress' construction and operation of the RC Line from the prior approval requirements of 49 U.S.C. 10901, subject to the requirement that DesertXpress build the FRA-preferred Build Alternative.

2. The Board adopts the environmental mitigation measures set forth in Attachment A to the FONSI and imposes them as conditions to the exemption granted here.

3. Notice will be published in the **Federal Register**.

4. Petitions for reconsideration must be filed by December 6, 2023.

5. This decision is effective, December 16, 2023.

Decided: November 15, 2023.

By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.

**Jeffrey Herzig,**
*Clearance Clerk.*

**Appendix**

**Surface Transportation Board**

*Washington, DC 20423*



---

interstate rail network and will be subject to the Board's jurisdiction. *See e.g.,* 49 U.S.C. 10501(a)(2)(A) (stating that the Board has jurisdiction over rail transportation between a place in "a State and a place in the same or another State as part of the interstate rail network"); *Cal. High-Speed Rail Auth.—Pet. for Declaratory Ord.,* FD 35724, slip op. at 13–14 (STB served June 13, 2013) (finding that a rail line to be located completely within California was subject to Board jurisdiction because it would have extensive interconnectivity with Amtrak, an interstate passenger rail carrier).

Office of Environmental Analysis

MEMORANDUM

TO: Martin Oberman, Chairman; Karen Hedlund, Vice Chairman; Patrick Fuchs, Member; Michelle Schultz, Member; Robert Primus, Member

Cc: Mai Dinh, Director, Office of Proceedings

FROM: Danielle Gosselin, Director, Office of Environmental Analysis

DATE: October 20, 2023

SUBJECT: Docket No. FD 36488, DesertXpress Enterprises, LLC—Construction and Operation Exemption—Passenger Rail Line Between Victor Valley and Rancho Cucamonga, Cal.: Environmental Memorandum

This memorandum summarizes the environmental and historic review conducted for the proposed 49-mile high-speed rail line between the Victor Valley and Rancho Cucamonga, California (RC Line or Project). The proposed RC Line would be part of the electrified high-speed passenger railroad system that DesertXpress Enterprises, LLC, d/b/a Brightline West (Brightline West) intends to construct and operate between Southern California and Las Vegas, Nevada. The memorandum also presents the Office of Environmental Analysis' (OEA) final recommendations to the Board regarding adoption of the Environmental Assessment (EA) for the Project, including the selection of the build alternative as the preferred alternative, and the environmental mitigation that should be imposed if the Board authorizes the RC Line.

**Introduction**

The Board, through OEA, participated in the environmental review of the RC Line as a cooperating agency under the lead of the Federal Railroad Administration (FRA). FRA prepared an EA in accordance with the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and related environmental laws to evaluate the potential environmental and historic impacts of the RC Line. The EA analyzed both a Build Alternative and No-Build Alternative (*i.e.,* No-Action Alternative), and FRA identified the Build Alternative as the Preferred Alternative. (EA xv, 10–14.) The EA also identified mitigation measures to reduce potential environmental impacts. (EA 57–58, 61–63, 67, 90–102, 137–38, 173–76, 192, 198–200.) The EA was made available for public review and comment between October 28, 2022, and November 28, 2022.

On July 12, 2023, FRA issued a Finding of No Significant Impact (FONSI), which incorporated the EA by reference,[1] and which concluded that the Build-Alternative would not significantly impact the quality of the human environment and should be authorized subject to appropriate

---

[1] The FONSI attached an errata sheet making certain corrections to the EA. (FONSI, Attachment B.) FRA used an errata sheet in lieu of a Final EA because the comments received on the EA were minor and the responses to the comments were limited to factual corrections or explanations of why the comments did not warrant further response. (FONSI 2.)

# EXHIBIT E

*Targeted 2023 Brightline Handbook and Train Crew Guardrails*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says no control facts tie the alleged injury to enterprise systems. | E-58-E-64 | The 2023 Handbook identifies Brightline enterprise HR, SOP, safety, FMLA, workers' compensation, and return-to-work systems. |
| Fortress says Plaintiff's post-incident/trauma theory is speculative. | E-65-E-73 | Train Crew Guardrails show train-crew-specific critical-incident, mental-health, medical-fitness, training, and safety-sensitive policies. |
| Fortress says discovery is unnecessary. | E-58-E-73 | Identifies written policies and decision points for HR, safety, incident relief, medical fitness, and return-to-work discovery. |

## WHY THESE PAGES MATTER

Exhibit E shows the internal policy layer relevant to Plaintiff's FELA theory. It is not offered as direct proof that Fortress employed Plaintiff. It shows Brightline had written HR, safety, train-crew, critical-incident, mental-health, medical-fitness, FMLA, workers' compensation, and return-to-work systems that somebody funded, approved, administered, and enforced.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| E-57 | Replacement cover sheet and motion-response roadmap. | Explains why internal policy materials matter to the Rule 12 discovery issue. |
| E-58-E-59 | 2023 Handbook source pages and Brightline Holdings/subsidiary applicability, including Brightline Management and Brightline Trains Florida. | Shows policies operated across a Brightline enterprise structure. |
| E-60-E-64 | SOPs, safety/IIPP, incident reporting, FMLA/workers' compensation, return-to-work, and receipt pages. | Supports discovery into HR/safety administration, reporting, leave, work status, and post-incident processes. |
| E-65-E-66 | Train Crew Guardrails source and applicability to Locomotive Engineers, Conductors, and Transportation Managers. | Makes the exhibit train-crew-specific rather than generic HR material. |
| E-67 | Equipment/radio/FECR Operating Rules and Brightline Special Instructions. | Shows train-crew work was governed by formal operational rules and manager reporting. |
| E-68-E-69 | Critical incident relief, compensation for remainder of shift, Part 272 relief, and mental-health provider contact requirement. | Directly supports Plaintiff's trauma/post-incident relief theory and discovery into who administered/funded these systems. |
| E-70-E-73 | Training, remedial training, medical fitness, mental-health review, prescription medication and safety-sensitive restrictions. | Shows safety-sensitive work, fitness, training, and return-to-duty issues were formal policy systems. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.



Exhibit E-58 of 73

# INTRODUCTION

### 1.1 Welcome to Brightline

Welcome Aboard to Brightline! You made a decision to join a collection of passionate, guest obsessed teammates striving to *create a brighter way to get there*. From the seamless digital guest experience to the smiling stations teammates, to our Brightline wave, or our crew that maintains and operates our rains, we all play a part in creating a welcoming and safe space for our guests enjoy the ride and where our teammates can thrive.

Building upon our values, this handbook is a guide for teammates to understand the role they play in building and sustaining a healthy working environment for everyone.  With these tools you will have the information you need to navigate any situation, including those where we may not yet have a policy. Our success is dependent on each one of us "Owning the Zone", making sure that we are personally accountable for the environment and culture that we create.

We are excited to start this brighter journey with you.

### 1.2 Teammate Handbook

This Teammate Handbook ("Handbook") is designed to summarize certain personnel policies and benefits of Brightline Holdings LLC (D/B/A Brightline) ("Brightline" or the "Company") and its direct and indirect subsidiaries, including Brightline Management LLC, Brightline Trains Florida LLC and BLH Capital & Management Services LLC, and to familiarize teammates with many of the rules concerning employment with the Company. This Handbook applies to all teammates, and compliance with the Company's policies is a condition of employment. This Handbook supersedes all previous employment policies, written and oral, express, and implied. Except for the policy of at-will employment, the Company reserves the right to modify, rescind, delete, or add to the provisions of this Handbook from time to time in its sole and absolute discretion. No oral statements or representations can change the provisions of this Teammate Handbook. This Teammate Handbook is not a binding contract between the Company and its teammates, either express or implied, nor is it intended to alter the at-will employment relationship between the Company and its teammates. No manager or supervisor has any authority to enter into a contract of employment express or implied that changes or alters the fact that employment with the Company is at-will. The Company reserves the right to interpret the policies in this Handbook and to deviate from them when, in its discretion, it determines it is appropriate.  If you have any questions, please contact the Company's People & Culture Department.

### 1.3 Changes in Policy

We have an entrepreneurial spirit, and our business may change, and this means our polices may also change from time to time. We reserve the right to revise, modify, delete,

1

Teammates who believe that they have been subjected to any conduct that violates this policy may register a complaint using the procedures outlined above. Any teammate who unlawfully discriminates or retaliates against another teammate as a result of the teammate's protected actions as described in this policy may be subject to corrective action, up to and including termination.

### 2.14 Performance Evaluations

The Company believes that good communication is the key to a teammate's success. Therefore, the Company encourages frequent discussions between teammates and their managers regarding job performance and goals. Additional formal performance evaluations are conducted to provide both managers and teammates the opportunity to discuss job responsibilities, identify and correct areas of development, encourage, and recognize strengths, and discuss positive, purposeful approaches for meeting goals.

Generally, the Company strives to conduct annual performance reviews of all teammates but reserves the right to change the time frame within which such reviews are conducted. During this formal review, the manager will evaluate the teammates' job performance on the basis of overall achievements in carrying out responsibilities for the full performance period. The performance reviews will be conducted in a non-discriminatory fashion, and to the extent possible, using objective criteria.

A positive performance review does not guarantee a salary increase or a promotion. These decisions are made at the discretion of the Company and depend on a number of factors in addition to a teammate's individual performance. We reserve the right to make any personnel changes (including termination) before or after performance evaluations.

### 2.15 Standard Operating Procedures

Each functional area in the Company may have specific Standard Operating Procedure (SOP) relating to a specific role and/or function. These step-by-step processes are used to ensure reliability, efficiency, and consistently meet quality standards in regular work-related activities. As applicable, teammates will be trained on these SOPs and may direct any questions related to the SOPs to their direct manager or the department head. Teammates are expected to adhere to all applicable SOPs in connection with their role(s).

## PAYROLL PRACTICES & BENEFITS

### 3.1 Pay Periods and Paydays

Our standard workweek begins at 12:00 am Monday and ends at 11:59 pm the following Sunday.

Teammates are paid on a bi-weekly or a semi-monthly basis in accordance with the Company's payroll practices. If the regular payday falls on a bank holiday, teammates generally will be paid on the last business day before the holiday.

16

- Possessing a weapon while on company property or while on company business unless specifically authorized by the President and in accordance with applicable law.
- Veiled threats of physical harm or similar intimidation.

Workplace violence does not refer to workplace arguments or debates that are zealous or impassioned, provided there is no resort to any form of coercion. Discussions about sporting activities, popular entertainment or current events are not considered workplace violence when there is no threat of violence being directed to the workplace or any individual connected with it. Rather, workplace violence refers to behavior that demonstrates an intention to engage in violence, condones violence in our workplace, or targets any individual with acts or threats of violence.

Any potentially dangerous situations should be immediately reported to a supervisor, the Security Department and/or the People & Culture department. If the matter is an emergency, it may be appropriate to contact 911 first. Reports can be made anonymously, and all reported incidents will be investigated. Even without an actual threat, teammates should alert management to any behavior they have witnessed that they regard as threatening or violent, when that behavior is job-related or might be carried out on a Company controlled site or is connected to Company equipment. Teammates are responsible for making this report regardless of the nature of the relationship between the individual who initiated the threat or threatening behavior.

Potential violations of this policy will be fully investigated, handled appropriately, and information will be disclosed to others only on a need-to-know basis.

Individuals who apply for or obtain a protective or restraining order that lists Company locations as being protected areas, shall provide their manager, the People & Culture Department and the Security Department with a copy of the petition and declarations used to seek the order, a copy of any temporary protective or restraining order which is granted, and a copy of any protective or restraining order that is made permanent.

Any violation of our Workplace Violence Policy will not be tolerated. Any teammate determined to have violated the policy will be subject to disciplinary action, up to and including termination. Non-teammates engaged in violent acts on the employer's premises will be reported to the proper authorities and fully prosecuted.

This policy is intended to bring the Company into compliance with existing legal provisions requiring employers to provide a safe workplace.

### 4.15 Safety Measures

The Company strives to provide safe working conditions for our teammates. We strive to observe the safety laws of all states and localities in whose jurisdiction we operate. No one will knowingly be required to work in any unsafe manner. Safety is every teammate's responsibility, and all teammates are expected to do everything reasonable and necessary to keep the Company a safe place to work. Supervisors should be notified of potential accidents or dangerous conditions immediately.

The Company maintains an Injury & Incident Prevention Plan ("IIPP"), which discusses safety procedures and policies in greater detail. Teammates are responsible for

38

reviewing and familiarizing themselves with the IIPP located on the company HRIS and contact the Safety Department if you have any questions concerning the Company's safety program.

In the event of any teammate accident, supervisors are to be notified immediately and the Company Incident Report contained within the Injury and Illness Prevention Program ("IIPP") document must be completed by the teammate's supervisor and forwarded to the designated Safety and Security representative and the People & Culture Department (hr@gobrightline.com). For serious injuries, teammates will be sent to an appropriate medical facility. Teammates who are injured on the job may be eligible for workers' compensation insurance benefits. *See* Workers' Compensation Policy above.

### 4.16 Arrests & Traffic Citations

Unless applicable state or local law provides otherwise, teammates who are arrested for any reason, on or off duty, while employed at the Company must inform People & Culture of the arrest no later than their next scheduled shift after the arrest occurred. An assessment of the conduct which led to the arrest is done to determine if such conduct also violated Company policy and the conduct makes the teammate unfit for their position. *See* the Company *Arrest & Conviction* Policy located on the company HRIS.

Teammates who drive a company vehicle or their own vehicle for company business must report any serious traffic citation received on or off duty that may potentially result in a criminal penalty (misdemeanor or felony), a suspension of driving privileges, or the imposition of a fine of $1000 or more to People & Culture in their next schedule shift after the citation occurred.

### 4.17 Firearms, Hazardous Materials & Other Prohibited Items

Teammates (except those specifically authorized to do so) are prohibited from possessing weapons on the Company's property, including inside buildings or trains. Violation will result in discipline up to and including termination. This does not impede a teammate from possessing any legally owned firearm or ammunition locked and out of view inside their vehicle parked in a Brightline parking garage or Company teammate lot in accordance with the Preservation and Protection of the Right to Keep and Bear Arms in Motor Vehicles Act of 2008.

The Company complies with applicable laws regarding weapons in the workplace. Please refer to your state-specific supplement for additional information.

## LEAVES OF ABSENCE

### 5.1 Family and Medical Leave Act Policy

This policy is being adopted to comply with the federal Family and Medical Leave Act, as amended (FMLA). If you are taking leave other than FMLA leave, please review the Company's specific policy on that type of leave.

39

When you take FMLA leave on an intermittent or reduced leave schedule basis, the Company will account for the leave in one-hour increments.

## REPORTING TO THE COMPANY WHILE ON LEAVE

If you are on FMLA leave or any other type of leave for medical or health reasons, you are required to report on a periodic basis regarding your status and intention to return to work. If circumstances change and you need either more or less leave, the Company requires that you provide the Company's FMLA Administrator with reasonable notice (i.e., within 2 business days) of the changed circumstances where foreseeable. The Company's FMLA Administrator will inform you how often you must report to the Company while on leave.

## WHAT RELATIONSHIP DOES FMLA LEAVE HAVE TO PAID LEAVE?

Unless applicable state law provides otherwise, the Company requires that you substitute (run concurrently) any unused, accrued PTO for FMLA leave. Once the Company's FMLA Administrator knows that the leave to be taken is for FMLA purposes, the Company's FMLA Administrator will give you timely notice as required by FMLA, which will indicate if the paid leave will count toward your FMLA leave.

## Workers' Compensation Injury and Substitution of Paid Time Off

If you are injured on the job and the injury qualifies as a serious health condition under FMLA, the Company requires that the time off for the workers' compensation injury be counted against your FMLA leave entitlement. Under those circumstances, neither you nor the Company may require substitution of accrued paid time off. However, you and the Company may agree, where state law permits, to have paid leave supplement workers' compensation benefits, such as in the case where workers' compensation only provides replacement income for two-thirds of a teammate's salary.

## The Effect of Use of the Company's Short-Term Disability Plan While on FMLA Leave

If you are eligible for and are using the Company's voluntary short-term disability plan for a serious health condition, the Company will count the time off taken under the disability plan against your FMLA entitlement. Under those circumstances, neither you nor the Company can substitute accrued paid time off for the short-term disability payments. However, the Company may require (where state law permits) to have paid leave (PTO) supplement the disability plan benefits, such as in the case where a plan only provides replacement income for two-thirds of your salary. You must comply with the requirements of the Company's short-term disability plan unless you elect to use the unpaid FMLA leave or substitute available accrued paid time off.

## ACCRUAL OF BENEFITS WHILE ON FMLA LEAVE

You will not accrue any seniority or employment benefits while on unpaid or paid FMLA leave. Accrual of any seniority or benefits will resume upon return to active employment. The taking of FMLA leave will not result in the loss of any employment benefits that you

46

leave because of other circumstances beyond your control, you must demonstrate this fact to the People & Culture Department, which will make the final decision concerning repayment of health insurance premium payments.

## WHAT RIGHTS DO YOU HAVE WHEN YOU RETURN TO WORK FROM FMLA LEAVE?

When you return from FMLA leave, you will be restored to the position held when FMLA leave started, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. The Company will not guarantee reinstatement of a position to you if you are on any other type of leave, unless required by law. You have no greater right to reinstatement or to other benefits and conditions of employment than if you have been continuously employed during FMLA leave.

**Key Teammate Exception:** Salaried eligible teammates (who are among the highest paid 10 percent of the teammates employed by the Company within 75 miles of the facility at which the teammates are employed), "Key Teammates" will not be guaranteed restoration to the position held at the start of the FMLA leave or to an equivalent position on the return to work from FMLA leave if restoration would create a substantial and grievous economic injury to the Company's operations and if the Company's FMLA Administrator notifies the teammate in accordance with the FMLA. Key Teammates will be notified of their status as Key Teammates in writing at the time the teammate requests leave under the FMLA.

## WHAT HAPPENS IF YOU FAIL TO RETURN TO WORK FROM FMLA LEAVE?

Failure to return to active employment at the end of FMLA leave period or any other leave period or failure to submit a fitness for duty certification and approval of the certification by the Company will be regarded as abandonment of your job, absent authorization to take additional leave under the Company's other leave policies (if applicable) or provided some other type of accommodation (if required by applicable law). Leave taken because of your own serious health condition may be extended under certain circumstances and as required under applicable law. If you are seeking additional leave, you should contact People & Culture.

## ADMINISTRATION OF THE POLICY

The function of this policy is to provide all teammates with a general description of their FMLA rights. In the event of any conflict between the policy and the applicable law, you will be afforded all rights required by law. This policy does not supersede any state or local law that provides greater family or medical leave rights. The Company will also administer this policy in a uniform, non-discriminatory fashion in accordance with all applicable laws, including but not limited to, the Americans with Disabilities Act.

## DEFINITIONS

    A.    The Company adopts the definitions of the FMLA, as amended. This policy lists some of the commonly used definitions. "Serious health condition" is defined as an illness, injury, impairment, or physical or mental condition that involves one of the following:

48



# Train Crew
# Guardrails

Exhibit E-65 of 73

## INTRODUCTION

The Trian Crew Guardrails ("Handbook") is designed to summarize policies applicable to those who are part of the train crew, such as Locomotive Engineer, Conductor and Transportation Manager. This Handbook supersedes all previous train crew policies, written and oral, expressed and implied for those applicable to the policies contained in this Handbook.   The policies in this Handbook are in addition to the policies applicable to all teammates that are contained in the Brightline Teammate Handbook.   The Company reserves the right to modify, rescind, delete, or add to the provisions of this Handbook from time to time in its sole and absolute discretion. This Handbook is not a binding contract between the Company and its teammates, nor is it intended to alter the at-will employment relationship between the Company and its teammates. The Company reserves the right to interpret the policies in this Handbook and to deviate from them when, in its discretion, it determines it is appropriate.  If you have any questions, please contact the Company's People &Culture Department.

## CHANGES IN POLICY

Being that we are entrepreneurs, that means our polices can change from time to time. We do reserve the right to revise, modify, delete, or add to all policies, procedures, or work rules stated in this Handbook or in any other document, except for the policy of at-will employment. Nothing in this Handbook or in any other document creates or is intended to create a promise or representation of continued employment for any teammate.

No oral statements or representations can in any way alter the provisions of this Handbook. Changes will be effective on dates determined by the Company and you may not rely on policies that have been superseded.

If you are uncertain about any policy or procedure, please check with your manager or the People & Culture Department.

2

D. Teammates who work on Memorial Day, July 4th, Labor Day, Thanksgiving, Christmas or New Year's Day will be compensated at one and a half times their usual hourly rate. To receive the added holiday premium the Teammate must work on the applicable holiday. Teammates who are on-call during a holiday will not receive the additional compensation unless they are called in and physically work the applicable holiday.

E. Teammates deadheading, by their own vehicle under orders of the Company, will be allowed pay for actual time consumed at the rate of the service to which being deadheaded from their home address, plus per diem mileage from their home terminal.

F. During service disruptions, it may not be possible to get teammates back to their home terminal. During this time, the company may place a teammate in a hotel room and the teammate will not be compensated for the time off company property. The company will pay for all hotel and food accommodations.

G. Teammates who are authorized by the Company to provide training to new hire teammates will be compensated an extra $100.00 per training day when providing compensated service.

H. Teammates who are authorized by the Company to act in the capacity of a pilot to assist already certified teammates in learning a new territory, will be compensated at an extra $50 per qualifying day when providing compensated service.

I. Teammates who work on their scheduled relief days will be compensated at 1.5 times their hourly rate for hours worked that day, regardless of the number of hours worked during their normal scheduled work week.

J. Teammates who are Reserves or National Guard members of one of the military branches will receive the agreed upon 40-hours guarantee pay for the week in which they attend their weekend military drills. Additionally, teammates will be paid the differential of their pay for their required two-week drills (not to exceed two weeks) within a calendar year period. Teammates must provide Management with their military orders a minimum of 30 days prior to the days required to perform weekend military duty, unless military necessity prevents it, or is otherwise impossible or unreasonable due to the demand of the military's needs. Teammates that do not provide the appropriate military orders in the prescribed timeframe will not be compensated the 40-hour guarantee. ***This is not applicable for military orders other than the required two-week drills and weekend drills.

K. Teammates directly involved in an incident and would like to be relieved from their tour of duty will be compensated for the remainder of their shift. Per the Critical Incident Stress Plan (49 CFR Part 272), additional relief from duty for up to three

6

work days may be requested by the teammate. To receive compensation for the additional relief days, the teammate is required to contact Brightline's mental health service provider on the first day of the additional relief day requested or the day(s) will be unpaid.

L.  Brightline strives to have a compensation program which attracts and retains talent and is competitive in the marketplace. These guidelines assistant in our ability to make increases to compensation and sets forth the manner in which we make increases to compensation. The below increase matrix removes this group of teammates from any other Brightline Pay Increase policy.

    a.  **Rates**

The Locomotive Rate of pay will be as follows (effective the first full pay period AFTER the below date):

January 1, 2023 – $46.30

January 1, 2024 – $48.30

The Conductor rate of pay will be as follows (effective the first full pay period AFTER the below date):

January 1, 2023 – $42.99

January 1, 2024 – $44.99

***Policy is subject to change based on finances of the company.

## Seniority

This is used to determine how teammates establish and exercise their seniority within the crew team.

A.  New teammates will establish seniority as of the first date of employment and be placed on a Conductor's or Locomotive Engineer's roster, depending on which craft the teammate was hired for. If there is more than one teammate starting employment on the same date, the teammates' seniority will be established using the LOTTO method.

B.  Two seniority rosters, Locomotive Engineers and Conductors, showing seniority dates and seniority standings will be posted in a conspicuous place at each crew base. The rosters will be revised and posted anytime there are changes made.

7

C. Seniority will be used to award assignment and vacation biddings, excluding single day PTO requests.

D. When a teammate is promoted from a Conductor to a Locomotive Engineer, the teammate will relinquish his/her seniority as a Conductor and be placed at the bottom of the Locomotive Engineers' seniority roster. *Note: The teammate will still maintain his/her original date of employment used for other seniority purposes.*

E. In reducing forces, seniority will govern. Teammates affected by a reduction of force or abolishment of positions will be notified by Management. Teammates whose positions are abolished may exercise their seniority rights to displace junior teammates, within their current roster, within twenty-four (24) hours after the date of notification of abolishment. Teammates displaced may exercise their seniority in the same manner within twenty-four (24) hours after the date of notification of displacement. *Note: Displaced Locomotive Engineers not possessing sufficient seniority to displace any Locomotive Engineer may displace a junior Conductor using their original date of employment. Teammates not possessing sufficient seniority to displace any teammate will be separated.*

F. Teammates exercising displacement rights under this Policy must meet all the qualifications required of the assignment to which they displace before being permitted to work.

G. When forces are increased, separated teammates will be notified and will return to service in seniority order.

## Training and Certification

A teammate selected to become a Locomotive Engineer, or a Conductor must attend and successfully complete all training requirements as prescribed by the Company and FRA including any classroom training that could occur off property. The Company will pay all reasonable costs associated with the training. A teammate will become fully certified only after they successfully complete all required training, tests and certification requirements and become qualified on all territories. All training requirements are subject to change to comply with any changes or updates to FRA regulations.

A. A Locomotive Engineer or Conductor must become and remain certified in accordance with applicable federal regulations and/or policies to serve as certified Locomotive Engineer or Conductor.

B. Teammates will be required to attend operating rules, safety and customer service training classes and pass examinations connected with their duties. Teammates who are required to attend training and rules classes will be compensated 8 hours at the teammate's regular hourly rate per day.

8

C. Teammates who are authorized by the Company to provide training to new hire teammates will be compensated an extra $100.00 per training day when providing compensated service.

## Remedial Training

The Company's first priority is the safety of our teammates, guests and the communities in which we operate.  Therefore, in case of a Locomotive Engineer or Conductor who is not able to operate due to a revocation, the company reserves the right to retrain the individual.

The company encourages (but does not require) all the teammates to review their notes, timetables, and other material while not operating in order keep their skills sharp.  The teammate will be allowed a reasonable amount of training once s/he returns from leave before training takes place.

The training includes:

- 8 hours of Operating Rules and Continuing Education Class
- Familiarization Ride(s) – the teammate may take up to 16 hours of familiarization rides in the head end of the train refamiliarize him/herself with the territory.
- During this training, teammates will be paid at a maximum of 24 hours at teammate's regular hourly rate.

The following must be met and are required to be considered to be retrained:

A. **Operating Rules**:  is dedicated to FECR Operating Rules and Brightline Special Instructions, followed by a written exam. A passing grade for an Exam is 85% or better with the exception to signal names and indications, which requires a passing grade of 100%.  If the trainee does not pass an exam, it will be retaken within 2 days.   A 90% or better is mandatory to pass on the retake, with the exception pertaining to signal names and indications, which requires a passing grade of 100%.

B. **Continuing Education**:  is comprised of multiple components.  Instructions are given on Emergency Preparedness, Air Brake, Troubleshooting, Safety, and updates relating to existing and new passenger equipment (where applicable) followed by a written exam.   A passing grade for an Exam is 85% or better.  If the teammate does not pass an exam, it will be retaken within 2 days.  A 90% or better is mandatory to pass on the retake.

C. **Physical Characteristics**:
   a. Written exam which requires a passing grade of 100%.  If the teammate does not pass an exam, it will be retaken within 2 days.

9

- If you are calling within a 24-hour window of the start of your shift Please call the Superintendent of Railroad Operations at (786-423-8259) or the OCC at (305-521-4700) during non-business hours to report an absence.
- If you are calling more than 24 hours prior to the start of your shift, please request a PTO day in the company HRIS.

E. **Confirmation (if needed)**
   If you have not had confirmation that your PTO request has been approved, you are required to receive confirmation from a Manager before missing your day at work. If you fail to receive confirmation, your absence will be considered a No Call/No Show.

## Medical Fitness Program

As a teammate in a safety sensitive position, your ability to safely perform your duties is paramount. This encompasses being physically and mentally fit to perform your job duties without placing yourself, fellow teammates, guests or general public at risk.

While FRA regulations stipulate hearing and vision standards for engineers and conductors, there are many other aspects of one's health and fitness that may affect the ability to perform their job safely. Brightline's Medical Fitness Program is outlined below and health status and condition will be assessed on an individualized case by case basis.

**The program will encompass:**
- Initial new hire examinations (A teammate who transferred to non-safety sensitive position within Brightline and returns at a later date to their original safety sensitive position will be considered a "new hire" for purposes of the Medical Fitness Program.)
- Periodic examinations
- Engineers and Transportation Management:
  - Full physical annually within month of birth
- Conductors:
  - Full physical every 3 years within month of birth
  - Physical becomes annually after age 50
- Promoted to Engineer mid exam cycle:
  - Full physical upon effective date of promotion
- Return to work examination if off more than 90 consecutive days
- Medical fitness examination on individual basis as determined by CMO

**Medical Fitness Assessments:**
Individuals who have had a new diagnosis of or change in health condition for any of the listed conditions under the **Medical Fitness review IS REQUIRED** section below, will need review by medical services prior to returning to duty.

18

Medical monitoring – those who have such conditions will need to provide periodic follow up to Brightline's Chief Health Officer ("CHO") and the CHO will request and review records and treatment consistent with usual follow up care from your doctor or may ask for forms related to your fitness to be by your physician. This is to ensure that your health status is such that you are able to continue working safely.

## Medical Fitness Program Requirements
Vision – (FRA requirements)
- Acuity at least 20/40 in each eye with or without corrective lenses.
- Peripheral vision – 70 degrees in lateral meridian
- Normal color vision (zero or one errors on Ishihara testing)

Hearing – (FRA requirements)
- 40 decibel average in better ear for frequency of 500, 1000, or 2000 Hertz - with or without hearing aids

Other health conditions

- In general, health conditions or use of medication that may affect one's balance, coordination, judgement, alertness or has a risk of incapacitation would be incompatible with safety sensitive work.
- All conditions are evaluated on a case-by-case individual basis.

## Medical Fitness review IS REQUIRED for the following:
Teammates who have been off work, had a recent diagnosis, change in condition, or event related to any of the following health conditions, *must be reviewed and cleared by the Brightline's Chief Health Officer prior to returning to work*:

1. Sleep disorders (sleep apnea, narcolepsy, etc.).
2. Fractures that involve joints, require surgery, or result in restricted motion or impairment.
3. Major surgery including orthopedic joint replacement procedures and arthroscopic procedures.
4. Cardiovascular conditions – i.e., coronary artery disease (myocardial infarction (heart attacks)), percutaneous interventions (balloon or stenting), open heart surgery, pacemakers, implanted defibrillators, heart rhythm problems, cardiomyopathy (enlarged heart) or heart failure.
5. Strokes and transient ischemic attacks (TIA).
6. Loss of consciousness.
7. Seizure, epilepsy, vertigo or use of anti-seizure medications.
8. Diabetes.
9. Mental health disorders.
10. Vision impairment including: (a) uncorrected or corrected visual acuity worse than 20/40 in either eye; (b) peripheral vision less than 70 degrees in either eye; (c) eye diseases or injuries that affect vision (e.g., diseases of the retina), retinal surgery, retinopathy.
11. Hearing impairment requiring the use of hearing aids.

19

12. Absence for more than 30 days due to any medical condition.
13. Activity restrictions for health conditions.
14. Other conditions that may affect balance, coordination, or judgment, or observation which raises concern about an individual's ability to safely perform work activities.

**Medical Fitness review is NOT required** for the following conditions _unless the manager has specific concerns about the employee's ability to perform their work activity or observes behaviors, actions, or performance of the employee which raises concerns about their fitness._

1. Minor surgery or diagnostic procedures without complications, and with physician release for full return to work within 30 days (including simple gastrointestinal, urological or gynecological procedures, and simple cosmetic, skin or vein surgery);
2. Short term infectious disease episodes that have resolved (except for tuberculosis);
3. Minor fractures not involving joints or surgery;
4. Sprains, strains, contusions or wounds that resolve in four weeks or less.

Contact for CHO
Timothy J. McCormick, DO, MPH
Office: (904)-288-8886
Fax: (904)-288-8331
tmccormick@bltrain.com

## Prescription Medication

As a teammate in a safety sensitive industry being alert, attentive, and vigilant are important for safely performing your duties. Many medications have the potential to impact one's alertness and performance.

Each teammate has the responsibility to ensure they are able to safely work with their medical condition and medication usage including supplements, and over the counter medications.

Teammates should not report to work if their ability to safely work is affected by their medical condition, or medication usage. Prescription medications or over the counter medications which affects alertness, coordination, reaction, and judgement should not be taken while on duty or while waiting to be engaged for duty. Controlled substances are prohibited per FRA regulation unless the step described below are followed:

20

# EXHIBIT F

*Targeted FRA Enforcement, Part 219, Post-Accident Testing, and DOT Drug/Alcohol Compliance Materials*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says the safety/post-accident systems are speculative. | F-75-F-78; F-82-F-86 | Official FRA, Part 219, and DOT materials show railroad safety, post-accident testing, policies, corrective action, and compliance systems are formal regulated systems. |
| Fortress says no employer-side control facts are pleaded. | F-87-F-89 | Part 40 identifies employer responsibilities, DER authority, and limits on service agents, showing key decisions are employer-side functions. |
| Fortress says discovery is unnecessary. | F-79-F-81; F-82-F-89 | Brightline/BLF enforcement entries and federal testing-policy provisions identify concrete records, decision-makers, and compliance targets. |

## WHY THESE PAGES MATTER

Exhibit F is the public federal-safety exhibit. It avoids confidential Brightline plan pages and uses public FRA/DOT materials to show that post-accident, drug/alcohol, DER/MRO/lab/SAP, recordkeeping, corrective-action, training, and safety-compliance systems are real regulated systems. It supports discovery; it does not assert a separate private Part 219 claim or final Fortress liability.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| F-74 | Replacement cover sheet and motion-response roadmap. | Frames public safety regulations as discovery targets, not standalone claims. |
| F-75-F-77 | FRA FY2024 Enforcement Report cover, introduction, civil penalties, correction, training, processes, recordkeeping, job briefings, and discipline. | Shows FRA safety enforcement is formal and corrective, undermining any suggestion that safety systems are vague. |
| F-78 | FRA violation categories, including Alcohol and Drug Use, Critical Incident Stress Plans, certification, Signal/Train Control, and Safety Management Systems. | Links the exhibit to railroad operating-practice and safety-management systems relevant to Plaintiff's claim. |
| F-79-F-81 | FRA abbreviation/respondent code pages and closed Brightline/BLF entries including AD and SI cases. | Shows Brightline-specific federal enforcement context and explains BLF/AD/SI codes. |
| F-82-F-83 | 49 CFR Part 219 purpose/scope and railroad-policy/employee-notice requirements. | Shows railroads must maintain written policies and education materials. |
| F-84-F-85 | Part 219 post-accident testing events and railroad responsibilities for specimens, timing, relief crew, and duty status. | Directly supports discovery into post-accident management and decision-making. |
| F-86 | FRA Drug & Alcohol / PATT program page. | Shows FRA post-accident testing has a national program and concrete forms/kits/procedures. |
| F-87-F-89 | Part 40 coverage, employer/DER definitions, service-agent limits, and employer responsibility. | Shows testing/evaluation decisions are employer-side management functions that cannot be delegated away. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

# Federal Railroad Administration

# Fiscal Year 2024 Enforcement Report

## II.   DISCUSSION OF RAILROAD SAFETY, ENFORCEMENT PROGRAMS, AND POLICIES – THE RELATIONSHIP OF INSPECTIONS, ENFORCEMENT, AND ACCIDENTS OR INCIDENTS

The safety of railroad operations – including the safety of railroad employees, railroad passengers, and the communities through which railroads operate – is FRA's top priority. FRA carries out its mission in many ways, notably through accident and incident investigations, extensive technical assistance, scientific research, data collection and analysis, and broad regulatory enforcement and oversight programs, including the assessment of civil penalties for violations of rail safety and hazardous materials regulations. FRA also engages and partners with both public and private stakeholders to identify and address critical safety issues that affect railroad operations.

Many variables, including the full range of FRA safety enforcement efforts, regulation, and the evolution of technology in the railroad industry, all intersect with the deterrent value of civil penalties to reduce railroad accidents and safety incidents. FRA's enforcement of rail safety and hazardous materials laws simultaneously compels compliance and aids the agency in the detection and prevention of unsafe conditions before they arise or cause harm. In this regard, FRA has increased safety in the rail industry by leveraging insights from proactive engagement with railroads, railroad workers, and other stakeholders, and the data gained through routine inspections and audits to target the most impactful areas of railroad safety.

Civil penalties are an important component of FRA's comprehensive safety efforts and a valuable tool to ensure compliance and deter future violations. Civil penalties serve several purposes in the enforcement process.[5] For example, the recommendation of a civil penalty is one direct way in which FRA inspectors communicate to regulated entities the seriousness of a violation. Additionally, throughout the country, railroads and shippers correct safety violations on a daily basis because they were cited by FRA's inspectors. FRA inspectors recommend the imposition of violations, including civil penalties, for those defects that they determine pose probable and serious risks of harm. FRA's experience shows that remedial action is generally swift with respect to those violations. The civil penalties and other corrective measures FRA imposes in response to violations are a valuable public-facing mechanism for demonstrating accountability in the industry.

FRA has decades of experience enforcing railroad safety regulations and has found that the fair and professional conduct of an agency's regulatory function requires the informed exercise of discretion, beginning with the FRA inspector on the ground. This use of discretion helps ensure that the agency's exercise of enforcement power is calibrated for efficiency and effectiveness,

---

[5] *See* appendix A to 49 C.F.R. part 209 for further discussion of FRA's enforcement practices, the purposes of civil penalties, and FRA jurisdiction, available at https://www.ecfr.gov/current/title-49/part-209/appendix-Appendix A to Part 209.

2

from the identification of serious safety concerns to the resolution of civil penalty assessment through settlement.[6]

In 2020, FRA significantly reorganized its Office of Railroad Safety. Prior to the reorganization, eight regional offices provided the institutional structure for safety inspections, from the implementation of national strategies to the daily review of inspection reports. The 2020 reorganization shifted emphasis towards targeting trends and patterns observable in the national operations of each major railroad or system of railroads, through a structure based on nine Safety Management Teams. FRA continues to rely heavily upon the knowledge and expertise of its field inspectors, who are most familiar with the unique attributes of specific railroad operations, geographic territories, facilities, and safety practices. From FRA's experience, their nuanced perceptions and judgments indicate that issuing civil penalties yields observable improvements in safety practices and compliance with the law.

FRA's enforcement program also includes use of its authority to apply the penalty provisions of the railroad safety statutes to individuals. As with acts of noncompliance by railroads, FRA's field inspectors and subject matter experts exercise discretion in deciding which enforcement method is most effective to ensure individual compliance with safety laws and regulations. FRA has a range of options for addressing instances of individual liability, including an informal warning, a more formal warning letter issued by the Office of the Chief Counsel, recommendation and assessment of a civil penalty, or disqualification or suspension from safety-sensitive service.[7] The purpose of such enforcement against individuals is to deter those who, of their free will, decide to violate the rail safety laws. The purpose is not to penalize individuals who are ordered to commit violations by those above them in the railroad chain of command. In FY 2024, FRA served notices of proposed disqualification or suspension from safety-sensitive functions in the rail industry on three individuals.

For violations assessed against regulated entities, FRA resolution of civil penalty cases through negotiated settlements ensures a measurable financial consequence that reflects the safety risks in each case, beginning with the initial assessment. For example, a single violation of the regulation prohibiting rolling stock from being left unattended too close to an adjacent track (which poses the risk that a train may sideswipe the idle equipment) typically results in an initial penalty assessment of $19,600. By contrast, some less hazardous violations in other areas trigger a lesser monetary penalty.

Before any settlement of a recommended violation and any accompanying civil penalty, and to avoid additional violations, railroads and shippers must correct each underlying, non-compliant condition. Subsequently, a penalty for every legally sustainable violation recommended by FRA's field inspectors is enforced, regardless of the fact that the violation was remedied (correcting the cited problem is a non-negotiable expectation in the enforcement process). Settlement negotiations offer a forum for the regulated entity to offer remedial action as mitigation, among other factors. Typically, it may entail improvements in training, processes,

---

[6] FRA commissioned an independent assessment of the role that civil penalties play in enforcing railroad safety laws in 2009. *See* appendix to the FY 2009 Enforcement Report, available at
https://railroads.dot.gov/sites/fra.dot.gov/files/fra_net/282/Annual_Enforcement_Report_2009.pdf.
[7] *See* 49 C.F.R. part 209, app. A.

3

6.  **Railroad Operating Practices**

| Violation Type | Number of Recommended Violations |
|---|---|
| Alcohol and Drug Use | 173 |
| Conductor Qualifications | 22 |
| Critical Incident Stress Plans | 0 |
| Engineer Qualifications | 66 |
| FRA Emergency Order(s) | 0 |
| Hours of Service Laws and Regulations | 490 |
| Hours of Service Recordkeeping | 115 |
| Railroad Communications | 116 |
| Railroad Operating Practices | 360 |
| Railroad Operating Rules | 69 |
| Railroad Safety Enforcement Procedures | 27 |
| Train Horn/Quiet Zone | 7 |
| Total | 1,445 |

7.  **Signal and Train Control**

| Violation Type | Number of Recommended Violations |
|---|---|
| Signal Inspection Regulations | 792 |

8.  **Track**

| Violation Type | Number of Recommended Violations |
|---|---|
| Bridge Safety Standards | 25 |
| Bridge Worker Safety Standards | 0 |
| Roadway Worker Protection | 95 |
| Track Safety Standards | 606 |
| All | 726 |

9.  **Safety Management Systems**

| Violation Type | Number of Recommended Violations |
|---|---|
| Risk Reduction Program | 4 |
| System Safety Program | 0 |
| Training, Qualification, and Oversight for Safety-Related Railroad Employees | 3 |
| All | 7 |

10

**Abbreviations and Explanations of Terms Used in this Report**

The type of violation alleged in each civil penalty case can be identified using the following codes, one of which appears as a suffix to each case number:

| | |
|---|---|
| AD | Alcohol and Drug Use |
| AR | Accident Reporting |
| BSS | Bridge Safety Standards |
| BW | Bridge Worker Safety Standards |
| CC | Conductor Qualifications |
| CIS | Critical Incident Stress Plans |
| EP | Railroad Safety Enforcement Procedures |
| EQ | Engineer Qualifications |
| FCS | Freight Car Safety Standards |
| GC | Grade Crossing Signal Safety |
| GS | Safety Glazing Standards |
| HMT | Hazardous Materials Regulations |
| HS | Hours of Service Laws and Regulations |
| HSR | Hours of Service Recordkeeping |
| LI | Locomotive Safety Standards |
| PEP | Passenger Train Emergency Preparedness |
| PEQ | Passenger Equipment Safety Standards |
| RMM | Roadway Maintenance Machines |
| ROP | Railroad Operating Practices |
| ROR | Railroad Operating Rules |
| RSP | Railroad Standard Procedures |
| RW | Roadway Worker Protection |
| SA | Safety Appliance Statutes and Regulations |
| SI | Signal Inspection Regulations and Positive Train Control |
| TH | Train Horn/Quiet Zone |
| TS | Track Safety Standards |

| FRA Number | No. Viol. | POCA | PRCA | Settlement Amount | Settlement Date | Comments |
|---|---|---|---|---|---|---|
| ATK 2023-026(PEQ) | 1 | $4,000 | $4,000 | $3,000 | 9/27/2024 | |
| ATK 2024-001(TS) | 1 | $10,000 | $10,000 | $7,400 | 9/27/2024 | |
| ATK 2024-002(RW) | 1 | $5,000 | $5,000 | $3,750 | 9/27/2024 | |
| ATK 2024-003(SA) | 1 | $10,300 | $10,300 | $7,500 | 9/27/2024 | |
| AVSX 2024-001(BSS) | 1 | $5,200 | $5,200 | $3,200 | 8/14/2024 | |
| AWRR 2023-001(TS) | 1 | $1,000 | $1,000 | $1,000 | 9/25/2024 | |
| AWRR 2023-002(TS) | 1 | $10,000 | $10,000 | $6,200 | 9/25/2024 | |
| AWRR 2023-003(ROP) | 1 | $15,000 | $15,000 | $5,000 | 9/25/2024 | |
| AWRR 2023-004(TS) | 3 | $22,000 | $22,000 | $13,640 | 9/25/2024 | |
| AWRR 2023-005(TS) | 1 | $10,000 | $10,000 | $7,500 | 9/25/2024 | |
| AWRR 2023-006(TS) | 2 | $10,000 | $10,000 | $6,200 | 9/25/2024 | |
| AWRR 2024-001(TS) | 3 | $30,000 | $30,000 | $18,600 | 9/25/2024 | |
| AWRR 2024-002(TS) | 1 | $10,000 | $10,000 | $7,500 | 9/25/2024 | |
| AWRR 2024-003(TS) | 1 | $10,000 | $10,000 | $6,200 | 9/25/2024 | |
| AWRR 2024-004(TS) | 1 | $10,000 | $10,000 | $6,200 | 9/25/2024 | |
| AZCR 2024-002(SA) | 1 | $5,000 | $5,000 | $3,250 | 7/23/2024 | |
| BB 2024-001(SA) | 1 | $10,000 | $5,000 | $4,000 | 3/4/2024 | Partially Terminated: 1 |
| BB 2024-002(HMT) | 1 | $10,000 | $10,000 | $8,750 | 5/7/2024 | |
| BDW 2024-001(HMT) | 2 | $5,000 | $5,000 | $3,500 | 6/11/2024 | |
| BDW 2024-002(HMT) | 1 | $10,000 | $10,000 | $7,500 | 7/12/2024 | |
| BEAR 2023-001(SA) | 1 | $10,000 | $10,000 | $7,000 | 9/27/2024 | |
| BEAR 2023-002(ROP) | 1 | $19,000 | $19,000 | $13,300 | 9/27/2024 | |
| BEAR 2024-001(SA) | 1 | $5,000 | $5,000 | $3,500 | 9/27/2024 | |
| BEAR 2024-002(TS) | 2 | $15,000 | $15,000 | $10,600 | 9/27/2024 | |
| BEAR 2024-003(SA) | 1 | $10,000 | $10,000 | $7,100 | 9/27/2024 | |
| BGCM 2023-001(CC) | 1 | $5,000 | $5,000 | $5,000 | 1/4/2024 | |
| BHRR 2023-002(EQ) | 1 | $5,000 | $5,000 | $3,500 | 9/25/2024 | |
| BIP 2023-001(SA) | 1 | $10,000 | $10,000 | $5,000 | 3/6/2024 | |
| BIP 2024-001(RSP) | 1 | $11,400 | $11,400 | $7,000 | 6/27/2024 | |
| BLEN 2024-001(HMT) | 1 | $5,000 | $5,000 | $5,000 | 4/5/2024 | |
| BLF 2023-003(AD) | 1 | $5,000 | $5,000 | $4,500 | 2/21/2024 | |
| BLF 2023-004(AD) | 1 | $5,000 | $5,000 | $4,500 | 2/21/2024 | |
| BLF 2024-001(SI) | 1 | $2,000 | $2,000 | $2,000 | 6/21/2024 | |
| BNSF 2021-189(SA) | 1 | $5,000 | $5,000 | $3,400 | 9/30/2024 | |
| BNSF 2021-362(SA) | 1 | $10,000 | $10,000 | $1,700 | 9/30/2024 | |
| BNSF 2021-386(SA) | 1 | $10,000 | $10,000 | $3,400 | 9/30/2024 | |
| BNSF 2022-172(HS) | 2 | $4,000 | $4,000 | $2,920 | 9/30/2024 | |
| BNSF 2022-419(SA) | 1 | $5,000 | $5,000 | $3,650 | 9/30/2024 | |
| BNSF 2022-431(TS) | 2 | $4,000 | $4,000 | $2,920 | 9/30/2024 | |
| BNSF 2022-583(HS) | 3 | $6,000 | $6,000 | $4,380 | 9/30/2024 | |
| BNSF 2022-603(SA) | 1 | $5,000 | $5,000 | $3,650 | 9/30/2024 | |
| BNSF 2023-002(SA) | 1 | $5,000 | $5,000 | $3,650 | 9/30/2024 | |

| Codes | Respondent Names |
|-------|------------------|
| 3MCZ | 3m Company |
| AA | Ann Arbor Railroad |
| AGR | Alabama & Gulf Coast Railway LLC |
| ALS | The Alton And Southern Railway Company |
| ANR | Angelina & Neches River Railroad Co. |
| ATK | National Railroad Passenger Corporation |
| AVSX | Abilene & Smoky Valley Railroad |
| AWRR | Austin Western Railroad |
| AZCR | Arizona Central Railroad, Incorporated |
| BB | Buckingham Branch Railroad Company |
| BDW | Bighorn Divide & Wyoming Railroad Inc. |
| BEAR | Berkshire & Eastern Railroad |
| BGCM | Bountiful Grain & Craig Mountain |
| BHRR | Birmingham Terminal Railway, LLC |
| BIP | Belpre Industrial Parkersburg Railroad |
| BLEN | BLEN TECH CORPORATION |
| BLF | Brightline |
| BNSF | BNSF Railway Company |
| BOCH | Border Chemical Company |
| BPRR | Buffalo & Pittsburgh Railroad, Inc. |
| BRC | The Belt Railway Company Of Chicago |
| BRG | Brownsville & Rio Grande International Rw |
| BVRR | Boise Valley Railroad, LLC |
| CBRW | Columbia Basin Railroad Company, Inc. |
| CFNR | California Northern Railroad Co. |
| CFRC | Central Florida Rail Corridor |
| CHRQ | Christensen Oil |
| CIND | The Central Railroad Company Of Indiana |
| CN | Canadian National Railway Company |
| CORP | Central Oregon & Pacific Railroad, Inc. |
| CP | Canadian Pacific Railway |
| CPDR | Carolina Piedmont Division |
| CPKC | Canadian Pacific Kansas City |
| CRRX | Canon City Royal Gorge Railroad |
| CRSM | Consolidated Rail Corporation |
| CSS | Chicago Southshore & South Bend Railroad |
| CSX | CSX Transportation Inc. |
| DCR | Delmarva Central Railroad |
| DGNO | Dallas, Garland And Northeastern Railroad, Inc. |
| EIRR | Eastern Idaho Railroad, Llc |
| EMRY | Eastern Maine Railway |
| ESPN | East Penn Railroad Llc |
| EXCE | Excelex Corporation |

## 49 CFR Part 219 - Purpose, Scope, Application, and Construction

Source: GovInfo / 49 CFR Part 219 | Official CFR PDF / 49 CFR Ch. II (10-1-24 Edition), pp. 261-262

---

**Public Source Excerpt**

**PART 219 - CONTROL OF ALCOHOL AND DRUG USE**

Authority: 49 U.S.C. 20103, 20107, 20140, 21301, 21304, 21311; 28 U.S.C. 2461 note; Div. A, Sec. 412, Pub. L. 110–432, 122 Stat. 4889 (49 U.S.C. 20140 note); Sec. 8102, Pub. L. 115-271, 132 Stat. 3894; and 49 CFR 1.89.

### Section 219.1 - Purpose and scope.

(a) The purpose of this part is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.

(b) This part prescribes minimum Federal safety standards for control of alcohol and drug use. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

### Section 219.3 - Application.

(a) General. This part applies to all railroads and contractors, except as provided in paragraphs (b), (c), and (d) of this section, and except for railroads that operate only on track inside an installation that is not part of the general railroad system of transportation; tourist, scenic, historic, or excursion operations that are not part of the general railroad system of transportation; or rapid transit operations in an urban area that are not connected to the general railroad system of transportation.

### Section 219.17 - Construction.

Nothing in this part restricts the power of FRA to conduct investigations under sections 20107, 20108, 20111, and 20112 of title 49, United States Code; creates a private right of action for enforcement of this part or damages resulting from noncompliance; or impacts state criminal law provisions for reckless conduct causing loss of life, injury, or property damage.

## 49 CFR 219.23 - Railroad Policies and Employee Materials

Source: GovInfo / 49 CFR Part 219 | Official CFR PDF / 49 CFR Ch. II (10-1-24 Edition), pp. 270-271

---

**Public Source Excerpt**

**Section 219.23 - Railroad policies.**

(a) Whenever a breath or body fluid test is required of a regulated employee under this part, the railroad, either through a railroad employee or a designated agent such as a contracted collector, must provide clear and unequivocal written notice to the employee that the test is being required under FRA regulations and is being conducted under Federal authority. The railroad must also provide clear written notice of the type of test required.

(c) Each railroad must develop and publish educational materials, specifically designed for regulated employees, that clearly explain the requirements of this part and the railroad's policies and procedures for meeting those requirements. The railroad must ensure that a copy of these materials is distributed to each regulated employee hired for or transferred to a position requiring alcohol and drug testing under this part.

(d) Required content. The materials must include, at a minimum, clear and detailed discussion of: the person designated to answer employee questions; the specific classes or crafts subject to this part, such as engineers, conductors, MOW employees, MECH employees, signal maintainers, or train dispatchers; the regulated service functions those employees perform; prohibited conduct; circumstances under which a regulated employee will be tested; procedures used to test for alcohol and controlled substances, protect the employee and testing integrity, safeguard test validity, and ensure results are attributed to the correct employee; refusal consequences; removal from regulated service; and information concerning the effects of alcohol and drug misuse, signs and symptoms, and available methods of evaluation and treatment.

## 49 CFR 219.201 - Events Requiring Post-Accident Testing

Source: GovInfo / 49 CFR Part 219 | Official CFR PDF / 49 CFR Ch. II (10-1-24 Edition), pp. 279-282

---

**Public Source Excerpt**

**Subpart C - Post-Accident Toxicological Testing**

**Section 219.201 - Events for which testing is required.**

(a) List of events. Except as provided in paragraph (b), FRA post-accident toxicological tests must be conducted after any event involving one or more listed circumstances, including:

(1) Major train accident. Any train accident involving damage above the reporting threshold and involving a fatality, certain hazardous material releases with evacuation or reportable injury, or railroad property damage of $1,500,000 or more.

(2) Impact accident. Any qualifying impact accident resulting in a reportable injury or railroad property damage of $150,000 or more.

(3) Fatal train incident. Any train incident involving a fatality to an on-duty employee who dies within 12 hours as a result of the operation of on-track equipment, regardless of whether that employee was performing regulated service.

(4) Passenger train accident. Any train accident involving a passenger train and a reportable injury to any person.

(5) Human-factor highway-rail grade crossing accident/incident involving specified signal, flagging, employee fatality, or FRA/railroad operating rule circumstances.

(c) Good faith determinations. The railroad representative responding to the scene must determine whether the accident/incident qualifies or falls within an exception. The representative must make reasonable inquiry into the facts necessary to make that determination and consider the need to obtain specimens as soon as practicable. The responding railroad representative may not be a person directly involved in the accident/incident.

# 49 CFR 219.203 - Railroad Responsibilities After Qualifying Events

Source: GovInfo / 49 CFR Part 219 | Official CFR PDF / 49 CFR Ch. II (10-1-24 Edition), pp. 282-284

---

## Public Source Excerpt

### Section 219.203 - Responsibilities of railroads and employees.

(a) Employees tested. A regulated employee subject to post-accident toxicological testing under this subpart must cooperate in the provision of specimens. Following each qualifying event described in section 219.201, a regulated employee directly involved in a qualifying event must provide blood and urine specimens for toxicological testing by FRA. This includes any regulated employee who may not have been present or on-duty at the time or location of the event, but whose actions may have played a role in its cause or severity, including an operator, dispatcher, or signal maintainer.

(b) Railroad responsibility. A railroad must take all practicable steps to ensure that all surviving regulated employees of the railroad who are subject to FRA post-accident toxicological testing provide blood and urine specimens. FRA post-accident toxicological testing takes priority over toxicological testing by state or local law enforcement officials.

(d) Timely specimen collection. A railroad must make every reasonable effort to assure that specimens are provided as soon as possible after the accident or incident, preferably within four hours. If not collected within four hours, specimens must be collected as soon thereafter as practicable and the railroad must notify FRA's Drug and Alcohol Program Manager and provide detailed information regarding the failure.

If a passenger train is in proper condition to continue after an accident or incident, the railroad must consider passenger safety and convenience in deciding whether the crew should be made immediately available for testing. A relief crew must be called as soon as possible. A regulated employee who may be subject to post-accident testing must be retained in duty status for the period necessary to make required determinations and complete specimen collection.

# FRA Drug and Alcohol Program - Regulated Employees and PATT

Source: FRA Drug and Alcohol web page | FRA railroad-safety/divisions/drug-and-alcohol page, last updated Oct. 27, 2025

---

## Public Source Excerpt

### FRA Drug and Alcohol - Who Is Regulated Under FRA's Drug and Alcohol Testing Requirements?

For purposes of 49 CFR Part 219, FRA identifies regulated employees as those who perform service under the hours-of-service laws (covered service), maintenance-of-way employees as defined as roadway workers in 49 CFR 214.7, and employees who perform certain mechanical tests or inspections on railroad rolling equipment or components.

As of March 4, 2022, regulated service includes hours-of-service employees, roadway workers, mechanical employees, regulated-service contractors, and volunteers performing regulated-service duties for a railroad. FRA lists examples including:

- Train and engine service employees involved in the movement of trains or engines, such as conductors, brakemen, switchmen, engineers, and locomotive hostlers/helpers;
- Dispatching employees who issue mandatory directives, such as train dispatchers and control operators;
- Signal employees who inspect, repair, or maintain signal systems;
- Maintenance-of-way employees performing roadway-worker duties; and
- Mechanical employees performing required tests or inspections on railroad rolling equipment or components.

### FRA Post-Accident Testing Guidance.

FRA has a customized post-accident toxicological testing (PATT) program that includes blood, urine, and tissue specimens for post-mortem testing through more than 6,000 toxicological testing kits located at railroad locations across the nation. PATT requirements are covered in 49 CFR Part 219 Subpart C, and FRA provides technical assistance materials, forms, guidance, flow charts, and post-accident documents to assist railroad employers in complying with the PATT program.

### Appendix G to Part 40

SAP Equivalency Requirements for Certification Organizations

### Appendix H to Part 40

Drug and Alcohol Testing Information that C/TPAs May Transmit to Employers

### Appendix I to Part 40

Alcohol Testing Form

### Appendix J to Part 40

DOT Drug and Alcohol Testing Management Information System (MIS) Data Collection Form

# PART 40—PROCEDURES FOR TRANSPORTATION WORKPLACE DRUG AND ALCOHOL TESTING PROGRAMS

**Authority:** 49 U.S.C. 102, 301, 322, 5331, 20140, 31306, and 54101 *et seq.*

**Source:** 65 FR 79526, Dec. 19, 2000, unless otherwise noted.

**Editorial Note:** Nomenclature changes to part 40 appear at 73 FR 33329, June 12, 2008.

## Subpart A—Administrative Provisions

### § 40.1 Who does this regulation cover?

(a) This part tells all parties who conduct drug and alcohol tests required by Department of Transportation (DOT) agency regulations how to conduct these tests and what procedures to use.

(b) This part concerns the activities of transportation employers, safety-sensitive transportation employees (including self-employed individuals, contractors and volunteers as covered by DOT agency regulations), and service agents.

(c) Nothing in this part is intended to supersede or conflict with the implementation of the Federal Railroad Administration's post-accident testing program (see 49 CFR 219.200).

### § 40.3 What do the terms used in this part mean?

In this part, the terms listed in this section have the following meanings:

*Adulterated specimen.* A specimen that has been altered, as evidenced by test results showing either a substance that is not a normal constituent for that type of specimen or showing an abnormal concentration of an endogenous substance.

*Collection site.* A place selected by the employer where employees present themselves for the purpose of providing a specimen for a drug test.

*Collector.* A person who instructs and assists employees at a collection site, who receives and makes an initial inspection of the specimen provided by those employees, and who initiates and completes the CCF.

*Commercial Driver's License Drug and Alcohol Clearinghouse (Clearinghouse).* A database, administered by the Federal Motor Carrier Safety Administration, containing records of commercial motor vehicle drivers' violations of controlled substances and alcohol testing program requirements, as set forth in part 382 of this title, as well as their return-to-duty status.

*Confirmatory drug test.* A second analytical procedure performed on a different aliquot of the original specimen to identify and quantify a specific drug or drug metabolite.

*Confirmatory validity test.* A second test performed on a different aliquot of the original urine specimen to further support a validity test result.

*Confirmed drug test.* A confirmation test result received by an MRO from a laboratory.

*Consortium/Third-party administrator (C/TPA).* A service agent that provides or coordinates the provision of a variety of drug and alcohol testing services to employers. C/TPAs typically perform administrative tasks concerning the operation of the employers' drug and alcohol testing programs. This term includes, but is not limited to, groups of employers who join together to administer, as a single entity, the DOT drug and alcohol testing programs of its members. C/TPAs are not "employers" for purposes of this part.

*Continuing education.* Training for substance abuse professionals (SAPs) who have completed qualification training and are performing SAP functions, designed to keep SAPs current on changes and developments in the DOT drug and alcohol testing program.

*Cutoff.* The analytical value (*e.g.*, drug or drug metabolite concentration) used as the decision point to determine a result (*e.g.*, negative, positive, adulterated, invalid, or substituted) or the need for further testing.

*Designated employer representative (DER).* An employee authorized by the employer to take immediate action(s) to remove employees from safety-sensitive duties, or cause employees to be removed from these covered duties, and to make required decisions in the testing and evaluation processes. The DER also receives test results and other communications for the employer, consistent with the requirements of this part. Service agents cannot act as DERs.

*Dilute specimen.* A urine specimen with creatinine and specific gravity values that are lower than expected for human urine.

*DOT, The Department, DOT Agency.* These terms encompass all DOT agencies, including, but not limited to, the Federal Aviation Administration (FAA), the Federal Railroad Administration (FRA), the Federal Motor Carrier Safety Administration (FMCSA), the Federal Transit Administration (FTA), the National Highway Traffic Safety Administration (NHTSA), the Pipeline and Hazardous Materials Safety Administration (PHMSA), and the Office of the Secretary (OST). For purposes of this part, the United States Coast Guard (USCG), in the Department of Homeland Security, is considered to be a DOT agency for drug testing purposes only since the USCG regulation does not incorporate Part 40 for its alcohol testing program. These terms include any designee of a DOT agency.

*Drugs.* The drugs for which tests are required under this part and DOT agency regulations are marijuana, cocaine, amphetamines, phencyclidine (PCP), and opioids.

*Employee.* Any person who is designated in a DOT agency regulation as subject to drug testing and/or alcohol testing. The term includes individuals currently performing safety-sensitive functions designated in DOT agency regulations and applicants for employment subject to pre-employment testing. For purposes of drug testing under this part, the term employee has the same meaning as the term "donor" as found on CCF and related guidance materials produced by the Department of Health and Human Services.

*Employer.* A person or entity employing one or more employees (including an individual who is self-employed) subject to DOT agency regulations requiring compliance with this part. The term includes an employer's officers, representatives, and management personnel. Service agents are not employers for the purposes of this part.

*Error Correction Training.* Training provided to BATs, collectors, and screening test technicians (STTs) following an error that resulted in the cancellation of a drug or alcohol test. Error correction training must be provided in person or by a means that provides real-time observation and interaction between the instructor and trainee.

*Evidential Breath Testing Device (EBT).* A device that is approved by the National Highway Traffic Safety Administration (NHTSA) for the evidential testing of breath at the .02 and .04 alcohol concentrations, and appears on ODAPC's Web page for "Approved Evidential Breath Measurement Devices" because it conforms with the model specifications available from NHTSA.

*HHS.* The Department of Health and Human Services or any designee of the Secretary, Department of Health and Human Services.

*Initial drug test.* The first test used to differentiate a negative specimen from one that requires further testing for drugs or drug metabolites.

*Initial specimen validity test.* The first test used to determine if a specimen is adulterated, diluted, substituted, or invalid.

*Invalid result.* The result reported by an HHS-certified in accordance with the criteria established by HHS when a positive, negative, adulterated, or substituted result cannot be established for a specific drug or specimen validity test.

*Laboratory.* Any U.S. laboratory certified by HHS under the National Laboratory Certification Program as meeting the minimum standards set by HHS; or, in the case of foreign laboratories, a laboratory approved for participation by DOT under this part.

*Limit of Detection (LOD).* The lowest concentration at which the analyte (*e.g.*, drug or drug metabolite) can be identified.

*Limit of Quantitation (LOQ).* For quantitative assays, the lowest concentration at which the identity and concentration of the analyte (*e.g.*, drug or drug metabolite) can be accurately established.

*Medical Review Officer (MRO).* A person who is a licensed physician and who is responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanations for certain drug test results.

*Negative result.* The result reported by an HHS-certified laboratory to an MRO when a specimen contains no drug or the concentration of the drug is less than the cutoff concentration for the drug or drug class and the specimen is a valid specimen.

*Non-negative specimen.* A specimen that is reported as adulterated, substituted, positive (for drug(s) or drug metabolite(s)), or invalid.

# EXHIBIT G

*Targeted FECR Lawsuit / FEC Corridor / JUA / RTC / Fortress-Control Materials*

Court-use note: Plaintiff cites this exhibit for plausibility, public-record context, targeted discovery, and possible leave to amend. Plaintiff does not ask the Court to resolve disputed facts or make final liability findings at the Rule 12 stage.

## FORTRESS MOTION ARGUMENTS ADDRESSED

| Fortress Motion Argument | Addressed By | How This Exhibit Helps the Court Evaluate the Motion |
|---|---|---|
| Fortress says it is a passive investor with no operational or corridor-control role. | G-91-G-92; G-99-G-106 | Public FECR allegations name Fortress/BFH and describe Fortress-related involvement in corridor, capacity, and ownership/control disputes. |
| Fortress says Plaintiff's shared-infrastructure and JUA/capacity theory is speculative. | G-93-G-98 | The FECR lawsuit identifies concrete JUA, RTC, train-count, maintenance, shared-infrastructure, and safety-margin disputes. |
| Fortress says discovery into Fortress/Brightline/FECR relationships is unnecessary. | G-91-G-106 | The exhibit identifies public litigation targets: FEC Corridor rights, JUA restrictions, RTC models, Service Standards Committee, capacity, maintenance, and Fortress/BFH communications. |
| Fortress may argue the FECR complaint is only allegations. | G-90 | Cover limits use to public-record context and discovery targets, not proof that every allegation is true. |

## WHY THESE PAGES MATTER

Exhibit G adds the corridor/shared-infrastructure layer. It is not offered as conclusive proof of the FECR allegations. It shows that disputes involving Fortress/BFH, Brightline, FECR, the FEC Corridor, JUA limits, RTC/capacity modeling, maintenance, shared infrastructure, and ownership/control statements are concrete public-record discovery targets relevant to the enterprise-control theory.

## PAGE-BY-PAGE GUIDE TIED TO FORTRESS'S MOTION

| Pages | What the Pages Contain | Direct Rule 12 Relevance |
|---|---|---|
| G-90 | Replacement cover sheet and motion-response roadmap. | Protects against overstatement and explains the exhibit's limited use. |
| G-91 | FECR lawsuit caption/parties including Fortress and Brightline-related defendants. | Shows the public lawsuit directly names Fortress, not just Brightline. |
| G-92 | Allegations about Fortress/FECI history and structuring of passenger rail rights. | Responds to the passive-investor framing with corridor-structure allegations. |
| G-93-G-95 | FEC Corridor, JUA restrictions, Service Standards Committee, RTC simulation, train caps and schedule-change requirements. | Identifies concrete JUA/capacity documents and committees for discovery. |
| G-96-G-98 | Allegations regarding expansion from 36 to 140 passenger trains, capacity strain, safety margins, blocked crossings, cease-and-desist/non-operator issues. | Supports discovery into capacity, dispatch, infrastructure funding, and safety-risk decision-making. |
| G-99-G-100 | Allegations of Fortress/BFH discussions with FECR/Counties about realistic capacity modeling, Coastal Link, and authority issues. | Direct Fortress/BFH relevance; not merely Brightline-only corridor allegations. |
| G-101-G-102 | Ownership/control and investor-statement disputes regarding who owns or controls the 235-mile rail system and FECR's alleged limited-use-right position. | Addresses control language and public/investor-facing representations. |
| G-103-G-106 | Maintenance/shared-infrastructure obligations and additional direct BFH/Fortress involvement allegations. | Shows why JUA, maintenance, capacity, and Fortress/BFH communications are proper discovery targets. |

Limited purpose: This cover is a navigation aid. The exhibit is cited to show concrete discovery targets and plausibility, not to ask the Court to decide disputed facts at Rule 12.

Filing # 232474092 E-Filed 09/26/2025 11:29:12 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2025-013297-CA-01
SECTION: CA08
JUDGE: Hon. Robert Watson

FLORIDA EAST COAST RAILWAY, LLC,

          Plaintiff,

v.

BRIGHTLINE TRAINS FLORIDA LLC, BRIGHTLINE FLORIDA HOLDINGS LLC, FORTRESS INVESTMENT GROUP, LLC, BL EXPANSION LLC, MDC COMMUTER LLC, BRWD COMMUTER LLC, AND PBC COMMUTER LLC,

          Defendants.

---

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Exhibit G-91 of 106

1.      Florida East Coast Railway, LLC ("FECR" or "Plaintiff"), by and through its undersigned counsel, brings this action against Brightline Trains Florida LLC ("Brightline"), Brightline Florida Holdings LLC ("BFH"), Fortress Investment Group, LLC ("Fortress," and collectively with Brightline and BFH, the "Brightline Defendants"), and BL Expansion LLC ("BL Expansion"), MDC Commuter LLC ("MDC Commuter"), BRWD Commuter LLC ("BRWD Commuter"), and PBC Commuter LLC ("PBC Commuter," and collectively with BL Expansion, MDC Commuter, BRWD Commuter, and PBC Commuter, the "Designee Defendants") seeking damages, declaratory and injunctive relief.  This Complaint refers to the Brightline Defendants and Designee Defendants, collectively, as "Defendants."

## PRELIMINARY STATEMENT

2.      Close to a decade ago, Defendant Fortress sold the Florida East Coast rail corridor ("FEC Corridor" or "Corridor")—an approximately 351-mile railroad traversing the state of Florida from Miami to Jacksonville—along with the freight operations (*i.e.*, the transportation of goods across Florida) on the Corridor, to Plaintiff FECR.  In doing so, Fortress arranged to maintain limited use rights on the FEC Corridor for purposes of establishing and operating a cutting-edge, privately financed passenger rail service to link South Florida's major cities.  The passenger rail service, Brightline, owned by Defendant Brightline, was to coexist with—and never to unreasonably interfere with—FECR's freight operations on the Corridor.  That coexistence is imperative to the safe operations of all trains on the Corridor.

3.      Unfortunately for Fortress and its investors, the grandiose plan to turn Brightline into a privately funded, thriving and profitable passenger service was a failure almost from the outset.  Without a sufficient funding commitment from within Fortress, Brightline had to rely on outside private investors—raising billions in debt financing—and ultimately on the taxpayers— obtaining millions more in local, state, and federal government funding.  But as the costs to develop

1

## FACTUAL ALLEGATIONS

I.   **BRIGHTLINE AND ITS CALAMITOUS FINANCIAL AND OPERATIONAL HISTORY**

   A.   **Fortress's Plan for the First Privately Funded Passenger Service**

47.   In 2007, Defendant Fortress acquired Florida East Coast Industries, LLC ("FECI") for approximately $3.5 billion.

48.   At the time of the acquisition, FECI was the owner of the FEC Corridor and directly or indirectly operated freight services (but no passenger service) thereon.

49.   Soon after the acquisition, Fortress set out to establish a passenger service—what would ultimately come to be known as Brightline—on the FEC Corridor. It was to be the first passenger service fully funded by private, not government, financing.

50.   Rather than preserve an integrated model, Fortress deliberately decoupled the freight railroad from FECI's real estate and development activities, positioning FECR as a stand-alone freight rail operation while concentrating corridor development opportunities inside the FECI portfolio.

51.   As part of that restructuring, Fortress reserved passenger-rail development rights over the FEC Corridor to FECI and its affiliates to be exercised through what became Brightline. The structure was no accident: FECR shouldered the costs and risks of maintaining the physical railroad and safeguarding freight capacity, while the Fortress-controlled passenger venture pursued revenue growth with far fewer infrastructure obligations. In short, Fortress kept the upside of passenger development while externalizing much of the operational burden to the freight railroad.

52.   In 2012, Fortress officially announced the launch of Brightline (which at the time was named All Aboard Florida), including plans to run a Brightline passenger rail service on the FEC Corridor from Miami to Orlando by 2014.

11

### a.   Prohibition Against Interfering with FECR's Freight Service

63.   The Brightline-FECR Agreements prohibit Brightline's passenger service from interfering with FECR's freight service.

64.   In particular, while Section 2.1 of the JUA grants Brightline "the right to operate its trains, locomotives, rail cars, and rail equipment with its own crews over the FECR Infrastructure," the JUA limits that right to protect FECR's operations. Ex. 1 § 2.1.

65.   Sections 2.3(a) and 2.4(a) of the JUA, for example, confine Brightline to providing "passenger service" (*e.g.*, it cannot provide freight service) and also require it not to "unreasonably interfere" with FECR's freight use. Ex. 1 §§ 2.3(a), 2.4(a).

66.   To ensure that Brightline's passenger service and FECR's freight service do not interfere with one another, the JUA also imposes caps on the number of trains each company can operate.  Specifically, Section 4.2(c) caps daily operations at up to 24 FECR freight trains and up to 36 Brightline passenger trains, which must be scheduled so as not to unreasonably interfere with one another. Ex. 1 § 4.2(c).

67.   The Passenger Easements similarly make clear that nothing permits Brightline to "unreasonably interfere with [FECR's] carrying out of [its] common carrier obligation." Exs. 2 & 3 § 2.6.

### b.   Prohibition on Unnoticed Operational and Schedule Changes

68.   To further avoid conflict and ensure safety, the JUA requires notice and, where applicable, approval for operational and schedule changes to train operations.

69.   Each party to the JUA must "keep the other party apprised of all operating rules [and] timetables," and any procedure that would "unreasonably interfere with [the other party's]

14

use" is subject to dispute resolution by the Service Standards Committee ("SSC"), which is a committee comprised of members of both FECR and Brightline. Ex. 1 §§ 3.1, 4.1.

70.     The SSC is responsible to, *inter alia*, (i) review/approve construction standards and placements; (ii) ensure improvements on the FEC Corridor do not unreasonably interfere with passenger or freight service and are consistent with the Brightline-FECR Agreements; and (iii) review/adjust changes to the passenger and freight train schedules. Ex. 1 §§ 4.1(a), (b), (c).

71.     Under the JUA, Brightline must also give the SSC "at least thirty (30) days prior written notice" of "any desired changes to the schedule or frequency of regularly scheduled passenger trains." Ex. 1 § 4.2(a).

72.     Additionally, in the event that Brightline proposes a "permanent change in the schedule or frequency of its trains" it must submit an updated "RTC Simulation" reflecting the additional trains. Ex. 1 § 4.2(a), 4.2(d). As discussed *infra* Paragraphs 162 to 164, an "RTC simulation" or "RTC model" is a computer simulation that plays out every train's movement on a rail line minute-by-minute to check if the schedule works safely, spot where trains would conflict, and see how delays impact the system.

c.     Limitations on Designating Rights to Third Parties

73.     Section 2.3(b) of the JUA gives Brightline the right to designate certain rights under the JUA to "one or more designees." Ex. 1 § 2.3(b).

74.     Brightline's ability to designate rights are limited, however, to the designation of operating rights, *i.e.*, "rights to **operate** Passenger Service over the Shared Infrastructure." Ex. 1 § 2.3(b) (emphasis added); *see also* Exs. 2 & 3 §§ 1.1, 2.5.

75.     Any operator designated by Brightline may also not "unreasonably interfere" with FECR's use of the FEC Corridor for freight service. Ex. 1 § 2.3(b).

15

learned that Brightline and Fortress intended to expand passenger service on the FEC Corridor from 36 trains per day—the amount permitted under the JUA—to 140 passenger trains per day by 2024, more than four times the number of trains permitted by the JUA.

### 2.    May 2020: Negotiations with the County Continue

127.    In late May 2020, Brightline submitted a proposed Memorandum of Understanding ("MOU") to the Miami-Dade County Board of Commissioners ("Board of Commissioners") that would add up to five new stations.  Although the Board rejected that specific MOU, it directed the County Mayor to continue negotiations and report back.

### 3.    August 2020: FECR Issues Cease and Desist

128.    On August 31, 2020, FECR issued a cease-and-desist directing Brightline to stop negotiating with the Counties about Coastal Link absent FECR's involvement and consent.

129.    FECR emphasized that Brightline's negotiations with Miami-Dade County violated multiple provisions of the JUA, and the proposed service "would unreasonably interfere with FECR's freight service."

### 4.    September 2020 to November 2020: Brightline Continues to Advance Negotiations

130.    Despite FECR's cease and desist, on September 21, 2020, the County Mayor reported to the Board of Commissioners active negotiations with Brightline, including appraisals "to support a fee for accessing the FEC right-of-way" and ridership modeling, with an agreement targeted for the Board's October 20, 2020, meeting.  As of the October 20, 2020, meeting, Brightline and Miami-Dade County had not yet reached an agreement.

131.    On November 13, 2020, the Board of Commissioners adopted a resolution directing finalization of Brightline negotiations—again, without the Brightline Defendants involving FECR.

24

to the FEC Corridor—all without obtaining FECR's prior written consent—thus converting a limited operator designation into a back-door access grant. The JUA squarely prohibits such maneuvers.

### 2.     October 2024: FECR Issues Another Cease and Desist

148.    On October 11, 2024, upon discovering the Brightline-BL Agreements, FECR served formal notice that the agreements violate the JUA.

149.    Among other things, FECR informed Brightline that (i) it cannot appoint BL Expansion as a designee because BL Expansion is not an operator; (ii) cramming commuter trains onto a constrained corridor without agreed capacity upgrades would unreasonably interfere with FECR's freight operations; and (iii) it failed to apprise FECR of operating rules and timetables and sidestepped the SSC's review.

### 3.     January 2025: Defendants Double Down and Execute Additional Agreements to End Run the JUA Restrictions

150.    After FECR's October 2024 notice, the Brightline Defendants did not correct course; they papered over the problem and pressed ahead.

151.    On January 29, 2025, the Brightline Defendants hastily executed a new set of agreements designed to keep its commuter plan moving while concealing the original violations.

152.    That day, the Brightline Defendants caused Brightline to enter three "Commuter Designee Agreements"—for Miami-Dade, Broward, and Palm Beach Counties—with MDC Commuter, BRWD Commuter, and PBC Commuter (collectively, "Commuter Entities") as BL Expansion's assignees under the Brightline-BL Agreements (attached as **Exhibits 6a, 6b** and **6c**).

153.    These contracts purport to give the Commuter Entities (i) the power to select an operator for the commuter service; and (ii) the authority to direct Brightline to designate that operator as Brightline's designee under the JUA. *See* Exs. 6a-6c § 1.01 ("█████████████████

28

*FECR*."[6] In other words, in response to FECR initiating litigation, Defendants have been working on a new way to circumvent FECR's rights.

159.    BFH indicated that Defendants would move forward with the Coastal Link under the "alternate" deal structure "even if FECR were to prevail in its claims for relief" in this litigation.

160.    In sum, as FECR moved to protect its rights in court, Defendants escalated their scheme.  And, despite repeatedly assuring FECR that they would pause the commuter effort, Defendants have continued pursuing it in the shadows—manipulating and misusing data that FECR commissioned and paid for to falsely portray the service as viable.

**D.    The Brightline Defendants Promise to Pause Their Illegal Conduct While an RTC Capacity Model Is Built**

161.    After FECR demanded that the Brightline Defendants cease and desist their discussions with the Counties regarding the Coastal Link, Brightline represented that no increase in trains on the FEC Corridor would be pursued unless and until the parties reached agreement on a baseline capacity model.

162.    The model, an RTC (rail traffic controller) simulation, is the industry standard for testing rail capacity. It reflects, *inter alia*, track layout, signals and switches, train types and routes, runtimes, and operating rules such as minimum headways and train schedule.

163.    Properly built, an RTC model shows whether proposed service can run on the corridor, what infrastructure is required, and how to schedule trains without gridlock. It is the tool for optimizing movements and using existing track more efficiently.

---

[6]    *Brightline Florida Revenue and Ridership Report – August 2025*, Brightline (last accessed Sept. 26, 2025), https://www.gobrightline.com/content/dam/brightline/pdfs/investor-relations/2025/brightline-florida-august-2025-revenue-ridership-report.pdf.

30

164. It is also a safety backstop: by exposing overlaps in track usage and bottlenecks, RTC modeling reduces the risk of trains occupying the same space at the same time—a risk that rises sharply as frequency increases.

165. Here, RTC modeling was indispensable to test whether the Coastal Link—which dramatically increases train counts—could be executed at all, and if so, what capital investments would be required to do it safely.

166. Defendants represented to FECR that they would not advance the Coastal Link unless and until the parties agreed on an RTC model.

167. The parties further agreed to start with a "Baseline Model" reflecting the then-current FECR and Brightline operations on the FEC Corridor. Only if they reached an agreement on that baseline would they use it to evaluate capacity increases, such as adding a commuter service, and use it to test whether those increases were feasible.

168. The Brightline Defendants acknowledged the importance of this sequence.

169. Indeed, on February 22, 2023, Patrick Goddard, President of Brightline, wrote to FECR, representing: "We believe it is critical to align on the baseline RTC model. Please let me know how we can do this. It's impossible to discuss service or infrastructure changes … without alignment on this."

170. The parties' agreement not to pursue any capacity increase until they aligned on the Baseline Model is reflected in numerous contemporaneous communications between the parties, as well as in an August 18, 2023, letter agreement between FECR and Brightline ("August 2023 Agreement"), which was signed by Mr. Goddard.

171. Specifically, in the August 2023 Agreement, Brightline represented that it would, *inter alia*, (i) "collaborate to develop a RTC model" that reflects the then-current operations;

31

(ii) "fund any additional infrastructure associated with the Baseline Model"; and (iii) make lump-sum payments for track maintenance through December 2026.

172.    On information and belief, the other Brightline Defendants were aware of Brightline and FECR's agreement concerning the Baseline Model. Indeed, FECR had discussions with Fortress about it, including the need for a "model that reflects a realistic operation," in July 2023, and it shared the August 2023 Agreement with Fortress.

### E.    FECR Expends Significant Time and Resources to Prepare the RTC Model Based on Defendants' Representations

173.    Relying on Defendants' representations, FECR devoted substantial time and resources to develop the Baseline Model.

174.    Among other things, FECR retained HDR, Inc. ("HDR"), a third-party engineering firm, to study the FEC Corridor and construct the Baseline Model.   FECR shouldered the cost of HDR's fees.

175.    In addition, FECR devoted considerable internal resources, time, and technical expertise to the effort.

176.    HDR delivered the Baseline Model to the parties on September 9, 2023.

### F.    Defendants Continue to Covertly Pursue the Commuter Service and Manipulate the RTC Model to Deceive the County

177.    For months after HDR delivered the Baseline Model, the Brightline Defendants sent emails to, and exchanged other communications with, FECR suggesting alignment on the model, yet—despite FECR's requests—they refused to accept it.

178.    Those assurances appear designed to distract FECR from protecting its rights while the Brightline Defendants continued to pursue negotiations concerning the commuter service with the Counties.

32

197.     The guaranteed result of adding additional passenger trains: lost revenue, higher costs, and degraded service quality for FECR with no corresponding benefit.

198.     Brightline's plan also leaves FECR paying the maintenance fees—fronting and absorbing escalated track, signal, and station upkeep driven by added passenger wear—while Brightline pursues new revenue.

199.     For example, FECR is already fronting Brightline's unpaid 50% share of Florida Dispatch Company costs because Brightline is behind on payments.

### 2.     The Loss to the Counties and Taxpayers

200.     Absent fully funded upgrades, the commuter plan diverts scarce public dollars into a commuter service that cannot work, crowds out freight, triggers delays, and pushes cargo to trucks—increasing congestion, emissions, and roadway wear.

201.     Supply chains suffer (minerals, ethanol, food, electronics), and PortMiami's efficiency declines, raising costs that flow through to consumers. Delays in waste removal add environmental and public-health risks.  Furthermore, a degradation in FECR's freight service would shift cargo from rail to trucks, adding more traffic to Florida's already congested highways—especially I-95.

202.     Bottom line: taxpayers fund the experiment while bearing the downstream economic losses.

### 3.     The Risk to Public Safety

203.     Packing more trains into a constrained corridor compresses headways and increases the chances that two trains need the same track at the same time—creating operational conflicts—and it lengthens blocked crossings, straining emergency response and track safety.

204.     Proceeding without the necessary capital improvements removes critical safety margin—turning routine delays into real hazards for employees, passengers, and the public.

36

## COUNT VI
### AIDING AND ABETTING FRAUDULENT INDUCEMENT
#### (Against BFH and Fortress)

250. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 206 and 223 through 231 (Count III - Fraudulent Inducement) as if fully set forth here.

251. The Brightline Defendants carried out a fraudulent campaign designed to induce FECR and others to fund their efforts to establish a Coastal Link service on the FEC Corridor by misrepresenting material information, and concealing or failing to disclose material facts, about their actions with respect to implementing, and the ability to safely implement, the Coastal Link service, including as follows:

a. The Brightline Defendants made misrepresentations and omissions of material facts to FECR, the Counties and the public, including about their intention, ability, and authority to expand passenger service on the FEC Corridor;

b. The Brightline Defendants knew they were misrepresenting material facts when they made them and concealing or failing to disclose material information when they did so;

c. The Brightline Defendants purposefully made these misrepresentations, and concealed or failed to disclose material information, in order to induce FECR, the Counties and the public to rely upon them;

d. FECR, as well as the Counties and the public, relied to their detriment on the Brightline Defendants' misrepresentations and omissions; and

e. FECR's reasonable reliance on the Brightline Defendants' misrepresentations and omissions directly and proximately caused FECR to sustain damages.

50

252. BFH and Fortress had knowledge of the fraud because, among other things, they were involved in executing all aspects of the fraudulent campaign to advance the Coastal Link, including but not limited to, (i) discussions with FECR about capacity on the FEC Corridor; (ii) discussions with FECR about the Brightline Defendants' intentions concerning the Coastal Link; and (iii) discussions with the Counties about the Brightline Defendants' ability and authority to implement the Coastal Link.

253. BFH and Fortress provided substantial assistance in the commission of the fraud by, among other ways, making misrepresentations to the Counties about the Brightline Defendants' ability and authority to expand passenger service on the FEC Corridor and making misrepresentations to FECR, and concealing or failing to disclose material facts about, the Brightline Defendants' intention to pursue the Coastal Link.

254. Knowing of the Brightline Defendants' intentional misrepresentations and material omissions to FECR, the Counties and the public, and those parties' reliance thereon, and intending to assist in those wrongful acts, BFH and Fortress provided substantial assistance in the commission of the fraud.

255. As a direct and proximate result of BFH and Fortress's conduct, Plaintiff has suffered actual damages in an amount to be proven at trial.

WHEREFORE, FECR prays for judgment against BFH and Fortress, and each of them, as set forth below.

Exhibit G-103 of 106

271.    The Brightline Defendants repeatedly made such false statements for years and have continued to do so even recently. Nowhere is this better reflected than in the Commuter Designee Agreements, which themselves reflect false assertions about FECR's rights over the FEC Corridor.

272.    The Brightline Defendants published these false statements about FECR's ownership rights to third parties, including Miami-Dade County and, on information and belief, Broward County and Palm Beach County.

273.    The Brightline Defendants knew or should have known that these false statements would induce third parties, including the Counties and others, not to deal with FECR in negotiating access rights to FECR's property. In fact, the Brightline Defendants made the statements for the express purpose of cutting FECR out of negotiations.

274.    The Brightline Defendants' false statements did, in fact, induce third parties, including the Counties, not to deal with FECR. Indeed, the Counties would never have decided to pay Defendants hundreds of millions of dollars, and pay FECR zero dollars, if they were not misled by the Brightline Defendants' false assertions about the nature and scope of their rights to access the FEC Corridor.

275.    Continuing this pattern of fraudulent conduct, Brightline lied to its own investors about its ownership of the FEC Corridor as recently as two months ago, claiming that it "own[s] or control[s] [its] entire 235-mile rail system, including [its] track and systems, land, trains, stations, and maintenance facilities." That statement, like the others, is patently false, and reflects Brightline's larger effort to lie its way into control of the FEC Corridor.

276.    As a direct and proximate result of the Brightline Defendants' false statements about FECR's ownership of the FEC Corridor, FECR has suffered actual damages, including

56

reasonable attorneys' fees incurred to clarify FECR's ownership that the Brightline Defendants' false statements required and economic injury, in an amount to be proven at trial.

WHEREFORE, FECR prays for judgment against the Brightline Defendants as set forth below.

**COUNT X**
**QUIET TITLE,**
**§ 65.061, FLA. STAT.**
**(Against The Brightline Defendants)**

277. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 206 as if fully set forth herein.

278. As a result of Fortress's sale of the FEC Corridor to FECR in 2017, FECR has valid legal title to the FEC Corridor subject to the limited use rights it granted to Brightline in the Passenger Easements.

279. Under the Brightline-FEC Agreements, Brightline must not "unreasonably interfere" with FECR's use of the Shared Infrastructure (Ex. 1 §2.3(a)) "unreasonably interfere with [FECR's] carrying out of [its] common carrier obligation" (Exs. 2 & 3 § 2.6). As such, Brightline does not own the Corridor, and its use of the Corridor is explicitly limited.

280. The Brightline Defendants have made a number of invalid claims regarding the extent of their interest in the FEC Corridor. *First*, on information and belief, the Brightline Defendants made false statements to the Counties asserting they may implement the Coastal Link without FECR's participation or consent.

281. *Second*, the Brightline Defendants have asserted similarly invalid claims about their rights to implement the Coastal Link in the Commuter Designee Agreements.

57

282.    *Third*, as recently as August 2025, the Brightline Defendants continue to falsely claim that they "own or control our entire 235-mile rail system, including our track and systems, land, trains, stations, and maintenance."

283.    The first two claims are invalid because the Brightline-FECR Agreements do not permit the Brightline Defendants to sell access to the FEC Corridor, including for the Coastal Link service.  The first two claims are also invalid because they ignore FECR's ownership of the FEC Corridor and the express limitations on Brightline's use rights in the Brightline-FECR Agreements.

284.    The third claim is invalid—indeed, it is patently false—because the Brightline Defendants do *not* "own or control" the entire "rail system."  FECR owns and controls the FEC Corridor, subject to Brightline's expressly circumscribed use rights.

285.    The Brightline Defendants' claims, repeated publicly to the Counties and to investors, cast a cloud on FECR's title to the Corridor.

286.    FECR brings this quiet title action to remove the cloud on its title caused by the Brightline Defendants' false assertions and invalid claims and to confirm the full extent of FECR's title to the corridor.

WHEREFORE, FECR prays for judgment against the Brightline Defendants as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, FECR respectfully prays that this Court grant the following relief:

a.    Damages for all injuries suffered as a result of the Defendants' unlawful and improper conduct, including rescissory, compensatory, consequential, and incidental damages, as well as attorneys' fees incurred to remove the cloud from FECR's title, where appropriate in an amount to be determined at trial, pre-judgment and post-judgment interest, and special damages, including without limitation attorney's fees and costs;

58